UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JOHN DOE #1, a minor by his parent and natural
guardian PARENT #1; JOHN DOE #2, a minor by his
parent and natural guardian PARENT #2; JOHN DOE #3,
a minor by his parent and natural guardian PARENT #3;
JANE DOE #4, a minor by her parent and natural
guardian PARENT #4; JANE DOE #5, a minor by her
legal guardian GRANDPARENT #5; JANE DOE #6, a
minor by her legal guardian GRANDPARENT #5; JOHN
DOE #7, a minor by his parent and natural guardian
PARENT #7; JANE DOE #8, a minor by her parent and
natural guardian PARENT #8; JOHN DOE #9, a minor by
his parents and natural guardians PARENT #9A and
PARENT #9B; JANE DOE #10, a minor by her parent
and natural guardian PARENT #10; JANE DOE #11, a
minor by her parent and natural guardian PARENT #11;[1]
and FAMILIES FOR EXCELLENT SCHOOLS, on
behalf of all persons similarly situated,

16-CV-1684

**JURY TRIAL
DEMANDED**

                                                                Plaintiffs,

                            v.

NEW YORK CITY DEPARTMENT OF EDUCATION
and CARMEN FARIÑA, in her official capacity as
Chancellor of the New York City Department of
Education,

                                                                Defendants.

**"[A]n effective and appropriate education may be negated by child bullying.  When a school
fails to take reasonable steps to prevent such objectionable harassment of a student, it has
denied her an educational benefit protected by statute."[2]**

---

[1] A plaintiff may proceed under a pseudonym when the plaintiff's interest in anonymity outweighs the public
interest in disclosure and any prejudice to the defendant.  *Sealed Pl. v. Sealed Def.*, 537 F.3d 185, 189 (2d Cir. 2008).
Plaintiffs have already experienced retaliation.  Public dissemination of Plaintiffs' identities will significantly
exacerbate the anxiety, shame, and humiliation that they have already endured due to Defendants' actions and
inactions.  Identifying the Plaintiffs will also place them in harm's way by putting them under threat of violence or
emotional torment from their bullies or their bullies' parents.  Defendants will not suffer prejudice, as Plaintiffs are
willing to submit their names under seal.

[2] *T.K. v. New York City Dep't of Educ.*, 779 F. Supp. 2d 289, 293 (E.D.N.Y. 2011).

Plaintiffs, JOHN DOE #1 ("JD1"), a minor by his parent and natural guardian PARENT #1; JOHN DOE #2 ("JD2"), a minor by his parent and natural guardian PARENT #2; JOHN DOE #3 ("JD3"), a minor by his parent and natural guardian PARENT #3; JANE DOE #4 ("JD4"), a minor by her parent and natural guardian PARENT #4; JANE DOE #5 ("JD5") and JANE DOE #6 ("JD6"), minors by their legal guardian GRANDPARENT #5; JOHN DOE #7 ("JD7"), a minor by his parent and natural guardian PARENT #7; JANE DOE #8 ("JD8"), a minor by her parent and natural guardian PARENT #8; JOHN DOE #9 ("JD9"), a minor by his parents and natural guardians PARENT #9A and PARENT #9B; JANE DOE #10 ("JD10"), a minor by her parent and natural guardian PARENT #10; JANE DOE #11 ("JD11"), a minor by her parent and natural guardian PARENT #11 (hereinafter, "Named Class Plaintiffs"); and Families for Excellent Schools, by their undersigned attorneys, Walden Macht & Haran LLP, on behalf of all persons similarly situated, allege as follows:

## **INTRODUCTION**

1.      New York law guarantees every child the right to a public school education free from violence, harassment and bullying.  The New York State Legislature has dictated that school districts must each implement a comprehensive system to report, investigate, and remediate student-on-student and teacher-on-student violence.

2.      Although the Chancellor of the New York City Department of Education ("DOE") has promulgated several regulations (the "Regulations") addressing in-school violence,[3] these regulations have proven ineffective and inadequate to stem system-wide violence within New York City's public schools.  The level of violence within New York City's public schools is already staggering but increasing precipitously.  The 2014-2015 school year (the last complete

---

[3] *See* Chancellor's Regulations A-420, A-421, A-449, and A-832.

school year) showed levels of violence not seen since the early 2000s.  Compared to the prior year alone, the number of violent incidents within New York City's public schools rose by 23%.  Since 2014, forcible sex offenses rose by 90%, assault with serious physical injury rose by 48%, and acts of reckless endangerment rose by 28%.

3.      New York City public schools are not only increasingly dangerous, they are also disproportionately dangerous as compared to schools in the rest of New York State.  In 2014-2015, New York City enrolled 39.5% of the State's public school students, yet it contained 84.3% of the State's persistently dangerous[4] schools.  In fact, a school in New York City is seven times more likely than a school in other parts of New York State to be persistently dangerous.

4.      The violence knows few boundaries, except that, on average, White and Asian students encounter far fewer incidents of school violence than Black and Hispanic students. During the 2014-2015 school year, New York City schools experienced an average of 15 violent incidents and 32 disruptive incidents for every 1000 students.  In the eleven geographic school districts where at least 90% of students were Black or Hispanic, the rate of violent incidents jumped to 22 violent incidents per 1000 students.  These districts also averaged 44 disruptive incidents per 1000 students.  By comparison, school districts with less than 50% of Black and Hispanic students experienced only 11 violent incidents and 29 disruptive incidents per 1000 students.

5.      Brooklyn is both the borough with the most public schools students (over 340,000 students), and home to the most-violent school district:  District 23, which includes Ocean Hill, Brownsville, and parts of East New York, averages 36 violent and 33 disruptive incidents per 1000

---

[4] Federal law requires each state to determine which public schools are "persistently dangerous" annually.  The New York State Education Department designates a school as persistently dangerous if, for two consecutive years, the school either has (1) a School Violence Index ("SVI") of 1.5 or greater or (2) an SVI of 0.5 or greater and a total of 60 or more violent incidents.  SVI is a ratio of violent incidents to enrollment in a school and is determined by the number of incidents, the seriousness of the incidents, and the school's enrollment.

students.  District 23 also has the highest percentage of Black and Hispanic students in the city (96.9%).  Queens, however, is home to the safest, and the least Black or Hispanic, school district in the city:  District 26, which includes Bayside, Fresh Meadows, and Jamaica Estates, averages less than 6 violent and 22 disruptive incidents per 1000 students.  Thus, the largely Black and Hispanic students at District 23 schools are six times more likely to suffer in-school violence than the largely White and Asian population at District 26 schools.

6.      Although the disparate impact on Black and Hispanic students is troubling, in-school violence also has a disproportionately severe impact on very young students, who have endured violence during the most important part of their developmental years, leaving these young children depressed, confused, angry, resistant to attending school at all, and ill-equipped to succeed when they do.[5]  As several of the narratives provided by the Named Class Plaintiffs attest, unremediated bullying also has the sad result of causing copy-cat acts of violence against young student-victims, escalating the violence and destroying any chance of meaningful learning.

7.      In addition to having a disparate impact on Black, Hispanic and very young students, in-school violence, harassment and bullying also has a disproportionate impact on students who identify as lesbian, gay, bisexual or transgender.[6]

---

[5] *See T.K.*, 779 F. Supp. 2d at 299 ("(T)he highest prevalence of bullying is among elementary-school aged children.") (quoting Gwen M. Glew, et al., *Bullying: Psychological Adjustment and Academic Performance in Elementary School*, 159 ARCHIVES OF PEDIATRIC AND ADOLESCENT MED. 1026, 1026 (2005)).

[6] *See* GAY, LESBIAN & STRAIGHT EDUCATION NETWORK, *2013 National School Climate Survey* (2013), *available at*  http://www.glsen.org/sites/default/files/2013%20National%20School%20Climate%20Survey%20Full%20Report_0.pdf (finding "55.5% of LGBT students felt unsafe at school because of their sexual orientation, and 37.8% because of their gender expression").

4

8.      In-school violence, harassment and bullying also has a disproportionate impact on students who suffer from learning disabilities, which is true of several of the Named Class Plaintiffs.[7]

9.      Several root causes underlie DOE's failure to address and remediate in-school violence in New York City's public schools, despite the clear mandate from the New York State Legislature to do so.  Many schools do not adhere to the Regulations, and DOE is apparently unable or unwilling to force compliance.  Even though the Regulations are written to apply to every act of in-school violence, teachers and administrators either ignore, are unaware of, or are tacitly or explicitly permitted to deviate from the Regulations, resulting in a failure to remediate in-school violence.  This leaves young and vulnerable victims exposed to continuing or new acts of violence.  Moreover, the Regulations themselves are deficient in a number of respects, including as applied by schools.  Schools often "remediate" violence by forcing the victim—rather than the perpetrator—to change schools without fully investigating the allegations of violence, thereby upending the victims' lives, interfering with their education, and causing psychological strains that exacerbate the damage from the violence they have already endured.  This custom and practice of punishing the victim by forcing him or her to transfer schools as a "remedy" for violence is not only unfair and wrong-headed, but contravenes explicit DOE policy, and operates as an additional unconstitutional deprivation of the victims' right to a public school education.

10.      Worse still, many schools retaliate against students who report in-school violence, as detailed *infra*, which has a chilling effect on future reporting.  Several of the Named Class

---

[7] *See* Jonathan Young et al., *Bullying and Students with Disabilities*, WHITE HOUSE CONFERENCE ON BULLYING PREVENTION, at 73 (2011) ("While both students with and without disabilities face significant negative emotional, educational and physical results from bullying, students with disabilities are both uniquely vulnerable and disproportionately impacted by the bullying phenomenon.").

Plaintiffs have suffered this "blame the victim" approach, which has caused severe anxiety and depression, suppressed their interest in learning, and even had a serious impact on their parents.

11.     Tragically, the scope and severity of the problem has been masked by DOE's custom and practice of underreporting school-violence statistics, in violation of state law.[8]  For example, an audit by the Office of the State Comptroller, released in April 2015, reviewed incidents of violence in ten public schools and found that nearly one third of all incidents go unreported.  "The more than 400 episodes that went unreported at the 10 schools included 50 assaults resulting in injuries, among them one case at Intermediate School 27 on Staten Island in which a student pushed another student over a desk, knocking him to the floor with the desk landing on top of him; 13 sex offenses; and two instances of confiscated weapons."[9]  Moreover, New York State data shows that New York City public schools experienced 15,934 incidents of violence in 2015, yet DOE's School Safety Division publicly released data reporting only 6875 incidents for the same period, a divergence of nearly 57%.[10]

12.     Taken together, all of these acts and omissions by DOE, especially in the face of overwhelming evidence of a systemic problem (which is undoubtedly known by DOE), reveal a custom and practice of deliberate indifference to in-school violence, creating a culture of indifference to continued, violent assaults against Named Class Plaintiffs and others similarly situated.  As described in more detail *infra*, DOE's actions and inactions are clearly unreasonable

---

[8] *See* N.Y. EDUC. L. § 2802 (requiring school districts to annually report violent and disruptive incidents to the New York State Education Commissioner); 8 NYCCR 100.2(kk)(3) (requiring school districts to annually report material incidents of harassment, bullying, and discrimination to the New York State Education Commissioner).

[9] Kate Taylor, *New York City Underreported School Violence to State, Audit Shows*, N.Y. TIMES, Apr. 29, 2015, http://www.nytimes.com/2015/04/30/nyregion/new-york-city-underreported-school-violence-to-state-audit-shows.html.

[10] Yoav Gonen, *Violent Incidents at NYC Schools Soar While de Blasio Claims They're Safer than Ever*, N.Y. POST, Feb. 18, 2016, http://nypost.com/2016/02/18/violent-incidents-at-nyc-schools-soar-while-de-blasio-claims-theyre-safer-than-ever/.

in light of all known circumstances.  Moreover, although the various episodes endured by the members of the Plaintiff class are tragic and disturbing individually, DOE's actions and inactions in light of the pervasiveness of the overall problem may fairly be said to "shock the contemporary conscience."[11]

13.     This Complaint therefore contains four claims for relief.  The first alleges that the Named Class Plaintiffs and those similarly situated are being deprived of their property and liberty interests in a public education, as guaranteed by the State of New York, without due process of law, in violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.  The second claim alleges that Defendants are selectively enforcing—or failing to enforce—the Regulations in a manner that violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.  In the third claim, Named Class Plaintiffs allege that they, and those similarly situated, have been deprived of their right to an education guaranteed by the New York State Constitution and state law.  Finally, the Named Class Plaintiffs allege in their fourth claim for relief that, in failing to follow the Regulations to curtail violence in schools, Defendants have failed to follow lawful procedure as required under New York State law, C.P.L.R. 7803(3).

14.     Students cannot learn in educational environments where violence is commonplace. "[T]he day-to-day adverse effects of bullying in damaging educational opportunities to students are as real as they are unnoticed.  It is a problem that affects the school performance, emotional well-being, mental health, and social development of school children throughout the United States."[12]   Thus, DOE's custom and practice of deliberate indifference has robbed and will continue to rob children of their chance to learn and succeed within the public school system.

---

[11] *See T.K.*, 779 F. Supp. 2d at 315 (quoting *Matican v. City of New York*, 524 F.3d 151, 155 (2d. Cir. 2008)).
[12] *See id.* at 298.

Named Class Plaintiffs bring this action on behalf of themselves and all children similarly situated to address the unconstitutional deprivation of their protected property and liberty interest in a public school education.

15.     As described more fully *infra*, Defendants manage and perpetuate an educational system that is characterized by chronic and deliberate indifference to the pervasive violence, intimidation and harassment experienced by their students.  The system is pock-marked by a "blame the victim" mentality, which often results in *de facto* punishment of, or retaliation against, the victims.  These burdens fall disproportionately on the shoulders of Black and Hispanic students.  As a result, every day, Named Class Plaintiffs (and innumerable other members of the class they represent) are systematically deprived of the right to a free public education conferred upon them by the State of New York, as codified in New York Education Law § 3202, and the right to equal protection of the law.

16.     That deprivation will end by grant of the relief requested herein.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, because it arises under the laws of the United States.

18.     This Court has supplemental jurisdiction over this action under 28 U.S.C. § 1367, because the claims that arise under the laws of New York are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

19.     Venue is proper in this District under 28 US.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.  Of the 1.1 million

students who attend New York City public school for the current school year, 63% are located in this District; 30% in Brooklyn; 27% in Queens; and 5.7% in Staten Island.

## PARTIES

20.     Plaintiff JD1 is a 9-year old male student enrolled in an elementary school in East Harlem, who has been subjected to repeated physical violence by fellow students.

21.     Plaintiff JD2 is an 8-year old male student enrolled in an elementary school in West Harlem, who has been subjected to bullying by fellow students.

22.     Plaintiff JD3 is a 9-year old male student enrolled in an elementary school in West Harlem, who was thrown down the stairs by his math teacher.

23.     Plaintiff JD4 is an 11-year old female student enrolled in an elementary school in West Harlem, who has been attacked by fellow students.

24.     Plaintiff JD5 is an 11-year old female student enrolled in an elementary school in Chelsea, who has endured six years of violence, including repeated assaults, by the same bully, whom DOE refuses to discipline or transfer.

25.     Plaintiff JD6 is a 7-year old female student enrolled in an elementary school in Chelsea, who is the sister of JD5, and who experienced assault and menacing by the same tormentor as her sister.

26.     Plaintiff JD7 is a 13-year old male student enrolled in a middle school on Staten Island, who experienced bullying, harassment, discrimination, and violence at his previous school.

27.     Plaintiff JD8 is a 9-year old female student enrolled in an elementary school in West Harlem, who has been subjected to verbal abuse and physical assaults by her fellow students.

28.     Plaintiff JD9 is a 12-year old male student enrolled at a special-needs school in the Bronx, who experienced violence by a teacher at his school.

29.     Plaintiff JD10 is a 13-year old female student enrolled in a middle school in the Upper West Side, who was attacked by a teacher at her school.

30.     JD11 is a 14-year old girl enrolled in a high school in the Bronx, who was attacked repeatedly at her former school by a group of students.

31.     Plaintiff Families for Excellent Schools ("FES") is a not-for-profit organization which seeks to improve the quality of education through changes in education policy. FES is a member-driven organization that works with families in New York, Massachusetts and Connecticut on education-related initiatives. A significant number of those families have children in the New York City public schools who are exposed on a daily basis to the type of school violence described in the Complaint, including families whose children are direct victims of such violence.

32.     Defendant DOE is the department of government of the City of New York that manages the city's public school system.

33.     Defendant Carmen Fariña ("Chancellor") is the Chancellor of DOE.

## CLASS ACTION ALLEGATIONS

34.     This action is maintainable as a class action under Fed. R. Civ. P. 23.

35.     Plaintiffs bring this action on behalf of a class consisting of all present and future students enrolled in the New York City public schools, who have been or may be the victims of in-school violence, including assault, menacing, threats, intimidation and bullying by fellow students or employees of the New York City public schools as defined by N.Y. EDUC. L. § 11(7).

36.     The class is so numerous that joinder of all members of the putative class is impracticable. The New York City public school system has over 1.1 million students currently enrolled in over 1800 schools. In-school violence, including assault, menacing, threats, intimidation and bullying by fellow students or employees of the New York City public schools

under N.Y. EDUC. L. § 11(7) affects a significant percentage of such students.  In addition, the student population is spread out over five separate boroughs, making joinder even more impractical.

37.    There exist questions of law and/or fact common to the entire New York City student class that predominate over any individual question, including but not limited to:

a.    Whether Defendants, by their actions, policies, practices, customs, and inaction, and through their deliberate indifference, are depriving members of the class of a protected property right to education free from in-school violence, including assault, menacing, threats, intimation, and bullying, without due process of law;

b.    Whether Defendants, by their actions, policies, practices, customs, and inaction, and through their deliberate indifference, are depriving members of the class of their right to equal protection under the law;

c.    Whether Defendants have violated Article XI(1) of the Constitution of the State of New York; and

d.    Whether Defendants have failed to perform duties imposed by the Chancellor's Regulations adopted under the mandates of state law and otherwise to address in-school violence, including assault, menacing, threats, intimation and bullying.

38.    Named Class Plaintiffs' claims are typical of the class.  Each Named Class Plaintiff has directly experienced in-school violence, including assault, menacing, threats, intimation and/or bullying.  Each Plaintiff has sought redress from DOE without success as a result of failure by DOE personnel to adhere to DOE's own stated policies and statutory law.  As a result of

Defendants' acts, omissions, policies, procedures, and customs that apply to Named Class Plaintiffs and all class members, Named Class Plaintiffs and the class are being denied the benefits of a free public education to which they are entitled.

39.     Named Class Plaintiffs will fairly and adequately protect the interests of the class. Named Class Plaintiffs are represented by experienced counsel.

40.     Defendants have acted or refused to act on grounds generally applicable to members of the class, thereby making appropriate final injunctive relief or corresponding declaratory relief to the class as a whole.

## BACKGROUND: LEGAL FRAMEWORK

41.     As detailed in the Factual Allegations section *infra*, the Named Class Plaintiffs have each suffered serious in-school violence, including assault, menacing, threats, intimation and bullying.  Although the New York State Legislature has mandated that every public school system have a robust and effective process or program to end in-school violence—based primarily on requirements for complete documentation and investigation of every incident of violence and effective remediation to end violence against students—in its design and operation, New York City's "system" is inconsistent with state requirements, leaving a shocking level of system-wide violence.  We begin with background on state-mandated requirements and New York City's implementing Regulations, and conclude with specific and detailed evidence of the "system's" unconstitutional flaws.

42.     Combatting in-school violence is not merely a state or local matter, but an issue that has garnered significant attention at the federal level.  It has long been a federal priority to combat in-school violence.  For example, in 2002, Congress enacted the No Child Left Behind Act ("NCLB").  NCLB amended the Elementary and Secondary Education Act, which provides federal

funding for public education, to require states receiving federal funds to establish and implement an "unsafe school choice option."  This allows students who are victims of violent criminal offenses or who attend a persistently dangerous school to transfer to a safe public school.[13]

43.     Moreover, as courts in this Circuit have noted, "[f]or at least ten years" the U.S. Department of Education has informed schools of their obligation to address persistent bullying within public schools:

> A school is responsible for addressing harassment incidents about which it knows or reasonably should have known. In some situations, harassment may be in plain sight, widespread or well-known to students and staff, such as harassment occurring in hallways, during academic or physical education classes, during extracurricular activities, at recess, on a school bus, or through graffiti in public areas. In these cases, the obvious signs of the harassment are sufficient to put the school on notice. In other situations, the school may become aware of misconduct, triggering an investigation that could lead to the discovery of additional incidents that, taken together, may constitute a hostile environment.[14]

## A.    New York State Constitution and Laws

44.     The Constitution of the State of New York provides:  "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated."  N.Y. CONST. art. XI, § 1

45.     By adopting Article XI(1), the State of New York "has obligated itself constitutionally to ensure the availability of a 'sound basic education' to all its children." *Campaign for Fiscal Equity, Inc. v. State of New York*, 100 N.Y.2d 893, 902 (2003) (citation omitted).

46.     Under N.Y. EDUC. L. § 3202, every person "over five and under twenty-one years of age who has not received a high school diploma is entitled to attend the public schools

---

[13] 20 U.S.C. § 7912.
[14] *T.K.*, 779 F. Supp. 2d at 316 (quoting U.S. Dep't of Educ., Office of Civil Rights, *Dear Colleague Letter: Bullying and Harassment*, at 2 (Oct. 26, 2010)).

13

maintained in the district in which such person resides without payment of tuition," *i.e.*, to receive

a free public education.

47.     Courts have found that the New York State Constitution and N.Y. EDUC. L. § 3202

"create a property interest in education protected by the Fourteenth Amendment."[15]

**B.     The Dignity for All Students Act**

48.     One critical component of the statutory right to a public education is the ability to

experience that right in an environment free of in-school violence, including assault, menacing,

threats, intimation and bullying.  The New York Legislature has specifically stated that "students'

ability to learn and to meet high academic standards, and a school's ability to educate its students,

are compromised by incidents of discrimination or harassment including bullying, taunting or

intimidation."  N.Y. EDUC. L. § 10.

49.     Accordingly, the New York State Legislature has defined the dimensions of the

right to public education in terms of "the policy of the state to afford all students in public schools

an environment free of discrimination and harassment."  *Id.* (emphasis added).

50.      To that end, on September 13, 2010, the New York State Legislature enacted the

Dignity for All Students Act ("DASA"), which took effect on July 1, 2012.[16]  DASA is codified

in Article 2 of the New York Education Law, N.Y. EDUC. L. §§ 10-18.

51.     The express statutory purpose[17] of DASA is "to prevent and prohibit conduct which

is inconsistent with a school's educational mission."  *Id.* § 10 (emphasis added).

---

[15] *Handberry v. Thompson*, 446 F.3d 335, 353 (2d Cir. 2006).

[16] The New York Court of Appeals has stated, in dicta, that DASA *requires* the government to provide students a violence-free education environment.  *People v. Marquan M.*, 24 N.Y.3d 1, 4 (2014) ("New York, for example, enacted the 'Dignity for All Students Act' in 2010, declaring that our State must 'afford all students in public schools an environment free of discrimination and harassment' caused by 'bullying, taunting or intimidation.'") (emphasis added) (citing N.Y. EDUC. L. § 10).

[17] The legislative purpose of DASA is to require schools to enact and implement policies that prevent bullying, harassment, and discrimination.  Assemblyman O'Donnell, who sponsored DASA stated: "The school has an

14

52.     DASA defines "harassment" and "bullying" broadly as "the creation of a hostile environment by conduct or by threats, intimidation or abuse, including cyberbullying, that (a) has or would have the effect of unreasonably and substantially interfering with a student's educational performance, opportunities or benefits, or mental, emotional or physical well-being; or (b) reasonably causes or would reasonably be expected to cause a student to fear for his or her physical safety; or (c) reasonably causes or would reasonably be expected to cause physical injury or emotional harm to a student; or (d) occurs off school property and creates or would foreseeably create a risk of substantial disruption within the school environment, where it is foreseeable that the conduct, threats, intimidation or abuse might reach school property." *Id.* § 11(7).

53.     DASA further provides that "[n]o student shall be subjected to harassment or bullying by employees or students on school property or at a school function." *Id.* § 12(1).

54.     Under DASA, each school district must adopt a code of conduct.  Such code of conduct must include an age-appropriate version of the above policy. *Id.* §§ 12(2), 2801.

55.     DASA requires a comprehensive compliance system, sufficient to identify, investigate, and remediate acts of in-school violence.  Specifically, DASA requires each school district to create and enforce policies, procedures and guidelines that shall include, but are not limited to:

    1.    Policies and procedures intended to create a school environment that is free from harassment, bullying and discrimination . . . ;

    2.    Guidelines to be used in school training programs to discourage the development of harassment, bullying and discrimination, and to make school employees aware of the effects of harassment, bullying, cyberbullying and discrimination on students and that are

---

obligation to have a policy. The school has an obligation to have people on staff who know how to deal with the policy. The school has an obligation to protect all children from that conduct." *Michael Terrill & Carol Terrill, Individually & as Parents & Nat. Guardians of B.T., Plaintiffs, v. Windham-Ashland-Jewett Cent. School Dist., & Kerry Overbaugh, Individually & as Agent of the Bd. of Educ., Defendants*, No. 1:15-CV-0615, 2016 WL 1275048, at *7 (N.D.N.Y. Mar. 31, 2016).

> designed . . . (b) to enable employees to prevent and respond to harassment, bullying and discrimination;
>
> . . .
>
> 4.    Guidelines relating to the development of measured, balanced and age-appropriate responses to instances of harassment, bullying or discrimination by students, with remedies and procedures following a progressive model that make appropriate use of intervention, discipline and education, vary in method according to the nature of the behavior, the developmental age of the student and the student's history of problem behaviors, and are consistent with the district's code of conduct . . . .

*Id.* § 13.

56.    DASA requires each school district to complete a comprehensive investigation of all reported acts of in-school violence.  Thus, DASA requires:

> school employees who witness harassment, bullying or discrimination, or receive an oral or written report of harassment, bullying or discrimination, to promptly orally notify the principal, superintendent or the principal's or superintendent's designee not later than one school day after such school employee witnesses or receives a report of harassment, bullying or discrimination, and to file a written report with the principal, superintendent or the principal or superintendent's designee not later than two school days after making such oral report.

*Id.* § 13(1)(c).

57.    DASA requires "the principal, superintendent or the principal's or superintendent's designee to lead or supervise the thorough investigation of all reports of harassment, bullying and discrimination, and to ensure that such investigation is completed promptly after receipt of any written reports made under this section."  *Id.* § 13(1)(d).

58.    DASA also mandates prompt, decisive, and effective enforcement, designed to "end the harassment, bullying or discrimination, eliminate any hostile environment, create a more positive school culture and climate, prevent recurrence of the behavior, and ensure the safety of the student or students against whom such harassment, bullying or discrimination was directed."  *Id.* § 13(1)(e).

59.     DASA requires each school district to guard against retaliation against students who report in-school violence.  Each school district's policy must "prohibit retaliation against any individual who, in good faith, reports, or assists in the investigation of, harassment, bullying or discrimination."  *Id.* § 13(1)(f).

60.     DASA mandates that each school district have "a school strategy to prevent harassment, bullying and discrimination."  *Id.* § 13(1)(g).

## C.     DOE's Implementing Regulations

61.     In 2007, DOE launched its citywide "Respect For All" program ("RFA") to promote a community of inclusion in New York City public schools.  Since the enactment of DASA, DOE has amended RFA in an attempt to comply with DASA, including through the adoption of various Regulations.

*(1)     Regulation Concerning Student-on-Student Violence*

62.     On August 21, 2013, DOE issued Chancellor's Regulation A-832 ("CR-A832"), as amended, which addresses "Student-to-Student Discrimination, Harassment, Intimidation and/or Bullying," as a means to comply with DASA's proscriptions concerning student-on-student violence (teacher-on-student violence and verbal abuse are covered by other regulations, as described *infra*).

63.     CR-A832(I)(C) prohibits any student from "creat[ing] a hostile school environment" for another student by conduct that unreasonably and substantially interferences with another student's education, participation in school activities, or mental, emotional, or physical well-being, or otherwise reasonably causes (or reasonably would be expected to cause) another student physical injury, emotional harm, or fear for physical safety.

64.     The Regulation prohibits a broad array of inappropriate behavior, including:

a.  physical violence;

b.  stalking;

c.  threats, taunts, teasing;

d.  aggressive or menacing gestures;

e.  exclusion from peer groups designed to humiliate or isolate;

f.  using derogatory language;

g.  making derogatory jokes or name calling or slurs;

h.  written or graphic material, including graffiti, photographs, drawings, or videos, containing comments or stereotypes that are electronically circulated or are written or printed.

CR-A832(I)(E).

65.  CR-A832(II) mandates reporting of incidents by DOE employees, but also permits reporting by students and parents, as follows:

a.  Each school must appoint an RFA liaison to whom reports of discrimination, harassment, intimidation and/or bullying can be made. CR-A832(II)(A).

b.  Students and parents may report incidents of discrimination harassment, intimidation and/or bullying to the RFA liaison or the principal/designee. CR-A832(II)(B), (E).

c.  School staff members who witness such incidents, or have knowledge of them, must promptly report such incidents to the RFA liaison or principal/designee within one school day and file a written report with the

RFA liaison or principal/designee within two days.  The school must keep all written reports on file.  CR-A832(II)(D).

d.      Complaints of discrimination, harassment, intimidation, and/or bullying must be entered into DOE's Online Occurrence Reporting System ("OORS") within 24 hours and promptly investigated.  CR-A832(III)(A).

66.     The principal/designee for the school where the reported incident occurred must undertake an investigation as soon as practicable, and not later than five days after receiving the complaint.  CR-A832(III)(B).  The required investigation includes:  (1) interviewing the alleged victim and documenting the conversation; (2) asking the alleged victim for a detailed written statement describing the behavior, when it took place, and who may have witnessed it; (3) interviewing the accused student and advising him/her that if the conduct has occurred, it must cease immediately; (4) asking the accused student for a written statement; and (5) interviewing any witnesses and obtaining their written statements.  *Id.*

67.     The principal/designee must advise the parent(s) of the accused student of the allegations.  The principal/designee also must advise the parent(s) of the alleged victim of the allegations, unless the alleged victim informs the principal/designee of safety concerns in regard to such notification.  CR-A832(III)(C).

68.     The school must advise the parents of the alleged victim and the parents of the accused student whether or not the allegations are substantiated.  CR-A832(III)(E).

69.     CR-A832 provides a broad set of allegedly corrective follow-up actions.  Principals are broadly permitted to:  (1) refer the complaining student and the accused student to the guidance counselor, school social worker, psychologist or other appropriate school staff for separate counseling, where appropriate; (2) utilize intervention methods, including sensitivity training,

counseling and/or referral to a community-based agency for counseling, support and education; and (3) subject students who have been found to have violated the policy to appropriate disciplinary action.  CR-A832(IV)(A)-(C).

70.     The principal/designee must also follow up to ensure that the conduct has stopped. CR-A832(IV)(D).  As detailed *infra*, administrators regularly fail in the critical imperative of stopping the offensive conduct.

71.     Although DASA mandates that school districts enact policies and procedures for "tak[ing] prompt actions reasonably calculated to end the harassment, bullying or discrimination," "prevent recurrence of the behavior," and "ensure the safety of the student" after an investigation verifies the veracity of an allegation, N.Y. EDUC. L. §13(1)(e), CR-A832 fails to do so.  It does <u>not</u> establish corrective steps that schools must take.  Rather, CR-A832 simply states that bullies will be subject to appropriate disciplinary action and requires the principal or her designee to "follow up."  CR-A832(IV)(D).

72.     CR-A832 further requires each principal to ensure that all staff members, as well as the RFA liaison, receive training on the relevant policies and procedures.  CR-A832(V)(D)-(E).

73.     CR-A832 prohibits retaliation against any student, teacher or school employee who reports an incident of alleged student-to-student discrimination, harassment, intimidation and/or bullying.  CR-A832(VIII).

74.     CR-A832 lacks any self-execution or enforcement mechanism.  As a result, schools routinely ignore it.

*(2)     Regulation Concerning Teacher-on-Student Violence*

75.     On October 30, 2014, DOE issued Chancellor's Regulation A-420 ("CR-A420"), as amended, which addresses "Pupil Discipline and Behavior – Corporal Punishment."  Corporal

punishment is defined as "any act of physical force upon a student for the purpose of punishing that student" by a teacher or other DOE employee.  CR-A420(II).

76.     CR-A420 states that "[d]isruptive behavior by a student must never be punished by the use of corporal punishment," *i.e.*, by the use of physical force.  Schools must address disruptive behavior by students "through offering guidance intervention, working with parents, and addressing behavior in accordance with Chancellor's regulation A-443 and the DOE's Discipline Code."  CR-A420(I)(B).

77.     The sole exception to this rule is that school employees may use "reasonable physical force" to (1) protect oneself from physical injury, (2) protect another pupil, teacher or other person from physical injury, (3) to protect school property, or (4) remove or restrain a disorderly student who refuses to comply with a request to stop, where alternative methods and procedures that do not involve the use of physical force cannot reasonably be employed to achieve such purposes.  CR-A420(II).

78.     CR-A420 requires any staff member who witnesses corporal punishment, or who has knowledge or information about or who receives a report about a student who may have been the victim of corporal punishment, to report the allegation orally to the principal/designee within one school day.  Within two school days of making the oral report, the staff member also must submit a written report to the principal/designee by completing a witness statement or file an online report directly with the Office of Special Investigations ("OSI").  CR-A420(IV)(A).

79.     CR-A420 requires principals or their designees to file reports of all allegations of corporal punishment with the OORS or the OSI immediately.  CR-A420(IV)(B).  Such allegations must be investigated by the school or the OSI.  CR-A420(VI)(A).

80.     CR-A420 requires OSI, upon receipt of a complaint of corporal punishment, to recommend whether the employee should be removed from his/her assignment pending completion of the investigation. If OSI does not recommend removal initially, the principal may request removal, subject to review by DOE counsel. CR-A420(V)(A).

81.     Under CR-A420, regardless of whether OSI or the school conducts the subsequent investigation, the necessary investigative steps include: (1) interviewing the alleged victim and student/staff witnesses separately and obtaining their written statements; (2) providing the accused employee with 48 hour written notice of the right to appear with a union representative at an investigative interview to discuss the allegation of corporal punishment; (3) meeting with the accused employee; (4) evaluating the evidence; and (5) maintaining a separate file for each complaint. CR-A420(VI)(B).

82.     If the school conducts the investigation, then the principal must determine whether or not the complaint is substantiated and complete an investigation form explaining the conclusions reached with respect to each allegation. The report must be completed within ten days in the absence of extenuating circumstances. CR-A420(VI)(C)(1).

83.     CR-A420 does not establish any time limit on OSI-conducted investigations. The ten day limit applies only to school-based investigations.

84.     CR-A420 requires the principal to submit the completed and signed investigative report, along with all interview notes, written statements, and investigative findings, to the senior field counsel when the school-based investigation is complete. The school-based investigation is considered closed only when senior field counsel so notifies the principal. CR-A420(VI)(C)(2).

85.     At the end of the investigation, regardless of whether it was OSI-conducted or school-based, the principal/designee "must inform the parent of the alleged victim whether the allegations were substantiated or not substantiated."  CR-A420(VI)(D).

86.     CR-A420 also prohibits retaliation against those who experience, report or witness corporal punishment.  CR-A420(IX).

87.     CR-A420 lacks any self-execution or enforcement mechanism.  As a result, schools routinely ignore it.

*(3)     Regulation Concerning Verbal Abuse of Students By Teachers*

88.     On October 30, 2014, DOE issued Chancellor's Regulation A-421 ("CR-A421"), as amended, which addresses "Pupil Discipline and Behavior – Verbal Abuse."  It prohibits "verbal abuse" of students by teachers and other school personnel.

89.     CR-A421 defines "verbal abuse" as language (written or oral) about or directed towards students that (1) belittles, embarrasses or subjects students to ridicule; (2) unreasonably and substantially interferes with any aspect of a student's education; (3) unreasonably and substantially interferes with  a student's mental, emotional, or physical well-being; (4) reasonably causes or would reasonably be expected to cause a student to fear for his/her physical safety; or (5) reasonably causes or would reasonably be expected to cause physical injury or emotional harm to a student.  CR-A421(II)(A).

90.     Within twenty-four hours of hearing allegations of verbal abuse of a student by a DOE employee, a principal/designee must report such allegations to the OSI via an online reporting form and also report the allegation in DOE's OORS.  CR-A421(IV)(B).

91.     CR-A421 states that the allegations may be investigated by the OSI or the school.  CR-A421(VI)(A).  If the school conducts the investigation, then the principal must separately

interview and take written statements from the victim and all witnesses as soon as practicable, and meet with the accused employee at least 48 hours after giving notice of the employee's right to have a union representative attend the meeting.  CR-A421(VI)(B).

92.    For school-based investigations, absent extenuating circumstances, CR-A421 requires the principal to complete the investigation within ten days.  CR-A421(VI)(C).  The principal must submit the completed and signed investigative report, along with all interview notes, written statements, and investigative findings, to the senior field counsel when the school-based investigation is complete.  The school-based investigation is considered closed only when senior field counsel so notifies the principal.  CR-A421(VI)(C)(2).

93.    CR-A421 also prohibits retaliation against those who experience, report or witness verbal abuse.  CR-A421(IX).

94.    CR-A421 lacks any self-execution or enforcement mechanism.  As a result, schools routinely ignore it.

*(4)    Regulation Concerning Safety Transfers*

95.    On March 9, 2011, DOE issued Chancellor's Regulation A-449 ("CR-A449"), as amended, which addresses "Safety Transfers" as a means of removing a student from a school when it is determined that a student's continued presence in the school is unsafe for the student.

96.    CR-A449 sets forth the procedures for granting safety transfer requests when students are victims of a violent criminal offense on school property or, in other situations, when it is determined that a student's continued presence in the school is unsafe for the student.

97.    CR-A449 requires, for allegations of violent criminal offenses on school grounds, that the principal or her designee "conduct a full investigation and take appropriate action in accordance with Chancellor's Regulations A-412 and A-443."  CR-A449(II)(B).  Within twenty-

24

four hours, if there is "reason to believe [the] student was a victim of a violent criminal offense on school grounds and is therefore entitled to a transfer, the Borough Director of Suspensions must notify the parent in writing of the right to transfer the student to another public school." *Id*.

98.     CR-A449 states that for a student who was not the victim of a violent criminal offense on school grounds, a safety transfer is available "if a student's parent has requested a safety transfer and it is determined that the student's continued presence in the school is unsafe for the student. Student Enrollment's Executive Director of Borough Enrollment/designee shall make this determination following a recommendation by the principal/designee." CR-A449(III)(A).

99.     Under CR-A449, where the safety transfer request involves an incident of school-related safety, the principal/designee must ensure:  (1) a full investigation is conducted, (2) an occurrence report is prepared, (3) statements from all involved parties and witnesses are obtained, and (4) appropriate disciplinary action is taken.  CR-A449(III)(B).

100.     CR-A449 requires the principal/designee to make a recommendation to the Student Enrollment's Executive Director of Borough Enrollment of whether she believes that the safety transfer is warranted within 48 hours of the receipt of a safety transfer request.  The principal/designee must also provide the following documents:  (1) the Safety Transfer Intake Form, (2) a summary of the principal's investigation, (3) a copy of the school occurrence report, and (4) a copy of the police report (if applicable).  CR-A449(III)(C).

101.     CR-A449 does not provide any standards for the principal/designee to use to determine when it is appropriate to recommend the granting a safety transfer request.

102.     CR-A449 requires the Student Enrollment's Executive Director of Borough Enrollment to determine whether to grant a safety transfer and notify the parent in writing of the

determination within one week of receipt of the principal's recommendation and supporting documentation.  CR-A449(III)(D).

103.    CR-A449 does <u>not</u> provide any standards for how the Student Enrollment's Executive Director of Borough Enrollment is to decide whether to grant a safety transfer.

104.    CR-A449 does <u>not</u> provide for a process to appeal a safety transfer decision.

105.    CR-A449 does <u>not</u> provide for an involuntary safety transfer of a student.  Rather, safety transfers pursuant to CR-A449 can only be initiated by the student's parent.

*(5)    Regulation Concerning Involuntary Transfer Procedures*

106.    On January 20, 2011, DOE issued Chancellor's Regulation A-450 ("CR-A450"), as amended, which established "Involuntary Transfer Procedures."  It "describes the procedures for effectuating the involuntary transfer of students in general education . . . pursuant to Section 3214(5) of the New York State Education Law."  CR-A450(I).

107.    CR-A450 makes schools responsible for in-school measures to address negative behaviors.  Specifically, "school personnel are responsible for developing and utilizing techniques and measures that promote optimal learning and address behaviors which negatively impact upon the education process.  When a student's behavioral and/or academic record indicates that adjustment in school is unsatisfactory, school personnel should develop plans and explore techniques for addressing a student's behavioral problem and discuss these alternatives with the student and his/her parent."  CR-A450(II)(A).

108.    CR-A450 allows for voluntary transfers that are similar to safety transfers.  If the in-school measures are unsuccessful, and if "the principal believes that the student will benefit from a transfer or will receive an appropriate education in another school, then the principal may explore a transfer with the parent."  CR-A450(II)(B).  A voluntary transfer is <u>effectuated only if</u>

the parent consents to the transfer and the Office of School and Youth Development ("OSYD") Borough Director of Student Suspensions agrees. *Id.*

109.   CR-A450 also permits, subject to certain procedures, involuntary transfers of students who display behavioral or academic problems.   The principal must consult with the Borough Director of Student Suspensions.   If the Borough Director agrees to consider a transfer, then the principal/designee must "send written notification to the student and parent stating that a recommendation to [involuntarily] transfer the student is under consideration."   CR-A450(III)(A)(1).   The letter must state the following:

     a.     The date, time and place of an informal conference with the principal. *Id.*

     b.     The parent and the student have "a right to be accompanied by counsel or an individual of their choice." *Id.*

     c.     The parent "has a right to request and obtain a copy of the student's records before the conference." CR-A450(III)(A)(2).

     d.     "[I]f, after the principal's conference, the principal believes that the transfer is warranted and the parent disagrees, the parent will have an opportunity to request a hearing before the transfer can take effect." CR-A450(III)(A)(3).

110.   If, after the informal conference with the parent, the principal concludes that the student should be transferred, CR-A450 requires the principal to issue a written transfer recommendation to the Borough Director of Student Suspensions within five days of the conference.   The recommendation "must include a description of the behavioral and/or academic problems which indicate the need for transfer and a description of alternatives explored and prior actions taken to resolve the student's problems."   A copy of the principal's written transfer recommendation must be provided to the student and parent.   CR-A450(III)(B)(6).

111.    Pursuant to CR-A450, the Borough Director of Student Suspensions can either reject the involuntary transfer recommendation as inappropriate or accept the recommendation for consideration and "notify the parent and student in writing that a transfer has been proposed and of their right to request a hearing . . . ."  CR-A450(IV)(A).

112.    CR-A450 requires the notice letter to include the following information:

a.    The specific reasons for considering the transfer.  CR-A450(IV)(B)(1).

b.    The parent and the student have ten days to request a hearing.  CR-A450(IV)(B)(2).

c.    If a hearing is requested, the parent and student shall also receive notice that the date, time, and place for the hearing will be arranged and that the proposed transfer shall not take effect until a written post-hearing decision is issued, unless the parent consents.  CR-A450(IV)(B)(3).

d.    If a hearing is not requested, the proposed transfer shall take effect after ten days, unless the parent provides written consent to an earlier date.  CR-A450(IV)(B)(4).

e.    Notice of the right to obtain copies of the student's record before the hearing, and also a list of community agencies that offer free or low-cost legal assistance.  CR-A450(IV)(B)(5).

f.    Notice of the right to bring counsel to the hearing.  CR-A450(IV)(B)(6).

g.    Notice of the right to request that DOE provide a translator at the hearing. CR-A450(IV)(B)(7).

113.    CR-A450 requires that a decision be made within ten school days of the hearing. The Borough Director of Student Suspensions must send both the principal and the parent a letter

informing them of the decision and the reasons for it.  CR-A450(IV)(D)(1).  The letter must "inform the student and the parent of the right to appeal the decision."  CR-A450(IV)(D)(6).

114.    CR-A450 states that the parent of the student can appeal the involuntary transfer decision within ten school days of the receipt of the tape recording or transcript of the formal hearing.  CR-A450(V).

## FACTUAL ALLEGATIONS

115.    As described in detail *infra*, the Named Class Plaintiffs, and others not herein named as plaintiffs, have suffered in-school violence, including episodes of student-on-student and teacher-on-student violence.  These episodes show DOE's systematic failure to comply with DASA or its own Regulations concerning in-school violence, which constitutes a custom and practice of deliberate indifference to in-school violence against Named Class Plaintiffs and others similarly situated.

**A.**    **JD1**

116.    JD1 is a 9-year old male student who is enrolled in an elementary school in East Harlem, New York County.

117.    JD1's school is in District 4, where 87.6% of students are Black or Hispanic. District 4 experienced 22 violent incidents per 1000 students.  It also experienced 46 disruptive incidents per 1000 students.  *See* Section K *infra*.

118.    On or about December 23, 2014, a male student ("Bully 1A") approached JD1, repeatedly kicked him on his body, and verbally harassed him.  JD1 and Bully 1A were in the same class and the incident occurred while school was in session.  JD1 did not defend himself based on fear of retaliation.

119.    JD1 reported the incident to his mother ("Parent 1") and stated that Bully 1A was often abusive to JD1 and other students, even when the teacher was present in the room.  To the best of Parent 1's knowledge, the teacher never reported the abuse to the school principal ("Principal 1") or his designee, in violation of CR-A832(II)(D).  Moreover, Bully 1A disrupted class by talking loudly and bothering other students who were trying to learn.  The teacher sometimes utilized an aide to walk Bully 1A student up and down the hallway to calm him down.

120.    Parent 1 contacted JD1's teacher and Principal 1 to report the incident via e-mail, telephone, and in person.  However, despite her numerous attempts to report the incident, Principal 1 did not respond to Parent 1's communications.

121.    To the best of Parent 1's knowledge, Principal 1 did not prepare or file a single incident report, in violation of CR-A832(III)(A).

122.    To the best of Parent 1's knowledge, Principal 1 did not conduct any investigation, in violation of CR-A832(III)(B) and N.Y. EDUC. L. § 13(1)(d).

123.    Principal 1 did not attempt to contact the accused student's parents, in violation of CR-A832(III)(C).

124.    To the best of Parent 1's knowledge, Principal 1 took no corrective action reasonably designed to ensure that the violence would stop, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

125.    In or around the fall of 2015, Bully 1A, along with another male student ("Bully 1B"), grabbed, kicked, and punched JD1 during the lunch period.  JD1 reported the incident to Parent 1 and stated that a lunch aide was present during the incident.  To the best of Parent 1's knowledge, this lunch aide did not report the incident to Principal 1 or other school officials, in violation of CR-A832(II)(D) and N.Y. EDUC. L. § 13(1)(c).

126.     In or around January 2016, Bully 1A again approached JD1 and choked him during the lunch period.  A lunch aide sent JD1 to the school nurse and called Parent 1.

127.     JD1 reported the incident to Parent 1.  To the best of Parent 1's knowledge, neither the school nurse nor the lunch aide informed Principal 1 or his designee of the incident, in violation of CR-A832(II)(D).

128.     Parent 1 reported the incident to Principal 1, who informed Parent 1 that he would investigate and report back to her.  Principal 1 did not ask JD1 to submit a detailed written narrative of the incident, in violation of CR-A832(III)(B).

129.     To the best of Parent 1's knowledge, Principal 1 did not prepare or file a single incident report, in violation of CR-A832(III)(A).

130.     To the best of Parent 1's knowledge, Principal 1 did not attempt to contact the accused student's parents, in violation of CR-A832(III)(C).

131.     Neither Principal 1 nor a designee notified Parent 1 whether the allegations were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

132.     To the best of Parent 1's knowledge, Principal 1 did not take investigative or corrective action reasonably designed to ensure that the violence would stop, in violation CR-A832(III)-(IV) and N.Y. EDUC. L. § 13(1)(d)-(e).

133.     Moreover, despite Parent 1's repeated complaints of violent behavior within the school, none of the school's administrators took any protective measures to prevent contact between JD1 and the bullies.  To the contrary, JD1 and the bullies remained in the same class.

134.     Moreover, after Parent 1 made numerous complaints, the school retaliated by not promoting JD1 to the next grade, in violation of CR-A832(VIII) and N.Y. EDUC. L. § 13(1)(f).  The school did not consult with or give Parent 1 any verbal or written notice that JD1 was being

held back prior to the school year.  Parent 1 and JD1 learned that the school held back JD1 when JD1 arrived at school on the first day of the school year.

135.    Here, the school provided no notice that JD1's promotion was in doubt or and made no effort to involve Parent 1 in the promotion decision.  When Parent 1 asked Principal 1 why JD1 was held back, Principal 1 could not articulate the reason with any level of specificity.  Principal 1 vaguely referred of JD1's absences from class even though Parent 1 informed Principal 1 that any absences were the results of the other students' assaults and harassment of JD1.

136.    As a result of the repeated assault and harassment from Bully 1A and Bully 1B, JD1 suffered anxiety attacks and expressed lack of desire to attend school because of the violence.

**B.**    **JD2**

137.    JD2 is an 8-year old male student who is enrolled in an elementary school in West Harlem, New York County.

138.    JD2's school is in District 6, where 94% of students are Black or Hispanic. District 6 experienced 16 violent incidents per 1000 students.  It also experienced 30 disruptive incidents per 1000 students.  *See* Section K *infra*.

139.    In or around September 2015, during school hours, two male students ("Bully 2A" and "Bully 2B") harassed and repeatedly hit JD2 on his body.  JD2 reported the incidents to his parent ("Parent 2").

140.    Parent 2 reported the incident to JD2's teacher during parent-teacher meetings.  The teacher placed the blame on JD2, indicating that JD2 was creating problems, but was unable to identify specific facts or incidents to support this assertion.  It was only later that Parent 2 realized that the teacher was not accurately relaying what was occurring in the classroom.

141.    To the best of Parent 2's knowledge, the teacher did not report the incident to the principal ("Principal 2") or the designee, in violation of CR-A832(II)(D).

142.    To the best of Parent 2's knowledge, Principal 2 did not prepare an incident report or document the incident in any way, in violation of CR-A832(III)(A).

143.    To the best of Parent 2's knowledge, no investigation was conducted—neither JD2 nor the accused student were interviewed, no written statements were prepared, and no witnesses were identified or interviewed—in violation of CR-A832(III)(A), CR-A832(III)(B), and N.Y. EDUC. L. § 13(1)(d).

144.    Neither Principal 2 nor her designee notified Parent 2 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

145.    To the best of Parent 2's knowledge, JD2 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

146.    To the best of Parent 2's knowledge, the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

147.    To the best of Parent 2's knowledge, neither Principal 2 nor her designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

148.    In or around October 2015, Bully 2A chased JD2 around the classroom and harassed JD2.  The teacher was present in the room.  After observing Bully 2A chasing and harassing JD2, the teacher had to restrain Bully 2A to stop him.  Yet, despite observing this incident, which required her intervention, to the best of Parent 2's knowledge, the teacher did not report the incident to Principal 2 or her designee, in violation of CR-A832(II)(D).

149.    To the best of Parent 2's knowledge, Principal 2 did not prepare an incident report or document the incident in any way, in violation of CR-A832(III)(A).

150.    To the best of Parent 2's knowledge, no investigation was conducted—neither JD2 nor the accused student were interviewed, no written statements were prepared, and no witnesses were identified or interviewed—in violation of CR-A832(III)(A), CR-A832(III)(B), and N.Y. EDUC. L. § 13(1)(d).

151.    Neither Principal 2 nor her designee notified Parent 2 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

152.    To the best of Parent 2's knowledge, JD2 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

153.    To the best of Parent 2's knowledge, the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C); and, perhaps most importantly, neither Principal 2 nor her designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

154.    In or around fall of 2015, JD2 began suffering from nightmares, anxiety, and increased fear of others. These anxiety attacks and fear began only after Bully 2A and Bully 2B began harassing JD2 at school.

155.    The bullying continued and JD2's symptoms steadily worsened.  His desperation reached its peak on or about December 16, 2015, when he stabbed himself in the ear.  When Parent 2 rushed to the school, she observed JD2 to have bruises on his leg in addition to the bleeding stab mark on his ear.

156.    JD2 told Parent 2 that during school hours, Bully 2B kicked him on the leg, which caused the visible bruises.

157.     JD2 told Parent 2 that he could not concentrate in class because Bully 2A and Bully 2B were insulting, harassing, and physically attacking him.  JD2 told Parent 2 that he was tired of defending himself and he did not want to hear the bullies' insults anymore.  He stabbed himself in the ear hoping to silence the insults.

158.     Parent 2 reported this incident to JD2's teacher.  The teacher was not receptive to Parent 2's complaints and no action was taken.  To the best of Parent 2's knowledge, the teacher did not report the incident to Principal 2 or the designee, in violation of CR-A832(II)(D).

159.     To the best of Parent 2's knowledge, Principal 2 did not prepare an incident report or document the incident in any way, in violation of CR-A832(III)(A).

160.     To the best of Parent 2's knowledge, no investigation was conducted—neither JD2 nor the accused student were interviewed, no written statements were prepared, and no witnesses were identified or interviewed—in violation of CR-A832(III)(A), CR-A832(III)(B), and N.Y. EDUC. L. § 13(1)(d).

161.     Neither Principal 2 nor her designee notified Parent 2 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

162.     To the best of Parent 2's knowledge, JD2 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A), the accused students were not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

163.     To the best of Parent 2's knowledge, neither Principal 2 nor her designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

164.     Parent 2 took JD2 to the emergency room at a local New York City hospital to receive medical treatment after the December 16 incident.  Yet, despite this, the school still did not take any investigative actions.

165.     On or about December 21, 2015, Parent 2 contacted 311 to report the incident and lack of response from JD2's school.

166.     On or about December 22, 2015, a school official called Parent 2 to inform Parent 2 that the school was moving JD2 to a new classroom.  The school official told Parent 2 to come into the school for a meeting with the school nurse, Principal 2, the guidance counselor, and the parent coordinator.

167.     At the meeting, instead of addressing the incident and harassment of JD2, Principal 2 admonished Parent 2 for contacting 311 and stated, in sum and substance, that Parent 2 should have come directly to school officials.  Parent 2 informed the Principal 2 that she had made multiple reports to the teacher, nurse, and guidance counselor; but Principal 2 was not receptive to Parent 2.

168.     To the best of Parent 2's knowledge, despite the conference, report to 311, and JD2's injuries, Principal 2 did not prepare an incident report or document the incident in any way, in violation of CR-A832(III)(A).

169.     To the best of Parent 2's knowledge, no investigation was conducted—neither JD2 nor the accused student were interviewed, no written statements were prepared, and no witnesses were identified or interviewed—in violation of CR-A832(III)(A), CR-A832(III)(B), and N.Y. EDUC. L. § 13(1)(d).

170.     Neither Principal 2 nor her designee notified Parent 2 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

171.    To the best of Parent 2's knowledge, JD2 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

172.    To the best of Parent 2's knowledge, the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

173.    To the best of Parent 2's knowledge, neither Principal 2 nor designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

174.    In and between September 2015 and December 2015, JD2 lost significant learning time in the classroom because of the bullies' harassment, insults, and physical assaults. He had trouble focusing and concentrating on school and resorted to self-inflicted injury to drown out the harassment from the bullies. JD2 was taken out of class to receive medical treatment and continues to suffer from severe anxiety and fear of the classroom where these incidents occurred. He was ultimately transferred to another class at the school.

**C.    JD3**

175.    JD3 is a 9-year old male student who is enrolled in an elementary school in West Harlem, New York County.

176.    JD3's school is in District 5, where 90.9% of students were Black or Hispanic. District 5 experienced 26 violent incidents per 1000 students. It also experienced over 36 disruptive incidents per 1000 students. *See* Section K *infra*.

177.    On or about October 20, 2013, JD3's math teacher ("Teacher 3"), an adult male, grabbed him by the ear, dragged him down the stairs and threw him onto a landing.

178.    After JD3's mother ("Parent 3") observed JD3's bruises, JD3 informed Parent 3 of the incident.

179.    Parent 3 then contacted the New York City Police Department ("NYPD"), which indicated that a police officer would meet Parent 3 at the school to investigate the incident. However, no NYPD representative ever came to the school.

180.    Parent 3 then contacted the school principal ("Principal 3") and met with Principal 3 and Teacher 3 to discuss the incident.  Teacher 3 stated that nothing had happened and that he had not had any physical contact with JD3.  He claimed that JD3 had fabricated the incident.  Parent 3's mother observed that Principal 3 took notes.  However, to the best of Parent 3's knowledge, Principal 3 did not prepare an actual incident report, in violation of CR-A420(IV)(B).

181.    Principal 3 stated that she would conduct an investigation and contact Parent 3 after its conclusion.  Two weeks passed, however, without any further word from Principal 3, in violation of CR-A420(VI)(C)(1) and N.Y. EDUC. L. § 13(1)(d).

182.    Although other students witnessed the incident, Parent 3 is unaware of any evidence that Principal 3 or a designee interviewed any other students to investigate this matter, in violation of CR-A420(VI)(B) and N.Y. EDUC. L. § 13(1)(d).

183.    Parent 3 then requested another meeting.  At this second meeting, Teacher 3 stated in substance: "I had him by the shirt and he tripped down the stairs."  Parent 3 noted that Teacher 3's story at the second meeting directly contradicted Teacher 3's explanation from the first meeting.

184.    Further, to Parent 3's knowledge, the school conducted no investigation into JD3's allegations or Teacher 3's implausible story, despite the serious injuries JD3 suffered, in violation of CR-A420(VI)(B) and N.Y. EDUC. L. § 13(1)(d).

185.    Principal 3's reaction to these events was, essentially, to punish JD3, in violation of CR-A420(IX).  JD3 was removed from the classroom during math period.  However, JD3 was

not placed in another math class and, therefore, received no math instruction at all.  While his peers received math instruction, JD3 was sent to a kindergarten classroom to spend the class period.

186.    Moreover, despite removing JD3 from the classroom, the school took no protective measures to prevent contact between JD3 and Teacher 3.  JD3 continued to see Teacher 3 when he came to the classroom to teach the rest of JD3's class.

187.    As further retaliation against JD3, Principal 3 initiated a "safety transfer" for JD3 under Chancellor's Regulation A-449.  However, Principal 3 did not consult with Parent 3 before doing so, did not seek Parent 3's consent for the transfer, and did not consult with Parent 3 concerning potential transfer sites, all in contravention of CR-A449.  The act of initiating a "safety transfer" is a demonstrable sign that either Principal 3 believed Teacher 3 posed a threat to JD3, or Principal 3 was simply punishing JD3 for reporting Teacher 3's conduct.

188.    Principal 3 only informed Parent 3 of the transfer after it had been approved, but she did not secure JD3's placement in any alternative school.  Thus, Principal 3 effectively expelled JD3.

189.    Such conduct directly violated Chancellor's Regulation A-449, the safety transfer protocol.  The protocol provides, in part, that a student who is the victim of a "violent criminal offense" on school grounds is entitled to a transfer.  However, any such transfer may be made only "[i]f the [student's] parent <u>wishes</u> to pursue a transfer."  CR-A449(II)(B)(2)(f) (emphasis added).  Further, in such circumstances, the Borough Director of Suspensions, in consultation with the Office of Student Enrollments, must "select a transfer site to <u>offer</u> the parent."   CR-A449(II)(B)(3)(c) (emphasis added).

190.    Alternatively, the protocol provides that safety transfers are available where the student is not the victim of a violent criminal offense, "if a student's parent has <u>requested</u> a transfer

and it is determined that the student's continued presence in the school is unsafe for the student." CR-A449(III)(A) (emphasis added).

191.    Here, regardless of whether the transfer was based on a determination that the student was a victim of a violent criminal offense or was made purely on the basis of a determination of student safety, the transfer violated the protocol because <u>the parent did not make any request</u> for a transfer.

192.    Instead, in violation of CR-A420(IX) and N.Y. EDUC. L. § 13(1)(f), which prohibit retaliation against a student who reports an incident of school violence, the school effectively expelled JD3 by telling Parent 3 that his transfer to another school was "approved" without actually securing a spot at another school.  Parent 3 had to assume the burden, after the fact, of finding another school for JD3.

193.    As a result of the attack by Teacher 3, JD3 suffered anxiety attacks, causing him to miss several days of school.  JD3's grades suffered because of this anxiety and his increased fear of being in the same school as the male teacher.  JD3 received medical treatment from a doctor after the incident because of the noted physical effects.  JD3 also received medical treatment from a psychiatrist for approximately six months and was diagnosed with post-traumatic stress disorder ("PTSD").  Three years later, at the time of this filing, JD3 still suffers from the effects of PTSD.

194.    In addition, JD3 was forced to miss several days of school after he was effectively expelled from his school because DOE had not secured a spot for JD3 at another school.

195.    In February 2016, Teacher 3 was arrested for assaulting another student in similar fashion, by throwing him across the hallway.

D.    **JD4**

196.    JD4 is an 11-year old female student who is enrolled in an elementary school in West Harlem, New York.

197.    JD4's school is in District 5, where 90.9% of students are Black or Hispanic. District 5 experienced 26 violent incidents per 1000 students.  It also experienced 36 disruptive incidents per 1000 students.  *See* Section K *infra.*

198.    On or about November 20, 2015, during school hours, JD4 observed three female students, who appeared to be whispering about her.  When the three female students walked out of the classroom, one female student ("Bully 4A") pushed JD4 into the chalkboard, which caused JD4 to hit her back on the metal part of the chalkboard.

199.    JD4 left the classroom, went to the bathroom crying, called her mother ("Parent 4"), and reported the incident to the school nurse. Parent 4 rushed to the school based on JD4's report.

200.    JD4 went to the school nurse who recorded in an informal log that JD4 had injured her back in the classroom.  However, to the best of Parent 4's knowledge, the school nurse did not report the incident to the school principal ("Principal 4") or the designee, in violation of CR-A832(II)(D).

201.    Neither the school nurse nor Principal 4 contacted Parent 4 directly to report the incident, in violation of CR-A832(III)(C).

202.    JD4 reached out to Principal 4 to report the incident, and Principal 4 sent JD4 to the school dean ("Dean 4").  To the best of Parent 4's knowledge, Principal 4 did not prepare an incident report of document the incident in any way, in violation of CR-A832(III)(A).

203.     When Parent 4 spoke with Principal 4 and Dean 4, she requested the incident report regarding the assault and harassment of JD4.  However, Principal 4 stated, in sum and substance, that the report did not exist yet, but she would fill one out and investigate the incident.  Further, Principal 4 told Parent 4, in sum and substance, that Parent 4 was not entitled to the report.

204.     To the best of Parent 4's knowledge, it was only after she requested the incident report that Principal 4 filled one out an incident report; Principal 4 had not created a report when the incident occurred.  After reviewing the incident report, Parent 4 noted that the report did not accurately reflect the incident.  The report states that the school notified and contacted the parent of the student, but as noted *supra*, school officials never attempted to directly advise or contact Parent 4 of the incident or allegations.

205.     To the best of Parent 4's knowledge, no investigation was conducted—neither JD4 nor the accused student were interviewed, no written statements were prepared, and no witnesses were identified or interviewed—in violation of CR-A832(III)(A), CR-A832(III)(B), and N.Y. Educ. L. § 13(1)(d).

206.     Neither Principal 4 nor her designee notified Parent 4 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

207.     To the best of Parent 4's knowledge, JD4 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

208.     To the best of Parent 4's knowledge, the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

209.     To the best of Parent 4's knowledge, neither Principal 4 nor the designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. Educ. L. § 13(1)(e).

210.     As a result of the aforementioned incident, JD4 suffered from cuts and scratches to her back, and feared for her physical safety.

211.     In January 2016, during school hours, a male student ("Bully 4B") grabbed JD4 and slammed her body against a desk.  Bully 4B threatened to punch JD4 in the face.

212.     JD4 felt scared because of the attack and threats.  She went to the bathroom crying and called Parent 4 to tell her about the incident.

213.     JD4 went to Dean 4's office to report the incident.  Dean 4 told JD4 that she would resolve it.  However, to the best of Parent 4's knowledge, Dean 4 did not document the incident in any way and the school did not prepare or file an incident report, in violation of CR-A832(III)(A).

214.     To the best of Parent 4's knowledge, JD4 sat in Dean 4's office and did not return to her classroom where school was in session while she was waiting for Parent 4 to arrive.

215.     Neither Dean 4 nor Principal 4 contact nor advised Parent 4 regarding the incident, in violation of CR-A832(III)(C).  Parent 4 came to the school because JD4 told her about the incident.

216.     Upon meeting with Parent 4, Dean 4 stated that she would attempt to contact Bully 4B's parents.  However, to the best of Parent 4's knowledge, the school officials did not contact or speak with Bully 4B's parents, in violation of CR-A832(III)(C).

217.     School officials did not take any corrective action reasonably designed to prevent a recurrence of the assault, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

218.     To the best of Parent 4's knowledge, the complaint was not entered into the OORS within 24 hours, in violation of CR-A832(III)(A); no investigation was conducted—neither JD4 nor the accused student were interviewed, no written statements were prepared, and no witnesses

43

were identified or interviewed—in violation of CR-A832(III)(A), CR-A832(III)(B), and N.Y. EDUC. L. § 13(1)(d).

219.    Neither Principal 4 nor her designee notified Parent 4 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

220.    To the best of Parent 4's knowledge, JD4 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

221.    To the best of Parent 4's knowledge, the school did not utilize intervention methods, in violation of CR-A832(IV)(B); and the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

222.    On or about March 3, 2016, a male student ("Bully 4C") approached JD4 and kicked her in the rear while shouting, in sum or substance, "You are a little White bitch, you need to take your little White ass out of here.  You don't belong here.  Go back to where you came from."

223.    JD4 called Parent 4 crying and reported the incident to Parent 4.  JD4 went to the school nurse to report the incident.  To the best of Parent 4's knowledge, the school nurse did not report the incident to Principal 4 or the designee, in violation of CR-A832(II)(D).

224.    A few days after the March 3, 2016 incident, Parent 4 went to the school and spoke with Dean 4.  Dean 4 stated that she was unaware of the incident on March 3, 2016, indicating that the nurse had not reported the incident, in violation of CR-A832(II)(D).  To the best of Parent 4's knowledge, despite having reported the incident to Dean 4, Dean 4 did not report the incident to Principal 4, in violation of CR-A832(II)(D).

225. Parent 4 requested a copy of the incident report regarding the incident, and Principal 4 again told Parent 4 that she was not entitled to any reports of documentation regarding the incident.

226. To the best of Parent 4's knowledge, school officials did not request a written narrative of the incident from JD4, in violation of CR-A832(III)(B).

227. School officials did not take any corrective action reasonably designed to prevent a recurrence of the assault, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

228. To the best of Parent 4's knowledge, the complaint was not entered into the OORS within 24 hours, in violation of CR-A832(III)(A); no investigation was conducted—neither JD4 nor the accused student were interviewed, no written statements were prepared, and no witnesses were identified or interviewed—in violation of CR-A832(III)(A), CR-A832(III)(B), and N.Y. EDUC. L. § 13(1)(d).

229. Neither Principal 4 nor her designee notified Parent 4 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

230. To the best of Parent 4's knowledge, JD4 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

231. To the best of Parent 4's knowledge, the school did not utilize intervention methods, in violation of CR-A832(IV)(B); and the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

232. On or about March 17, 2016, Bully 4A repeatedly pushed JD4 into a desk in the classroom during school hours.

233.    There were two teachers in the room at the time of this incident.  However, neither teacher attempted to assist JD4, separate the two students, or take any other measures to stop the assault.

234.    To the best of Parent 4's knowledge, neither of the teachers who were present in the classroom attempted to report the incident to Principal 4 or her designee, in violation of CR-A832(II)(D).

235.    JD4 left the classroom crying and called Parent 4 to tell her about the incident.

236.    Parent 4 responded to the school and spoke with a school official.  This school official asked JD4 to write a narrative report regarding the incident.  This was the first time that a school official asked JD4 to document an incident of bullying or violence.

237.    To the best of Parent 4's knowledge, school officials did not take any corrective action reasonably designed to prevent a recurrence of the assault, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

238.    To the best of Parent 4's knowledge, the complaint was not entered into the OORS within 24 hours, in violation of CR-A832(III)(A)

239.    Neither Principal 4 nor her designee notified Parent 4 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

240.    To the best of Parent 4's knowledge, JD4 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

241.    To the best of Parent 4's knowledge, the school did not utilize intervention methods, in violation of CR-A832(IV)(B).

242.    To the best of Parent 4's knowledge, and the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

46

243.    Due to the inadequate response from the school and its failure to take investigative and corrective action against the ongoing harassment and violence against JD4, Parent 4 called 311 to inquire about remedies.  The 311 operator informed her of the Department of Education's safety transfer policy.  This was the first time Parent 4 had heard of this available remedy.  The 311 operator informed Parent 4 that she would need documentation from the school of each incident, which included occurrence reports, police reports, if any, a summary investigation form, and a "T-form."

244.    Parent 4 was not in possession of any of these documents because the school failed to prepare these reports for each incident; or, if they did exist, the school failed to provide access or copies of each to Parent 4.  Each and every time she attempted to procure any documentation, Principal 4 responded that Parent 4 was not entitled to any documentation.

245.    Due to the aforementioned conduct, which included repeated assault and harassment from the fall of 2015 through to the spring of 2016, JD4 suffered from repeated anxiety and panic attacks during mornings before going to school.  JD4 received medical treatment from a therapist because of her fear of attending school and her increased anxiety.

246.    Since the incidents began in the fall of 2015, JD4's grades have suffered.  JD4 is unable to focus in school.  JD4 received a "Promotion in Doubt" notice from her mathematics class.  Many of the students who assaulted and harassed JD4 are in her mathematics class.

**E.    JD5 and JD6**

247.    JD5 is an 11-year old female student who is enrolled at an elementary school in Chelsea, New York County.  She has been bullied by the same bully ("Bully 5") since she was in kindergarten.  Grandparent 5 is JD5's legal guardian.

248.    JD6 is a 7-year old female student, who is enrolled at the same elementary school in Chelsea, New York County.  She is JD5's sister.  Beginning in approximately April 2015, JD5 has been physically assaulted and verbally abused by JD5's tormentor.

249.    JD5 and JD6's school is in District 2, where 49.9% of students are Black or Hispanic.  District 2 experienced 10 violent incidents per 1000 students.  It also experienced 31 disruptive incidents per 1000 students.  *See* Section K *infra*.

250.    In kindergarten (the 2010-2011 school year) Bully 5 began assaulting and harassing JD5, including kicking and teasing her.  Grandparent 5 reported the conduct to JD5's teacher, and the teacher separated the students in the classroom.

251.    To the best of Grandparent 5's knowledge, the teacher did not file an incident report, in violation of CR-A832(II)(D) and N.Y. Educ. L. § 13(1)(c).

252.    To the best of Grandparent 5's knowledge, the complaint was not entered into the OORS within 24 hours, in violation of CR-A832(III)(A).

253.    To the best of Grandparent 5's knowledge, no investigation was conducted—neither JD5 nor the accused student were interviewed, no written statements were prepared, and no witnesses were identified or interviewed—in violation of CR-A832(III)(A), CR-A832(III)(B), and N.Y. Educ. L. § 13(1)(d).

254.    To the best of Grandparent 5's knowledge, JD5 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

255.    To the best of Grandparent 5's knowledge, the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

256.    To the best of Grandparent 5's knowledge, neither the principal ("Principal 5A") nor her designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

257.    Bully 5 began escalating her harassing conduct the following year, in first grade, the 2011-2012 school year.  Early in the school year, Bully 5 began assaulting and harassing JD5. This included both physical assaults and verbal abuse, including by calling JD5 "ugly," saying her mother was ugly, and making other disparaging remarks that caused JD5 severe anguish. Grandparent 5 tried to obtain a meeting with Principal 5A, but the assistant principal ("Assistant Principal 5") said she had to handle the matter first and she would inform Principal 5A.  Assistant Principal 5 referred the matter to the teacher, who said she would speak with both girls together. Notwithstanding the teacher's ostensible intervention, the bullying conduct continued unabated.

258.    To the best of Grandparent 5's knowledge, neither Assistant Principal 5 nor the teacher filed an incident report, in violation of CR-A832(II)(D) and N.Y. EDUC. L. § 13(1)(c), nor was there any investigation, written statements obtained, or follow-up or corrective action taken, in violation of CR-A832(III)-(IV) and N.Y. EDUC. L. § 13(1)(d)-(e).

259.    Neither Principal 5A nor her designee notified Grandparent 5 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

260.    To the best of Grandparent 5's knowledge, JD5 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

261.    To the best of Grandparent 5's knowledge, the school did not utilize intervention methods, in violation of CR-A832(IV)(B).

262.    To the best of Grandparent 5's knowledge, the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

263.    Neither Principal 5A or her designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

264.    Grandparent 5 then filed a report with DOE on November 18, 2011.  She reported that JD5 "has been bullied . . . pinched, punched, chased, picked-on, [and] called names." Grandparent 5's report added that JD5 was in "a state of depression, always crying not wanting [to] go [to] school," and that the bullying "is causing [JD5] to act nervous and hav[e] panic attacks."  DOE told Grandparent 5 that it would conduct an investigation, but the subsequent "investigation" was limited to Assistant Principal 5 speaking with Bully 5 and some other first grade children.  Assistant Principal 5 did not obtain written statements from JD5, Bully 5 or the witnesses, or contact Bully 5's parents, in violation of CR-A832(III)(B) and CR-A832(III)(C). Based on this wholly insubstantial and inadequate investigation, DOE determined that JD5's complaints were meritless.

265.    Predictably, the bullying not only continued but escalated.  Bully 5 attacked JD5 by punching her, pulling her hair, and kicking her.  Bully 5 rallied other children to assault and harass JD5 as well.  In one attack in first grade, the bully and several other students held JD5 down while they screamed at her, called her names, and spit on her.  As demonstrated by this attack, neither Principal 5A nor her designee had followed up on the previous incidents to ensure that the bullying conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e). Because DOE determined—based on a wholly insufficient investigation, lacking the procedures mandated by CR-A832-that the bullying "did not exist," neither DOE nor the school developed a

corrective action plan reasonable designed to end the violence, in violation of CR-A832(IV) and N.Y. EDUC. L. § 13(1)(e).

266.    Regarding the attack in which JD5 was held down, screamed at, and spit upon, to the best of Grandparent 5's knowledge, no school official filed an incident report, in violation of CR-A832(II)(D) and N.Y. EDUC. L. § 13(1)(c).

267.    To the best of Grandparent 5's knowledge, the complaint was not entered into the OORS within 24 hours, in violation of CR-A832(III)(A).

268.    Neither Principal 5A, nor her designee notified Grandparent 5 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

269.    To the best of Grandparent 5's knowledge, JD5 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

270.    To the best of Grandparent 5's knowledge, the school did not utilize intervention methods, in violation of CR-A832(IV)(B).

271.    To the best of Grandparent 5's knowledge, the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

272.    To the best of Grandparent 5's knowledge, neither Principal 5A or her designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

273.    In response to this incident and the long series of other incidents that year, Grandparent 5 spoke with Principal 5A late in the first grade school year to request that JD5 and Bully 5 be placed in different classes for the second grade.  Principal 5A ignored this request and did not investigate the complaint, in violation of CR-A832(III) and N.Y. EDUC. L. § 13(1)(d).

Instead, Principal 5A put JD5 and Bully 5 in the same class in second grade.  Bully 5 continued to harass and assault JD5 throughout the second grade school year of 2012-2013, and the teacher and school administrators did nothing to stop the continuing incidents, in violation of CR-A832(IV)(D) and N.Y. Educ. L. § 13(1)(e).

274.    Grandparent 5 made continued reports to school officials, including Assistant Principal 5, regarding the ongoing harassment and bullying throughout the year.  To the best of Grandparent 5's knowledge, neither Assistant Principal 5 nor anybody else filed any incident reports, in violation of CR-A832(II)(D) and N.Y. Educ. L. § 13(1)(c).

275.    To the best of Grandparent 5's knowledge, the complaints were not entered into the OORS, in violation of CR-A832(III)(A); no investigations were conducted—neither JD5 nor Bully 5 were interviewed, no written statements were prepared, and no witnesses were identified or interviewed—in violation of CR-A832(III)(A), CR-A832(III)(B), and N.Y. Educ. L. § 13(1)(d).

276.    Neither Principal 5A nor her designee notified Grandparent 5 of either allegations against Bully 5 or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

277.    To the best of Grandparent 5's knowledge, JD5 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

278.    To the best of Grandparent 5's knowledge, the school did not utilize intervention methods, in violation of CR-A832(IV)(B).

279.    To the best of Grandparent 5's knowledge, the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

280.    To the best of Grandparent 5's knowledge, neither Principal 5 nor her designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

281.    Grandparent 5 again requested—to both Principal 5A and DOE—that JD5 and Bully 5 be placed in different classes in third grade.  Again, the request was ignored.  JD5 and Bully 5 were placed in the same third grade class during the 2013-2014 school year.

282.    Throughout second and third grade, JD5 cried many nights after coming home from school, and begged not to have to go to school the following day.  She started eating lunch in the bathroom to avoid Bully 5.  In February 2013, when JD5 was in second grade, Grandparent 5 met with Principal 5A to report more bullying, and Principal 5A said she was not aware of any of the previous conduct that Grandparent 5 had reported to Assistant Principal 5 or DOE.  This was an admission that Assistant Principal 5 and JD5's teacher had violated CR-832A(II)(D) and 832(III)(A) by failing to document the repots, and that school officials had violated CR-832(III)-(IV) and N.Y. EDUC. L. § 13(1)(d)-(e) by failing to conduct any investigation or ensure that the violence had ended.

283.    Grandparent 5 reminded Principal 5A that she had previously spoken with her directly about the bullying.  Yet, in a subsequent meeting in approximately the spring of 2013, Principal 5A called Grandparent 5 a "liar" and said that she had not received any oral or written reports about JD5 being attacked.  In so saying, Principal 5A admitted again that she and the school had violated the reporting procedures in CR-A832(II)(D).

284.    Grandparent 5 again requested that JD5 and the bully be split into different classes in fourth grade, but the students were again placed in the same class.  This was another violation

of A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e), because the school did not take steps to ensure that the bullying conduct would stop.

285.    Bully 5 continued harassing and assaulting JD5 throughout the fourth grade year, during 2014-2015, and even escalated her conduct by attacking not only JD5, but also JD5's sister, JD6, who is four years younger and at the time was in first grade.  JD6 has a diagnosis of mild autism, a fact of which the school is aware, which makes her more vulnerable to the negative effects of bullying.

286.    On April 28, 2015, the bully hit JD6 with enough force to knock JD6 down to the ground.  JD6 went to the school nurse after this attack.  Upon information and belief, the school did not escalate the matter to the school's RFA liaison or the principal/designee, in violation of CR-A832(II)(D).  The nurse's report claims that JD6 had "no visible red area, bruise, or swelling." Yet, when Grandparent 5 picked JD6 up from school that day, Grandparent 5 saw that JD6 had a mark on her face where she had been hit, and JD6 complained of a headache.  The incident again proved that neither Principal 5A nor her designee followed up on any of the previous bullying to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

287.    Moreover, to the best of Grandparent 5's knowledge, JD6 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

288.    To the best of Grandparent 5's knowledge, the school did not utilize intervention methods, in violation of CR-A832(IV)(B).

289.    To the best of Grandparent 5's knowledge, the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).  JD6 continues to be verbally harassed and bullied by Bully 5, indicating that neither Principal 5A nor her designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

290.   The following day, on April 29, 2015, Grandparent 5 filed two complaints with the DOE.  Regarding JD5, Grandparent 5 reported a "severe bullying case.  Started [three years] ago [and] still not resolve[d]… [The bully is] literally beating both of my girls.  [The] principal is not taking enough actions to separate these girls but putting them together in the same class [and it is] getting worse.  My daughter is afraid [to] go to school… she hides in bathrooms."

291.   Regarding JD6, Grandparent 5 reported "my 6-yr old (1st grade) has been struck, pushed, and cursed by a 4th grader who [is also] my 4th grader's bully.  This 4th grader is now try[ing] to get to my little 1st grader… [I] am sick [and] tired of no actions being taken…"

292.   DOE told Grandparent 5 that it would look into the incident.  To the best of Grandparent 5's knowledge, DOE did not ask for written narratives from either JD5 or JD6, nor did it otherwise investigate the incident, in violation of CR-832(III)(B) and N.Y. EDUC. L. § 13(1)(d).

293.   Nobody at DOE ever contacted Grandparent 5 to notify her about whether her allegations were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

294.   Neither JD5 nor JD6 was referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

295.   To the best of Grandparent 5's knowledge, the school did not utilize intervention methods, in violation of CR-A832(IV)(B), and the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

296.   The bullying continued through the rest of the year, indicating that neither Principal 5A nor her designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

297.     A few weeks later, Grandparent 5 was called in for a meeting with DOE and the school's administration.  Principal 5A again claimed to be unaware of the extent of the problem, and admitted that the school did not have records of the previous four years of bullying, all of which had been reported by Grandparent 5.  This again was an admission of the school's violation of CR-A832's various reporting, investigation, and follow-up procedures.  Grandparent 5 told DOE that she would file a police report if the harassment and assaults continued.  Principal 5A suggested only that Grandparent 5 transfer JD5 to a different school.  As noted *supra*, this is a common DOE reaction to bullying, constituting an additional punishment, and imposing an extreme burden, on the victim, in violation of CR-A832(VIII) and N.Y. EDUC. L. § 13(1)(f), which prohibit retaliation against students who report bullying.

298.     When JD5 reached 5th grade, the school had a new principal ("Principal 5B"). JD5's bully was finally put into a different class, but continued bullying JD5 at the beginning of the day during line up and at lunch.  Bully 5 threatened JD5 with violence and verbally harassed her.  Bully 5 even sent notes from her classroom to JD5 in JD5's classroom, containing harassing messages.  This again demonstrated that neither Principal 5A nor her designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N N.Y. EDUC. L. § 13(1)(e).

299.     To the best of Grandparent 5's knowledge, during the past six years, Bully 5 has <u>never</u> been disciplined for her conduct toward JD5 or JD6.  The only preventative steps taken by the school were to separate JD5 from her classmates during recess and lunch.  Instead of taking breaks for recreation during recess and lunch like her classmates, JD5 is assigned "community service" work in the kindergarten, where she assists the teachers.  In essence, the victim is the one who is punished, in violation of CR-832(I)(B) and N.Y. EDUC. L. § 13(1)(f), which prohibit

retaliation against students who report bullying.  The clear and consistent failure to take any corrective action, allowing six years of violent behavior to go undocumented, uninvestigated, and un-remediated is a further violation of CR-A832(III)(A), (III)(B) and (IV)(D), and N.Y. EDUC. L. § 13(1)(d)-(3).

300.    Principal 5B has taken a stronger approach to the bullying.  Still, JD5 was bullied for six years despite repeated cries from JD5 and Grandparent 5 for help.  During this time, JD5's academic performance suffered.  She cried while doing her homework.  She was placed under psychiatric and psychological care, including receiving psychotherapy.  She was diagnosed with severe depression and anxiety disorder, and has developed nervous ticks.  She failed to progress in her academic achievement, beginning in approximately second grade.

**F.    JD7**

301.    JD7 is a 13-year old male student who is enrolled at a middle school in District 31 on Staten Island since September 2014.  From January to June of 2014, JD7 attended another middle school in District 31 (the "previous school").  There, he was bullied, harassed, and discriminated against, including on the basis of his race.

302.    In District 31, only 40% of students are Black or Hispanic.  However, at JD7's previous school during his time there, over 70% of the students were Black or Hispanic.  At JD7's current school, less than 30% of the students at this school are Black or Hispanic.

303.    District 31 experienced 14.7 violent incidents per 1000 students in the 2014-2015 school year.  It also experienced 44 disruptive incidents per 1000 students.  *See* Section K *infra*.

304.    JD7 enrolled at the previous school in or around January 2014.  The bullying, including by teachers at the previous school, began almost immediately.  Teachers at the school regularly called students "animals," "stupid," "idiots," and told them that they would never go to

college.  These insults, made to belittle students, unreasonably and substantially interfered with their mental well-being.  These statements embarrassed and belittled JD7, who reported them to his mother ("Parent 7").

305.    In addition, on a daily basis, students punched JD7, spat on him, and called him racial slurs.  These acts of violence occurred in classrooms and hallways and were witnessed by various school staff, who never intervened.  In contrast, JD7's current school, which has a significantly lower percentage of Black and Hispanic students, has a zero-tolerance policy for misconduct.  School staff regularly and proactively address behavioral issues.  For example, during the 2014-2015 school year, Parent 7 received a phone call from a school administrator of the current school who notified Parent 7 that JD7 had thrown a paper airplane in class, and asked that Parent 7 discipline JD7.

306.    On or about February 4, 2014, the previous school distributed a "sexual offender notice" to students at the school.  The notice, addressed to parents and guardians, stated that a registered sex offender had moved into the neighborhood of the school.  Upon receipt of the notice, students began bullying JD7, claiming that he was a rapist because of a perceived similarity in appearance between JD7 and the registered sex offender.

307.    The following day, on February 5, 2014, Parent 7 contacted the parent coordinator, a school employee, to discuss the inappropriateness of providing the graphic notices directly to young students and the fact that JD7 was being bullied because of the notice.  The parent-coordinator stated that the notice was given to students, rather than their parents, because of administrative convenience and promised to bring the issue to the school's principal ("Principal 7").  Later that day, Principal 7 called Parent 7 to further discuss the notice.  There is no indication that the parent coordinator told Principal 7 about the bullying.  In addition, Principal 7 did not

discuss bullying at any point during the call, despite Parent 7's notifying her of JD7's bullying problem.

308.    On or about March 7, 2014, Parent 7 called the school assistant principal ("Assistant Principal 7") to discuss impediments to JD7's education.  Specifically, Parent 7 mentioned the issue of verbal abuse by teachers and student bullying.  Assistant Principal 7, expressing skepticism of the veracity of Parent 7's allegation, replied "I was not aware of that, but I will follow up with the teacher."

309.    To the best of Parent 7's knowledge, Assistant Principal 7 did not report the allegations of teacher verbal abuse by entering them into OORS or OSI's reporting system, in violation of CR-A21(IV)(B)(1) and (2).

310.    In addition, Assistant Principal 7 did not report Parent 7's allegations of student bullying to DOE, either orally or in writing, in violation of CR-A821(II)(D) and N.Y. EDUC. L. § 13(1)(c)

311.    To the best of Parent 7's knowledge, the school did not investigate Parent 7's allegations within five days, in violation of CR-A832(III)(B) and N.Y. EDUC. L. § 13(1)(d)

312.    Neither Principal 7 nor her designee notified Parent 7 of whether the allegations were substantiated, in violation of CR-A832(III)(E).

313.    To the best of Parent 7's knowledge, the school did not subject any of the bullies to appropriate disciplinary action, in violation of CR-A832(IV)(C).

314.    To the best of Parent 7's knowledge, the school did not take corrective follow-up action to ensure that the bullying ceased, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

315.    On March 28, 2014, Parent 7 called the school to follow up on the March 7, 2014, call and to schedule an in-person meeting for April 4, 2014.  At about this time, students at the previous school began playing a "game" called "yaggling," where a bully would ambush JD7 from behind and pull his hood over his head, limiting JD7's ability to breathe.

316.    At the April 4, 2014 meeting with Assistant Principal 7, Parent 7 complained of the prevalence of "yaggling" at the school.  It occurred throughout school premises, in the presence of teachers and other school staff.  Teachers occasionally asked students to stop, but were generally powerless to end the violence.  In response to Parent 7's allegations regarding "yaggling," Assistant Principal 7 stated in sum or substance, "It is just a game."  To the best of Parent 7's knowledge, the teachers who witnessed "yaggling" and Assistant Principal 7, whom Parent 7 notified, failed to follow the proper procedures regarding school violence.

317.    Specifically, they failed to report the incidents, either orally or in writing, in violation of CR-A821(II)(D) and N.Y. Educ. L. § 13(1)(c)

318.    To the best of Parent 7's knowledge, the school did not investigate Parent 7's allegations within five days, in violation of CR-A832(III)(B) and N.Y. Educ. L. § 13(1)(d).

319.    Neither Principal 7 nor her designee notified Parent 7 of whether the allegations were substantiated, in violation of CR-A832(III)(E).

320.    To the best of Parent 7's knowledge, the school did not subject any of the bullies to appropriate disciplinary action, in violation of CR-A832(IV)(C).

321.    To the best of Parent 7's knowledge, the school did not take corrective follow-up action to ensure that the "yaggling" ended, in violation of CR-A832(IV)(D) and N.Y. Educ. L. § 13(1)(e).

322.    On or about April 11, 2014, Parent 7 filed a complaint against Assistant Principal 7 with 311.  On or about April 29, 2014, Parent 7 sent a letter to Principal 7 outlining all the various issues of bullying, harassment, racial discrimination, and teacher abuse.  Principal 7 did not respond.

323.    In the beginning of May 2014, the parent advocate for District 31 contacted Parent 7 regarding the 311 complaint.  She organized a meeting between Parent 7 and Principal 7.

324.    On or about May 12, 2014, Parent 7 met with Principal 7 to discuss the issue of violence at the school.  Principal 7 did not take any of Parent 7's allegations seriously.  For instance, after Parent 7 complained of bullies stealing JD7's lunch, including his mozzarella sticks, Principal 7 responded, in sum or substance, "I don't know why but mozzarella sticks are a hot commodity."  Principal 7 did not offer any form of remediation or express concern for the fact that, due to lunch thefts, JD7 would go hungry the rest of the day, impairing his ability to focus on his studies.  The only action that Principal 7 agreed to take was to have the guidance counselor speak with JD7.

325.    To the best of Parent 7's knowledge, Principal 7 did not report Parent 7's allegations into DOE's system, in violation of CR-A832(III)(A).

326.    To the best of Parent 7's knowledge, Principal 7 did not investigate Parent 7's allegations within five days, in violation of CR-A832(III)(B) and N.Y. Educ. L. § 13(1)(d).

327.    Neither Principal 7 nor her designee notified Parent 7 of whether the allegations were substantiated, in violation of CR-A832(III)(E).

328.    To the best of Parent 7's knowledge, the school did not take appropriate disciplinary action, in violation of CR-A832(IV)(C).

329.    To the best of Parent 7's knowledge, the school did not take corrective follow-up action to end the school violence, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

330.    At the May 12, 2014 meeting, Parent 7 requested a safety transfer because JD7 no longer felt safe at the school. Principal 7's reply was that a police report was required for the grant of a safety transfer. This was false. Under CR-A449(III)(B), the school principal should ask for a copy of a police report only "[i]f the [school-related safety] incident was criminal in nature." After contacting a number of DOE offices, Parent 7 learned of the correct requirements for safety transfers.

331.    On May 30, 2014, Parent 7 requested the previous school's administration to submit the actual documents necessary for a safety transfer—a safety intake form, an occurrence report, and a safety transfer summary of investigation form—to the Office of Student Enrollment.

332.    On or about June 2, 2014, Parent 7 pulled JD7 out of school due to anxiety, on the advice of his doctor. JD7 began developing physical manifestations of the psychological and physiological difficulties created by the persistent bullying including nail biting, teeth grinding, and severe stomachaches. Although the last day of school was June 26, JD7 never returned to the previous school. Instead, JD7 obtained classwork from the school and did it on his own at home for the remainder of the school year. Parent 7 does not believe that JD7 learned adequately during this time.

333.    On or about June 5, 2014, the Office of Student Enrollment notified Parent 7 that the request for a safety transfer was denied. The following day, Parent 7 spoke with the Assistant Director of the Office of Student Enrollment who claimed that the situation did not warrant a safety transfer but offered a medical transfer, which does not require a principal to determine that there is a safety issue at the school. Parent 7 rejected the medical transfer.

334.    On or about June 10, 2014, Parent 7 called the Senior Director of the Office of Student Enrollment to discuss why her application for a safety transfer was denied.  The Senior Director's response was, in sum or substance, "There are no safety issues in District 31."  Parent 7, out of desperation, began reaching out to community groups, high-level DOE officials and local politicians.

335.    On June 11, 2014, JD7 received an upper gastrointestinal endoscopy and a biopsy. JD7's doctor stated his belief that JD7's medical ailments were a result of bullying and the hostile education environment found at the previous school.  JD7 was ultimately diagnosed with anxiety disorder and placed on an education plan consistent with the requirements of Section 504 of the Rehabilitation Act.

336.    In August 2014, Parent 7 secured a medical transfer for JD7 to his current school.

**G.    JD8**

337.    JD8 is a 9-year old female student who is enrolled in an elementary school in West Harlem, New York County.  She previously attended a different elementary school ("the previous school") in the same district.

338.    JD8's school is in District 5, where 90.9% of students are Black or Hispanic. District 5 experienced 26 violent incidents per 1000 students.  It also experienced over 36 disruptive incidents per 1000 students.  *See* Section K *infra*.

339.    In fall of 2012, during school hours at the school she initially attended, a male student ("Bully 8A") wrote on JD8's pants and called her a "bitch."

340.    JD8's mother ("Parent 8") called the school and asked that the school to speak with Bully 8A's parents.  However, to Parent 8's knowledge, the school did not contact or speak with Bully 8A's parents, in violation of CR-A832(III)(C).

341.     It was only after Parent 8 requested a conference with Bully 8A's parents directly that the school arranged for such a conference.  At this conference, Bully 8A admitted that JD8's allegations were true and apologized to JD8.  Although the school's assistant principal ("Assistant Principal 8A") was present at this meeting, to the best of Parent 8's knowledge, the school did not prepare or file a single incident report, in violation of CR-A832(III)(A).

342.     To the best of Parent 8's knowledge, no complaint was entered into the OORS within 24 hours, in violation of CR-A832(III)(A).

343.     To the best of Parent 8's knowledge, no investigation was conducted—neither JD8 nor the accused student were interviewed, no written statements were prepared, and no witnesses were identified or interviewed—in violation of CR-A832(III)(A), CR-A832(III)(B), and N.Y. EDUC. L. § 13(1)(d).

344.     Neither the school principal ("Principal 8A") nor her designee notified Parent 8 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

345.     To the best of Parent 8's knowledge, JD8 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

346.     To the best of Parent 8's knowledge, the school did not utilize intervention methods, in violation of CR-A832(IV)(B).

347.     To the best of Parent 8's knowledge, the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

348.     To the best of Parent 8's knowledge, neither or designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

349.   In the spring of 2013, JD8 attended an after-school program at her school that was operated by DOE.

350.   On or about July 15, 2013, while attending the after-school program, program officials sent JD8 to the bathroom without an adult escort despite the program's policy of requiring staff to escort minor students to the bathroom.  The purpose of this policy is to ensure the safety of the very young students, who are vulnerable to attacks when they travel alone.  It is far safer for them to travel with an adult.

351.   While in the bathroom, two female students ("Bully 8B" and "Bully 8C"), who were unknown to JD8 and who appeared to be approximately the same age as JD8, grabbed JD8 and pushed her into a bathroom stall.  The female students held JD8 in the stall and one of the female students grabbed and pulled down JD8's pants.  One of the female students attempted to place her mouth on JD8's exposed groin area.

352.   Parent 8 immediately removed JD8 from the program after JD8 reported incident to her.  Parent 8 contacted the program to report the incident and requested that officials investigate the incident.  The officials claimed that they would conduct the investigation.  However, Parent 8 parent never heard from the officials regarding the status of the investigation, in violation of CR-A832(III)(E).

353.   To the best of Parent 8's knowledge, school officials did not request a written narrative of the incident from JD8, in violation of CR-A832(III)(B).

354.   To the best of Parent 8's knowledge, officials did not take any corrective action reasonably designed to prevent a recurrence of the assault, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

355.     To the best of Parent 8's knowledge, the complaint was not entered into the OORS within 24 hours, in violation of CR-A832(III)(A); no investigation was conducted—neither JD8 nor the accused student were interviewed, no written statements were prepared, and no witnesses were identified or interviewed—in violation of CR-A832(III)(A), CR-A832(III)(B), and N.Y. EDUC. L. § 13(1)(d)

356.     Neither Principal 8A nor her designee notified Parent 8 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

357.     To the best of Parent 8's knowledge, JD8 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

358.     To the best of Parent 8's knowledge, the school did not utilize intervention methods, in violation of CR-A832(IV)(B).

359.     To the best of Parent 8's knowledge, the accused students were not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

360.     On or about July 15, 2013, Parent 8 brought the issue to the attention of the NYPD. The NYPD indicated that Parent 8 should file an incident report with the after-school program.

361.     On or about July 24, 2013, Parent 8 contacted the after-school program again to follow-up with the incident, and inquire about the status of their investigation, and spoke with a school official.  The school official stated, in sum and substance, "the case is closed because we did not find anything."

362.     To the best of Parent 8's knowledge, the program officials did not open any investigation as to the incident or to ascertain the identity of the female students who assaulted, harassed, and abused JD8, or take any follow-up actions in response to any of Parent 8's complaints, in violation of CR-A832(III)-(IV) and N.Y. EDUC. L. § 13(1)(d)-(e).

363.   In the fall of 2014, JD8 enrolled in another elementary school in East Harlem, New York County.

364.   In or about February 2016, a group of male students repeatedly harassed, intimidated, and taunted JD8 on school grounds.  A male student ("Bully 8D") held up his middle finger to JD8. A second male student ("Bully 8E") repeatedly approached JD8 and called her "a faggot."

365.   Separately, JD8 suffered ongoing harassment and intimidation at lunch.  A female student ("Bully 8F") repeatedly approached JD8 during lunchtime and whispered abusive statements in JD8's ear.  JD8 reported to Parent 8 that these statements intimidated her.

366.   To the best of Parent 8's knowledge, JD8 reported these incidents to a teacher.  In addition, Parent 8 requested a conference with JD8's teacher and the principal of the new school ("Principal 8B") to discuss the pervasive harassment and intimidation occurring inside the school. At the conference, the teacher stated, in sum and substance, that she had some knowledge that these incidents occurred but that she "did not think they were a big deal or understand the extent to which they were occurring."

367.   To the best of Parent 8's knowledge, the teacher never reported any of these incidents to Principal 8B or other school officials, in violation of CR-A832(II)(D).

368.   To the best of Parent 8's knowledge, school officials did not request a written narrative of the incident from JD8, in violation of CR-A832(III)(B).

369.   To the best of Parent 8's knowledge, school officials did not take any corrective action reasonably designed to prevent a recurrence of the assault, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

370.   To the best of Parent 8's knowledge, the complaint was not entered into the OORS within 24 hours, in violation of CR-A832(III)(A); no investigation was conducted—neither JD8 nor the accused student were interviewed, no written statements were prepared, and no witnesses were identified or interviewed—in violation of CR-A832(III)(A), CR-A832(III)(B), and N.Y. EDUC. L. § 13(1)(d).

371.   Neither Principal 8B nor her designee notified Parent 8 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

372.   To the best of Parent 8's knowledge, JD8 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

373.   To the best of Parent 8's knowledge, the school did not utilize intervention methods, in violation of CR-A832(IV)(B).

374.   To the best of Parent 8's knowledge, the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

375.   As a result of the aforementioned incidents, JD8 suffered from anxiety attacks and fear of socializing with others.  JD8 began eating her lunch in the bathroom because she did not want to be around other students and has since begun acting in a withdrawn, disinterested, and sullen manner.

**H.    <u>JD9</u>**

376.   JD9 is a 12-year old male student.  He is autistic and attends a Bronx elementary school in District 75.

377.   District 75 is a citywide school district that specifically caters to the needs of students who are on the autism spectrum.

378.     As a result of JD9's autism, he does not adapt well to sudden changes.  Prior to March 2016, JD9's regular routine was to take the school bus to school and have breakfast in the school cafeteria, which was supervised by JD9's teacher.  However, at the beginning of March, JD9's school bus route changed, requiring JD9 to take an earlier bus.

379.     On March 10, 2016, JD9 arrived at his school cafeteria earlier than normal, at about 7:50 AM.  At this time, the cafeteria was supervised not by JD9's teacher, but instead by a teacher unfamiliar to JD9.

380.     In the cafeteria, JD9 began engaging in horseplay with another student.  There was no indication that either student was physically harming the other.

381.     The teacher ordered JD9 and the other student to stop playing.  JD9 did not stop. As a result, the teacher began to physically restrain JD9.  She held him by the arms and neck.  JD9, who did not understand the situation, began to resist.  This led the teacher to struggle with JD9, utilizing an increasing amount of force to restrain JD9.  JD9 received a number of significant cuts, scratches, and bruises on both arms and his neck.  Another staff member was needed to stop this incident.

382.     Shortly thereafter, JD9 was taken to the nurse's office.  At around 9:00 AM, JD9's father, ("Parent 9A"), received a call from the school, informing him that there had been an incident.  At around 9:30 AM, Parent 9A received another call from the school nurse, who explained that JD9 was a bit shaken up and asked Parent 9A to come pick him up.

383.     Parent 9A arrived at the school at about 10:00 AM, picked up JD9 in the main office, and went to the nurse's office to inquire about the incident.  The nurse claimed that JD9 had been disruptive and had threatened the teacher.  JD9 also gave an oral account of the incident.

384.    The following day, on March 11, 2016, JD9's mother ("Parent 9B"), called the school principal ("Principal 9") to discuss the incident, and Principal 9 quickly apologized.  Parent 9B requested a meeting with the teacher involved in the incident and all other witnesses, but Principal 9 denied the request.  Principal 9 claimed that Parent 9B could not speak with the teacher because there was an ongoing investigation.

385.    The following week, Parent 9A asked the school about the progress of the investigation.  The school informed him that OSI was conducting the investigation and provided him with the case number.  Yet, when Parent 9A contacted OSI, they informed him that they could not speak to him about the investigation and that he could only obtain information from the school.

386.    On March 28, 2016, Parent 9B spoke to JD9's teacher.  JD9's teacher claimed that she could not discuss the investigation and could not provide any information about the timeline of the investigation.  All JD9's teacher could offer about the investigation was that "it is a process."

387.    As of April 5, 2016, nearly a month after the incident, no one has interviewed JD9 as part of the investigation or obtained his written statement, in violation of CR-A420(VI)(B)(1).

388.    To date, neither JD9's school nor OSI have provided JD9's parents with any information regarding the investigation.  JD9's parents still do not know if the investigation has concluded and, if it has, what the results of the investigation are, a possible violation of CR-A420(VI)(D).

I.    **JD10**

389.    JD10 is a 13-year old female student enrolled in a middle school in the Upper West Side, New York County.

390.    JD10's school is in District 3, where 58.6% of students are Black or Hispanic. District 3 experienced 21 violent incidents per 1000 students.  It also experienced 47 disruptive incidents per 1000 students.  *See* Section K *infra*.

391.    On or about December 14, 2015, JD10 was attacked by her science teacher as she was entering the classroom.  The attack appears to have been triggered when JD10 and two of her friends, who were horsing around on their way to class, accidentally bumped into her teacher. JD10's teacher pounced upon JD10, first striking her in the face and then knocking her to the ground and pinning her down.

392.    Once the teacher had JD10 pinned, she pressed down on JD10's upper chest or neck with her knee and squeezed JD10's throat with her hands, choking her.  JD10, who suffers from asthma, could not breathe and turned red.  Two of JD10's friends ("Friend 10A" and "Friend 10B"), came to JD10's assistance but could not pull the teacher off of JD10.  Other teachers saw the attack but failed to intervene.  One teacher called the assistant principal ("Assistant Principal 10"), who, rather than try to pull Teacher 10 off of the eighth grade student, pleaded with her to let JD10 go.  Teacher 10 shouted back, in sum and substance, that she wanted to punch some students in the school, and refused to remove her knee from JD10's chest or her hands from JD10's throat.  While Assistant Principal 10 was trying to coax Teacher 10 into releasing JD10, Assistant Principal 10 held JD10's hand while the eighth grader pleaded to him that she could not breathe. Teacher 10 still did not let up.  Eventually, Teacher 10 released JD10.

393.    The attack lasted several minutes and JD10 was severely traumatized by the incident.  She ran into the bathroom and called her mother ("Parent 10") crying.  Parent 10 came to the school immediately.

394.    When Parent 10 arrived at the school, it was immediately clear to her that her daughter had been involved in a very serious incident. JD10 had bruises on her chest, arms, and neck.  There were fingermarks around her throat, and fingernail imprints on her neck and face where Teacher 10 had broken through JD10's skin.  Parent 10 took pictures of these injuries.

395.    The school asked for statements from witnesses.  Teacher 10 and at least one other teacher—who was not present when the altercation started, and was later found to be not credible by an independent finder of fact—said that JD10 started the incident.  JD10, Friend 10A, Friend 10B, and other students claimed that Teacher 10 had attacked JD10.  Moreover, even if JD10 had started the altercation—which she had not—these witnesses described Teacher 10's response as excessive and unnecessary.

396.    Faced with these conflicting reports, and with a student accusing a teacher of a violent attack, the school should have begun two investigations:  one under CR-A420 (for incidents of teacher-on-student violence), and another under CR-A443 (for student disciplinary procedures).  As discussed *infra*, the school began only one investigation, into JD10's conduct pursuant to CR-A443.

397.    However, to the best of Parent 10's knowledge, the school never conducted an investigation of Teacher 10's role in the incident, in violation of CR-A420 and N.Y. EDUC. L. §§ 10 et seq.  The school did not inform Parent 10 of whether JD10's allegations against Teacher 10 were substantiated or not substantiated, in violation of CR-A420(VI)(D).

398.    Instead, school officials sought only to blame JD10 for the incident.  She was given a sixty-day Superintendent's suspension, which she appealed.

399.    Shortly after the incident, in mid-December 2015, Parent 10 called OSI to lodge a complaint against Teacher 10.  As of this filing on April 6, 2016, nearly four months later, no one

from DOE has called Parent 10 to report on the outcome of an investigation of Teacher 10, in violation of CR-A420(VI)(D). Upon information and belief, this is because DOE has not conducted any investigation of Teacher 10 at all, in violation of various provisions of CR-A420 and N.Y. EDUC. L. § 10 et seq. When Parent 10 called the school to ask about the status of the investigation, she was told that the school would not provide an update.

400.    On or about January 12, 2016, JD10 was afforded a DOE suspension hearing before an independent hearing officer as finder of fact. The hearing officer concluded that JD10's version of events was credible, and that Teacher 10's version, which was shared by other school officials, was not credible. The charge against JD10 was dismissed on the merits and the suspension expunged from her record. In other words, the independent finder of fact found that JD10 had not attacked Teacher 10.[18]

401.    The school had previously rejected JD10's allegations that she was attacked by Teacher 10, and instead accused JD10 of being the attacker. On information and belief, the school had to that point not conducted an investigation into Teacher 10's conduct pursuant to CR-A420. When an independent DOE fact finder found the school's theory unsubstantiated and not credible, the school should have, *at that point* at the very least, taken steps pursuant to CR-A420.

402.    Yet to the best of Parent 10's knowledge, no investigation of Teacher 10 has taken place—not by the school, by OSI, or DOE— in violation of CR-A420 and N.Y. EDUC. L. §§ 10 et seq., even after the hearing officer's findings supported the likelihood that Teacher 10 had acted improperly.

403.    Teacher 10 continues to work at the school, although she no longer teaches JD10's class. As a result of the attack and the suspension, JD10 missed a month of school. She was

---

[18] Tragically, this determination came after school officials had JD10 arrested for her role in the incident, although JD10 was never convicted and the matter was successfully adjusted by the Department of Probation.

assigned to an alternative education site for that month, but she nevertheless failed three classes that semester.  She had never previously failed a single class.

## J.    <u>JD11</u>

404.    JD11 is a 15-year old female student who is enrolled in a high school in the Bronx.

405.    She experienced violent at her former middle school, in District 10, and her previous high school, in District 7.  In District 10, 85.1% of students are Black or Hispanic.  It experienced 18 violent incidents per 1000 students and 30 disruptive incidents per 1000 students.  In District 7, 96.5% of students are Black or Hispanic.  It experienced 27.8 violent incidents per 1000 students and 62 disruptive incidents per 1000 students.  *See* Section K *infra.*

406.    In 2012, JD11 transferred from a private school to public school in part due to the fact that she was bullied in private school.  DOE had knowledge that JD11 was transferred on account of being a victim of bullying.  DOE conducted an evaluation of JD11 and found that she suffered from social and emotional irregularities, and developed an individualized education program ("IEP") for her.

407.    In and between 2012 and 2015, JD11 was enrolled in a junior high school in Bronx, New York.  During that time period, a female student ("Bully 11A") repeatedly assaulted, harassed, and intimidated JD11.  JD11 reported these incidents to her parent ("Parent 11").

408.    Parent 11 contacted the school principal ("Principal 11A") to report the incidents and file complaints.  Despite knowing about JD11's history of susceptibility to bullying, the school's response was wholly inadequate, causing Bully 11A's violent aggression to escalate over time throughout junior high school, and even continuing into high school.

409.    To the best of Parent 11's knowledge, the Principal 11A did not prepare or file a single incidence report, in violation of CR-A832(III)(A).

410.    To the best of Parent 11's knowledge, Principal 11A did not otherwise investigate any of the incidents, in violation of CR-A832(III) and N.Y. EDUC. L. § 13(1)(d).

411.    Neither the principal nor her designee notified Parent 11 of whether the allegations were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

412.    To the best of Parent 11's knowledge, Principal 11A failed to take any follow-up or corrective actions in response to any of Parent 11's complaints, in violation of CR-A832(IV) and N.Y. EDUC. L. § 13(1)(e).

413.    To the best of Parent 11's knowledge, Principal 11A did not attempt to contact any of the students' parents who harassed JD11, in violation of CR-A832(III)(C) or otherwise investigate the incident, in violation of CR-A832(III)(B) and N.Y. EDUC. L. § 13(1)(d).

414.    To the best of Parent 11's knowledge, Principal 11A failed to take any corrective actions reasonably designed to end the harassment, bullying, and violence against JD11, in violation of CR-A832(IV) and N.Y. EDUC. L. § 13(1)(e).

415.    In the fall of 2015, JD11 enrolled in a high school in Bronx, New York. Bully 11 enrolled in the same high school, and was assigned to the same class as JD11.

416.    In or about October 2015, a male student ("Bully 11B"), who was friends with Bully 11A, approached JD11 and verbally harassed her. Bully 11B repeatedly called JD11 fat and ugly.

417.    Parent 11 went to the school to make a complaint. Moreover, Parent 11 asked the high school principal ("Principal 11B") to contact Bully 11B's parents.

418.    To the best of Parent 11's knowledge, Principal 11B did not prepare or file a single incidence report, in violation of CR-A832(III)(A).

419.    To the best of Parent 11's parent's knowledge, Principal 11B did not otherwise investigate the incident, in violation of N.Y. EDUC. L. § 13(1)(d).

420.    Neither the principal nor her designee notified Parent 11 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

421.    To the best of Parent 11's knowledge, Principal 11B failed to take any follow-up actions in response to any of JD11's parent's complaints or otherwise take corrective action, in violation of CR-A832(IV) and N.Y. EDUC. L. § 13(1)(e).

422.    Between October 2015 and January 2016, classmates continues to harass and intimidate JD11.  They continued to belittle and shame her.

423.    Specifically, on or about January 4, 2016, a group of male and female students threatened to attack JD11.  Fearful for her safety, JD11 met with her guidance counselor to report the threat.  Immediately upon JD11's leaving the guidance counselor's office, the students jumped JD11 and attacked her in an adjacent classroom during school hours.

424.    The students began grabbing, punching, striking, and kicking JD11.  They threw JD11 to the ground where they continued to assault her.  While the group of students were attacking JD11, a teacher was present in the classroom, but took several minutes before making an attempt to break up the attack or come to JD11's assistance.

425.    It took school safety personnel between fifteen and twenty minutes to respond to the incident.

426.    Principal 11B knew, or should have known, that JD11 had a history of being bullied by these same students, and that JD11 had reported a threat of an attack to the guidance counselor just moments before the attack occurred.  Despite this, Principal 11B did not treat JD11 as the victim of school violence or bullying.  Instead, Principal 11B told Parent 11 that the incident would

be treated as a fight between students.  JD11 was suspended for five days.  Only two of her attackers faced discipline, and, on information and belief, were suspended for only three days.  On information and belief, one or more parents of the attackers threatened Principal 11B with physical violence.

427.    Parent 11 asked Principal 11B what had happened, and why the school was suspending JD11 when she was the victim of the incident.  Principal 11B stated, in sum and substance, that Parent 11 should not question the principal or her rationale for the suspension, and gave no further response.

428.    Principal 11B told Parent 11 that she would investigate the incident, but never contacted JD11 with any further updates, in violation of CR-A832(III)(E).

429.    To the best of Parent 11's knowledge, Principal 11B did not otherwise investigate the incident, in violation of CR-A832(III) and N.Y. EDUC. L. § 13(1)(d).

430.    To the best of Parent 11's knowledge, Principal 11B did not prepare or file a single incidence report, in violation of CR-A832((III)(A).

431.    To the best of Parent 11's knowledge, Principal 11B failed to take any follow-up or corrective actions in response to any of Parent 11's complaints, in violation of CR-A832(IV) and N.Y. EDUC. L. § 13(1)(e).

432.    On or about January 5, 2016, one of the students in the group that attacked JD11 sent JD11 a video of the assault.  JD11 showed Parent 11 the video.  On or about January 8, 2016, Parent 11 contacted the high school principal to show her the video, but Principal 11B would not meet with Parent 11.  Parent 11 then sought the incident report from the school safety officer, but the school safety officer refused to provide it.

433.    The students thereafter posted the video to Facebook, in an act of cyberbullying against JD11.

434.    On or about January 11, 2016, members of the group of students that attacked JD11 threatened to harm JD11 because she reported the assault to the school and to the NYPD.

435.    Parent 11 contacted Principal 1B again to report the students' threats to JD11. Principal 11B did not respond.  Parent 11 asked members of the NYPD to escort JD11 to and from school because of these threats.

436.    To the best of Parent 11's knowledge, Principal 11B did not prepare or file a single incidence report regarding the continued harassment and threats, in violation of CR-A832(III)(A).

437.    To the best of Parent 11's knowledge, Principal 11B did not attempt to contact any of the students' parents who harassed JD11, in violation of CR-A832(III)(C) or otherwise investigate the incident, in violation of CR-A832(III)(B) and N.Y. EDUC. L. § 13(1)(d).

438.    Neither the principal nor her designee notified Parent 11 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

439.    To the best of Parent 11's knowledge, Principal 11B failed to take any corrective actions reasonably designed to end the violence against JD11, in violation of CR-A832(IV) and N.Y. EDUC. L. § 13(1)(e).

440.    Between January 4 and February 9, 2016, JD11 was the victim of ongoing cyberbullying from the same group of students.  The students posted information online and sent JD11 harassing text messages, ridiculing and demeaning her, and threatening more violence. Parent 11 made several visits to the school to show Principal 11B, but Principal 11B dismissed her, refused to have any substantive discussion with her, failed to initiate any investigation, and

failed to take any further corrective action, in violation of CR-A832(III)-(IV) and N.Y. Educ. L. § 13(1)(d)-(e).

441.   Further, to the best of Parent 11's knowledge, Principal 11B and teacher did not document the incident or Parent 11's repeated complaints in any way, in violation of CR-A832(III)(A).

442.   Finally, on or about February 9, 2016, Parent 11 took JD11 out of school because of the continued assault, harassment, and threats.

443.   With no other alternative, on or about February 9, 2016 Parent 11 contacted DOE directly and initiated the school safety transfer process pursuant to CR-A449.  DOE indicated to Parent 11 that she would need Principal 11B and officials to certify, with documentation, that there was a safety issue present in the school before the safety transfer application was approved.

444.   Approximately a few days later, Parent 11 contacted Principal 11B to follow up on her school safety transfer request.  Principal 11B attempted to deter Parent 11 from pursuing a school safety transfer and stated, in sum and substance, that the school would investigate and remedy the safety issue.  Parent 11 requested that Principal 11B give her and DOE the necessary paperwork to effectuate the safety transfer.  Principal 11B refused to do so.

445.   To the best of Parent 11's knowledge, Principal 11B never filed or prepared documentation or incidence reports for DOE and Parent 11's school safety transfer application, in violation of CR-A449(III)(C).

446.   On or about March 4, 2016, an attorney, on behalf of JD11's parent, contacted the school and DOE to follow up with JD11's parent's school safety transfer application.  Only after his request did the school provide DOE with required transfer paperwork from the school.  On

information and belief, any reports of the January 4, 2016, incident, and all other harassment and bullying, incorrectly described JD11's victimization.

447.    To the best of Parent 11's knowledge, Principal 11B and school officials did not turn over transfer paperwork, school records, or documentation until her attorney requested it, despite Parent 11's efforts and communications with the school regarding this matter.

448.    As a result of the foregoing incidents and delay on behalf of the school and Principal 11B, JD11 missed approximately four weeks of school before she was granted a transfer to another high school.

449.    As a result of the foregoing incidents, JD11 suffered anxiety and loss of confidence in the school setting

## K.    Other Instances of School Violence

450.    Several recent incidents of student-on-student and teacher-on-student violence in the New York City public schools reported in the media further confirm both the widespread nature of the problem and the urgent need for class relief.

451.    Last year, five DOE employees stood idly by at a public school in Long Island City, Queens while a group of eighth grade students coerced younger students to square off with one another in a "fight club."  A girl who refused was dragged down the hallway by one of the organizers and slammed into a wall.[19]

452.    This year, a third-grader in a public school on the Lower East Side reported being bullied by eighth graders, who aggressively pushed him up against a wall and subjected him to homophobic slurs.  The bullies also attempted to humiliate the victim by shoving his face into their

---

[19] Ben Chapman et al., *4 Teachers, Students 'Removed' From Queens School Where 8th-graders Beat Up 7-Year Old Girl Over Refusal to Fight Other Kids*, N.Y. DAILY NEWS, Mar. 26, 2015, http://www.nydailynews.com/new-york/education/4-teachers-removed-school-teens-beat-girl-7-article-1.2163188.

crotch.  The bullies were reportedly not disciplined, and their parents were not notified of the incident by the school.[20]

453.    Another parent reported that the school principal at a Staten Island public school falsely told her that her disabled son was "bumped out of his chair" by a teacher's aide, when in fact the teacher's aide had grabbed the student and thrown him to the floor.[21]

454.    Recently, a teacher in Harlem has been charged with criminally assaulting a seven-year old student by throwing him across a hallway.  The teacher was "reprimanded" for corporal punishment, verbal abuse of students, and "using bad judgment."  This was not the teacher's first incident, as he had a history of violence towards schoolchildren.[22]

## L.    Citywide Statistics

455.    Instances of in-school violence, including those described in detail *supra*, significantly and disproportionately harm Black and Hispanic students, who comprise 68% of New York City public schools.[23]

---

[20] Samantha Silva, *Parent Opinion: Mayor de Blasio Needs to Give New Yorkers Real Facts About Violence in Our Schools*, 74 MILLION, Feb. 18, 2016, https://www.the74million.org/article/parent-opinion-mayor-de-blasio-needs-to-give-new-yorkers-real-facts-about-violence-in-our-schools.

[21] Aaron Dickens, *Mother Claims Son Was Abused at School*, NY1, Mar. 22, 2016, http://www.ny1.com/nyc/staten-island/news/2016/03/23/mother-claims-son-was-abused-at-school.html.

[22] Ben Chapman & Shayna Jacobs, *Harlem Teacher Held on $1G Bail on Charges of Assaulting 7-year-old Student*, N.Y. DAILY NEWS, Feb. 25, 2016, http://www.nydailynews.com/new-york/nyc-crime/harlem-teacher-held-1g-bail-assaulting-7-year-old-article-1.2543321.

[23] Statistics and figures referenced in this Complaint were obtained and derived from publicly available datasets provided by New York State and New York City.  They include:  (1) N.Y. State Educ. Dep't, *NYC Violent and Disruptive Incidents 2014-2015*, http://www.p12.nysed.gov/irs/school_safety/2015/DATA/VADIR-INCIDENTS-NYC-2015.xls; (2) N.Y. State Educ. Dep't, *NYC Violent and Disruptive Incidents 2013-2014*, http://www.p12.nysed.gov/irs/school_safety/2015/VADIR_INCIDENTS_NYC_2014.xls; (3) N.Y. State Educ. Dep't, *2015-16 Persistently Dangerous Schools Designation Based on Violent and Disruptive Incident Reporting*, http://www.p12.nysed.gov/sss/documents/FINALPDSCHOOLSLIST1516.pdf; (4) N.Y.C. Dep't of Educ., *Demographic Snapshots*, http://schools.nyc.gov/NR/rdonlyres/20056B95-8351-4E45-B8A1-9901B4B6A93B/0/DemographicSnapshot201112to201516Public_FINAL.xlsx.; (5) N.Y.C. Dep't of Educ., *Cohorts of 2001 Through 2011 (Classes of 2005 through 2015) Graduation Outcomes*, http://schools.nyc.gov/Accountability/data/GraduationDropoutReports/default.htm; and (6) N.Y.C. Dep't of Educ., *New York State Common Core English Language Arts (ELA) & Mathematics Tests Grades 3 – 8 New York City Results*, http://schools.nyc.gov/Accountability/data/TestResults/ELAandMathTestResults.

456.    There is a strong correlation—with a coefficient of determination[24] of 0.94—between higher rates of Black and Hispanic student enrollment and higher rates of violent incidents when schools are ranked from highest to lowest enrollment percentages of Black and Hispanic students and grouped into quintiles.

457.    For the 2014-2015 school year, across the city's thirty two geographic school districts, the citywide average for violent incidents[25] was 15 incidents per 1000 students. Additionally, the citywide average for disruptive incidents[26] was 32 incidents per 1000 students.

458.    Fifteen districts were less violent than the citywide average.  They experienced 11 violent incidents and 28 disruptive incidents per 1000 students.  These districts had fewer Black and Hispanic students than the city's average; only 51% of students in these less-violent schools are Black or Hispanic.

459.    There were seventeen school districts more violent than the citywide average.  They experienced 21 violent incidents and 40 disruptive incidents per 1000 students.  In these districts, 85% of students are Black or Hispanic.

---

[24] The coefficient of determination is a measure of the proportion of variation in the data that can be explained by the regressor variable.  Where the correlation is between a variable and the rate of violent incidents, only violent incidents (and not other disruptive incidents) are considered.  A perfect correlation would have a coefficient of determination of 1.  Here, the coefficient of determination of 0.94 indicates that 94% of the variation in school violence can be explained by the enrollment percentages of Black and Hispanic students.

[25] The term "violent incident" refers to serious crimes and incidents involving weapons that have been reported to the N.Y. State Education Department's Violent and Disruptive Incident Reporting ("VADIR") system.  It includes homicides, forcible sex offenses, other sex offenses, robbery, assault with serious physical injury, arson, kidnapping, assault with physical injury, reckless endangerment, minor altercations with weapons, intimidation with weapons, harassment with weapons, menacing with weapons, bullying with weapons, burglary with weapons, criminal mischief with weapons, larceny or other theft with weapons, riots with weapons, and weapons possession.  It does not include other disruptive incidents.

[26] The term "other disruptive incident" refers to incidents reported pursuant to VADIR that are neither serious crimes nor involve weapons, but still contribute significantly toward the creation of a hostile education environment. Other disruptive incidents include minor altercations without weapons, intimidation without weapons, harassment without weapons, menacing without weapons, bullying without weapons, burglary without weapons, criminal mischief without weapons, larceny or other theft without weapons, bomb threats, false alarms, riots without weapons, drug possessions, alcohol possessions, and other disruptions.

460.    In the eleven geographic school districts where at least 90% of students are Black or Hispanic, the rate of violent incidents jumped to 22 violent incidents per 1000 students, nearly 1.5 times the city's average.  These eleven districts also averaged 44 disruptive incidents per 1000 students.  However, the six districts with fewer than 50% Black and Hispanic students experienced only 11 violent and nearly 29 disruptive incidents per 1000 students.

461.    District 23 in Brooklyn, which includes Ocean Hill, Brownsville, and parts of East New York, was the most violent district in the city.  District 23 students experienced 36 violent incidents per 1000 students—2.4 times the citywide average—and 33 disruptive incidents per 1000 students.  It has the highest percentage of Black and Hispanic students in the city (97%).

462.    District 26 in northeast Queens, which includes Bayside, Fresh Meadows, and Jamaica Estates, was the least violent district in the city.  It also had the lowest percentage of Black and Hispanic students in the city (29.2%).  District 26 students experienced less than 6 violent incidents and 22 disruptive incidents per 1000 students.

463.    The racial disparity in rates of in-school violence cannot be explained by other variables.  For example, the correlation between the percentage of students living below the poverty line and the rates of violent incidents in schools is much weaker than that between race and violent incidents.  The coefficient of determination is only 0.68 when schools are ranked from highest to lowest poverty levels and grouped into quintiles.

464.    Higher rates of in-school violence are not only correlated with higher enrollments of Black or Hispanic students; they are also correlated with lower rates of educational attainment. Based on measures of academic proficiency and graduation rates, students cannot learn in violent education environments.

465.    In public elementary and middle schools ("K-8 schools"), higher rates of in-school violence are tightly correlated with lower ELA-Math proficiency.[27]   The coefficient of determination is 0.98 when schools are ranked from highest to lowest rates of violent incidents and grouped into quintiles.  In the 2014-2015 school year, the citywide ELA-Math proficiency rate was 33%.  Only 8% of students at the ten most violent K-8 schools—where students experienced 148 violent incidents per 1000 students, nearly ten times the citywide average—are ELA-Math proficient.

466.    In the most violent quintile of K-8 schools (comprised of 251 schools), only 18% of students were ELA-Math proficient.  These schools experienced 52 violent incidents per 1000 students.

467.    As each successive quintile's rate of violent incidents decreases, rates of ELA-Math proficiency increase.  The least violent quintile of K-8 schools (comprised of 251 schools) had a proficiency rate of 47%.  These schools experienced only 1 violent incident per 1000 students.

468.    Conversely, higher rates of ELA-Math proficiency are also tightly correlated with lower rates of in-school violence.  The coefficient of determination is 0.97 when schools are ranked from lowest to highest proficiency and grouped into quintiles.  The most ELA-Math proficient quintile of K-8 schools had a proficiency average of 64%.  These schools experienced only 7 violent incidents per 1000 students.  As proficiency rates decreased, rates of violent incidents correspondingly increased.  The quintile of K-8 schools with the lowest ELA-Math proficiency rate—averaging only 9%—experienced about 35 violent incidents per 1000 students.

469.    The correlation between higher rates of violent incidents and lower educational attainment continues past K-8 schools and into high school.  There is a tight correlation between

---

[27] "ELA-Math proficiency" refers to schools' average proficiency rate in English language arts and math.

higher rates of violent incidents and lower rates of four-year high school graduation in public high schools. The coefficient of determination is 0.94 when schools are ranked from the highest to the lowest rates of violent incidents and grouped into quintiles. The ten most violent public high schools experienced 72 violent incidents per 1000 students. These schools also had the lowest educational outcomes in the city, with a four-year graduation rate of 53% and a dropout rate of 16%.

470.    The most violent quintile of high schools (comprised of 90 schools) experienced 34 violent incidents per 1000 students. These schools had an average four-year graduation rate of 58% and a dropout rate of 14%. As the rate of violent incidents steadily decreased in each successive quintile, four-year graduation rates increased and dropout rates decreased. The least violent quintile of high schools (comprised of 89 schools), experiencing only 2 violent incidents per 1000 students, had a four-year graduation rate of 82% and a dropout rate of only 6%.

471.    Conversely, higher graduation rates are also strongly correlated with lower levels of violence. The coefficient of determination is 0.89 when schools are ranked from highest to lowest graduation rates and grouped into quintiles. The quintile of schools with the highest graduation rates—with an average graduation rate of 95% and a dropout rate of 1%—experienced only 5 violent incidents per 1000 students. However, as graduation rates decreased in successive quintiles, rates of violent incidents increased. The quintile of high schools with the lowest graduation rates—with an average graduation rate of 35% and a dropout rate of 20%—experienced 19 violent incidents per 1000 students.

## CONCLUSION

472.    As described in detail *supra*, the experiences of the Named Class Plaintiffs show Defendant's custom and practice of deliberate indifference to in-school violence: (1) school

administrators routinely fail to file incident reports; (2) school administrators routinely fail to seek a full investigation of the facts, including by failing to ask for or obtain narrative descriptions of in-school violence from victim and perpetrator; (3) school administrators routinely fail to take corrective actions reasonably intended to end in-school violence; and (4) school administrators take retaliatory and punishing actions toward students who report in-school violence, all in direct contravention of DASA, CR-A832, CR-A420 and CR-A421.

473.    DOE's failure to comply with DASA and the Chancellor's Regulations is not limited to a particular school district or a particular borough.  Schools across the city, in all five boroughs, regularly ignore allegations of bullying and rely on a "blame the victim" approach that only exacerbates violence.  Based on these actions and inactions, in violation of lawful procedure, DOE is denying Named Class Plaintiffs, and other students similarly situated, with their enjoyment of a constitutionally protected right:  to a free public education in a safe educational environment.

474.    Defendants' custom and practice of deliberate indifference disproportionately impacts Black and Hispanic students.  These students are often enrolled in schools with unusually high rates of violent incidents.  Defendants' failures to address the violence, as required by DASA and the Chancellor's Regulations, disproportionately deprive Black and Hispanic students of their right to free education.

## FIRST CLAIM FOR RELIEF
### (Violation of 42 U.S.C. § 1983)
### (Due Process Clause)

475.    Plaintiffs repeat and re-allege paragraphs 1 through 471 as if fully set forth herein.

476.    Under N.Y. Educ. L. § 3202, the State of New York confers an entitlement upon Named Class Plaintiffs and all members of the class they represent to receive a free public education.

477.    Such right is a property and/or liberty interest, within the meaning of the Fourteenth Amendment of the United States Constitution.

478.    Under DASA, the State of New York further entitles Plaintiffs and all members of the class they represent to obtain that education in a school environment that is free of harassment and bullying by employees or students on school property or at a school function.

479.    Accordingly, Plaintiffs and members of the class have a property and/or liberty interest[28] in such a school environment within the meaning of the Fourteenth Amendment of the United States Constitution.

480.    Moreover, the New York State Legislature has expressly decreed that students' ability to obtain the free public education to which they are entitled is directly and profoundly compromised by incidents of discrimination or harassment including bullying, taunting or intimidation.

481.    This legislative decree is supported by the extremely tight correlations between higher rates of violent incidents and (1) lower rates of ELA-Math proficiency in K-8 schools and (2) lower rates of graduation in high schools.

482.    This legislative decree is also supported by the experience of Named Class Plaintiffs, whose children's educations have been compromised as a result of being subjected to hostile education environments.  Named Class Plaintiffs and members of the class are being deprived of their protected property interest in education, through exposure to a hostile education environment in which they routinely experience bullying, taunting and intimidation, including physical violence and verbal abuse, at the hands of fellow students and teachers.

---

[28] Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).

483.   Such ongoing, pervasive and severe bullying, taunting and intimidation is occurring during school hours, on school grounds, and/or at school functions.

484.   Defendants are statutorily mandated to implement policies and procedures to prevent such harassment and bullying.  DASA, and its implementing Chancellor's Regulations, apply to each and every act of bullying and harassment that occurs during school hours, on school grounds and at school functions.  Defendants have the ability to prevent the foregoing deprivation through enforcement of such policies and procedures.

485.   Defendants, through receipt of complaints and otherwise, have actual knowledge that such incidents of harassment and bullying are occurring in New York City public schools.

486.   Notification of such incidents should have, but did not, trigger investigations, reporting, and remediation by the schools and DOE pursuant to the Chancellor's Regulations. These Regulations were instituted specifically for the purpose of protecting the Plaintiff's property and/or liberty interests.  But the schools and DOE have failed to follow the regulations and have not initiated the mandatory investigative and reporting steps.

487.   Defendants are also aware that the schools are not following policies and procedures to investigate, report and correct such harassment and bullying.

488.   Defendants have exhibited a custom and practice of deliberate indifference to the widespread incidence of harassment and bullying in the New York City public schools by school employees and students alike, as well as to the failure of the New York City public schools to implement and follow the policies and procedures that are supposed to address, correct and eliminate such bullying and harassment.

489.   In sum, Defendants have failed to provide Named Class Plaintiffs and similarly situated class members any pre-deprivation process.

490.     Accordingly, Defendants are responsible for the maintenance and perpetuation of hostile education environments and for the resultant deprivation of Named Class Plaintiffs' and their fellow class members' protected property and/or liberty interests.

491.     Named Class Plaintiffs and fellow class members have no adequate post-deprivation remedy.  Bullying and harassment directly compromise a student's ability to obtain a free public education through participation in the school curriculum and school activities at the time they are being offered.

492.     Unaddressed bullying and harassment also cause long-term psychological and emotional harm, including, but not limited to loss of self-esteem; aversion to education and to participation in school events; extreme emotional distress; depression; and anger management. These effects themselves further undermine a student's ability to obtain a free public education. They also cannot be addressed through a post-deprivation remedy.

493.     Further, because education is fundamental to meaningful participation in all aspects of civil society—its economy, culture and politics—no post-deprivation remedy could possibly compensate adequately for the loss of this cornerstone entitlement.

494.     By failing to follow procedures as required by law to prevent ongoing bullying and harassment by school and employees and fellow students, Defendants have deprived, and are continuing to deprive, Named Class Plaintiffs and their fellow class members of protected property and/or liberty interests, without due process of law.

495.      By reason of the foregoing, Defendants have violated and are in continuing violation of 42 U.S.C. § 1983.

**SECOND CLAIM FOR RELIEF**
**(Violation of 42 U.S.C. § 1983)**
**(Equal Protection Clause)**

496.     Plaintiffs repeat and re-allege paragraphs 1 through 471 as if fully set forth herein.

497.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

498.    Under the Equal Protection Clause, discrimination based on race is presumptively unconstitutional and subject to strict scrutiny.

499.    As described *supra*, Defendants have exhibited a custom and practice of deliberate indifference to the widespread incidence of violence in the New York City public schools and to the failure of the schools to implement and follow the policies and procedures that are supposed to address, correct and eliminate such violence.

500.    Defendants' custom and practice of deliberate indifference adversely impacts Black and Hispanic students enrolled in DOE schools, such as Named Class Plaintiffs and members of the class, more than students of other races.  Public schools with higher rates of Black and Hispanic enrollment have higher rates of violent incidents.  Schools with lower rates of Black and Hispanic enrollment have dramatically fewer violent incidents.  Thus, Black and Hispanic students suffer from in-school violence, and the resulting deprivation of their rights to a free public education, significantly more frequently than their peers who are not Black or Hispanic.

501.    Defendants have a statutory mandate, under DASA, to implement policies and procedures to prevent such instances of in-school violence.  DASA, and its implementing Chancellor's Regulations, apply to each and every act of bullying and harassment that occurs during school hours, on school grounds, and at school functions.  Defendants have the ability to reduce the rates of violent incidents through enforcement of such policies and procedures.

502.    Defendants' failure to implement the regulations for combating in-school violence was on the basis of an impermissible consideration of race.  There is an extremely tight correlation

between higher rates of Black and Hispanic enrollment and higher rates of violent incidents in DOE schools.

503.    Other explanations for the discrepancy, such as the rate of students living below the poverty line, are unlikely because they are weakly correlated with rates of school violence.

504.    By reason of the foregoing, Defendants have violated and are in continuing violation of 42 U.S.C. § 1983.

## THIRD CLAIM FOR RELIEF
### (Violation of the Constitution of the State of New York)

505.    Plaintiffs repeat and re-allege paragraphs 1 through 471 as if fully set forth herein.

506.    Article XI(1) of the Constitution of the State of New York provides: "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated."

507.    N.Y. EDUC. L. § 3202 confers an entitlement upon Named Class Plaintiffs and all members of the class they represent to receive a free public education.

508.    Defendants' failure to adhere to the Chancellor Regulations have created an atmosphere where Named Class Plaintiffs are unable to receive the minimum education required by the New York State Constitution.

509.    By reason of the foregoing, Defendants have deprived Plaintiffs and members of the class of rights secured by the New York State Constitution.

## FOURTH CLAIM FOR RELIEF
### (Failure to Adhere to Perform Duties Enjoined by Law)
### (Failure to Follow Lawful Procedure)

510.    Plaintiffs repeat and re-allege paragraphs 1 through 471 as if fully set forth herein.

511.    DASA requires Defendants to create policies, procedures and guidelines intended to create a school environment that is free from harassment, bullying and discrimination. N.Y.

EDUC. L. § 13(1).   Defendants, moreover, are directly responsible for creating a school environment that is free from harassment, bullying and discrimination through enforcement of DASA and attendant Chancellor's Regulations.

512.   Defendants have failed to perform duties imposed by the Chancellor's Regulations, including, but not limited to, duties imposed by Regulations A-420 (Pupil Behavior and Discipline - Corporal Punishment), A-421 (Pupil Behavior and Discipline – Verbal Abuse), A-449 (Safety Transfers), and A-832   (Student-To-Student Discrimination, Harassment, Intimidation, and/or Bullying).

513.   The Chancellor's Regulations apply to every act of bullying, harassment, discrimination, and violence.  But, by custom and practice, DOE has granted its employees a wide berth of flexibility that is not found anywhere in the regulations.

514.   As a result, Plaintiffs have been subject to school violence, harassment, intimidation, and bullying, at the hands of both students and school employees.

515.   By reason of the foregoing, Defendants have failed to perform duties enjoined upon them by law within the meaning of CPLR 7803(1), and failed to follow lawful procedure within the meaning of CPLR 7803(3).

## **JURY TRIAL DEMANDED**

516.   Plaintiffs demand a jury trial as to all issues triable by a jury.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray that the Court:

a.   Determine that this action can be maintained as a class action;

b.   Declare that Defendants are in violation of 42 U.S.C. § 1983 and any applicable provisions of state law;

c.  Issue permanent injunctive relief requiring Defendants to adopt provisions in CR-A832 requiring schools to "take prompt actions reasonably calculated to end the harassment, bullying or discrimination," "prevent recurrence of the behavior," and "ensure the safety of the student" after an investigation verifies a bullying allegation, in accordance with N.Y. Educ. L. section 13(1)(e); and further, requiring Defendants to adopt enforcement and self-execution provisions in CR-A832, CR-A420, and CR-A421, so that school officials cannot deviate from the Regulations.

d.  Issue permanent injunctive relief requiring Defendants to enforce the Chancellor Regulations, including the new provisions, in all instances of suspected, reported, or known harassment, bullying or discrimination;

e.  Declare that Defendants did not comply with DASA, the attendant Chancellor's Regulations, the New York Constitution, and/or the United States Constitution when the Named Class Plaintiffs, and similarly situated class members in the New York City Public Schools, reported acts of school bullying and violence, or when school officials knew or should have known about acts of school bullying and violence;

f.  Issue permanent injunctive relief requiring Defendants to review all previous reports of school violence by the Named Class Plaintiffs and those of similarly situated class members in the New York City Public Schools, and requiring Defendants to resolve said matters pursuant to Chancellor Regulations that are amended in accordance with this Court's orders, and compliant with DASA, the New York Constitution, and the United States Constitution;

g.      Issue permanent injunctive relief requiring Defendants to develop an action plan to comply with this Court's orders, to be approved by the Court or a Court-appointed independent monitor;

h.      Issue permanent injunctive relief requiring Defendants to report back to this Court at regular intervals, at least quarterly, with status updates on Defendants' progress in complying with this Court's orders;

i.      Appoint an independent monitor, with the power to issue recommendations that are binding on Defendants, to ensure Defendants' compliance with the orders of this Court and Defendants' future compliance with DASA, the Chancellor Regulations, the New York Constitution, and the United States Constitution;

j.      Award Plaintiffs their costs and reasonable attorney's fees pursuant to any and all applicable statutes and provisions of law; and

k.      Grant such other and further relief as is just, equitable and proper.

Dated: New York, New York
       April 6, 2016

                              WALDEN MACHT & HARAN LLP

                              By: _____
                                   Jim Walden
                                   Adam Cohen
                                   Daniel Cohen
                                   Johnson Lin
                                   Avni Patel
                                   Catherine Sloane
                              One Broadway, 6th Floor
                              New York, NY 10004
                              Tel.:    (212) 335-2030
                              Email: jwalden@wmhlaw.com

                              *Attorneys for Plaintiffs*