UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JOHN DOE #1, a minor by his parent and natural guardian PARENT #1; JOHN DOE #2, a minor by his parent and natural guardian PARENT #2; JOHN DOE #3, a minor by his parent and natural guardian PARENT #3; JANE DOE #4, a minor by her parent and natural guardian PARENT #4; JANE DOE #5, a minor by her legal guardian GRANDPARENT #5; JANE DOE #6, a minor by her legal guardian GRANDPARENT #5; JOHN DOE #7, a minor by his parent and natural guardian PARENT #7; JANE DOE #8, a minor by her parent and natural guardian PARENT #8; JOHN DOE #9, a minor by his parents and natural guardians PARENT #9A and PARENT #9B; JANE DOE #10, a minor by her parent and natural guardian PARENT #10; JANE DOE #11, a minor by her parent and natural guardian PARENT #11; JANE DOE #12, a minor by her parent and natural guardian PARENT #12; JOHN DOE #13, a minor by his parent and natural guardian PARENT #13; JANE DOE #14, a minor by her parent and natural guardian PARENT #14; JANE DOE #15, a minor by her parent and natural guardian PARENT #15; JOHN DOE #16, a minor by his parent and natural guardian PARENT #16; JOHN DOE #17, a minor by his parents and natural guardians PARENT #17A and PARENT #17B; JOHN DOE #18, a minor by his parents and natural guardians PARENT #18A and PARENT #18B; JOHN DOE #19, a minor by his parent and natural guardian PARENT #19; JANE DOE #20, a minor by her parent and natural guardian PARENT #20; JOHN DOE #21, a minor by his parent and natural guardian PARENT #21; JOHN DOE #22, a minor by his parent and natural guardian PARENT #22; JOHN DOE #23, a minor by his parent and natural guardian PARENT #23;[1] and FAMILIES FOR EXCELLENT SCHOOLS, on behalf of all persons similarly situated,

Plaintiffs,

16 Civ. 1684 (NGG) (RLM)

**JURY TRIAL DEMANDED**

**SECOND AMENDED COMPLAINT**

---

[1] A plaintiff may proceed under a pseudonym when the plaintiff's interest in anonymity outweighs the public interest in disclosure and any prejudice to the defendant. *Sealed Pl. v. Sealed Def.*, 537 F.3d 185, 189 (2d Cir. 2008). Plaintiffs have actually experienced retaliation. Public dissemination of Plaintiffs' identities will significantly exacerbate the anxiety, shame, and humiliation that they have already endured due to Defendants' actions and inactions. Identifying the Plaintiffs will also place them in harm's way by putting them under threat of violence or emotional torment from their bullies or their bullies' parents. The Parties have already executed a Stipulation as to confidentiality and non-retaliation, such that Plaintiffs' identities have been provided to the Defendants.

v.

NEW YORK CITY DEPARTMENT OF EDUCATION
and CARMEN FARIÑA, in her official capacity as
Chancellor of the New York City Department of
Education,

Defendants.

**"[A]n effective and appropriate education may be negated by child bullying.  When a school fails to take reasonable steps to prevent such objectionable harassment of a student, it has denied her an educational benefit protected by statute."[2]**

Plaintiffs, JOHN DOE #1 ("JD1"), a minor by his parent and natural guardian PARENT #1; JOHN DOE #2 ("JD2"), a minor by his parent and natural guardian PARENT #2; JOHN DOE #3 ("JD3"), a minor by his parent and natural guardian PARENT #3; JANE DOE #4 ("JD4"), a minor by her parent and natural guardian PARENT #4; JANE DOE #5 ("JD5") and JANE DOE #6 ("JD6"), minors by their legal guardian GRANDPARENT #5; JOHN DOE #7 ("JD7"), a minor by his parent and natural guardian PARENT #7; JANE DOE #8 ("JD8"), a minor by her parent and natural guardian PARENT #8; JOHN DOE #9 ("JD9"), a minor by his parents and natural guardians PARENT #9A and PARENT #9B; JANE DOE #10 ("JD10"), a minor by her parent and natural guardian PARENT #10; JANE DOE #11 ("JD11"), a minor by her parent and natural guardian PARENT #11; JANE DOE #12 ("JD12"), a minor by her parent and natural guardian PARENT #12; JOHN DOE #13 ("JD13"), a minor by his parent and natural guardian PARENT #13; JANE DOE #14 ("JD14"), a minor by her parent and natural guardian PARENT #14; JANE DOE #15 ("JD15"), a minor by her parent and natural guardian PARENT #15; JOHN DOE #16 ("JD16"), a minor by his parent and natural guardian PARENT #16; JOHN DOE #17 ("JD17"), a minor by his parents and natural guardians PARENT #17A and PARENT #17B; JOHN

---

[2] *T.K. v. New York City Dep't of Educ.*, 779 F. Supp. 2d 289, 293 (E.D.N.Y. 2011).

DOE #18, a minor by his parents and natural guardians PARENT #18A and PARENT #18B;

JOHN DOE #19 ("JD19"), a minor by his parent and natural guardian PARENT #19; JANE DOE

#20 ("JD20"), a minor by her parent and natural guardian PARENT #20; JOHN DOE #21

("JD21"), a minor by his parent and natural guardian PARENT #21; JOHN DOE #22 ("JD22"), a

minor by his parent and natural guardian PARENT #22; JOHN DOE #23 ("JD23"), a minor by his

parent and natural guardian PARENT #23 (hereinafter, "Named Class Plaintiffs"); and Families

for Excellent Schools ("FES"), by their undersigned attorneys, Walden Macht & Haran LLP, on

behalf of all persons similarly situated, allege as follows:

## **INTRODUCTION**

1.       New York law guarantees every child the right to a public school education free

from violence, harassment and bullying.  The New York State Legislature has dictated that school

districts must each implement a comprehensive system to report, investigate, and remediate

student-on-student and teacher-on-student violence.

2.       Although the Chancellor of the New York City Department of Education ("DOE")

has promulgated several regulations (the "Regulations") addressing in-school violence,[3] these

regulations have proven ineffective and inadequate to stem system-wide violence within New

York City's public schools.  The level of violence within New York City's public schools is

already staggering but increasing precipitously.  The 2014-15 school year (the last complete school

year before this action commenced) showed levels of violence not seen since the early 2000s.

Compared to the prior year alone, the number of violent incidents within New York City's public

---

[3] *See* N.Y.C. DEP'T OF EDUC., Regulation of the Chancellor A-420 (Oct. 30, 2014), N.Y.C. DEP'T OF EDUC., Regulation of the Chancellor A-421 (Oct. 30, 2014), N.Y.C. DEP'T OF EDUC., Regulation of the Chancellor A-449 (Mar. 9, 2011), and N.Y.C. DEP'T OF EDUC., Regulation of the Chancellor A-832 (Aug. 21, 2013).

schools rose by 23%.[4]   Since 2014, forcible sex offenses rose by 90%, assaults with serious

physical injury rose by 48%, and acts of reckless endangerment rose by 28%.[5]

3.     New York City public schools are not only increasingly dangerous, they are also

disproportionately dangerous as compared to schools in the rest of New York State.  In 2014-15,

New York City enrolled 39.5% of the State's public school students, yet it contained 84.3% of the

State's "persistently dangerous"[6] schools.[7]  In fact, a school in New York City is seven times more

likely than a school in other parts of New York State to be persistently dangerous.[8]

4.     The violence knows few boundaries, except that, on average, White and Asian

students encounter far fewer incidents of school violence than Black and Hispanic students.

During the 2014-15 school year, New York City schools experienced an average of 15 violent

incidents[9] and 32 disruptive incidents[10] for every 1000 students.[11]  In the eleven geographic school

districts where at least 90% of students were Black or Hispanic, the rate of violent incidents jumped

---

[4] *See* Declaration of Nathan Jensen, dated May 23, 2016 ("Jensen Decl."), ¶ 3.

[5] *Id.* ¶ 4.

[6] Federal law requires each state to determine which public schools are "persistently dangerous" annually.  The New York State Education Department designates a school as persistently dangerous if, for two consecutive years, the school either has (1) a School Violence Index ("SVI") of 1.5 or greater or (2) an SVI of 0.5 or greater and a total of 60 or more violent incidents.  SVI is a ratio of violent incidents to enrollment in a school and is determined by the number of incidents, the seriousness of the incidents, and the school's enrollment.

[7] Jensen Decl. ¶¶ 5 - 6.

[8] *Id.* ¶ 7.

[9] The term "violent incident" refers to serious crimes and incidents involving weapons that have been reported to the N.Y. State Education Department's Violent and Disruptive Incident Reporting ("VADIR") system.  It includes homicides, forcible sex offenses, other sex offenses, robbery, assault with serious physical injury, arson, kidnapping, assault with physical injury, reckless endangerment, minor altercations with weapons, intimidation with weapons, harassment with weapons, menacing with weapons, bullying with weapons, burglary with weapons, criminal mischief with weapons, larceny or other theft with weapons, riots with weapons, and weapons possession.  It does not include other disruptive incidents.

[10] The term "other disruptive incident" refers to incidents reported pursuant to VADIR that are neither serious crimes nor involve weapons, but still contribute significantly toward the creation of a hostile education environment.  Other disruptive incidents include minor altercations without weapons, intimidation without weapons, harassment without weapons, menacing without weapons, bullying without weapons, burglary without weapons, criminal mischief without weapons, larceny or other theft without weapons, bomb threats, false alarms, riots without weapons, drug possessions, alcohol possessions, and other disruptions.

[11] Jensen Decl. ¶¶ 8 – 9.

to 22 violent incidents per 1000 students.[12]  These districts also averaged 44 disruptive incidents

per 1000 students.[13]  By comparison, school districts with less than 50% enrollment of Black and

Hispanic students experienced only 11 violent incidents and 29 disruptive incidents per 1000

students.

5.      Brooklyn is both the borough with the most public schools students (over 340,000

students), and home to the most-violent school district:  District 23, which includes Ocean Hill,

Brownsville, and parts of East New York, averages 36 violent and 33 disruptive incidents per 1000

students.[14]  District 23 also has the highest percentage of Black and Hispanic students in the city

(96.9%).[15]  Queens, however, is home to the safest, and the least Black or Hispanic, school district

in the city[16]:  District 26, which includes Bayside, Fresh Meadows, and Jamaica Estates, averages

fewer than 6 violent and 22 disruptive incidents per 1000 students.[17]  Only 29.2% of students in

District 26 are Black or Hispanic.  Thus, the largely Black and Hispanic students at District 23

schools are six times more likely to suffer in-school violence than the largely White and Asian

population at District 26 schools.

6.      Although the disparate impact of in-school violence on Black and Hispanic students

is troubling, in-school violence also has a disproportionately severe impact on very young students,

who have endured violence during the most important part of their developmental years, leaving

these young children depressed, confused, angry, resistant to attending school at all, and ill-

equipped to succeed when they do.[18]  As several of the narratives provided by the Named Class

---

[12] *Id.* ¶ 10.
[13] *Id.* ¶ 11.
[14] *Id.* ¶ 14.
[15] *Id.* ¶ 15.
[16] *Id.* ¶ 16.
[17] *Id.* ¶ 17.
[18] *See T.K. v. New York City Dep't of Educ.*, 779 F. Supp. 2d 289, 299 (E.D.N.Y. 2011) ("[T]he highest prevalence of bullying is among elementary-school aged children.") (quoting Gwen M. Glew, et al., *Bullying: Psychological*

Plaintiffs attest, unremediated bullying also has the sad result of causing copy-cat acts of violence against young student-victims, escalating the violence and destroying any chance of meaningful learning.

7.      In addition to having a disparate impact on Black, Hispanic and very young students, in-school violence, harassment and bullying also has a disproportionate impact on students who identify as lesbian, gay, bisexual, or transgender.[19]

8.      In-school violence, harassment, and bullying also has a disproportionate impact on students with disabilities, which is true of several of the Named Class Plaintiffs.[20]

9.      Several root causes underlie Defendant DOE's failure to address and remediate in-school violence in New York City's public schools, despite the clear mandate from the New York State Legislature to do so.  Many schools do not adhere to the Regulations, and Defendant DOE is apparently unable or unwilling to force compliance.  Even though the Regulations are written to apply to every act of in-school violence, teachers and administrators either ignore, are unaware of, or are tacitly or explicitly permitted to deviate from the Regulations, resulting in a failure to remediate in-school violence.  This leaves young and vulnerable victims exposed to continuing or new acts of violence.

10.     Moreover, the Regulations themselves are deficient in a number of respects, including as applied by schools.  Schools often "remediate" violence by forcing the victim—rather

---

*Adjustment and Academic Performance in Elementary School*, 159 ARCHIVES OF PEDIATRIC AND ADOLESCENT MED. 1026, 1026 (2005)).

[19] *See* GAY, LESBIAN & STRAIGHT EDUCATION NETWORK, *2013 National School Climate Survey* (2013), http://www.glsen.org/sites/default/files/2013%20National%20School%20Climate%20Survey%20Full%20Report_0. pdf (finding "55.5% of LGBT students felt unsafe at school because of their sexual orientation, and 37.8% because of their gender expression").

[20] *See* Jonathan Young et al., *Bullying and Students with Disabilities*, WHITE HOUSE CONFERENCE ON BULLYING PREVENTION, at 73 (2011) ("While both students with and without disabilities face significant negative emotional, educational and physical results from bullying, students with disabilities are both uniquely vulnerable and disproportionately impacted by the bullying phenomenon.").

than the perpetrator—to change schools or classrooms without fully investigating the allegations of violence, thereby upending the victims' lives, interfering with their education, and causing psychological strains that exacerbate the damage from the violence they have already endured. This custom and practice of punishing the victim by forcing him or her to transfer schools or classrooms as a "remedy" for violence is not only unfair and wrong-headed, but contravenes Defendant DOE's explicit policies, and operates as an additional unconstitutional deprivation of the victims' right to a public school education.

11.     Worse still, many schools retaliate against students who report in-school violence, as detailed *infra*, which has a chilling effect on future reporting. Several of the Named Class Plaintiffs have suffered this "blame the victim" approach, which has caused severe anxiety and depression, suppressed their interest in learning, and even had a serious impact on their parents.

12.     Tragically, the scope and severity of the problem has been masked by Defendant DOE's custom and practice of underreporting school-violence statistics, in violation of state law.[21] For example, an audit by the Office of the State Comptroller, released in April 2015, reviewed incidents of violence in ten public schools and found that nearly one third of all incidents go unreported. "The more than 400 episodes that went unreported at the 10 schools included 50 assaults resulting in injuries, among them one case at Intermediate School 27 on Staten Island in which a student pushed another student over a desk, knocking him to the floor with the desk landing on top of him; 13 sex offenses; and two instances of confiscated weapons."[22] Moreover, New York State data shows that New York City public schools experienced 15,934 violent

---

[21] *See* N.Y. EDUC. L. § 2802 (requiring school districts to annually report violent and disruptive incidents to the New York State Education Commissioner); 8 NYCRR 100.2(kk)(3) (requiring school districts to annually report material incidents of harassment, bullying, and discrimination to the New York State Education Commissioner).

[22] Kate Taylor, *New York City Underreported School Violence to State, Audit Shows*, N.Y. TIMES, Apr. 29, 2015, http://www.nytimes.com/2015/04/30/nyregion/new-york-city-underreported-school-violence-to-state-audit-shows.html.

incidents during the 2014-15 school year, yet the New York City Police Department's ("NYPD's") School Safety Division publicly released data reporting only 6875 incidents for the same period, a divergence of nearly 57%.[23]

13.     Taken together, all of these acts and omissions by Defendant DOE, especially in the face of overwhelming evidence of a systemic problem (which is undoubtedly known by Defendant DOE), reveal a custom and practice of deliberate indifference to in-school violence, creating a culture of indifference to continued, violent assaults against Named Class Plaintiffs and others similarly situated.  As described in more detail *infra*, Defendant DOE's actions and inactions are clearly unreasonable in light of all known circumstances.  Moreover, although the various episodes endured by the Named Class Plaintiffs are tragic and disturbing individually, Defendant DOE's actions and inactions in light of the pervasiveness of the overall problem may fairly be said to "shock the contemporary conscience."[24]

14.     This Complaint therefore contains six claims for relief.  The first alleges that the Named Class Plaintiffs and those similarly situated are being deprived of their property interests in a public education, as guaranteed by the State of New York, without due process of law, in violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, a procedural due process claim.  The second claim alleges that Defendants have failed to protect the liberty interests of elementary school students—a subclass of Named Class Plaintiffs—and those similarly situated—with whom Defendants have a special relationship—from unjustified intrusions on personal security, in violation of the Due Process Clause of the Fourteenth

---

[23] Yoav Gonen, *Violent Incidents at NYC Schools Soar While de Blasio Claims They're Safer than Ever*, N.Y. POST, Feb. 18, 2016, http://nypost.com/2016/02/18/violent-incidents-at-nyc-schools-soar-while-de-blasio-claims-theyre-safer-than-ever/.

[24] *See T.K. v. New York City Dep't of Educ.*, 779 F. Supp. 2d 289, 315 (E.D.N.Y. 2011) (quoting *Matican v. City of New York*, 524 F.3d 151, 155 (2d. Cir. 2008)).

Amendment to the U.S. Constitution, a substantive due process claim.  The third claim alleges that Defendants are failing to enforce the Regulations in a manner that violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.  The fourth claim alleges that Defendants have failed to provide students with disabilities with free and appropriate public education, in violation of the Individuals with Disabilities Education Act ("IDEA").  In the fifth claim, Named Class Plaintiffs allege that they, and those similarly situated, have been deprived of their right to an education guaranteed by the New York State Constitution and state law.  Finally, the Named Class Plaintiffs allege in their sixth claim for relief that, in failing to follow the Regulations to curtail violence in schools, Defendants have failed to follow lawful procedure as required under New York State law, C.P.L.R. 7803(3).

15.    Students cannot learn in educational environments where violence is commonplace. "[T]he day-to-day adverse effects of bullying in damaging educational opportunities to students are as real as they are unnoticed.  It is a problem that affects the school performance, emotional well-being, mental health, and social development of school children throughout the United States."[25]  Thus, Defendant DOE's custom and practice of deliberate indifference has robbed, and will continue to rob, children of their chance to learn and succeed within the public school system. Named Class Plaintiffs bring this action on behalf of themselves and all children similarly situated to address the unconstitutional deprivation of their protected property interest in a public school education.

16.    As described more fully *infra*, Defendants manage and perpetuate an educational system that is characterized by chronic and deliberate indifference to the pervasive violence, intimidation, and harassment experienced by their students.  The system is pock-marked by a

---

[25] *Id*. at 298.

"blame the victim" mentality, which often results in *de facto* punishment of, or retaliation against, the victims.  These burdens fall disproportionately on the shoulders of Black and Hispanic students, students with disabilities, and very young students.  As a result, every day, Named Class Plaintiffs (and innumerable other members of the classes they represent) are systematically deprived of the right to a free public education conferred upon them by the State of New York, as codified in N.Y. EDUC. L § 3202 and N.Y. EDUC. L. §§ 10-18, and the right to equal protection of the law.

17.     That deprivation will end by grant of the relief requested herein.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, because it arises under the laws of the United States.

19.     This Court has supplemental jurisdiction over this action under 28 U.S.C. § 1367, because the claims that arise under the laws of New York are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

20.     Venue is proper in this District under 28 US.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.  Of the 1.1 million students who attended New York City public school for the 2015-16 school year, 63% are located in this District; 30% in Brooklyn; 27% in Queens; and 5.7% in Staten Island.

## PARTIES

21.     Plaintiff JD1 is a 9-year old Black male student enrolled in an elementary school in East Harlem, who has been subjected to repeated physical violence by fellow students.  He is a child with a disability within the meaning of the IDEA.

22.     Plaintiff JD2 is an 8-year old Black male student enrolled in an elementary school in West Harlem, who has been subjected to bullying by fellow students.  He is a child with a disability within the meaning of the IDEA.

23.     Plaintiff JD3 is a 9-year old Hispanic male student enrolled in an elementary school in West Harlem, who was thrown down the stairs by his math teacher.  He is a child with a disability within the meaning of the IDEA.

24.     Plaintiff JD4 is an 11-year old White female student enrolled in an elementary school in West Harlem, who has been attacked by fellow students.  She is a child with a disability within the meaning of the IDEA.

25.     Plaintiff JD5 is an 11-year old Hispanic female student enrolled in an elementary school in Chelsea, who has endured six years of violence, including repeated assaults, by the same bully, whom Defendant DOE refused to discipline or transfer.

26.     Plaintiff JD6 is a 7-year old Hispanic female student enrolled in an elementary school in Chelsea, who is the sister of JD5, and who experienced assault and menacing by the same tormentor as her sister.

27.     Plaintiff JD7 is a 13-year old Black male student enrolled in a middle school on Staten Island, who experienced bullying, harassment, discrimination, and violence at his previous school.

28.     Plaintiff JD8 is a 9-year old Black Hispanic female student enrolled in an elementary school in West Harlem, who has been subjected to verbal abuse and physical assaults by her fellow students.  She is a child with a disability within the meaning of the IDEA.

29.     Plaintiff JD9 is a 12-year old Hispanic male student enrolled at a special-needs school in the Bronx, who experienced violence by a teacher at his school.

30.     Plaintiff JD10 is a 13-year old Hispanic female student enrolled in a middle school in the Upper West Side, who was attacked by a teacher at her school.  She is a child with a disability within the meaning of the IDEA.

31.     Plaintiff JD11 is a 15-year old Hispanic female enrolled in a high school in the Bronx, who was attacked repeatedly at her former school by a group of students.  She is a child with a disability within the meaning of the IDEA.

32.     Plaintiff JD12 is an 8-year old Hispanic female student enrolled in an elementary school in College Point, who was bullied and attacked by other students.

33.     Plaintiff JD13 is a 13-year old Black male student who previously attended elementary school in the Bronx, who was attacked by another student who was known to the school to be violent.  JD13 is a child with a disability within the meaning of the IDEA.

34.     Plaintiff JD14 is a 13-year old Black Hispanic female student enrolled in a middle school in the Upper West Side, who was a victim of student-on-student bullying, teacher-on-student violence, and retaliation by her school for reporting teacher-on-student violence.

35.     Plaintiff JD15 is an 11-year old Hispanic female student enrolled in the fifth grade in an elementary school in West Harlem, who was verbally abused by a lunch room aide over multiple years.

36.     Plaintiff JD16 is an 8-year old Black male student enrolled in the fourth grade in an elementary school in West Harlem, who was the victim of corporal punishment.  He is a child with a disability within the meaning of the IDEA.

37.     Plaintiff JD17 is a 17-year old Hispanic male student enrolled in a high school in the Bronx, who was attacked by students in a different school that occupies the same school building.

38.     Plaintiff JD18 is a 10-year old Black male student enrolled in an elementary school in the Bronx, who suffered student-on-student bullying and retaliation by his teacher.

39.     Plaintiff JD19 is an 11-year old Hispanic male student enrolled in an elementary school in West Harlem, who was attacked by older students.  He is a child with a disability within the meaning of the IDEA.

40.     Plaintiff JD20 is a 9-year old Black Hispanic female student enrolled in an elementary school in Maspeth, Queens, who was a victim of bullying by other students and abuse by her teachers.

41.     Plaintiff JD21 is an 8-year old Hispanic male student enrolled in the second grade in an elementary school in the Bronx, who was a victim of violence by other students and a paraprofessional.  He is a child with a disability within the meaning of the IDEA.

42.     Plaintiff JD22 is a 9-year old Hispanic male student enrolled in the fourth grade in an elementary school in the Bronx, who was the victim of student-on-student bullying.

43.     Plaintiff JD23 is a 6-year old Hispanic male student enrolled in kindergarten in an elementary school in the Bronx who was the victim of student-on-student abuse.  He is a child with a disability within the meaning of the IDEA.

44.     Plaintiff Families for Excellent Schools ("FES") is a not-for-profit organization which seeks to improve the quality of education through changes in education policy.  FES is a member-driven organization that works with families in New York, Massachusetts and Connecticut on education-related initiatives.  A significant number of those families have children in the New York City public schools who are exposed on a daily basis to the type of school violence described in the Complaint, including families whose children are direct victims of such violence.  In addition, a significant number of those families have children in the New York City public

schools who are children with a disability within the meaning of the IDEA.  FES works with those families on initiatives pertaining to special education needs, one of which is addressing the types of school violence issues that are described in this Complaint and the disruption such violence causes to educational attainment.  FES is a plaintiff solely for the purpose of non-§1983 claims.

45.     Defendant DOE is the department of government of the City of New York that manages the city's public school system.

46.     Defendant Carmen Fariña ("Chancellor") is the Chancellor of Defendant DOE.

## CLASS ACTION ALLEGATIONS

47.     This action is maintainable as a class action under Fed. R. Civ. P. 23.

48.     Plaintiffs bring this action on behalf of a class consisting of all present and future students enrolled in the New York City public schools, who have been or may be the victims of in-school violence, including assault, menacing, threats, intimidation, and bullying by fellow students or employees of the New York City public schools as defined by N.Y. EDUC. L. § 11(7).

49.     The proposed class includes a subclass of Named Class Plaintiffs who are, or were, subject to individualized education programs ("IEP") pursuant to the IDEA, 20 U.S.C. §§ 1400 et seq. (the "IEP Subclass").  Plaintiffs JD1, JD2, JD3, JD4, JD8, JD10, JD11, JD13, JD16, JD19, JD21, and JD23 are putative members of the IEP Subclass.

50.     The proposed class also includes a subclass of Named Class Plaintiffs who are, or were, elementary school students when they were victims of in-school violence (the "Elementary School Subclass").  Plaintiffs JD1, JD2, JD3, JD4, JD5, JD6, JD8, JD12, JD15, JD16, JD18, JD19, JD20, JD21, JD22, and JD23 are putative members of the Elementary School Subclass.

51.     The class is so numerous that joinder of all members of the putative class is impracticable.  The New York City public school system has over 1.1 million students currently

enrolled in over 1800 schools.  In-school violence, including assault, menacing, threats, intimidation, and bullying by fellow students or employees of the New York City public schools under N.Y. EDUC. L. § 11(7) affects a significant percentage of such students.  In addition, the student population is spread out over five separate boroughs, making joinder even more impractical.

52.    There exist questions of law and/or fact common to the entire New York City student class that predominate over any individual question, including but not limited to:

a.    Whether Defendants, by their actions, policies, practices, customs, and inaction, and through their deliberate indifference, are depriving members of the class of a protected property right to education free from in-school violence, including assault, menacing, threats, intimidation, and bullying, without due process of law;

b.    Whether Defendants, by their actions, policies, practices, customs, and inaction, and through their deliberate indifference, are depriving members of the Elementary School Subclass of their protected liberty interest to be free from unjustified intrusions on personal security;

c.    Whether Defendants, by their actions, policies, practices, customs, and inaction, and through their deliberate indifference, are depriving members of the class of their right to equal protection under the law;

d.    Whether Defendants, by their actions, policies, practices, customs, and inaction, and through their deliberate indifference, are depriving members of the IEP Subclass of their right to a free and appropriate public education, in violation of the Individuals with Disabilities Education Act;

e.      Whether Defendants have violated Article XI(1) of the Constitution of the State of New York; and

f.      Whether Defendants have failed to perform duties imposed by the Chancellor's Regulations adopted under the mandates of state law and otherwise to address in-school violence, including assault, menacing, threats, intimidation, and bullying.

53.    Named Class Plaintiffs' claims are typical of the class.  Each Named Class Plaintiff has directly experienced in-school violence, including assault, menacing, threats, intimidation, and/or bullying.  Each of the Named Class Plaintiffs has sought redress from Defendant DOE without success as a result of failure by Defendant DOE's personnel to adhere to Defendant DOE's own stated policies and statutory law.  As a result of Defendant DOE's acts, omissions, policies, procedures, and customs that apply to Named Class Plaintiffs and all class members, Named Class Plaintiffs and the class are being denied the benefits of a free public education to which they are entitled.

54.    Named Class Plaintiffs will fairly and adequately protect the interests of the class. Named Class Plaintiffs are represented by experienced counsel.

55.    Defendants have acted or refused to act on grounds generally applicable to members of the class, thereby making appropriate final injunctive relief or corresponding declaratory relief to the class as a whole.

## BACKGROUND: LEGAL FRAMEWORK

56.    As detailed in the Factual Allegations section *infra*, the Named Class Plaintiffs have each suffered serious in-school violence, including assault, menacing, threats, intimidation and bullying.  Although the New York State Legislature has mandated that every public school system

have a robust and effective process or program to end in-school violence—based primarily on requirements for complete documentation and investigation of every incident of violence and effective remediation to end violence against students—in its design and operation, New York City's "system" is inconsistent with state requirements, leaving a shocking level of system-wide violence.  We begin with background on state-mandated requirements and New York City's implementing Regulations, and conclude with specific and detailed evidence of the "system's" unconstitutional flaws.

57.    Combatting in-school violence is not merely a state or local matter, but an issue that has garnered significant attention at the federal level.  It has long been a federal priority to combat in-school violence.  For example, in 2002, Congress enacted the No Child Left Behind Act ("NCLB").  NCLB amended the Elementary and Secondary Education Act, which provides federal funding for public education, to require states receiving federal funds to establish and implement an "unsafe school choice option."  This allows students who are victims of violent criminal offenses or who attend a persistently dangerous school to transfer to a safe public school.[26]

58.    Moreover, as courts in this Circuit have noted, "[f]or at least ten years" the U.S. Department of Education has informed schools of their obligation to address persistent bullying within public schools:

> A school is responsible for addressing harassment incidents about which it knows or reasonably should have known. In some situations, harassment may be in plain sight, widespread or well-known to students and staff, such as harassment occurring in hallways, during academic or physical education classes, during extracurricular activities, at recess, on a school bus, or through graffiti in public areas. In these cases, the obvious signs of the harassment are sufficient to put the school on notice. In other situations, the school may become aware of misconduct, triggering an

---

[26] 20 U.S.C. § 7912.

investigation that could lead to the discovery of additional incidents that, taken together, may constitute a hostile environment.[27]

## A.     New York State Constitution and Laws

59.     The Constitution of the State of New York provides:  "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated."  N.Y. CONST. art. XI, § 1.

60.     By adopting Article XI(1), the State of New York "has obligated itself constitutionally to ensure the availability of a 'sound basic education' to all its children." *Campaign for Fiscal Equity, Inc. v. State of New York*, 100 N.Y.2d 893, 902 (2003) (citation omitted).

61.     Under N.Y. EDUC. L. § 3202, every person "over five and under twenty-one years of age who has not received a high school diploma is entitled to attend the public schools maintained in the district in which such person resides without payment of tuition," *i.e.*, to receive a free public education.

62.     Courts have found that the New York State Constitution and N.Y. EDUC. L. § 3202 "create a property interest in education protected by the Fourteenth Amendment."[28]

## B.     Compulsory Attendance Laws

63.     New York requires school-age children to attend school.  In New York State, "each minor from six to sixteen years of age shall attend upon full time instruction."  N.Y. EDUC. L. § 3205(1)(a).

---

[27] *T.K.*, 779 F. Supp. 2d at 316 (quoting U.S. DEP'T OF EDUC., OFF. OF CIVIL RIGHTS, *Dear Colleague Letter: Bullying and Harassment*, at 2 (Oct. 26, 2010)).

[28] *Handberry v. Thompson*, 446 F.3d 335, 353 (2d Cir. 2006).

64.    In New York City, the age for mandatory attendance is even lower.  Children "from 5 to 17 years of age in New York City [are] required to attend school on a full-time basis." Chancellor's Regulation A-210 ("CR-A210").[29]

65.    Under N.Y. EDUC. L. § 3202, "[a] supervisor of attendance, attendance teacher or attendance officer . . . may arrest without warrant any minor who is unlawfully absent from attendance upon instruction.  He shall forthwith place the minor so arrested in attendance upon required instruction and shall notify the parent or guardian of the minor, and he may then begin proceedings for his commitment as a school delinquent or arraign him before a court having jurisdiction."

66.    Moreover, parents' failure to "ensure their child's prompt and regular attendance in school . . . resulting in an adverse effect on the child's educational progress or imminent danger of such an adverse effect" may constitute educational neglect.  Chancellor's Regulation A-750 ("CR-A750").[30]

67.    Schools must report educational neglect when the following conditions exist:

a.    Reasonable cause to suspect that the parents are aware or should have been aware of the illegal absenteeism;

b.    Reasonable cause to suspect that the parents contributed to the problem or are failing to take steps to address the problem effectively (*i.e.*, failure to provide a minimum degree of care); and

---

[29] N.Y.C. DEP'T OF EDUC., Regulation of the Chancellor A-210 (Sept. 20, 2013) addresses "Minimum Standards for Attendance Programs."

[30] N.Y.C. DEP'T OF EDUC., Regulation of the Chancellor A-750 (Jan. 20, 2011) addresses "Child Abuse Prevention."

       c.        Reasonable cause to suspect educational impairment/harm to the child or imminent danger of impairment/harm (proof of actual educational harm is not necessary so long as harm can be reasonably presumed).

CR-A750(I)(E)(1).

68.    School officials must orally report educational neglect directly to the New York State Central Register and submit a written report to the County Department of Social Services within 48 hours of the oral report. The State Central Register then submits a report to the Administration of Children's Services to investigate the alleged educational neglect.[31]

## C.    **The Dignity for All Students Act**

69.    One critical component of the statutory right to a public education is the ability to experience that right in an environment free of in-school violence, including assault, menacing, threats, intimidation, and bullying by other students, teachers, or school staff members. The New York Legislature has specifically stated that "students' ability to learn and to meet high academic standards, and a school's ability to educate its students, are compromised by incidents of discrimination or harassment including bullying, taunting or intimidation." N.Y. EDUC. L. § 10.

70.    Accordingly, the New York State Legislature has defined the dimensions of the right to public education in terms of "the policy of the state to afford all students in public schools an environment free of discrimination and harassment." *Id.* (emphasis added).

---

[31] N.Y.C. ADMIN. FOR CHILDREN'S SERV., *Joint Policy Statement on the Reporting and Investigating of Educational Neglect*, (Mar. 1, 2010), http://docs.nycenet.edu/docushare/dsweb/Get/Document-416/Educational_Neglect_Policy_020101.pdf.

71.     To that end, on September 13, 2010, the New York State Legislature enacted the Dignity for All Students Act ("DASA"), which took effect on July 1, 2012.[32]  DASA is codified in Article 2 of the New York Education Law, N.Y. EDUC. L. §§ 10-18.

72.     The express statutory purpose[33] of DASA is "to prevent and prohibit conduct which is inconsistent with a school's educational mission." *Id.* § 10 (emphasis added).

73.     DASA defines "harassment" and "bullying" broadly as "the creation of a hostile environment by conduct or by threats, intimidation or abuse, including cyberbullying, that (a) has or would have the effect of unreasonably and substantially interfering with a student's educational performance, opportunities or benefits, or mental, emotional or physical well-being; or (b) reasonably causes or would reasonably be expected to cause a student to fear for his or her physical safety; or (c) reasonably causes or would reasonably be expected to cause physical injury or emotional harm to a student; or (d) occurs off school property and creates or would foreseeably create a risk of substantial disruption within the school environment, where it is foreseeable that the conduct, threats, intimidation or abuse might reach school property." *Id.* § 11(7).

74.     DASA further provides that "[n]o student shall be subjected to harassment or bullying by employees or students on school property or at a school function." *Id.* § 12(1).

---

[32] The New York Court of Appeals has stated, in dicta, that DASA *requires* the government to provide students a violence-free education environment.  *People v. Marquan M.*, 24 N.Y.3d 1, 4 (2014) ("New York, for example, enacted the 'Dignity for All Students Act' in 2010, declaring that our State must 'afford all students in public schools an environment free of discrimination and harassment' caused by 'bullying, taunting or intimidation.'") (emphasis added) (citing N.Y. EDUC. L. § 10).

[33] The legislative purpose of DASA is to require schools to enact and implement policies that prevent bullying, harassment, and discrimination.  Assemblyman O'Donnell, who sponsored DASA stated:  "The school has an obligation to have a policy. The school has an obligation to have people on staff who know how to deal with the policy. The school has an obligation to protect all children from that conduct."  *Michael Terrill & Carol Terrill, Individually & as Parents & Nat. Guardians of B.T., v. Windham-Ashland-Jewett Cent. School Dist., & Kerry Overbaugh, Individually & as Agent of the Bd. of Educ.*, No. 1:15-CV-0615, 2016 WL 1275048, at *7 (N.D.N.Y. Mar. 31, 2016).

75.     Under DASA, each school district must adopt a code of conduct.  Such code of conduct must include an age-appropriate version of the above policy.  *Id.* §§ 12(2), 2801.

76.     DASA requires a comprehensive compliance system, sufficient to identify, investigate, and remediate acts of in-school violence.  Specifically, DASA requires each school district to create and enforce policies, procedures, and guidelines that shall include, but are not limited to:

> 1.    Policies and procedures intended to create a school environment that is free from harassment, bullying and discrimination . . . ;
> 2.    Guidelines to be used in school training programs to discourage the development of harassment, bullying and discrimination, and to make school employees aware of the effects of harassment, bullying, cyberbullying and discrimination on students and that are designed . . . (b) to enable employees to prevent and respond to harassment, bullying and discrimination;
> . . .
> 4.    Guidelines relating to the development of measured, balanced and age-appropriate responses to instances of harassment, bullying or discrimination by students, with remedies and procedures following a progressive model that make appropriate use of intervention, discipline and education, vary in method according to the nature of the behavior, the developmental age of the student and the student's history of problem behaviors, and are consistent with the district's code of conduct . . . .

*Id.* § 13.

77.     DASA requires each school district to complete a comprehensive investigation of all reported acts of in-school violence.  Thus, DASA requires:

> school employees who witness harassment, bullying or discrimination, or receive an oral or written report of harassment, bullying or discrimination, to promptly orally notify the principal, superintendent or the principal's or superintendent's designee not later than one school day after such school employee witnesses or receives a report of harassment, bullying or discrimination, and to file a written report with the principal, superintendent or the principal or superintendent's designee not later than two school days after making such oral report.

*Id.* § 13(1)(c).

78.     DASA requires "the principal, superintendent or the principal's or superintendent's designee to lead or supervise the thorough investigation of all reports of harassment, bullying and discrimination, and to ensure that such investigation is completed promptly after receipt of any written reports made under this section." *Id.* § 13(1)(d).

79.     DASA also mandates prompt, decisive, and effective enforcement, designed to "end the harassment, bullying or discrimination, eliminate any hostile environment, create a more positive school culture and climate, prevent recurrence of the behavior, and ensure the safety of the student or students against whom such harassment, bullying or discrimination was directed." *Id.* § 13(1)(e).

80.     DASA requires each school district to guard against retaliation against students who report in-school violence.  Each school district's policy must "prohibit retaliation against any individual who, in good faith, reports, or assists in the investigation of, harassment, bullying or discrimination." *Id.* § 13(1)(f).

81.     DASA mandates that each school district have "a school strategy to prevent harassment, bullying and discrimination." *Id.* § 13(1)(g).

**D.     Defendant DOE's Implementing Regulations**

82.     In 2007, Defendant DOE launched its citywide "Respect For All" program ("RFA") to promote a community of inclusion in New York City public schools.  Since the enactment of DASA, Defendant DOE has amended RFA in an attempt to comply with DASA, including through the adoption of various Regulations.

*(1)     Regulation Concerning Student-on-Student Violence*

83.     On August 21, 2013, Defendant DOE issued Chancellor's Regulation A-832 ("CR-A832"), as amended, which addresses "Student-to-Student Discrimination, Harassment,

Intimidation and/or Bullying," as a means to comply with DASA's proscriptions concerning student-on-student violence (teacher-on-student violence and verbal abuse are covered by other regulations, as described *infra*).

84.     CR-A832(I)(C) prohibits any student from "creat[ing] a hostile school environment" for another student by conduct that unreasonably and substantially interferences with another student's education, participation in school activities, or mental, emotional, or physical well-being, or otherwise reasonably causes (or reasonably would be expected to cause) another student physical injury, emotional harm, or fear for physical safety.

85.     The Regulation prohibits a broad array of inappropriate behavior, including:

      a.     physical violence;

      b.     stalking;

      c.     threats, taunts, teasing;

      d.     aggressive or menacing gestures;

      e.     exclusion from peer groups designed to humiliate or isolate;

      f.     using derogatory language;

      g.     making derogatory jokes or name calling or slurs;

      h.     written or graphic material, including graffiti, photographs, drawings, or videos, containing comments or stereotypes that are electronically circulated or are written or printed.

CR-A832(I)(E).

86.     CR-A832(II) mandates reporting of incidents by DOE employees, but also permits reporting by students and parents, as follows:

a.     Each school must appoint an RFA liaison to whom reports of discrimination, harassment, intimidation and/or bullying can be made.  CR-A832(II)(A).

b.     Students and parents may report incidents of discrimination harassment, intimidation, and/or bullying to the RFA liaison or the principal/designee.  CR-A832(II)(B), (E).

c.     School staff members who witness such incidents, or have knowledge of them, must promptly report such incidents to the RFA liaison or principal/designee within one school day and file a written report with the RFA liaison or principal/designee within two days.  The school must keep all written reports on file.  CR-A832(II)(D).

d.     Complaints of discrimination, harassment, intimidation, and/or bullying must be entered into DOE's Online Occurrence Reporting System ("OORS") within 24 hours and promptly investigated.  CR-A832(III)(A).

87.    The principal/designee for the school where the reported incident occurred must undertake an investigation as soon as practicable, and not later than five days after receiving the complaint.  CR-A832(III)(B).  The required investigation includes:  (1) interviewing the alleged victim and documenting the conversation; (2) asking the alleged victim for a detailed written statement describing the behavior, when it took place, and who may have witnessed it; (3) interviewing the accused student and advising him/her that if the conduct has occurred, it must cease immediately; (4) asking the accused student for a written statement; and (5) interviewing any witnesses and obtaining their written statements.  *Id.*

88.     The principal/designee must advise the parent(s) of the accused student of the allegations.  The principal/designee also must advise the parent(s) of the alleged victim of the allegations, unless the alleged victim informs the principal/designee of safety concerns in regard to such notification.  CR-A832(III)(C).

89.     The school must advise the parents of the alleged victim and the parents of the accused student whether or not the allegations are substantiated.  CR-A832(III)(E).

90.     CR-A832 provides a broad set of allegedly corrective follow-up actions.  Principals are broadly permitted to:  (1) refer the complaining student and the accused student to the guidance counselor, school social worker, psychologist, or other appropriate school staff for separate counseling, where appropriate; (2) utilize intervention methods, including sensitivity training, counseling, and/or referral to a community-based agency for counseling, support, and education; and (3) subject students who have been found to have violated the policy to appropriate disciplinary action.  CR-A832(IV)(A)-(C).

91.     The principal/designee must also follow up to ensure that the conduct has stopped.  CR-A832(IV)(D).  As detailed *infra*, administrators regularly fail in the critical imperative of stopping the offensive conduct.

92.     Although DASA mandates that school districts enact policies and procedures for "tak[ing] prompt actions reasonably calculated to end the harassment, bullying or discrimination," "prevent[ing] recurrence of the behavior," and "ensur[ing] the safety of the student" after an investigation verifies the veracity of an allegation, N.Y. EDUC. L. §13(1)(e), CR-A832 fails to do so.  It does <u>not</u> establish corrective steps that schools must take.  Rather, CR-A832 simply states that bullies will be subject to appropriate disciplinary action and requires the principal or her designee to "follow up."  CR-A832(IV)(D).

93.     CR-A832 further requires each principal to ensure that all staff members, as well as the RFA liaison, receive training on the relevant policies and procedures.  CR-A832(V)(D)-(E).

94.     CR-A832 prohibits retaliation against any student, teacher, or school employee who reports an incident of alleged student-on-student discrimination, harassment, intimidation, and/or bullying.  CR-A832(VIII).

95.     CR-A832 lacks any self-execution or enforcement mechanism.  As a result, schools routinely ignore it.

(2)     *Regulation Concerning Teacher-on-Student Violence*

96.     On October 30, 2014, Defendant DOE issued Chancellor's Regulation A-420 ("CR-A420"), as amended, which addresses "Pupil Discipline and Behavior – Corporal Punishment."  Corporal punishment is defined as "any act of physical force upon a student for the purpose of punishing that student" by a teacher or other DOE employee.  CR-A420(II).

97.     CR-A420 states that "[d]isruptive behavior by a student must never be punished by the use of corporal punishment," *i.e.*, by the use of physical force.  Schools must address disruptive behavior by students "through offering guidance intervention, working with parents, and addressing behavior in accordance with Chancellor's Regulation A-443 and the DOE's Discipline Code."  CR-A420(I)(B).

98.     The sole exception to this rule is that school employees may use "reasonable physical force" to (1) protect oneself from physical injury, (2) protect another pupil, teacher, or other person from physical injury, (3) to protect school property, or (4) remove or restrain a disorderly student who refuses to comply with a request to stop, where alternative methods and procedures that do not involve the use of physical force cannot reasonably be employed to achieve such purposes.  CR-A420(II).

99.     CR-A420 requires any staff member who witnesses corporal punishment, or who has knowledge or information about or who receives a report about a student who may have been the victim of corporal punishment, to report the allegation orally to the principal/designee within one school day.  Within two school days of making the oral report, the staff member also must submit a written report to the principal/designee by completing a witness statement or file an online report directly with the Office of Special Investigations ("OSI").  CR-A420(IV)(A).

100.    CR-A420 requires principals or their designees to file reports of all allegations of corporal punishment with the OORS or the OSI immediately.  CR-A420(IV)(B).  Such allegations must be investigated by the school or the OSI.  CR-A420(VI)(A).

101.    CR-A420 requires OSI, upon receipt of a complaint of corporal punishment, to recommend whether the employee should be removed from his/her assignment pending completion of the investigation.  If OSI does not recommend removal initially, the principal may request removal, subject to review by DOE counsel.  CR-A420(V)(A).

102.    Under CR-A420, regardless of whether OSI or the school conducts the subsequent investigation, the necessary investigative steps include:  (1) interviewing the alleged victim and student/staff witnesses separately and obtaining their written statements; (2) providing the accused employee with 48 hour written notice of the right to appear with a union representative at an investigative interview to discuss the allegation of corporal punishment; (3) meeting with the accused employee; (4) evaluating the evidence; and (5) maintaining a separate file for each complaint.  CR-A420(VI)(B).

103.    If the school conducts the investigation, then the principal must determine whether or not the complaint is substantiated and complete an investigation form explaining the conclusions

reached with respect to each allegation.  The report must be completed within ten days in the absence of extenuating circumstances.  CR-A420(VI)(C)(1).

104.    CR-A420 does <u>not</u> establish any time limit on OSI-conducted investigations.  The ten day limit applies only to school-based investigations.

105.    CR-A420 requires the principal to submit the completed and signed investigative report, along with all interview notes, written statements, and investigative findings, to the senior field counsel when the school-based investigation is complete.  The school-based investigation is considered closed <u>only</u> when senior field counsel so notifies the principal.  CR-A420(VI)(C)(2).

106.    At the end of the investigation, regardless of whether it was OSI-conducted or school-based, the principal/designee "must inform the parent of the alleged victim whether the allegations were substantiated or not substantiated."  CR-A420(VI)(D).

107.    CR-A420 also prohibits retaliation against those who experience, report, or witness corporal punishment.  CR-A420(IX).

108.    CR-A420 lacks any self-execution or enforcement mechanism.  As a result, schools routinely ignore it.

(3)    *Regulation Concerning Verbal Abuse of Students By Teachers*

109.    On October 30, 2014, Defendant DOE issued Chancellor's Regulation A-421 ("CR-A421"), as amended, which addresses "Pupil Discipline and Behavior – Verbal Abuse."  It prohibits "verbal abuse" of students by teachers and other school personnel.

110.    CR-A421 defines "verbal abuse" as language (written or oral) about or directed toward students that (1) belittles, embarrasses, or subjects students to ridicule; (2) unreasonably and substantially interferes with any aspect of a student's education; (3) unreasonably and substantially interferes with a student's mental, emotional, or physical well-being; (4) reasonably

causes or would reasonably be expected to cause a student to fear for his/her physical safety; or (5) reasonably causes or would reasonably be expected to cause physical injury or emotional harm to a student. CR-A421(II)(A).

111. Within twenty-four hours of hearing allegations of verbal abuse of a student by a DOE employee, a principal/designee must report such allegations to the OSI via an online reporting form and also report the allegation in the OORS. CR-A421(IV)(B).

112. CR-A421 states that the allegations may be investigated by the OSI or the school. CR-A421(VI)(A). If the school conducts the investigation, then the principal must separately interview and take written statements from the victim and all witnesses as soon as practicable, and meet with the accused employee at least 48 hours after giving notice of the employee's right to have a union representative attend the meeting. CR-A421(VI)(B).

113. For school-based investigations, absent extenuating circumstances, CR-A421 requires the principal to complete the investigation within ten days. CR-A421(VI)(C). The principal must submit the completed and signed investigative report, along with all interview notes, written statements, and investigative findings, to the senior field counsel when the school-based investigation is complete. The school-based investigation is considered closed only when senior field counsel so notifies the principal. CR-A421(VI)(C)(2).

114. CR-A421 also prohibits retaliation against those who experience, report, or witness verbal abuse. CR-A421(IX).

115. CR-A421 lacks any self-execution or enforcement mechanism. As a result, schools routinely ignore it.

(4)    *Regulation Concerning Safety Transfers*

116.    On March 9, 2011, Defendant DOE issued Chancellor's Regulation A-449 ("CR-A449"), as amended, which addresses "Safety Transfers" as a means of removing a student from a school when it is determined that a student's continued presence in the school is unsafe for the student.

117.    CR-A449 sets forth the procedures for granting safety transfer requests when students are victims of a violent criminal offense on school property or, in other situations, when it is determined that a student's continued presence in the school is unsafe for the student.

118.    CR-A449 requires, for allegations of violent criminal offenses on school grounds, that the principal or her designee "conduct a full investigation and take appropriate action in accordance with Chancellor's Regulations A-412 and A-443." CR-A449(II)(B). Within twenty-four hours, if there is "reason to believe [the] student was a victim of a violent criminal offense on school grounds and is therefore entitled to a transfer, the Borough Director of Suspensions must notify the parent in writing of the right to transfer the student to another public school." *Id*.

119.    CR-A449 states that for a student who was not the victim of a violent criminal offense on school grounds, a safety transfer is available "if a student's parent has requested a safety transfer and it is determined that the student's continued presence in the school is unsafe for the student. Student Enrollment's Executive Director of Borough Enrollment/designee shall make this determination following a recommendation by the principal/designee." CR-A449(III)(A).

120.    Under CR-A449, where the safety transfer request involves an incident of school-related safety, the principal/designee must ensure: (1) A full investigation is conducted, (2) an occurrence report is prepared, (3) statements from all involved parties and witnesses are obtained, and (4) appropriate disciplinary action is taken. CR-A449(III)(B).

121.   CR-A449 requires the principal/designee to make a recommendation to the Student Enrollment's Executive Director of Borough Enrollment of whether she believes that the safety transfer is warranted within 48 hours of the receipt of a safety transfer request.   The principal/designee must also provide the following documents:  (1) The Safety Transfer Intake Form, (2) a summary of the principal's investigation, (3) a copy of the school occurrence report, and (4) a copy of the police report (if applicable).  CR-A449(III)(C).

122.   CR-A449 does not provide any standards for the principal/designee to use to determine when it is appropriate to recommend the granting of a safety transfer request.

123.   CR-A449 requires the Student Enrollment's Executive Director of Borough Enrollment to determine whether to grant a safety transfer and notify the parent in writing of the determination within one week of receipt of the principal's recommendation and supporting documentation.  CR-A449(III)(D).

124.   CR-A449 does not provide any standards for how the Student Enrollment's Executive Director of Borough Enrollment is to decide whether to grant a safety transfer.

125.   CR-A449 does not provide for a process to appeal a safety transfer decision.

126.   CR-A449 does not provide for an involuntary safety transfer of a student.  Rather, safety transfers pursuant to CR-A449 can only be initiated by the student's parent.

(5)   *Regulation Concerning Involuntary Transfer Procedures*

127.   On January 20, 2011, Defendant DOE issued Chancellor's Regulation A-450 ("CR-A450"), as amended, which established "Involuntary Transfer Procedures."  It "describes the procedures for effectuating the involuntary transfer of students in general education . . . pursuant to Section 3214(5) of the New York State Education Law."  CR-A450(I).

128.    CR-A450 makes schools responsible for in-school measures to address negative behaviors.  Specifically, "school personnel are responsible for developing and utilizing techniques and measures that promote optimal learning and address behaviors which negatively impact upon the education process.  When a student's behavioral and/or academic record indicates that adjustment in school is unsatisfactory, school personnel should develop plans and explore techniques for addressing a student's behavioral problem and discuss these alternatives with the student and his/her parent."  CR-A450(II)(A).

129.    CR-A450 allows for voluntary transfers that are similar to safety transfers.  If the in-school measures are unsuccessful, and if "the principal believes that the student will benefit from a transfer or will receive an appropriate education in another school, then the principal may explore a transfer with the parent."  CR-A450(II)(B).  A voluntary transfer is <u>effectuated only if the parent consents</u> to the transfer and the Office of School and Youth Development ("OSYD") Borough Director of Student Suspensions agrees.  *Id.*

130.    CR-A450 also permits, subject to certain procedures, involuntary transfers of students who display behavioral or academic problems.  The principal must consult with the Borough Director of Student Suspensions.  If the Borough Director agrees to consider a transfer, then the principal/designee must "send written notification to the student and parent stating that a recommendation to [involuntarily] transfer the student is under consideration."  CR-A450(III)(A)(1).  The letter must state the following:

a.    The date, time and place of an informal conference with the principal.  *Id.*

b.    The parent and the student have "a right to be accompanied by counsel or an individual of their choice."  *Id.*

33

      c.      The parent "has a right to request and obtain a copy of the student's records before the conference."  CR-A450(III)(A)(2).

      d.      "[I]f, after the principal's conference, the principal believes that the transfer is warranted and the parent disagrees, the parent will have an opportunity to request a hearing before the transfer can take effect."  CR-A450(III)(A)(3).

131.    If, after the informal conference with the parent, the principal concludes that the student should be transferred, CR-A450 requires the principal to issue a written transfer recommendation to the Borough Director of Student Suspensions within five days of the conference.  The recommendation "must include a description of the behavioral and/or academic problems which indicate the need for transfer and a description of alternatives explored and prior actions taken to resolve the student's problems."  A copy of the principal's written transfer recommendation must be provided to the student and parent.  CR-A450(III)(B)(6).

132.    Pursuant to CR-A450, the Borough Director of Student Suspensions can either reject the involuntary transfer recommendation as inappropriate or accept the recommendation for consideration and "notify the parent and student in writing that a transfer has been proposed and of their right to request a hearing . . . ."  CR-A450(IV)(A).

133.    CR-A450 requires the notice letter to include the following information:

      a.      The specific reasons for considering the transfer.  CR-A450(IV)(B)(1).

      b.      The parent and the student have ten days to request a hearing.  CR-A450(IV)(B)(2).

      c.      If a hearing is requested, the parent and student shall also receive notice that the date, time, and place for the hearing will be arranged and that the

proposed transfer shall not take effect until a written post-hearing decision is issued, unless the parent consents.  CR-A450(IV)(B)(3).

d.      If a hearing is not requested, the proposed transfer shall take effect after ten days, unless the parent provides written consent to an earlier date.  CR-A450(IV)(B)(4).

e.      Notice of the right to obtain copies of the student's record before the hearing, and also a list of community agencies that offer free or low-cost legal assistance.  CR-A450(IV)(B)(5).

f.      Notice of the right to bring counsel to the hearing.  CR-A450(IV)(B)(6).

g.      Notice of the right to request that DOE provide a translator at the hearing. CR-A450(IV)(B)(7).

134.    CR-A450 requires that a decision be made within ten school days of the hearing. The Borough Director of Student Suspensions must send both the principal and the parent a letter informing them of the decision and the reasons for it.  CR-A450(IV)(D)(1).  The letter must "inform the student and the parent of the right to appeal the decision."  CR-A450(IV)(D)(6).

135.    CR-A450 states that the parent of the student can appeal the involuntary transfer decision within ten school days of the receipt of the tape recording or transcript of the formal hearing.  CR-A450(V).

**E.      The Individuals with Disabilities Education Act**

136.    Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).

137.    The U.S. Department of Education, Office of Special Education and Rehabilitative

Services, has offered the following guidance regarding a free appropriate public education

("FAPE"):

> Schools have an obligation to ensure that a student with a disability who is the target
> of bullying behavior continues to receive FAPE in accordance with his or her IEP.
> The School should, as part of its appropriate response to the bullying, convene the
> IEP Team to determine whether, as a result of the effects of the bullying, the
> student's needs have changed such that the IEP is no longer designed to provide
> meaningful educational benefit.[34]

138.    For a state to be eligible for federal education funding, it must have policies and

procedures in effect that ensure, among other things, that (1) "[a] free appropriate public education

is available to all children with disabilities residing in the state between the ages of 3 and 21," (2)

"[a]n individualized education program . . . is developed, reviewed, and revised for each child with

a disability," and (3) "[t]o the maximum extent appropriate, children with disabilities . . . are

educated with children who are not disabled . . . ."  20 U.S.C. § 1412(a).

139.    New York State has enacted IDEA-compliant policies and procedures guaranteeing

that "[a] student with a disability shall be provided with appropriate special education."  8 NYCRR

§ 200.6(a).

140.    The appropriate special education for a student is "the special education specified

on the student's IEP to be necessary to meet the student's unique needs."  8 NYCRR § 200.6(a)(2).

141.    This FAPE must be provided "in the least restrictive environment . . . . [t]o enable

students with disabilities to be educated with nondisabled students to the maximum extent

appropriate . . . ."  8 NYCRR § 200.6(a)(1).

---

[34] U.S. DEP'T OF EDUC., OFF. OF SPECIAL EDUCATION AND REHABILITATIVE SERV., *Dear Colleague: Bullying of
Students with Disabilities*, (Aug. 20, 2013), https://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/bullyingdcl-
8-20-13.pdf.

142.   Local educational agencies must "ha[ve] in effect policies, procedures, and programs that are consistent with the State policies and procedures . . . ."  20 U.S.C. § 1413(a).

143.   New York has a two-tiered administrative process to address parents' complaints that a school has failed to provide their child with a FAPE.  First, parents may request a hearing before an impartial hearing officer.  8 NYCRR § 200.5(j).  Following the hearing, parents may appeal the impartial hearing officer's decision to the State review officer.  8 NYCRR § 200.5(k)

144.   An impartial hearing officer is "an individual assigned by a board of education . . . to conduct a hearing and render a decision."  8 NYCRR § 200.1(x).  During the impartial hearing, "[t]he parents . . . shall have an opportunity to present evidence."  8 NYCRR § 200.5(j)(3)(xii).

145.   The "decision made by an impartial hearing officer shall be made on substantive grounds based on a determination of whether the student received a free appropriate public education."  8 NYCRR § 200.5(j)(4)(i).

146.   New York State regulation requires that notice of these procedural safeguards be provided to all parents of children with disabilities, at least on an annual basis. 8 NYCRR § 200.5(f).

147.   Defendant DOE has established policies and procedures for implementing IDEA in New York City public schools.  Most notably, Defendant DOE's policies state that "[t]he Principal has overall responsibility for ensuring that students with disabilities are provided with their recommended programs and services" as set forth in students' IEPs.[35]

148.   Defendant DOE has also issued a Bill of Student Rights and Responsibilities, K-12, which states that "students with disabilities who have been determined to be in need of special

---

[35] N.Y.C. DEP'T OF EDUC., *Standard Operating Procedures Manual: The Referral, Evaluation, and Placement of School-Age Students with Disabilities*, at 20 (Feb. 2009), *available at* http://schools.nyc.gov/NR/rdonlyres/B658DB42 -561D-4A93-9707-1645FD3AE961/0/SOPM.pdf.

education are entitled to a free appropriate public education from age 3 until age 21, as provided by law."[36]

## FACTUAL ALLEGATIONS

149.    As described in detail *infra*, the Named Class Plaintiffs, and others not herein named as plaintiffs, have suffered in-school violence, including harassment, intimidation, bullying, and abuse, some inflicted student-on-student and some teacher-on-student.  These episodes show Defendant DOE's systematic failure to comply with DASA or its own Regulations concerning in-school violence, which constitutes a custom and practice of deliberate indifference to in-school violence against Named Class Plaintiffs and others similarly situated.[37]

A.    **Allegations of Named Class Plaintiffs**

**JD1**

150.    JD1 is a 9-year old Black male student who is enrolled in an elementary school in East Harlem, New York County.  He is a child with a disability within the meaning of the IDEA, specifically a speech or language impairment, and has an IEP.  He has been denied a FAPE, a consequence of the violence and bullying he has experienced at school.

---

[36] N.Y.C. DEP'T OF EDUC., *Citywide Behavioral Expectations to Support Student Learning*, at 15 (Apr. 2015), *available at* http://schools.nyc.gov/NR/rdonlyres/CD69C859-524C-43E1-AF25-C49543974BBF/0/DiscCodebooklet April2015FINAL.pdf.

[37] Even since the commencement of this case, Defendant DOE's conduct has made clear that it does not have a satisfactory system in place to monitor incidents of bullying.  After commencing this lawsuit, Plaintiffs agreed by stipulation to disclose to Defendants the names of all the victims, the schools in which the incidents took place, and, if known, the names of relevant DOE staff.  Therefore, it should have been very easy for the Defendants to locate documentation of the incidents described below, if Defendant DOE had followed its own Regulations.  Instead, Defendants sent Plaintiffs a letter demanding the names of the bullies, apparently because they were unable to find them or identify the incidents described in the Amended Complaint. This letter was tantamount to an admission that Defendant DOE did not properly document *ab initio* at least some of the incidents alleged below, in violation of the Regulations and DASA.  Since Plaintiffs' counsel had already provided to Defendants' counsel the names of the victims and the names of many DOE Officials involved in the incidents, Defendant DOE should have been able— assuming the incidents were properly documented in accordance with the Regulations—to identify the incidents and the names of the bullies.  Defendant DOE's claimed inability to do this further evidences its failure to document, investigate, and remediate in-school violence and bullying incidents, such as those which lie at the heart of this Complaint, as described in the allegations below.

151.    JD1's school is in District 4, where 87.6% of students are Black or Hispanic. District 4 experienced 22 violent incidents per 1000 students.  It also experienced 46 disruptive incidents per 1000 students.[38]  *See* Section C *infra*.

152.    On or about December 23, 2014, a male student ("Bully 1A") approached JD1, repeatedly kicked him on his body, and verbally harassed him.  JD1 and Bully 1A were in the same class and the incident occurred while school was in session.  JD1 did not defend himself based on fear of retaliation.

153.    JD1 reported the incident to his mother ("Parent 1") and stated that Bully 1A was often abusive to JD1 and other students, even when the teacher was present in the room.  To the best of Parent 1's knowledge, the teacher never reported the abuse to the school principal ("Principal 1") or his designee, in violation of CR-A832(II)(D).  Moreover, Bully 1A disrupted class by talking loudly and bothering other students who were trying to learn.  The teacher sometimes asked an aide to walk Bully 1A up and down the hallway to calm him down.

154.    Parent 1 contacted JD1's teacher and Principal 1 to report the incident via e-mail, telephone, and in person.  However, despite her numerous attempts to report the incident, Principal 1 did not respond to Parent 1's communications.

155.    To the best of Parent 1's knowledge, Principal 1 did not prepare or file a single incident report, in violation of CR-A832(III)(A).

156.    To the best of Parent 1's knowledge, Principal 1 did not conduct any investigation, in violation of CR-A832(III)(B) and N.Y. EDUC. L. § 13(1)(d).

157.    Principal 1 did not attempt to contact the accused student's parents, in violation of CR-A832(III)(C).

---

[38] Jensen Decl. ¶ 20.

158.    To the best of Parent 1's knowledge, Principal 1 took no corrective action reasonably designed to ensure that the violence would stop, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

159.    In or around the fall of 2015, Bully 1A, along with another male student ("Bully 1B"), grabbed, kicked, and punched JD1 during the lunch period.  JD1 reported the incident to Parent 1 and stated that a lunch aide was present during the incident.  To the best of Parent 1's knowledge, this lunch aide did not report the incident to Principal 1 or other school officials, in violation of CR-A832(II)(D) and N.Y. EDUC. L. § 13(1)(c).

160.    In or around January 2016, Bully 1A again approached JD1 and choked him during the lunch period.  A lunch aide sent JD1 to the school nurse and called Parent 1.

161.    To the best of Parent 1's knowledge, neither the school nurse nor the lunch aide informed Principal 1 or his designee of the incident, in violation of CR-A832(II)(D).

162.    Parent 1 reported the incident to Principal 1, who informed Parent 1 that he would investigate and report back to her.  Principal 1 did not ask JD1 to submit a detailed written narrative of the incident, in violation of CR-A832(III)(B).

163.    To the best of Parent 1's knowledge, Principal 1 did not prepare or file a single incident report, in violation of CR-A832(III)(A).

164.    To the best of Parent 1's knowledge, Principal 1 did not attempt to contact the accused student's parents, in violation of CR-A832(III)(C).

165.    Neither Principal 1 nor a designee notified Parent 1 whether the allegations were substantiated, in violation of CR-A832(III)(E).

166.     To the best of Parent 1's knowledge, Principal 1 did not take investigative or corrective action reasonably designed to ensure that the violence would stop, in violation CR-A832(III)-(IV) and N.Y. EDUC. L. § 13(1)(d)-(e).

167.     Moreover, despite Parent 1's repeated complaints of violent behavior within the school, none of the school's administrators took any protective measures to prevent contact between JD1 and the bullies.  To the contrary, JD1 and the bullies remained in the same class.

168.     As a result of the repeated assaults and harassment from Bully 1A and Bully 1B, JD1 suffered anxiety attacks and expressed lack of desire to attend school because of the violence.

169.     JD1 has been the victim of prolonged harassment, intimidation, and bullying, which are known risk factors that adversely affect learning, particularly in children with an IEP.  Despite this, his school did not take the harassment, intimidation, and bullying into account when creating or modifying JD1's IEP.  The school also did not take JD1's IEP into account when addressing the harassment, intimidation, and bullying against JD1.  Principal 1 thus ignored a condition of federal funding as outlined in guidance provided by the U.S. Department of Education, *see supra* ¶ 137, and was in contravention of the DOE's own operation manual.  *See supra* ¶ 147.

170.     Upon information and belief, Defendant DOE did not provide Parent 1 with annual notice of the procedural safeguards available to students with disabilities, as required by 8 NYCRR § 200.5(f).

**JD2**

171.     JD2 is an 8-year old Black male student who is enrolled in an elementary school in West Harlem, New York County.  He is a child with a disability within the meaning of the IDEA, specifically a learning disability, and has an IEP.  He has been denied a FAPE, a consequence of the violence and bullying he has experienced at school.

41

172.    JD2's school is in District 6, where 94% of students are Black or Hispanic. District 6 experienced 16 violent incidents per 1000 students.  It also experienced 30 disruptive incidents per 1000 students.[39]  *See* Section C *infra*.

173.    In or around September 2015, during school hours, two male students ("Bully 2A" and "Bully 2B") harassed and repeatedly hit JD2 on his body.  JD2 reported the incidents to his parent ("Parent 2").

174.    Parent 2 reported the incident to JD2's teacher during parent-teacher meetings.  The teacher placed the blame on JD2, indicating that JD2 was creating problems, but was unable to identify specific facts or incidents to support this assertion.  It was only later that Parent 2 realized that the teacher was not accurately relaying what was occurring in the classroom.

175.    To the best of Parent 2's knowledge, the teacher did not report the incident to the principal ("Principal 2") or the designee, in violation of CR-A832(II)(D).

176.    To the best of Parent 2's knowledge, Principal 2 did not prepare an incident report or document the incident in any way, in violation of CR-A832(III)(A).

177.    To the best of Parent 2's knowledge, no investigation was conducted—neither JD2 nor the accused student was interviewed, no written statements were prepared, and no witnesses were identified or interviewed—in violation of CR-A832(III)(A), CR-A832(III)(B), and N.Y. EDUC. L. § 13(1)(d).

178.    Neither Principal 2 nor her designee notified Parent 2 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

179.    To the best of Parent 2's knowledge, JD2 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

---

[39] *Id.* ¶ 22.

180.    To the best of Parent 2's knowledge, the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

181.    To the best of Parent 2's knowledge, neither Principal 2 nor her designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

182.    In or around October 2015, Bully 2A chased JD2 around the classroom and harassed JD2.  The teacher was present in the room.  After observing Bully 2A chasing and harassing JD2, the teacher had to restrain Bully 2A to stop him.  Despite observing and intervening in this incident, to the best of Parent 2's knowledge, the teacher did not report the incident to Principal 2 or her designee, in violation of CR-A832(II)(D).

183.    To the best of Parent 2's knowledge, Principal 2 did not prepare an incident report or document the incident in any way, in violation of CR-A832(III)(A).

184.    To the best of Parent 2's knowledge, no investigation was conducted—neither JD2 nor the accused student was interviewed, no written statements were prepared, and no witnesses were identified or interviewed—in violation of CR-A832(III)(A), CR-A832(III)(B), and N.Y. EDUC. L. § 13(1)(d).

185.    Neither Principal 2 nor her designee notified Parent 2 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

186.    To the best of Parent 2's knowledge, JD2 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

187.    To the best of Parent 2's knowledge, the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C); and, perhaps most importantly, neither

Principal 2 nor her designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

188.     In or around fall of 2015, JD2 began suffering from nightmares, anxiety, and increased fear of others. These anxiety attacks and fear began only after Bully 2A and Bully 2B began harassing JD2 at school.

189.     The bullying continued and JD2's symptoms steadily worsened.  His desperation reached its peak on or about December 16, 2015, when he stabbed himself in the ear.  When Parent 2 rushed to the school, she observed JD2 to have bruises on his leg in addition to the bleeding stab mark on his ear.

190.     JD2 told Parent 2 that during school hours, Bully 2B kicked him on the leg, which caused the visible bruises.

191.     JD2 told Parent 2 that he could not concentrate in class because Bully 2A and Bully 2B were insulting, harassing, and physically attacking him.  JD2 told Parent 2 that he was tired of defending himself and he did not want to hear the bullies' insults anymore.  He stabbed himself in the ear hoping to silence the insults.

192.     Parent 2 reported this incident to JD2's teacher.  The teacher was not receptive to Parent 2's complaints and no action was taken.  To the best of Parent 2's knowledge, the teacher did not report the incident to Principal 2 or the designee, in violation of CR-A832(II)(D).

193.     To the best of Parent 2's knowledge, Principal 2 did not prepare an incident report or document the incident in any way, in violation of CR-A832(III)(A).

194.     To the best of Parent 2's knowledge, no investigation was conducted—neither JD2 nor the accused student was interviewed, no written statements were prepared, and no witnesses

44

were identified or interviewed—in violation of CR-A832(III)(A), CR-A832(III)(B), and N.Y. EDUC. L. § 13(1)(d).

196.    Neither Principal 2 nor her designee notified Parent 2 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

196.    To the best of Parent 2's knowledge, JD2 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A), and the accused students were not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

197.    To the best of Parent 2's knowledge, neither Principal 2 nor her designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

198.    Parent 2 took JD2 to the emergency room at a local New York City hospital to receive medical treatment after the December 16 incident.  Yet, despite this, the school still did not take any investigative actions.

199.    On or about December 21, 2015, Parent 2 contacted 311 to report the incident and lack of response from JD2's school.

200.    On or about December 22, 2015, a school official called Parent 2 to inform Parent 2 that the school was moving JD2 to a new classroom.  The school official told Parent 2 to come into the school for a meeting with the school nurse, Principal 2, the guidance counselor, and the parent coordinator.

201.    At the meeting, instead of addressing the incident and harassment of JD2, Principal 2 admonished Parent 2 for contacting 311 and stated, in sum and substance, that Parent 2 should have come directly to school officials.  Parent 2 informed the Principal 2 that she had

made multiple reports to the teacher, nurse, and guidance counselor, but Principal 2 was not receptive to Parent 2.

202.    To the best of Parent 2's knowledge, despite the conference, report to 311, and JD2's injuries, Principal 2 did not prepare an incident report or document the incident in any way, in violation of CR-A832(III)(A).

203.    To the best of Parent 2's knowledge, no investigation was conducted—neither JD2 nor the accused student was interviewed, no written statements were prepared, and no witnesses were identified or interviewed—in violation of CR-A832(III)(A), CR-A832(III)(B), and N.Y. EDUC. L. § 13(1)(d).

204.    Neither Principal 2 nor her designee notified Parent 2 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

205.    To the best of Parent 2's knowledge, JD2 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

206.    To the best of Parent 2's knowledge, the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

207.    To the best of Parent 2's knowledge, neither Principal 2 nor her designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

208.    In and between September 2015 and December 2015, JD2 lost significant learning time in the classroom because of the bullies' harassment, insults, and physical assaults. He had trouble focusing and concentrating on school and resorted to self-inflicted injury to drown out the harassment from the bullies. JD2 was taken out of class to receive medical treatment and continues

to suffer from severe anxiety and fear of the classroom where these incidents occurred.  He was ultimately transferred to another class at the school.

209.     Upon information and belief, Defendant DOE did not provide Parent 2 with annual notice of the procedural safeguards available to students with disabilities, as required by 8 NYCRR § 200.5(f).

**JD3**

210.     JD3 is a 9-year old Hispanic male student who is enrolled in an elementary school in West Harlem, New York County.  He is a child with a disability within the meaning of the IDEA, specifically a speech and language impairment and a learning disability, and has an IEP. He has been denied a FAPE, a consequence of the violence and bullying he has experienced at school.

211.     JD3's school is in District 5, where 90.9% of students were Black or Hispanic. District 5 experienced 26 violent incidents per 1000 students.   It also experienced over 36 disruptive incidents per 1000 students.[40]  *See* Section C *infra*.

212.     On or about October 20, 2013, JD3's math teacher ("Teacher 3"), an adult male, grabbed him by the ear, dragged him down the stairs and threw him onto a landing.

213.     After JD3's mother ("Parent 3") observed JD3's bruises, JD3 informed Parent 3 of the incident.

214.     Parent 3 then contacted the NYPD, which indicated that a police officer would meet Parent 3 at the school to investigate the incident.  However, no NYPD representative ever came to the school.  Accordingly, to the best of Parent 3's knowledge, this incident was not included in the NYPD's reporting data.  *See* Section C *infra*.

---

[40] *Id.* ¶ 21.

215.    Parent 3 then contacted the school principal ("Principal 3") and met with Principal 3 and Teacher 3 to discuss the incident.  Teacher 3 stated that nothing had happened and that he had not had any physical contact with JD3.  He claimed that JD3 had fabricated the incident.  Parent 3's mother observed that Principal 3 took notes.  However, to the best of Parent 3's knowledge, Principal 3 did not prepare an actual incident report, in violation of CR-A420(IV)(B).

216.    Principal 3 stated that she would conduct an investigation and contact Parent 3 after its conclusion.  Two weeks passed, however, without any further word from Principal 3, in violation of CR-A420(VI)(C)(1) and N.Y. EDUC. L. § 13(1)(d).

217.    Although other students witnessed the incident, Parent 3 is unaware of any evidence that Principal 3 or a designee interviewed any other students to investigate this matter, in violation of CR-A420(VI)(B) and N.Y. EDUC. L. § 13(1)(d).

218.    Parent 3 then requested another meeting.  At this second meeting, Teacher 3 stated in substance:  "I had him by the shirt and he tripped down the stairs."  Parent 3 noted that Teacher 3's story at the second meeting directly contradicted Teacher 3's explanation from the first meeting.

219.    Further, to Parent 3's knowledge, the school conducted no investigation into JD3's allegations or Teacher 3's implausible story, despite the serious injuries JD3 suffered, in violation of CR-A420(VI)(B) and N.Y. EDUC. L. § 13(1)(d).

220.    Principal 3's reaction to these events was, essentially, to punish JD3, in violation of CR-A420(IX).  JD3 was removed from the classroom during math period.  However, JD3 was not placed in another math class and, therefore, received no math instruction at all.  While his peers received math instruction, JD3 was sent to a kindergarten classroom to spend the class period.

221.   Moreover, despite removing JD3 from the classroom, the school took no protective measures to prevent contact between JD3 and Teacher 3.  JD3 continued to see Teacher 3 when he came to the classroom to teach the rest of JD3's class.

222.    As further retaliation against JD3, Principal 3 initiated a "safety transfer" for JD3 under Chancellor's Regulation A-449.  However, Principal 3 did not consult with Parent 3 before doing so, did not seek Parent 3's consent for the transfer, and did not consult with Parent 3 concerning potential transfer sites, all in contravention of CR-A449.  The act of initiating a "safety transfer" is a demonstrable sign that either Principal 3 believed Teacher 3 posed a threat to JD3, or Principal 3 was simply punishing JD3 for reporting Teacher 3's conduct.

223.   Principal 3 only informed Parent 3 of the transfer after it had been approved, but she did not secure JD3's placement in any alternative school.  Thus, Principal 3 effectively expelled JD3.

224.   Such conduct directly violated Chancellor's Regulation A-449, the safety transfer protocol.  The protocol provides, in part, that a student who is the victim of a "violent criminal offense" on school grounds is entitled to a transfer.  However, any such transfer may be made only "[i]f the [student's] parent wishes to pursue a transfer."   CR-A449(II)(B)(2)(f) and CR-A449(II)(3)(c) (emphasis added).   Further, in such circumstances, the Borough Director of Suspensions, in consultation with the Office of Student Enrollments, must "select a transfer site to offer the parent."  CR-A449(II)(B)(3)(c) (emphasis added).

225.   Alternatively, the protocol provides that safety transfers are available where the student is not the victim of a violent criminal offense, "if a student's parent has requested a safety transfer and it is determined that the student's continued presence in the school is unsafe for the student."  CR-A449(III)(A) (emphasis added).

226.    Here, regardless of whether the transfer was based on a determination that the student was a victim of a violent criminal offense or was made purely on the basis of a determination of student safety, the transfer violated the protocol because <u>the parent did not make any request</u> for a transfer.

227.    Instead, in violation of CR-A420(IX) and N.Y. EDUC. L. § 13(1)(f), which prohibit retaliation against a student who reports an incident of school violence, the school effectively expelled JD3 by telling Parent 3 that his transfer to another school was "approved" without actually securing a spot at another school.  Parent 3 had to assume the burden, after the fact, of finding another school for JD3.

228.    As a result of the attack by Teacher 3, JD3 suffered anxiety attacks, causing him to miss several days of school.  JD3's grades suffered because of this anxiety and his increased fear of being in the same school as the male teacher.  JD3 received medical treatment from a doctor after the incident because of the noted physical effects.  JD3 also received medical treatment from a psychiatrist for approximately six months and was diagnosed with post-traumatic stress disorder ("PTSD").  Three years later, at the time of this filing, JD3 still suffers from the effects of PTSD.

229.    In addition, JD3 was forced to miss several days of school after he was effectively expelled from his school because Defendant DOE had not secured a spot for JD3 at another school.

230.    In February 2016, Teacher 3 was arrested for assaulting another student in similar fashion, by throwing him across the hallway.

231.    JD3 was the victim of harassment, intimidation, violence, and/or bullying, which are known risk factors that adversely affect learning, particularly in children with an IEP.  Despite this, his school did not take the harassment, intimidation, and bullying into account when creating or modifying JD3's IEP.  The school also did not take JD3's IEP into account when addressing the

harassment, intimidation, and bullying against JD3.  Principal 3 thus ignored a condition of federal funding as outlined in guidance provided by the U.S. Department of Education, *see supra* ¶ 137, and was in contravention of the DOE's own operation manual.  *See supra* ¶ 147.

232.    Upon information and belief, Defendant DOE did not provide Parent 3 with annual notice of the procedural safeguards available to students with disabilities, as required by 8 NYCRR § 200.5(f).

**<u>JD4</u>**

233.    JD4 is an 11-year old White female student who is enrolled in an elementary school in West Harlem, New York County.  She is a child with a disability within the meaning of the IDEA, specifically a learning disability, and has an IEP.  She has been denied a FAPE, a consequence of the violence and bullying he has experienced at school.

234.    JD4's school is in District 5, where 90.9% of students are Black or Hispanic.  District 5 experienced 26 violent incidents per 1000 students.  It also experienced 36 disruptive incidents per 1000 students.[41]  *See* Section C *infra*.

235.    On or about November 20, 2015, during school hours, JD4 observed three female students, who appeared to be whispering about her.  When the three female students walked out of the classroom, one female student ("Bully 4A") pushed JD4 into the chalkboard, which caused JD4 to hit her back on the metal part of the chalkboard.

236.    JD4 left the classroom, went to the bathroom crying, called her mother ("Parent 4"), and reported the incident to the school nurse.  Parent 4 rushed to the school based on JD4's report.

237.    JD4 went to the school nurse who recorded in an informal log that JD4 had injured her back in the classroom.  However, to the best of Parent 4's knowledge, the school nurse did not

---

[41] *Id.* ¶ 21.

report the incident to the school principal ("Principal 4") or the designee, in violation of CR-A832(II)(D).

238.    Neither the school nurse nor Principal 4 contacted Parent 4 directly to report the incident, in violation of CR-A832(III)(C).

239.    JD4 reached out to Principal 4 to report the incident, and Principal 4 sent JD4 to the school dean ("Dean 4").  To the best of Parent 4's knowledge, Principal 4 did not prepare an incident report or document the incident in any way, in violation of CR-A832(III)(A).

240.    When Parent 4 spoke with Principal 4 and Dean 4, she requested the incident report regarding the assault and harassment of JD4.  However, Principal 4 stated, in sum and substance, that the report did not exist yet, but she would fill one out and investigate the incident.  Further, Principal 4 told Parent 4, in sum and substance, that Parent 4 was not entitled to the report.

241.    To the best of Parent 4's knowledge, it was only after she requested the incident report that Principal 4 filled one out; Principal 4 had not created a report when the incident occurred.  After reviewing the incident report, Parent 4 noted that the report did not accurately reflect the incident.  The report states that the school notified and contacted the parent of the student, but as noted *supra*, school officials never attempted to directly advise or contact Parent 4 of the incident or allegations.

242.    To the best of Parent 4's knowledge, no investigation was conducted—neither JD4 nor the accused student was interviewed, no written statements were prepared, and no witnesses were identified or interviewed—in violation of CR-A832(III)(A), CR-A832(III)(B), and N.Y. EDUC. L. § 13(1)(d).

243.    Neither Principal 4 nor her designee notified Parent 4 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

244.    To the best of Parent 4's knowledge, JD4 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

245.    To the best of Parent 4's knowledge, the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

246.    To the best of Parent 4's knowledge, neither Principal 4 nor the designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

247.    As a result of the aforementioned incident, JD4 suffered from cuts and scratches to her back, and feared for her physical safety.

248.    In January 2016, during school hours, a male student ("Bully 4B") grabbed JD4 and slammed her body against a desk.  Bully 4B threatened to punch JD4 in the face.

249.    JD4 felt scared because of the attack and threats.  She went to the bathroom crying and called Parent 4 to tell her about the incident.

250.    JD4 went to Dean 4's office to report the incident.  Dean 4 told JD4 that she would resolve it.  However, to the best of Parent 4's knowledge, Dean 4 did not document the incident in any way and the school did not prepare or file an incident report, in violation of CR-A832(III)(A).

251.    To the best of Parent 4's knowledge, JD4 sat in Dean 4's office and did not return to her classroom where class was in session while she was waiting for Parent 4 to arrive.

252.    Neither Dean 4 nor Principal 4 contacted nor advised Parent 4 regarding the incident, in violation of CR-A832(III)(C).  Parent 4 came to the school because JD4 told her about the incident.

253.    Upon meeting with Parent 4, Dean 4 stated that she would attempt to contact Bully 4B's parents.  However, to the best of Parent 4's knowledge, the school officials did not contact or speak with Bully 4B's parents, in violation of CR-A832(III)(C).

254.    School officials did not take any corrective action reasonably designed to prevent a recurrence of the assault, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

255.    To the best of Parent 4's knowledge, the complaint was not entered into the OORS within 24 hours, in violation of CR-A832(III)(A); no investigation was conducted—neither JD4 nor the accused student was interviewed, no written statements were prepared, and no witnesses were identified or interviewed—in violation of CR-A832(III)(A), CR-A832(III)(B), and N.Y. EDUC. L. § 13(1)(d).

256.    Neither Principal 4 nor her designee notified Parent 4 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

257.    To the best of Parent 4's knowledge, JD4 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

258.    To the best of Parent 4's knowledge, the school did not utilize intervention methods, in violation of CR-A832(IV)(B); and the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

259.    On or about March 3, 2016, a male student ("Bully 4C") approached JD4 and kicked her in the rear while shouting, in sum or substance, "You are a little White bitch, you need to take your little White ass out of here.  You don't belong here.  Go back to where you came from."

260.     JD4 called Parent 4 crying and reported the incident to Parent 4.  JD4 went to the school nurse to report the incident.  To the best of Parent 4's knowledge, the school nurse did not report the incident to Principal 4 or the designee, in violation of CR-A832(II)(D).

261.     A few days after the March 3, 2016 incident, Parent 4 went to the school and spoke with Dean 4.  Dean 4 stated that she was unaware of the incident on March 3, 2016, indicating that the nurse had not reported the incident, in violation of CR-A832(II)(D).  To the best of Parent 4's knowledge, despite having reported the incident to Dean 4, Dean 4 did not report the incident to Principal 4, in violation of CR-A832(II)(D).

262.     Parent 4 requested a copy of the incident report regarding the incident, and Principal 4 again told Parent 4 that she was not entitled to any reports of documentation regarding the incident.

263.     To the best of Parent 4's knowledge, school officials did not request a written narrative of the incident from JD4, in violation of CR-A832(III)(B).

264.     School officials did not take any corrective action reasonably designed to prevent a recurrence of the assault, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

265.     To the best of Parent 4's knowledge, the complaint was not entered into the OORS within 24 hours, in violation of CR-A832(III)(A); no investigation was conducted—neither JD4 nor the accused student was interviewed, no written statements were prepared, and no witnesses were identified or interviewed—in violation of CR-A832(III)(A), CR-A832(III)(B), and N.Y. EDUC. L. § 13(1)(d).

266.     Neither Principal 4 nor her designee notified Parent 4 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

267.    To the best of Parent 4's knowledge, JD4 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

268.    To the best of Parent 4's knowledge, the school did not utilize intervention methods, in violation of CR-A832(IV)(B); and the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

269.    On or about March 17, 2016, Bully 4A repeatedly pushed JD4 into a desk in the classroom during school hours.

270.    There were two teachers in the room at the time of this incident.  However, neither teacher attempted to assist JD4, separate the two students, or take any other measures to stop the assault.

271.    To the best of Parent 4's knowledge, neither of the teachers who were present in the classroom attempted to report the incident to Principal 4 or her designee, in violation of CR-A832(II)(D).

272.    JD4 left the classroom crying and called Parent 4 to tell her about the incident.

273.    Parent 4 complained to the school and spoke with a school official.  This school official asked JD4 to write a narrative report regarding the incident.  This was the first time that a school official asked JD4 to document an incident of bullying or violence.

274.    To the best of Parent 4's knowledge, school officials did not take any corrective action reasonably designed to prevent a recurrence of the assault, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

275.    To the best of Parent 4's knowledge, the complaint was not entered into the OORS within 24 hours, in violation of CR-A832(III)(A)

276. Neither Principal 4 nor her designee notified Parent 4 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

277. To the best of Parent 4's knowledge, JD4 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

278. To the best of Parent 4's knowledge, the school did not utilize intervention methods, in violation of CR-A832(IV)(B).

279. To the best of Parent 4's knowledge, the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

280. Due to the inadequate response from the school and its failure to take investigative and corrective action against the ongoing harassment and violence against JD4, Parent 4 called 311 to inquire about remedies. The 311 operator informed her of Defendant DOE's safety transfer policy. This was the first time Parent 4 had heard of this available remedy. The 311 operator informed Parent 4 that she would need documentation from the school of each incident, which included occurrence reports, police reports, if any, a summary investigation form, and a "T-form."

281. Parent 4 was not in possession of any of these documents because the school failed to prepare these reports for each incident; or, if they did exist, the school failed to provide access or copies of each to Parent 4. Each and every time she attempted to procure any documentation, Principal 4 responded that Parent 4 was not entitled to any documentation.

282. Due to the aforementioned conduct, which included repeated assault and harassment from the fall of 2015 through the spring of 2016, JD4 suffered from repeated anxiety and panic attacks during mornings before going to school. JD4 received medical treatment from a therapist because of her fear of attending school and her increased anxiety.

283.    Since the incidents began in the fall of 2015, JD4's grades have suffered.  JD4 is unable to focus in school.  JD4 received a "Promotion in Doubt" notice from her mathematics class.  Many of the students who assaulted and harassed JD4 are in her mathematics class.

284.    Upon information and belief, Defendant DOE did not provide Parent 4 with annual notice of the procedural safeguards available to students with disabilities, as required by 8 NYCRR § 200.5(f).

### **JD5 and JD6**

285.    JD5 is an 11-year old Hispanic female student who is enrolled at an elementary school in Chelsea, New York County.  She has been bullied by the same bully ("Bully 5") since she was in kindergarten.  Grandparent 5 is JD5's legal guardian.

286.    JD6 is a 7-year old Hispanic female student, who is enrolled at the same elementary school in Chelsea, New York County.  She is JD5's sister.  Beginning in approximately April 2015, JD5 has been physically assaulted and verbally abused by JD5's tormentor.

287.    JD5 and JD6's school is in District 2, where 49.9% of students are Black or Hispanic.  District 2 experienced 10 violent incidents per 1000 students.  It also experienced 31 disruptive incidents per 1000 students.[42]  *See* Section C *infra*.

288.    In kindergarten (the 2010-2011 school year) Bully 5 began assaulting and harassing JD5, including kicking and teasing her.  Grandparent 5 reported the conduct to JD5's teacher, and the teacher separated the students in the classroom.

289.    To the best of Grandparent 5's knowledge, the teacher did not file an incident report, in violation of CR-A832(II)(D) and N.Y. EDUC. L. § 13(1)(c).

---

[42] *Id.* ¶ 18.

290.    To the best of Grandparent 5's knowledge, the complaint was not entered into the OORS within 24 hours, in violation of CR-A832(III)(A).

291.    To the best of Grandparent 5's knowledge, no investigation was conducted—neither JD5 nor the accused student was interviewed, no written statements were prepared, and no witnesses were identified or interviewed—in violation of CR-A832(III)(A), CR-A832(III)(B), and N.Y. EDUC. L. § 13(1)(d).

292.    To the best of Grandparent 5's knowledge, JD5 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

293.    To the best of Grandparent 5's knowledge, the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

294.    To the best of Grandparent 5's knowledge, neither the principal ("Principal 5A") nor her designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

295.    Bully 5 began escalating her harassing conduct the following year, in first grade, the 2011-12 school year.  Early in the school year, Bully 5 began assaulting and harassing JD5. This included both physical assaults and verbal abuse, including by calling JD5 "ugly," saying her mother was ugly, and making other disparaging remarks that caused JD5 severe anguish. Grandparent 5 tried to obtain a meeting with Principal 5A, but the assistant principal ("Assistant Principal 5") said she had to handle the matter first and she would inform Principal 5A.  Assistant Principal 5 referred the matter to the teacher, who said she would speak with both girls together. Notwithstanding the teacher's ostensible intervention, the bullying conduct continued unabated.

296.    To the best of Grandparent 5's knowledge, neither Assistant Principal 5 nor the teacher filed an incident report, in violation of CR-A832(II)(D) and N.Y. EDUC. L. § 13(1)(c), nor

was any investigation conducted, written statement obtained, or follow-up or corrective action taken, in violation of CR-A832(III)-(IV) and N.Y. Educ. L. § 13(1)(d)-(e).

297.    Neither Principal 5A nor her designee notified Grandparent 5 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

298.    To the best of Grandparent 5's knowledge, JD5 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

299.    To the best of Grandparent 5's knowledge, the school did not utilize intervention methods, in violation of CR-A832(IV)(B).

300.    To the best of Grandparent 5's knowledge, the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

301.    Neither Principal 5A nor her designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. Educ. L. § 13(1)(e).

302.    Grandparent 5 then filed a report with Defendant DOE on November 18, 2011.  She reported that JD5 "has been bullied . . . pinched, punched, chased, picked-on, [and] called names." Grandparent 5's report added that JD5 was in "a state of depression, always crying not wanting [to] go [to] school," and that the bullying "is causing [JD5] to act nervous and hav[e] panic attacks."  Defendant DOE told Grandparent 5 that it would conduct an investigation, but the subsequent "investigation" was limited to Assistant Principal 5 speaking with Bully 5 and some other first grade children.  Assistant Principal 5 did not obtain written statements from JD5, Bully 5 or the witnesses, or contact Bully 5's parents, in violation of CR-A832(III)(B) and CR-A832(III)(C).  Based on this wholly insubstantial and inadequate investigation, Defendant DOE determined that JD5's complaints were meritless.

303.    Predictably, the bullying not only continued but escalated.  Bully 5 attacked JD5 by punching her, pulling her hair, and kicking her.  Bully 5 rallied other children to assault and harass JD5 as well.  In one attack in first grade, Bully 5 and several other students held JD5 down while they screamed at her, called her names, and spit on her.  As demonstrated by this attack, neither Principal 5A nor her designee had followed up on the previous incidents to ensure that the bullying conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e). Because Defendant DOE determined—based on a wholly insufficient investigation, lacking the procedures mandated by CR-A832—that the bullying "did not exist," neither Defendant DOE nor the school developed a corrective action plan reasonably designed to end the violence, in violation of CR-A832(IV) and N.Y. EDUC. L. § 13(1)(e).

304.    Regarding the attack in which JD5 was held down, screamed at, and spit upon, to the best of Grandparent 5's knowledge, no school official filed an incident report, in violation of CR-A832(II)(D) and N.Y. EDUC. L. § 13(1)(c).

305.    To the best of Grandparent 5's knowledge, the complaint was not entered into the OORS within 24 hours, in violation of CR-A832(III)(A).

306.    Neither Principal 5A nor her designee notified Grandparent 5 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

307.    To the best of Grandparent 5's knowledge, JD5 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

308.    To the best of Grandparent 5's knowledge, the school did not utilize intervention methods, in violation of CR-A832(IV)(B).

309.    To the best of Grandparent 5's knowledge, the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

310.    To the best of Grandparent 5's knowledge, neither Principal 5A nor her designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

311.    In response to this incident and the long series of other incidents that year, Grandparent 5 spoke with Principal 5A late in the first grade school year to request that JD5 and Bully 5 be placed in different classes for the second grade.  Principal 5A ignored this request and did not investigate the complaint, in violation of CR-A832(III) and N.Y. EDUC. L. § 13(1)(d). Instead, Principal 5A put JD5 and Bully 5 in the same class in second grade.  Bully 5 continued to harass and assault JD5 throughout the second grade school year of 2012-13, and the teacher and school administrators did nothing to stop the continuing incidents, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

312.    Grandparent 5 made continued reports to school officials, including Assistant Principal 5, regarding the ongoing harassment and bullying throughout the year.  To the best of Grandparent 5's knowledge, neither Assistant Principal 5 nor anybody else filed any incident reports, in violation of CR-A832(II)(D) and N.Y. EDUC. L. § 13(1)(c).

313.    To the best of Grandparent 5's knowledge, the complaints were not entered into the OORS, in violation of CR-A832(III)(A); no investigations were conducted—neither JD5 nor Bully 5 was interviewed, no written statements were prepared, and no witnesses were identified or interviewed—in violation of CR-A832(III)(A), CR-A832(III)(B), and N.Y. EDUC. L. § 13(1)(d).

314.    Neither Principal 5A nor her designee notified Grandparent 5 of either allegations against Bully 5 or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

315.    To the best of Grandparent 5's knowledge, JD5 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

316.    To the best of Grandparent 5's knowledge, the school did not utilize intervention methods, in violation of CR-A832(IV)(B).

317.    To the best of Grandparent 5's knowledge, the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

318.    To the best of Grandparent 5's knowledge, neither Principal 5 nor her designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

319.    Grandparent 5 again requested—to both Principal 5A and Defendant DOE—that JD5 and Bully 5 be placed in different classes in third grade.  Again, the request was ignored.  JD5 and Bully 5 were placed in the same third grade class during the 2013-14 school year.

320.    Throughout second and third grades, JD5 cried many nights after coming home from school, and begged not to have to go to school the following day.  She started eating lunch in the bathroom to avoid Bully 5.  In February 2013, when JD5 was in second grade, Grandparent 5 met with Principal 5A to report more bullying.  Principal 5A said she was not aware of any of the previous conduct that Grandparent 5 had reported to Assistant Principal 5 or Defendant DOE. This was an admission that Assistant Principal 5 and JD5's teacher had violated CR-A832 (II)(D) and CR-A832(III)(A) by failing to document the repots, and that school officials had violated CR-

63

A832(III)-(IV) and N.Y. EDUC. L. § 13(1)(d)-(e) by failing to conduct any investigation or ensure that the violence had ended.

321.    Grandparent 5 reminded Principal 5A that she had previously spoken with her directly about the bullying.  Yet, in a subsequent meeting in approximately the spring of 2013, Principal 5A called Grandparent 5 a "liar" and said that she had not received any oral or written reports about JD5 being attacked.  In so saying, Principal 5A admitted again that she and the school had violated the reporting procedures in CR-A832(II)(D).

322.    Grandparent 5 again requested that JD5 and the bully be split into different classes in fourth grade, but the students were again placed in the same class.  This was another violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e), because the school did not take steps to ensure that the bullying conduct would stop.

323.    Bully 5 continued harassing and assaulting JD5 throughout the fourth grade year, during 2014-15, and even escalated her conduct by attacking not only JD5, but also JD5's sister, JD6, who is four years younger and at the time was in first grade.  JD6 has a diagnosis of mild autism, a fact of which the school is aware, which makes her more vulnerable to the negative effects of bullying.

324.    On April 28, 2015, the bully hit JD6 with enough force to knock JD6 down to the ground.  JD6 went to the school nurse after this attack.  Upon information and belief, the school did not escalate the matter to the school's RFA liaison or the principal/designee, in violation of CR-A832(II)(D).  The nurse's report claims that JD6 had "no visible red area, bruise, or swelling."  Yet, when Grandparent 5 picked JD6 up from school that day, Grandparent 5 saw that JD6 had a mark on her face where she had been hit, and JD6 complained of a headache.  The incident again

proved that neither Principal 5A nor her designee followed up on any of the previous bullying to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

325.    Moreover, to the best of Grandparent 5's knowledge, JD6 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

326.    To the best of Grandparent 5's knowledge, the school did not utilize intervention methods, in violation of CR-A832(IV)(B).

327.    To the best of Grandparent 5's knowledge, the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).  JD6 continues to be verbally harassed and bullied by Bully 5, indicating that neither Principal 5A nor her designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

328.    The following day, on April 29, 2015, Grandparent 5 filed two complaints with the Defendant DOE.  Regarding JD5, Grandparent 5 reported a "severe bullying case.  Started [three years] ago [and] still not resolve[d]… [The bully is] literally beating both of my girls.  [The] principal is not taking enough actions to separate these girls but putting them together in the same class [and it is] getting worse.  My daughter is afraid [to] go to school… she hides in bathrooms."

329.    Regarding JD6, Grandparent 5 reported "my 6-yr old (1st grade) has been struck, pushed, and cursed by a 4th grader who [is also] my 4th grader's bully.  This 4th grader is now try[ing] to get to my little 1st grader… [I] am sick [and] tired of no actions being taken…"

330.    Defendant DOE told Grandparent 5 that it would look into the incident.  To the best of Grandparent 5's knowledge, Defendant DOE did not ask for written narratives from either JD5 or JD6, nor did it otherwise investigate the incident, in violation of CR-A832(III)(B) and N.Y. EDUC. L. § 13(1)(d).

331.    Defendant DOE never contacted Grandparent 5 to notify her about whether her allegations were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

332.    Neither JD5 nor JD6 was referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

333.    To the best of Grandparent 5's knowledge, the school did not utilize intervention methods, in violation of CR-A832(IV)(B), and the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

334.    The bullying continued through the rest of the year, indicating that neither Principal 5A nor her designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

335.    A few weeks later, Grandparent 5 was called in for a meeting with Defendant DOE and the school's administration.  Principal 5A again claimed to be unaware of the extent of the problem, and admitted that the school did not have records of the previous four years of bullying, all of which had been reported by Grandparent 5.  This again was an admission of the school's violation of CR-A832's various reporting, investigation, and follow-up procedures.  Grandparent 5 told Defendant DOE that she would file a police report if the harassment and assaults continued. Principal 5A suggested only that Grandparent 5 transfer JD5 to a different school.  As noted *supra*, this is a common Defendant DOE reaction to bullying, constituting an additional punishment, and imposing an extreme burden, on the victim, in violation of CR-A832(I) and N.Y. EDUC. L. § 13(1)(f), which prohibit retaliation against students who report bullying.

336.    When JD5 reached 5th grade, the school had a new principal ("Principal 5B"). JD5's bully was finally put into a different class, but continued bullying JD5 at the beginning of the day during line up and at lunch.  Bully 5 threatened JD5 with violence and verbally harassed

her.  Bully 5 even sent notes from her classroom to JD5 in JD5's classroom, containing harassing messages.  This again demonstrated that neither Principal 5A nor her designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

337.    To the best of Grandparent 5's knowledge, during the past six years, Bully 5 has never been disciplined for her conduct toward JD5 or JD6.  The only preventative steps taken by the school were to separate JD5 from her classmates during recess and lunch.  Instead of taking breaks for recreation during recess and lunch like her classmates, JD5 is assigned "community service" work in the kindergarten, where she assists the teachers.  In essence, the victim is the one who is punished, in violation of CR-832(I)(B) and N.Y. EDUC. L. § 13(1)(f), which prohibit retaliation against students who report bullying.  The clear and consistent failure to take any corrective action, allowing six years of violent behavior to go undocumented, uninvestigated, and unremediated is a further violation of CR-A832(III)(A), (III)(B) and (IV)(D), and N.Y. EDUC. L. § 13(1)(d)-(e).

338.    Principal 5B has taken a stronger approach to the bullying.  Still, JD5 was bullied for six years despite repeated cries from JD5 and Grandparent 5 for help.  During this time, JD5's academic performance suffered.  She cried while doing her homework.  She was placed under psychiatric and psychological care, including receiving psychotherapy.  She was diagnosed with severe depression and anxiety disorder, and has developed nervous ticks.  She failed to progress in her academic achievement, beginning in approximately second grade.

**JD7**

339.    JD7 is a 13-year old Black male student who has been enrolled at a middle school in District 31 in Richmond County since September 2014.  From January to June of 2014, JD7

attended another middle school in District 31 (the "previous school").  There, he was bullied, harassed, and discriminated against, including on the basis of his race.

340.    In District 31, only 40% of students are Black or Hispanic.  However, at JD7's previous school, during his time there, over 70% of the students were Black or Hispanic.  At JD7's current school, less than 30% of the students are Black or Hispanic.[43]

341.    District 31 experienced 15 violent incidents per 1000 students in the 2014-15 school year.  It also experienced 44 disruptive incidents per 1000 students.  *See* Section C *infra*.

342.    JD7 enrolled at the previous school in or around January 2014.  The bullying, including by teachers at the previous school, began almost immediately.  Teachers at the school regularly called students "animals," "stupid," "idiots," and told them that they would never go to college.  These insults, made to belittle students, unreasonably and substantially interfered with their mental well-being.  These statements did embarrass and belittle JD7, who reported them to his mother ("Parent 7").

343.    In addition, on a daily basis, students punched JD7, spat on him, and called him racial slurs.  On a few occasions, these students approached JD7 and said in sum and substance that JD7 "was not acting Black enough" and that JD7 "thought he was a White boy."  The aforementioned taunts are examples, but not an exhaustive list, of the racially motivated taunts directed toward JD7.  These acts of violence occurred in classrooms and hallways and were witnessed by various school staff, who never intervened.  In contrast, JD7's current school, which has a significantly lower percentage of Black and Hispanic students, has a zero-tolerance policy for misconduct.  School staff regularly and proactively address behavioral issues.  For example, during the 2014-15 school year, Parent 7 received a phone call from a school administrator of the

---

[43] *Id.* ¶ 30.

current school who notified Parent 7 that JD7 had thrown a paper airplane in class, and asked that Parent 7 discipline JD7.

344.    On or about February 4, 2014, the previous school distributed a "sexual offender notice" to students at the school.  The notice, addressed to parents and guardians, stated that a registered sex offender had moved into the neighborhood of the school.  Upon receipt of the notice, students began bullying JD7, claiming that he was a rapist because of a perceived similarity in appearance between JD7 and the registered sex offender.

345.    The following day, on February 5, 2014, Parent 7 contacted the parent coordinator, a school employee, to discuss the inappropriateness of providing the graphic notices directly to young students and the fact that JD7 was being bullied because of the notice.  The parent-coordinator stated that the notice was given to students, rather than their parents, because of administrative convenience and promised to bring the issue to the school's principal ("Principal 7").  Later that day, Principal 7 called Parent 7 to further discuss the notice.  There is no indication that the parent coordinator told Principal 7 about the bullying.  In addition, Principal 7 did not discuss bullying at any point during the call, despite Parent 7's notifying her of JD7's bullying problem.

346.    On or about March 7, 2014, Parent 7 called the assistant principal ("Assistant Principal 7") to discuss impediments to JD7's education.  Specifically, Parent 7 mentioned the issue of verbal abuse by teachers and student bullying.  Assistant Principal 7, expressing skepticism of the veracity of Parent 7's allegation, replied "I was not aware of that, but I will follow up with the teacher."

347.    To the best of Parent 7's knowledge, Assistant Principal 7 did not report the allegations of teacher verbal abuse by entering them into OORS or OSI's reporting system, in violation of CR-A421(IV)(B)(1) and (2).

348.    In addition, Assistant Principal 7 did not report Parent 7's allegations of student bullying to Defendant DOE, either orally or in writing, in violation of CR-A832(II)(D) and N.Y. EDUC. L. § 13(1)(c).

349.    To the best of Parent 7's knowledge, the school did not investigate Parent 7's allegations within five days, in violation of CR-A832(III)(B) and N.Y. EDUC. L. § 13(1)(d).

350.    Neither Principal 7 nor her designee notified Parent 7 of whether the allegations were substantiated, in violation of CR-A832(III)(E).

351.    To the best of Parent 7's knowledge, the school did not subject any of the bullies to appropriate disciplinary action, in violation of CR-A832(IV)(C).

352.    To the best of Parent 7's knowledge, the school did not take corrective follow-up action to ensure that the bullying ceased, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

353.    On March 28, 2014, Parent 7 called the school to follow up on the March 7, 2014, call and to schedule an in-person meeting for April 4, 2014.  At about this time, students at the previous school began playing a "game" called "yaggling," where a bully would ambush JD7 from behind and pull his hood over his head, limiting JD7's ability to breathe.

354.    At the April 4, 2014 meeting with Assistant Principal 7, Parent 7 complained of the prevalence of "yaggling" at the school.  It occurred throughout school premises, in the presence of teachers and other school staff.  Teachers occasionally asked students to stop, but were generally powerless to end the violence.  In response to Parent 7's allegations regarding "yaggling,"

Assistant Principal 7 stated in sum or substance, "It is just a game." To the best of Parent 7's knowledge, the teachers who witnessed "yaggling" and Assistant Principal 7, whom Parent 7 notified, failed to follow the proper procedures regarding school violence.

355.    Specifically, they failed to report the incidents, either orally or in writing, in violation of CR-A832(II)(D) and N.Y. EDUC. L. § 13(1)(c).

356.    To the best of Parent 7's knowledge, the school did not investigate Parent 7's allegations within five days, in violation of CR-A832(III)(B) and N.Y. EDUC. L. § 13(1)(d).

357.    Neither Principal 7 nor her designee notified Parent 7 of whether the allegations were substantiated, in violation of CR-A832(III)(E).

358.    To the best of Parent 7's knowledge, the school did not subject any of the bullies to appropriate disciplinary action, in violation of CR-A832(IV)(C).

359.    To the best of Parent 7's knowledge, the school did not take corrective follow-up action to ensure that the "yaggling" ended, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

360.    On or about April 11, 2014, Parent 7 filed a complaint against Assistant Principal 7 with 311. On or about April 29, 2014, Parent 7 sent a letter to Principal 7 outlining all the various issues of bullying, harassment, racial discrimination, and teacher abuse. Principal 7 did not respond.

361.    In the beginning of May 2014, the parent advocate for District 31 contacted Parent 7 regarding the 311 complaint. She organized a meeting between Parent 7 and Principal 7.

362.    On or about May 12, 2014, Parent 7 met with Principal 7 to discuss the issue of violence at the school. Principal 7 did not take any of Parent 7's allegations seriously. For instance, after Parent 7 complained of bullies stealing JD7's lunch, including his mozzarella sticks,

Principal 7 responded, in sum or substance, "I don't know why but mozzarella sticks are a hot commodity." Principal 7 did not offer any form of remediation or express concern for the fact that, due to lunch thefts, JD7 would go hungry the rest of the day, impairing his ability to focus on his studies. The only action that Principal 7 agreed to take was to have the guidance counselor speak with JD7.

363. To the best of Parent 7's knowledge, Principal 7 did not report Parent 7's allegations into Defendant DOE's system, in violation of CR-A832(III)(A).

364. To the best of Parent 7's knowledge, Principal 7 did not investigate Parent 7's allegations within five days, in violation of CR-A832(III)(B) and N.Y. EDUC. L. § 13(1)(d).

365. Neither Principal 7 nor her designee notified Parent 7 of whether the allegations were substantiated, in violation of CR-A832(III)(E).

366. To the best of Parent 7's knowledge, the school did not take appropriate disciplinary action, in violation of CR-A832(IV)(C).

367. To the best of Parent 7's knowledge, the school did not take corrective follow-up action to end the school violence, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

368. At the May 12, 2014 meeting, Parent 7 requested a safety transfer because JD7 no longer felt safe at the school. Principal 7's reply was that a police report was required for the grant of a safety transfer. This was false. Under CR-A449(III)(B), the school principal should ask for a copy of a police report only "[i]f the [school-related safety] incident was criminal in nature." After contacting a number of DOE offices, Parent 7 learned of the correct requirements for safety transfers.

369.    On May 30, 2014, Parent 7 requested the previous school's administration to submit the actual documents necessary for a safety transfer—a safety intake form, an occurrence report, and a safety transfer summary of investigation form—to the Office of Student Enrollment.

370.    On or about June 2, 2014, Parent 7 pulled JD7 out of school due to anxiety, on the advice of his doctor.  JD7 began developing physical manifestations of the psychological and physiological difficulties created by the persistent bullying including nail biting, teeth grinding, and severe stomachaches.  Although the last day of school was June 26, 2014, JD7 never returned to the previous school.  Instead, JD7 obtained classwork from the school and did it on his own at home for the remainder of the school year.  Parent 7 does not believe that JD7 learned adequately during this time.

371.    On or about June 5, 2014, the Office of Student Enrollment notified Parent 7 that the request for a safety transfer was denied.  The following day, Parent 7 spoke with the Assistant Director of the Office of Student Enrollment who claimed that the situation did not warrant a safety transfer but offered a medical transfer, which does not require a principal to determine that there is a safety issue at the school.  Parent 7 rejected the medical transfer.

372.    On or about June 10, 2014, Parent 7 called the Senior Director of the Office of Student Enrollment to discuss why her application for a safety transfer was denied.  The Senior Director's response was, in sum or substance, "There are no safety issues in District 31."  Parent 7, out of desperation, began reaching out to community groups, high-level DOE officials and local politicians.

373.    On June 11, 2014, JD7 received an upper gastrointestinal endoscopy and a biopsy. JD7's doctor stated his belief that JD7's medical ailments were a result of bullying and the hostile education environment found at the previous school.  JD7 was ultimately diagnosed with anxiety

disorder and placed on an education plan consistent with the requirements of Section 504 of the Rehabilitation Act.

374.    In August 2014, Parent 7 secured a medical transfer for JD7 to his current school.

**JD8**

375.    JD8 is a 9-year old Black Hispanic female student who is enrolled in an elementary school in West Harlem, New York County.  She previously attended a different elementary school ("the previous school") in the same district.  She is a child with a disability within the meaning of the IDEA, specifically a learning disability, and has an IEP.  She has been denied a FAPE, a consequence of the violence and bullying she has experienced at school.

376.    JD8's school is in District 5, where 90.9% of students are Black or Hispanic.  District 5 experienced 26 violent incidents per 1000 students.  It also experienced over 36 disruptive incidents per 1000 students.[44]  *See* Section C *infra*.

377.    In fall of 2012, during school hours at the school she initially attended, a male student ("Bully 8A") wrote on JD8's pants and called her a "bitch."

378.    JD8's mother ("Parent 8") called the school and asked that the school to speak with Bully 8A's parents.  However, to Parent 8's knowledge, the school did not contact or speak with Bully 8A's parents, in violation of CR-A832(III)(C).

379.    It was only after Parent 8 requested a conference with Bully 8A's parents directly that the school arranged for such a conference.  At this conference, Bully 8A admitted that JD8's allegations were true and apologized to JD8.  Although the school's assistant principal ("Assistant Principal 8A") was present at this meeting, to the best of Parent 8's knowledge, the school did not prepare or file a single incident report, in violation of CR-A832(III)(A).

---

[44] *Id.* ¶ 21.

380.    To the best of Parent 8's knowledge, no complaint was entered into the OORS within 24 hours, in violation of CR-A832(III)(A).

381.    To the best of Parent 8's knowledge, no investigation was conducted—neither JD8 nor the accused student was interviewed, no written statements were prepared, and no witnesses were identified or interviewed—in violation of CR-A832(III)(A), CR-A832(III)(B), and N.Y. EDUC. L. § 13(1)(d).

382.    Neither the school principal ("Principal 8A") nor her designee notified Parent 8 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

383.    To the best of Parent 8's knowledge, JD8 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

384.    To the best of Parent 8's knowledge, the school did not utilize intervention methods, in violation of CR-A832(IV)(B).

385.    To the best of Parent 8's knowledge, the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

386.    To the best of Parent 8's knowledge, neither Principal 8A nor a designee followed up to ensure that the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

387.    In the spring of 2013, JD8 attended an after-school program at her school that was operated by Defendant DOE.

388.    On or about July 15, 2013, while attending the after-school program, program officials sent JD8 to the bathroom without an adult escort despite the program's policy of requiring staff to escort minor students to the bathroom.  The purpose of this policy is to ensure the safety

of the very young students, who are vulnerable to attacks when they travel alone. It is far safer for them to travel with an adult.

389.    While in the bathroom, two female students ("Bully 8B" and "Bully 8C"), who were unknown to JD8 and who appeared to be approximately the same age as JD8, grabbed JD8 and pushed her into a bathroom stall. The female students held JD8 in the stall and one of the female students grabbed and pulled down JD8's pants. One of the female students attempted to place her mouth on JD8's exposed groin area.

390.    Parent 8 immediately removed JD8 from the program after JD8 reported incident to her. Parent 8 contacted the program to report the incident and requested that officials investigate the incident. The officials claimed that they would conduct the investigation. However, Parent 8 parent never heard from the officials regarding the status of the investigation, in violation of CR-A832(III)(E).

391.    To the best of Parent 8's knowledge, school officials did not request a written narrative of the incident from JD8, in violation of CR-A832(III)(B).

392.    To the best of Parent 8's knowledge, officials did not take any corrective action reasonably designed to prevent a recurrence of the assault, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

393.    To the best of Parent 8's knowledge, the complaint was not entered into the OORS within 24 hours, in violation of CR-A832(III)(A); no investigation was conducted—neither JD8 nor the accused student was interviewed, no written statements were prepared, and no witnesses were identified or interviewed—in violation of CR-A832(III)(A), CR-A832(III)(B), and N.Y. EDUC. L. § 13(1)(d).

394.    Neither Principal 8A nor her designee notified Parent 8 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

395.    To the best of Parent 8's knowledge, JD8 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

396.    To the best of Parent 8's knowledge, the school did not utilize intervention methods, in violation of CR-A832(IV)(B).

397.    To the best of Parent 8's knowledge, the accused students were not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

398.    On or about July 15, 2013, Parent 8 brought the issue to the attention of the NYPD. The NYPD indicated that Parent 8 should file an incident report with the after-school program.

399.    On or about July 24, 2013, Parent 8 contacted the after-school program again to follow-up with the incident, and inquire about the status of their investigation, and spoke with a school official.  The school official stated, in sum and substance, "the case is closed because we did not find anything."

400.    To the best of Parent 8's knowledge, the program officials did not open any investigation as to the incident or to ascertain the identity of the female students who assaulted, harassed, and abused JD8, or take any follow-up actions in response to any of Parent 8's complaints, in violation of CR-A832(III)-(IV) and N.Y. EDUC. L. § 13(1)(d)-(e).

401.    In the fall of 2014, JD8 enrolled in another elementary school in East Harlem, New York County.

402.    In or about February 2016, a group of male students repeatedly harassed, intimidated, and taunted JD8 on school grounds.  A male student ("Bully 8D") held up his middle

finger to JD8. A second male student ("Bully 8E") repeatedly approached JD8 and called her "a faggot."

403.    Separately, JD8 suffered ongoing harassment and intimidation at lunch.  A female student ("Bully 8F") repeatedly approached JD8 during lunchtime and whispered abusive statements in JD8's ear.  JD8 reported to Parent 8 that these statements intimidated her.

404.    To the best of Parent 8's knowledge, JD8 reported these incidents to a teacher.  In addition, Parent 8 requested a conference with JD8's teacher and the principal of the new school ("Principal 8B") to discuss the pervasive harassment and intimidation occurring inside the school. At the conference, the teacher stated, in sum and substance, that she had some knowledge that these incidents occurred but that she "did not think they were a big deal or understand the extent to which they were occurring."

405.    To the best of Parent 8's knowledge, the teacher never reported any of these incidents to Principal 8B or other school officials, in violation of CR-A832(II)(D).

406.    To the best of Parent 8's knowledge, school officials did not request a written narrative of the incident from JD8, in violation of CR-A832(III)(B).

407.    To the best of Parent 8's knowledge, school officials did not take any corrective action reasonably designed to prevent a recurrence of the assault, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(e).

408.    To the best of Parent 8's knowledge, the complaint was not entered into the OORS within 24 hours, in violation of CR-A832(III)(A); no investigation was conducted—neither JD8 nor the accused student was interviewed, no written statements were prepared, and no witnesses were identified or interviewed—in violation of CR-A832(III)(A), CR-A832(III)(B), and N.Y. EDUC. L. § 13(1)(d).

409.    Neither Principal 8B nor her designee notified Parent 8 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

410.    To the best of Parent 8's knowledge, JD8 was not referred to appropriate school staff for counseling, in violation of CR-A832(IV)(A).

411.    To the best of Parent 8's knowledge, the school did not utilize intervention methods, in violation of CR-A832(IV)(B).

412.    To the best of Parent 8's knowledge, the accused student was not subjected to appropriate discipline, in violation of CR-A832(IV)(C).

413.    As a result of the aforementioned incidents, JD8 suffered from anxiety attacks and fear of socializing with others.  JD8 began eating her lunch in the bathroom because she did not want to be around other students and has since begun acting in a withdrawn, disinterested, and sullen manner.

414.    Upon information and belief, Defendant DOE did not provide Parent 8 with annual notice of the procedural safeguards available to students with disabilities, as required by 8 NYCRR § 200.5(f).

**JD9**

415.    JD9 is a 12-year old Hispanic male student.  He is autistic and attends a District 75 elementary school in Bronx County.  He is a child with a disability within the meaning of the IDEA, and has an IEP.

416.    District 75 is a citywide school district that specifically caters to the needs of students who are on the autism spectrum.

417.    As a result of JD9's autism, he does not adapt well to sudden changes.  Prior to March 2016, JD9's regular routine was to take the school bus to school and have breakfast in the

school cafeteria, which was supervised by JD9's teacher.  However, at the beginning of March, JD9's school bus route changed, requiring JD9 to take an earlier bus.

418.    On March 10, 2016, JD9 arrived at his school cafeteria earlier than normal, at about 7:50 AM.  At this time, the cafeteria was supervised not by JD9's teacher, but instead by a teacher unfamiliar to JD9.

419.    In the cafeteria, JD9 began engaging in horseplay with another student.  There was no indication that either student was physically harming the other.

420.    The teacher ordered JD9 and the other student to stop playing.  JD9 did not stop. As a result, the teacher began to physically restrain JD9.  She held him by the arms and neck.  JD9, who did not understand the situation, began to resist.  This led the teacher to struggle with JD9, utilizing an increasing amount of force to restrain JD9.  JD9 received a number of significant cuts, scratches, and bruises on both arms and his neck.  Another staff member was needed to stop this incident.

421.    Shortly thereafter, JD9 was taken to the nurse's office.  At around 9:00 AM, JD9's father, ("Parent 9A"), received a call from the school, informing him that there had been an incident.  At around 9:30 AM, Parent 9A received another call from the school nurse, who explained that JD9 was a bit shaken up and asked Parent 9A to come pick him up.

422.    Parent 9A arrived at the school at about 10:00 AM, picked up JD9 in the main office, and went to the nurse's office to inquire about the incident.  The nurse claimed that JD9 had been disruptive and had threatened the teacher.  JD9 also gave an oral account of the incident.

423.    The following day, on March 11, 2016, JD9's mother ("Parent 9B"), called the school principal ("Principal 9") to discuss the incident, and Principal 9 quickly apologized.  Parent 9B requested a meeting with the teacher involved in the incident and all other witnesses, but

Principal 9 denied the request.  Principal 9 claimed that Parent 9B could not speak with the teacher because there was an ongoing investigation.

424.    The following week, Parent 9A asked the school about the progress of the investigation.  The school informed him that OSI was conducting the investigation and provided him with the case number.  Yet, when Parent 9A contacted OSI, they informed him that they could not speak to him about the investigation and that he could only obtain information from the school.

425.    On March 28, 2016, Parent 9B spoke to JD9's teacher.  JD9's teacher claimed that she could not discuss the investigation and could not provide any information about the timeline of the investigation.  All JD9's teacher could offer about the investigation was that "it is a process."

426.    As of April 5, 2016, nearly a month after the incident, no one has interviewed JD9 as part of the investigation or obtained his written statement, in violation of CR-A420(VI)(B)(1).

427.    To date, neither JD9's school nor OSI has provided JD9's parents with any information regarding the investigation.  JD9's parents still do not know if the investigation has concluded and, if it has, what the results of the investigation are, a possible violation of CR-A420(VI)(D).

428.    JD9 was the victim of harassment, intimidation, violence and/or bullying, which are known risk factors that adversely affect learning, particularly in children with an IEP.  Despite this, his school did not take the harassment, intimidation, and bullying into account when creating or modifying JD9's IEP.  The school also did not take JD9's IEP into account when addressing the harassment, intimidation, and bullying against JD9.  Principal 9 thus ignored a condition of federal funding as outlined in guidance provided by the U.S. Department of Education, *see supra* ¶ 137, and was in contravention of the DOE's own operation manual.  *See supra* ¶ 147.

**JD10**

429.    JD10 is a 13-year old Hispanic female student enrolled in a middle school in the Upper West Side, New York County.  She is a child with a disability within the meaning of the IDEA, specifically a learning disability, and has an IEP.  She has been denied a FAPE, a consequence of the violence and bullying she has experienced at school.

430.    JD10's school is in District 3, where 58.6% of students are Black or Hispanic. District 3 experienced 21 violent incidents per 1000 students.  It also experienced 47 disruptive incidents per 1000 students.[45]  *See* Section C *infra*.

431.    On or about December 14, 2015, JD10 was attacked by her science teacher as she was entering the classroom.  The attack appears to have been triggered when JD10 and two of her friends, who were "horsing around" on their way to class, accidentally bumped into her teacher. JD10's teacher pounced upon JD10, first striking her in the face and then knocking her to the ground and pinning her down.

432.    Once the teacher had JD10 pinned, she pressed down on JD10's upper chest or neck with her knee and squeezed JD10's throat with her hands, choking her.  JD10, who suffers from asthma, could not breathe and turned red.  Two of JD10's friends ("Friend 10A" and JD14), came to JD10's assistance but could not pull the teacher off of JD10.  Other teachers saw the attack but failed to intervene.  One teacher called the assistant principal ("Assistant Principal 10"), who, rather than try to pull Teacher 10 off of the eighth grade student, pleaded with her to let JD10 go. Teacher 10 shouted back, in sum and substance, that she wanted to punch some students in the school, and refused to remove her knee from JD10's chest or her hands from JD10's throat.  While Assistant Principal 10 was trying to coax Teacher 10 into releasing JD10, Assistant Principal 10

---

[45] *Id.* ¶ 19.

held JD10's hand while the eighth grader pleaded to him that she could not breathe.  Teacher 10 still did not let up.  Eventually, Teacher 10 released JD10.

433.    The attack lasted several minutes and JD10 was severely traumatized by the incident.  She ran into the bathroom and called her mother ("Parent 10") crying.  Parent 10 came to the school immediately.

434.    When Parent 10 arrived at the school, it was immediately clear to her that her daughter had been involved in a very serious incident. JD10 had bruises on her chest, arms, and neck.  There were fingermarks around her throat, and fingernail imprints on her neck and face where Teacher 10 had broken through JD10's skin.  Parent 10 took pictures of these injuries.

435.    The school asked for statements from witnesses.  Teacher 10 and at least one other teacher—who was not present when the altercation started, and was later found to be not credible by an independent finder of fact—said that JD10 started the incident.  JD10, Friend 10A, JD14, and other students claimed that Teacher 10 had attacked JD10.  Moreover, even if JD10 had started the altercation—which she had not—these witnesses described Teacher 10's response as excessive and unnecessary.

436.    Faced with these conflicting reports, and with a student accusing a teacher of a violent attack, the school should have begun two investigations:  one under CR-A420 (for incidents of teacher-on-student violence), and another under CR-A443 (for student disciplinary procedures).  As discussed *infra*, the school began only one investigation, into JD10's conduct pursuant to CR-A443.

437.    However, to the best of Parent 10's knowledge, the school never conducted an investigation of Teacher 10's role in the incident, in violation of CR-A420 and N.Y. Educ. L.

§§ 10 et seq.  The school did not inform Parent 10 of whether JD10's allegations against Teacher 10 were substantiated or not substantiated, in violation of CR-A420(VI)(D).

438.    Instead, school officials sought only to blame JD10 for the incident.  She was given a sixty-day Superintendent's suspension, which she appealed.

439.    Shortly after the incident, in mid-December 2015, Parent 10 called OSI to lodge a complaint against Teacher 10.  As of this filing on April 6, 2016, nearly four months later, no one from Defendant DOE has called Parent 10 to report on the outcome of an investigation of Teacher 10, in violation of CR-A420(VI)(D).  Upon information and belief, this is because Defendant DOE has not conducted any investigation of Teacher 10 at all, in violation of various provisions of CR-A420 and N.Y. EDUC. L. § 10 et seq.  When Parent 10 called the school to ask about the status of the investigation, she was told that the school would not provide an update.

440.    On or about January 12, 2016, JD10 was afforded a DOE suspension hearing before an independent hearing officer as finder of fact.  The hearing officer concluded that JD10's version of events was credible, and that Teacher 10's version, which was shared by other school officials, was not credible.  The charge against JD10 was dismissed on the merits and the suspension expunged from her record.  In other words, the independent finder of fact found that JD10 had not attacked Teacher 10.[46]

441.    The school had previously rejected JD10's allegations that she was attacked by Teacher 10, and instead accused JD10 of being the attacker.  On information and belief, the school had, to that point, failed to conduct an investigation into Teacher 10's actions pursuant to CR-A420.  When an independent DOE fact finder found the school's theory unsubstantiated and not credible–and had further found that Teacher 10's conduct "defies the bounds of reasonable

---

[46] Tragically, this determination came after school officials had JD10 arrested for her role in the incident, although JD10 was never convicted and the matter was successfully adjusted by the Department of Probation.

behavior"—the school should have, *at that point* at the very least, taken steps pursuant to CR-A420.

442.     Yet to the best of Parent 10's knowledge, no investigation of Teacher 10 has taken place—not by the school, by OSI, or Defendant DOE—in violation of CR-A420 and N.Y. EDUC. L. §§ 10 et seq., even after the hearing officer's findings supported the likelihood that Teacher 10 had acted improperly.

443.     Teacher 10 continues to work at the school, although she no longer teaches JD10's class.  As a result of the attack and the suspension, JD10 missed a month of school.  She was assigned to an alternative education site for that month, but she nevertheless failed three classes that semester.  She had never previously failed a single class.

444.     On information and belief, this is not the first time that JD10's school ignored a significant complaint about teacher-on-student violence.   On information and belief, in approximately 2013, a teacher's aide was accused by a student and his mother of assaulting the student.  The student's mother alleges that despite complaining to the school, no action was taken against the teacher's aide at the time.  Recently, on about May 12, 2016, that same teacher's aide was accused of assaulting a child during lunch period, causing bruising to the child.  The teacher's aide was arrested.[47]

445.     JD10 was the victim of prolonged harassment, intimidation, violence, and/or bullying, which are known risk factors that adversely affect learning, particularly in children with an IEP.  Despite this, her school did not take the harassment, intimidation, and bullying into account when creating or modifying JD10's IEP.  The school also did not take JD10's IEP into account when addressing the harassment, intimidation, and bullying against JD10.  Assistant

---

[47]  Jim Hoffer, *Teacher's Aide Charged with Assaulting Student*, WABC-TV, May 12, 2016, http://abc7ny.com/news/exclusive-uws-teachers-aide-charged-with-assaulting-student/1335435.

Principal 10 thus ignored a condition of federal funding as outlined in guidance provided by the U.S. Department of Education, *see supra* ¶ 137, and was in contravention of the DOE's own operation manual.  *See supra* ¶ 147.

**JD11**

446.    JD11 is a 15-year old Hispanic female student who is enrolled in a high school in Bronx County.  She is a child with a disability within the meaning of the IDEA, specifically a learning disability, and has an IEP.  She has been denied a FAPE, a consequence of the violence and bullying she has experienced at school.

447.    She experienced violence at her former middle school, in District 10, and her previous high school, in District 7.  In District 10, 85.1% of students are Black or Hispanic.  It experienced 18 violent incidents per 1000 students and 30 disruptive incidents per 1000 students. In District 7, 96.5% of students are Black or Hispanic.  It experienced 28 violent incidents per 1000 students and 62 disruptive incidents per 1000 students.[48]  *See* Section C *infra*.

448.    In 2012, JD11 transferred from a private school to public school in part due to the fact that she was bullied in private school.  Defendant DOE had knowledge that JD11 was transferred on account of being a victim of bullying.  Defendant DOE conducted an evaluation of JD11 and found that she suffered from social and emotional irregularities, and developed an IEP for her.

449.    In and between 2012 and 2015, JD11 was enrolled in a junior high school in Bronx County.  During that time period, a female student ("Bully 11A") repeatedly assaulted, harassed, and intimidated JD11.  JD11 reported these incidents to her parent ("Parent 11").

---

[48] Jensen Decl. ¶ 23.

450.    Parent 11 contacted the school principal ("Principal 11A") to report the incidents and file complaints.  Despite knowing about JD11's history of susceptibility to bullying, the school's response was wholly inadequate, causing Bully 11A's violent aggression to escalate over time throughout junior high school, and even continuing into high school.

451.    To the best of Parent 11's knowledge, the Principal 11A did not prepare or file a single incident report, in violation of CR-A832(III)(A).

452.    To the best of Parent 11's knowledge, Principal 11A did not otherwise investigate any of the incidents, in violation of CR-A832(III) and N.Y. EDUC. L. § 13(1)(d).

453.    Neither Principal 11A nor her designee notified Parent 11 of whether the allegations were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

454.    To the best of Parent 11's knowledge, Principal 11A failed to take any follow-up or corrective actions in response to any of Parent 11's complaints, in violation of CR-A832(IV) and N.Y. EDUC. L. § 13(1)(e).

455.    To the best of Parent 11's knowledge, Principal 11A did not attempt to contact any of the parents of the students who harassed JD11, in violation of CR-A832(III)(C) or otherwise investigate the incident, in violation of CR-A832(III)(B) and N.Y. EDUC. L. § 13(1)(d).

456.    To the best of Parent 11's knowledge, Principal 11A failed to take any corrective actions reasonably designed to end the harassment, bullying, and violence against JD11, in violation of CR-A832(IV) and N.Y. EDUC. L. § 13(1)(e).

457.    In the fall of 2015, JD11 enrolled in a high school in Bronx County.  Bully 11 enrolled in the same high school, and was assigned to the same class as JD11.

458.    In or about October 2015, a male student ("Bully 11B"), who was friends with Bully 11A, approached JD11 and verbally harassed her.  Bully 11B repeatedly called JD11 "fat" and "ugly."

459.    Parent 11 went to the school to make a complaint.  Moreover, Parent 11 asked the high school principal ("Principal 11B") to contact Bully 11B's parents.

460.    To the best of Parent 11's knowledge, Principal 11B did not prepare or file a single incident report, in violation of CR-A832(III)(A).

461.    To the best of Parent 11's knowledge, Principal 11B did not otherwise investigate the incident, in violation of CR-A832(III)(B) and N.Y. EDUC. L. § 13(1)(d).

462.    Neither Principal 11B nor her designee notified Parent 11 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

463.    To the best of Parent 11's knowledge, Principal 11B failed to take any follow-up actions in response to any of JD11's parent's complaints or otherwise take corrective action, in violation of CR-A832(IV) and N.Y. EDUC. L. § 13(1)(e).

464.    Between October 2015 and January 2016, classmates continues to harass and intimidate JD11.  They continued to belittle and shame her.

465.    Specifically, on or about January 4, 2016, a group of male and female students threatened to attack JD11.  Fearful for her safety, JD11 met with her guidance counselor to report the threat.  Immediately upon JD11's leaving the guidance counselor's office, the students jumped JD11 and attacked her in an adjacent classroom during school hours.

466.    The students began grabbing, punching, striking, and kicking JD11.  They threw JD11 to the ground where they continued to assault her.  While the group of students were attacking

JD11, a teacher was present in the classroom, but took several minutes before making an attempt to break up the attack or come to JD11's assistance.

467.    It took school safety personnel between fifteen and twenty minutes to respond to the incident.

468.    Principal 11B knew, or should have known, that JD11 had a history of being bullied by these same students, and that JD11 had reported a threat of an attack to the guidance counselor just moments before the attack occurred.  Despite this, Principal 11B did not treat JD11 as the victim of school violence or bullying.  Instead, Principal 11B told Parent 11 that the incident would be treated as a fight between students.  JD11 was suspended for five days.  Only two of her attackers faced discipline, and, on information and belief, were suspended for only three days.  On information and belief, one or more parents of the attackers threatened Principal 11B with physical violence.

469.    Parent 11 asked Principal 11B what had happened, and why the school was suspending JD11 when she was the victim of the incident.  Principal 11B stated, in sum and substance, that Parent 11 should not question Principal 11B or her rationale for the suspension, and gave no further response.

470.    Principal 11B told Parent 11 that she would investigate the incident, but never contacted JD11 with any further updates, in violation of CR-A832(III)(E).

471.    To the best of Parent 11's knowledge, Principal 11B did not otherwise investigate the incident, in violation of CR-A832(III)(B) and N.Y. EDUC. L. § 13(1)(d).

472.    To the best of Parent 11's knowledge, Principal 11B did not prepare or file a single incident report, in violation of CR-A832(III)(A).

473.    To the best of Parent 11's knowledge, Principal 11B failed to take any follow-up or corrective actions in response to any of Parent 11's complaints, in violation of CR-A832(IV) and N.Y. EDUC. L. § 13(1)(e).

474.    On or about January 5, 2016, one of the students in the group that attacked JD11 sent JD11 a video of the assault.  JD11 showed Parent 11 the video.  On or about January 8, 2016, Parent 11 contacted Principal 11B to show her the video, but Principal 11B would not meet with Parent 11.  Parent 11 then sought the incident report from the school safety officer, but the school safety officer refused to provide it.

475.    The students thereafter posted the video to Facebook, in an act of cyberbullying against JD11.

476.    On or about January 11, 2016, members of the group of students that attacked JD11 threatened to harm JD11 because she reported the assault to the school and to the NYPD.

477.    Parent 11 contacted Principal 1B again to report the students' threats to JD11. Principal 11B did not respond.  Parent 11 asked members of the NYPD to escort JD11 to and from school because of these threats.

478.    To the best of Parent 11's knowledge, Principal 11B did not prepare or file a single incident report regarding the continued harassment and threats, in violation of CR-A832(III)(A).

479.    To the best of Parent 11's knowledge, Principal 11B did not attempt to contact any of the students' parents who harassed JD11, in violation of CR-A832(III)(C) or otherwise investigate the incident, in violation of CR-A832(III)(B) and N.Y. EDUC. L. § 13(1)(d).

480.    Neither Principal 11B nor her designee notified Parent 11 of either the allegations or whether they were substantiated, in violation of CR-A832(III)(C) and CR-A832(III)(E).

481.    To the best of Parent 11's knowledge, Principal 11B failed to take any corrective actions reasonably designed to end the violence against JD11, in violation of CR-A832(IV) and N.Y. EDUC. L. § 13(1)(e).

482.    Between January 4 and February 9, 2016, JD11 was the victim of ongoing cyberbullying from the same group of students.  The students posted information online and sent JD11 harassing text messages, ridiculing and demeaning her, and threatening more violence. Parent 11 made several visits to the school to show Principal 11B, but Principal 11B dismissed her, refused to have any substantive discussion with her, failed to initiate any investigation, and failed to take any further corrective action, in violation of CR-A832(III)-(IV) and N.Y. EDUC. L. § 13(1)(d)-(e).

483.    Further, to the best of Parent 11's knowledge, Principal 11B and teacher did not document the incident or Parent 11's repeated complaints in any way, in violation of CR-A832(III)(A).

484.    Finally, on or about February 9, 2016, Parent 11 took JD11 out of school because of the continued assault, harassment, and threats.

485.    With no other alternative, on or about February 9, 2016 Parent 11 contacted Defendant DOE directly and initiated the school safety transfer process pursuant to CR-A449. Defendant DOE indicated to Parent 11 that she would need Principal 11B and officials to certify, with documentation, that there was a safety issue present in the school before the safety transfer application was approved.

486.    Approximately a few days later, Parent 11 contacted Principal 11B to follow up on her school safety transfer request.  Principal 11B attempted to deter Parent 11 from pursuing a school safety transfer and stated, in sum and substance, that the school would investigate and

remedy the safety issue.  Parent 11 requested that Principal 11B give her and Defendant DOE the necessary paperwork to effectuate the safety transfer.  Principal 11B refused to do so.

487.    To the best of Parent 11's knowledge, Principal 11B never filed or prepared documentation or incident reports for Defendant DOE and Parent 11's school safety transfer application, in violation of CR-A449(III)(C).

488.    On or about March 4, 2016, an attorney, on behalf of JD11's parent, contacted the school and Defendant DOE to follow up with JD11's parent's school safety transfer application. Only after his request did the school provide Defendant DOE with required transfer paperwork from the school.  On information and belief, any reports of the January 4, 2016, incident, and all other harassment and bullying, incorrectly described JD11's victimization.

489.    To the best of Parent 11's knowledge, Principal 11B and school officials did not turn over transfer paperwork, school records, or documentation until her attorney requested it, despite Parent 11's efforts and communications with the school regarding this matter.

490.    As a result of the foregoing incidents and delay on behalf of the school and Principal 11B, JD11 missed approximately four weeks of school before she was granted a transfer to another high school.

491.    As a result of the foregoing incidents, JD11 suffered anxiety and a loss of confidence in the school setting.

492.    JD11 was the victim of prolonged harassment, intimidation, violence, and/or bullying, which are known risk factors that adversely affect learning, particularly in children with an IEP.  Despite this, her schools did not take the harassment, intimidation, and bullying into account when creating or modifying JD11's IEP.  The schools also did not take JD11's IEP into account when addressing the harassment, intimidation, and bullying against JD11.  Principal 11A

92

and Principal 11B thus ignored a condition of federal funding as outlined in guidance provided by the U.S. Department of Education, *see supra* ¶ 137, and were in contravention of the DOE's own operation manual. *See supra* ¶ 147.

493. Upon information and belief, Defendant DOE did not provide Parent 11 with annual notice of the procedural safeguards available to students with disabilities, as required by 8 NYCRR § 200.5(f).

**JD12**

494. JD12 is an 8-year old Hispanic female student who is enrolled in an elementary school in College Point, Queens County.

495. JD12's school is in District 25, where 37.4% of students are Black or Hispanic. It experienced 9 violent incidents per 1000 students. It also experienced 21 disruptive incidents per 1000 students.[49] *See* Section C *infra*.

496. In or about November 2014, a group of female students harassed JD12 about the way her shampoo smelled and ridiculed her repeatedly.

497. JD12's parents ("Parent 12A" and "Parent 12B") requested a conference with the Assistant Principal ("Assistant Principal 12") and the Principal ("Principal 12") of her school. Principal 12's response to the parents' complaint was to suggest that JD12 use a different shampoo because the smell was likely bothering other students. Principal 12 did not ask the student to provide a written narrative of the incident, in violation of CR-A832(III)(B).

498. JD12's parents then asked Principal 12 to speak with the parents of the bullies. Principal 12 refused to do so, but instead stated dismissively that "there is no bullying here" and "your child is too sensitive." To the best of Parent 12A and Parent 12B's knowledge, Principal 12

---

[49] *Id.* ¶ 29.

did not attempt to contact the parents of the bullies, or otherwise investigate JD12's parents' allegations within five days of their complaint, in violation of CR-A832(III)(B)-(C).

499.    Thereafter, the same group of female students continued to subject JD12 to harassment and ridicule.

500.    JD12 and her parents continued their attempt, on multiple occasions, to end the cycle of bullying.  Later on in 2014, JD12 and her parents scheduled another meeting with Principal 12, Assistant Principal 12, and JD12's teacher to discuss the bullying that JD12 was experiencing.  However, at the meeting, Principal 12 refused to discuss the issue of bullying, responding with words to the effect of "but it was an accident" to each of the parents' allegations. JD12's parents understood this to mean that Principal 12 was downplaying the incident by suggesting that the bullies did not intend to subject JD12 to verbal torment.

501.    Moreover, Principal 12 attempted to intimidate JD12 to dissuade further complaints.  Principal 12 said to JD12, in front of her parents and teacher, words to the effect of "is the purpose of this meeting to discuss whether JD12 had urinated on herself?"  This was a reference to the fact that JD12's parents had previously told Principal 12 that JD12 had instances of incontinence as a result of her anxiety.  Principal 12's discussion of this highly-sensitive matter in front of JD12, her parents, and her teacher, constituted verbal abuse, in violation of CR-A421(I), and served no purpose other than to belittle and embarrass JD12.

502.    To the best of JD12's parents' knowledge, the school did not prepare or file a single incident report, in violation of CR-A832(III)(A); it did not investigate the allegations of bullying, in violation of CR-A832(III)(B); neither Principal 12 nor Assistant Principal 12 contacted any of the parents of the students who harassed and ridiculed JD12, in violation of CR-A832(III)(C); and

neither Principal 12 nor Assistant Principal 12 took any follow-up action in response to any of JD12's and her parents' complaints, in violation of CR-A832(IV).

503.    Instead, by adopting the implausible fiction that other students were taunting JD12 by "accident," Principal 12 evaded her legal obligation to report, investigate and follow up on these incidents and take corrective action, in violation of CR-A832(III)-(IV) and N.Y. EDUC. L. § 13(1)(d)-(e).

504.    In the fall of 2015, JD12 experienced a serious health scare the night before the first day of school.  As a result, her parents took her to the hospital for tests.

505.    Initially, the hospital thought JD12 had a thyroid problem because her heart rate was abnormally quick and she was constantly shaking.  Eventually, however, the episode was diagnosed as an anxiety attack.

506.    JD12's parents then discussed the incident and anxiety attacks with JD12, who stated she was scared to go to school because of the menacing and harassment.

507.    On or about December 3, 2015, JD12 was at recess on school property, when a fellow student shoved her, causing her to fall and hit her head on the concrete.  JD12 was taken to the school nurse.  The nurse called JD12's mother, asking her to pick JD12 up from school.  JD12 was visibly injured.  The school did not provide JD12's parents any documentation regarding the incident.  To JD12's parents' knowledge, the nurse did not file an oral or written report, in violation of CR-A832(II)(D) and N.Y. EDUC. L. § 13(1)(c).

508.    JD12's parents then contacted Principal 12, who stated that she would investigate the incident.  However, JD12's parents never heard back from Principal 12.  Principal 12 did not ask JD12 to prepare a detailed narrative of the attack, again in violation of CR-A832(III)(B).

509.    As before, to JD12's parents' knowledge, the school did not (a) document the incident, (b) contact the accused students or their parents, or (c) engage in any follow-up or corrective action, all in violation of CR-A832(III)-(IV) and N.Y. EDUC. L. § 13(1)(d)-(e).

510.    In or about January or February 2016, another male student kicked JD12 in the leg. A few days later, the same male student hit JD12 in the face.

511.    JD12's parents again spoke with Principal 12 several times about the series of violent episodes. Principal 12 again stated that she would investigate the incident.

512.    Once again, however, to the best of JD12's parents' knowledge, the school (a) did not document the incident, (b) did not contact the accused student or his parents, and (c) did not engage in any follow-up or corrective action, all in violation of CR-A832(III)-(IV) and N.Y. EDUC. L. § 13(1)(d)-(e).

513.    Later that week, JD12's mother, Parent 12A, spoke directly to the father of the student who had hit JD12 in the face.  Parent 12A notified the attacker's father of the situation. The attacker's father expressed surprise regarding the incident, stating that he had not been notified by the school administration about the incident.  The father made his son apologize to JD12, which occurred in the presence of JD12's teacher.

514.    Within minutes, Assistant Principal 12 called Parent 12A and stated that she had previously spoken with the parents of the bully, the school had investigated the incident, and it had concluded that it was an accident.  This was false because just minutes before this call, the bully's father stated that he had not even been aware of the incident.  Thus, it is clear that the school failed to conduct an investigation into an ongoing and persistent pattern of taunting, humiliation and physical violence, as legally required by CR-A832(III)(B) and N.Y. EDUC. L § 13(1)(d).

515. On or about February 18, 2016, JD12's parents moved to a new address within the same school district. At that time, Principal 12 falsely told JD12's parents that JD12 would have to change schools.

516. JD12's parents understood Principal 12's statement to be retaliation for their efforts at reporting and attempting to secure remediation of the persistent bullying JD12 experienced at Principal 12's school, in violation of CR-A832(I)(B) and N.Y. EDUC. L § 13(1)(f). They believed this to be the case because the school secretary told JD12's parents that she prepared a form for Principal 12 to sign to keep JD12 in the school, but that Principal 12 refused to sign it. JD12's parents were able to keep her in the school only after they contacted 311 and were told that Principal 12's statement was false and that JD12 could stay in her current school.

517. After JD12's parents resolved the issue of whether JD12 could stay in her school, Principal 12 reported to Defendant DOE that JD12 had "excessive absences" from school. Principal 12 had previously threatened, at one of the meetings in which Parent 12A tried to resolve her daughter's bullying issues, that she would make such a report to Defendant DOE. Principal 12 cut off the conversation and abruptly said, in sum and substance, "I could report you for the absences." Parent 12A replied that JD12 missed school because she was scared about bullying and suffered from anxiety as a result. Despite the foregoing, in retaliation for JD12's and her parents' efforts to address the bullying situation at her school, Principal 12 sought to blame JD12 for Principal 12's own failure to remediate a hostile educational environment, in violation of CR-A832(I)(B) and N.Y. EDUC. L. § 13(1)(f).

518. After Principal 12 made the report to Defendant DOE, Parent 12A received a call from Defendant DOE regarding JD12's "excessive absences" from school. Defendant DOE requested that Parent 12A come to its offices in Long Island City for a meeting. At the meeting,

Parent 12A explained that JD12 was absent because of the bullying which made her scared and anxious.  The DOE official stressed the importance of JD12 not missing school, and stated that JD12 could be held back as a result.  He did not make any offer to help with the underlying root cause of JD12's absences–bullying.

519.   In or about late March 2016, a female student accosted JD12, and told JD12 that she "should die."  This student also told JD12 that she was glad there was no school the following day, so she wouldn't have to see JD12.  Another girl witnessed this interaction.

520.   Parent 12A called the school guidance counselor to report the bullying.  The guidance counselor said she would investigate the bullying.  She called Parent 12A back to confirm that the allegations were substantiated, and that the guidance counselor made the student apologize to JD12.  Parent 12A was not notified whether this incident was reported in accordance with CR-A832(II)(D) and N.Y. EDUC. L. § 13(1)(c).  The guidance counselor did not ask JD12 to prepare a detailed narrative of the incident, again in violation of CR-A832(III)(B).

521.   The following week Parent 12A was summoned to the superintendent's office.  The superintendent's office informed Parent 12A that it was aware of the situation described in paragraph 504 above, and that the school informed the parents of the alleged bully of the allegations and spoke with the parents of the student witness to get a witness account.  Parent 12A thereafter spoke to the parents of the student witness, who said they had <u>not</u> been contacted by anyone about the incident, contradicting the superintendent's account.

522.   On or about May 4, 2016, a male student accosted JD12, telling her that he hoped JD12 and her mother "both died."  JD12 reported this to Parent 12A, who called the guidance counselor to report the conduct.  The guidance counselor responded that the conduct was not significant as it had occurred in drama class, implying that the bully was merely play acting—

which he was not.  In downplaying the incident in such a manner, the guidance counselor indicated that she did not plan to report or investigate the incident, or to otherwise adhere to CR-A832's other requirements.

### JD13

523.   JD13 is 13-year old Black male student, who previously attended elementary school in Bronx County.  JD13 has a disability within the meaning of the IDEA, and has been diagnosed with a developmental delay and a learning disability, and has an IEP.  He has been denied a FAPE, a consequence of the violence and bullying he has experienced at school.

524.   JD13's school is in District 10, where 85.1% of students are Black or Hispanic. District 10 experienced 18 violent incidents per 1000 students.  It also experienced 30 disruptive incidents per 1000 students.[50]  *See* Section C *infra*.

525.   JD13 has been bullied by another 13-year old student in his school ("Bully 13"). On information and belief, Bully 13 has a history of significant behavioral problems in school.  On information and belief, this includes incidences of violence against other students and bringing weapons to school.

526.   On information and belief, the school assigned a full-time paraprofessional to assist Bully 13 to ensure that he did not hurt other students.

527.   In November 2014, Bully 13 attacked JD13 in the lunchroom during lunch.  Bully 13 choked JD13 and slammed him into a brick wall.  This made JD13 lightheaded and his vision blurred.  Other students witnessed the attack.  JD13 was later diagnosed with a concussion.  He was also subsequently diagnosed with anxiety and post-traumatic stress disorder.

---

[50] *Id.* ¶ 25.

528.    To the best of JD13's mother's ("Parent 13's") knowledge, no school official informed the school safety officer that the incident occurred.  The school safety officer told Parent 13 that he could not investigate the matter because he had not been given a report of the incident.

529.    To the best of Parent 13's knowledge, no school official filed a written report of the incident, in violation of CR-A832(II)(D) and N.Y. EDUC. L. § 13(1)(c).

530.    To the best of Parent 13's knowledge, the school principal ("Principal 13") did not prepare or file an incident report with the OORS regarding the bullying incident, in violation of CR-A832(III)(A).

531.    Principal 13 did not interview JD13 nor ask JD13 to prepare a written statement for the incident, in violation of CR-A832(III)(B)(1) and CR-A832(III)(B)(2).

532.    To the best of Parent 13's knowledge, Principal 13 did not ask the accused attacker, Bully 13, to prepare a written statement, in violation of CR-A832(III)(B)(3) and CR-A832(III)(B)(4).

533.    To the best of Parent 13's knowledge, Principal 13 did not ask any of the other witnesses to prepare written statements, in violation of CR-A832(III)(B)(5).

534.    To the best of Parent 13's knowledge, Principal 13 did not attempt to contact any parents of the student who harassed, bullied, and intimidated JD13, in violation of CR-A832(III)(C).

535.    Bully 13 was already known to be a violent student with behavioral problems.  His attack on JD13 demonstrates that, with respect to his previous incidences, Principal 13 and/or other DOE officials failed to take any follow-up or corrective actions to ensure that the harassment, bullying, and/or intimidation had stopped, in violation of CR-A832(IV) and N.Y. EDUC. L. § 13(1)(e).

536.    JD13 has been the victim of prolonged harassment, intimidation, and bullying, which are known risk factors that adversely affect learning, particularly in children with an IEP. Despite this, his school did not take the harassment, intimidation, and bullying into account when creating or modifying JD13's IEP.  The school also did not take JD13's IEP into account when addressing the harassment, intimidation, and bullying against JD13.  Principal 13 thus ignored a condition of federal funding as outlined in guidance provided by the U.S. Department of Education, *see supra* ¶ 137, and was in contravention of the DOE's own operation manual.  *See supra* ¶ 147.

### JD14

537.    JD14 is a 13-year old Black Hispanic female student enrolled in a middle school in the Upper West Side, New York County.

538.    JD14 experienced violence at her former middle school, also in the Upper West Side, New York County.

539.    JD14's former middle school is in District 3, where 58.6% of students are Black or Hispanic.  District 3 experienced 21 violent incidents per 1000 students.  It also experienced 47 disruptive incidents per 1000 students.[51]  *See* Section C *infra*.

540.    JD14 has been the victim of student-on-student bullying, teacher-on-student violence, and retaliation by her school for reporting teacher-on-student violence.

541.    Beginning in approximately 2013, when JD14 was in sixth grade, a male student ("Bully 14") harassed and bullied JD14 by making fun of her appearance.  Bully 14 would also throw balls at JD14, steal her shoes, and intentionally bump into JD14.  Bully 14 tormented JD14 in this manner for at least a year.

---

[51] *Id.* ¶ 19.

542.     JD14 began seeing the school guidance counselor ("Guidance Counselor 14").  She confided in him that she was the victim of bullying.  In approximately spring 2015, when JD14 was in seventh grade, JD14 told Guidance Counselor 14 that the teasing and bullying had become so bad that she was experiencing suicidal ideation.

543.     Guidance Counselor 14 reported this information to JD14's parent ("Parent 14").

544.     Despite the school's knowledge of Bully 14's conduct and the profound impact it was having on JD14, the school took no action to curtail Bully 14's bullying.

545.     To the best of Parent 14's knowledge, neither Guidance Counselor 14 nor any staff members who witnessed or had notice of the bullying made an oral report or filed a written report about the bullying, in violation of CR-A832(II)(D).

546.     To the best of Parent 14's knowledge, neither the principal ("Principal 14") nor her designee prepared or filed incident reports for the DOE's OORS regarding the bullying, in violation of CR-A832(III)(A).

547.     To the best of Parent 14's knowledge, neither Principal 14 nor her designee otherwise investigated the bullying, in violation of CR-A832(III)(B) and N.Y. EDUC. L. § 13(1)(d).

548.     Neither Principal 14 nor her designee interviewed JD14 or asked JD14 to prepare a written statement regarding the bullying, in violation of CR-A832(III)(B)(1) and CR-A832(III)(B)(2).

549.     To the best of Parent 14's knowledge, neither Principal 14 nor her designee interviewed Bully 14 or asked him to prepare a written statement, in violation of CR-A832(III)(B)(3) and CR-A832(III)(B)(4).

550.     To the best of Parent 14's knowledge, neither Principal 14 nor her designee asked other witnesses to prepare written statements, in violation of CR-A832(III)(B)(5).

551.    To the best of Parent 14's knowledge, Principal 14 and her designee failed to take any follow-up or corrective actions to ensure that the harassment, bullying, and/or intimidation had stopped, in violation of CR-A832(IV) and N.Y. EDUC. L. § 13(1)(e).

552.    Indeed, the bullying continued until JD14 began sticking up for herself and fighting back.

553.    On or about December 14, 2015, while still attending her former school, JD14's friend, JD10, was attacked by her science teacher as she was entering the classroom.  The attack appears to have been triggered when JD14, JD10, and Friend 10A, who were horsing around on their way to class, accidentally bumped into Teacher 10.  Teacher 10 pounced upon JD10, first striking her in the face, then knocking her to the ground and pinning her down.

554.    JD14 went to assist JD10 because JD14 observed Teacher 10 pressing down on JD10's upper chest or neck with her leg, and choking JD10 by squeezing JD10's throat with her hands.  JD14 also knew JD10 suffered from asthma.

555.    Other teachers or school officials observed the incident but failed to intervene when JD14 yelled for help.  Seeing that her friend could not breathe and by now was turning red, JD14 attempted to separate Teacher 10 from JD10, but was unable to do so.  Finally, one of the teachers called Assistant Principal 10 who, rather than try to separate Teacher 10 and JD10, merely pleaded with Teacher 10 to let JD10 go.  Eventually, Teacher 10 released JD10.

556.    Teachers took JD14, who was severely distraught and crying due to the attack, to Assistant Principal 10's office.

557.    Guidance Counselor 14 took JD14 into his office and asked JD14 to write a statement. JD14 stated that Teacher 10 attacked JD10 and that JD14 became involved because she was trying to assist JD10.

558.    The school asked for a statement from, among others, Teacher 10, who stated that JD10 had started the incident and that JD14 "jumped in" to aide JD10 in the attack by kicking Teacher 10.

559.    Faced with conflicting reports, and with a student accusing a teacher of a violent attack, the school should have begun two investigations: (1) one under CR-A420 (for incidents of teacher-on-student violent), and (2) another under CR-A443 (for student disciplinary procedures). As discussed *infra*, the school began only one investigation, into JD10 and JD14's conduct pursuant to CR-A443, but not into Teacher 10's role in initiating the attack or Teacher 10's use of unacceptable force.

560.    Additionally, the school did not notify or inform Parent 14 of the incident, the status of the school's investigation, or whether JD14's allegations against Teacher 10 were substantiated or not substantiated, in violation of CR-A420(VI)(D).

561.    Instead, the next day, JD14's former school and its officials, filed juvenile delinquency reports against JD14 and JD10.  The reports claimed that JD10 and JD14 attacked Teacher 10.  Both JD10 and JD14 were arrested and charged with assault.

562.    Additionally, the school issued JD14 a ninety-day superintendent's suspension.

563.    JD14 appealed her suspension.  The hearing officer at JD14's suspension hearing found that Teacher 10 was not credible with respect to several crucial elements of the incident, including her statement that JD10 had initiated the attack.  Coincidentally, JD10's suspension hearing was held at the same time in a different location.  There, JD10's hearing officer made the same finding and vindicated JD10, overturning her suspension and expunging the record.  Both hearing officers determined, in effect, that Teacher 10 initiated the altercation, and both found that

Teacher 10 had viciously attacked JD10 including by choking her.  Despite evidence that JD14's involvement was solely to come to the victim's aid, JD14's hearing officer upheld her suspension.

564.    Both the school's unwarranted suspension and its filing of juvenile delinquency reports were acts of retaliation for JD14's report against Teacher 10, in violation of CR-A420(IX), which prohibits retaliation against those who experience or report corporal punishment.

565.    Two separate fact finders found Teacher 10's story "not credible."  One fact finder added that Teacher 10's conduct "defies the bounds of reasonable behavior."  Yet, to the best of Parent 14's knowledge, the school failed to conduct an investigation into Teacher 10's conduct, even after these independent findings, in violation of CR-A420.

566.    On information and belief, this is not the first time that JD10's school ignored a significant complaint about teacher-on-student violence.  On information and belief, in approximately 2013, a teacher's aide was accused by a student and his mother of assaulting the student.  The student's mother alleges that despite complaining to the school, no action was taken against the teacher's aide at the time.  Recently, on or about May 12, 2016, that same teacher's aide was accused of assaulting a child during lunch period, causing bruising on the child.  The teacher's aide was arrested.[52]

567.    Parent 14 requested, and was granted, a school safety transfer at the hearing.  JD14 did not return to her former school after her suspension concluded.  As a result of the aforementioned violent incident, and its resulting unwarranted suspension, JD14's grades suffered.  JD14 currently risks failing the 8th grade because of the number of school days she missed.

---

[52] Hoffer, *supra* note 47.

**JD15**

568.    JD15 is an 11-year old Hispanic female student, enrolled in the fifth grade in an elementary school in West Harlem, New York County.

569.    JD15's school is in District 6, where 94% of students are Black or Hispanic. District 6 experienced 16 violent incidents per 1000 students.  It also experienced nearly 30 disruptive incidents per 1000 students.[53]  *See* Section C *infra*.

570.    JD15 is the smallest student in her class and an easy target for bullying. One morning in third grade, Parent 15 took her daughter to the lunchroom for breakfast.  Not realizing Parent 15 was present, the Lunch Room Aide ("Aide 15") told JD15 that she could not come in and closed the door on her.

571.    It was not until Parent 15, seeing what had just transpired, spoke to Aide 15 and pointed out that her daughter was indeed allowed to get breakfast at that time, that Aide 15 finally let JD15 into the lunchroom.  Parent 15 spoke with her daughter's guidance counselor ("Guidance Counselor 15") about the incident and he confirmed that JD15 should have been allowed into the lunchroom for breakfast.

572.    After this incident, JD15 often came home crying.  She complained that Aide 15 screamed at her and was picking on her.

573.    In another instance, at 7:58 AM on a particularly cold winter morning, Aide 15 refused to allow JD15 to come into the school for breakfast even though breakfast is served from 7:45 AM to 8 AM.  Parent 15 was aware of the precise time because, unbeknownst to Aide 15, Parent 15 was again watching from afar.

---

[53] Jensen Decl. ¶ 22.

574.    Once more, Parent 15 spoke to Aide 15 and asked her why her child was not allowed to get breakfast even though it was still being served.  The Aide said it was too late to get breakfast and students were not allowed into the building until 8am, and therefore JD15 would have to wait outside.  Had Parent 15 not been present, JD15 would have had to wait, unsupervised, outside.

575.    On information and belief, Aide 15 excluded JD15 from the school, without basis, in retaliation against JD15 and her mother for previously reporting the Aide's actions to Guidance Counselor 15.  Such conduct violated CR-A421(IX) and N.Y. Educ. L. § 13(1)(f) which prohibits retaliation against those who experience or report verbal abuse of students by a staff member.

576.    When JD15 reached fourth grade (the 2014-15 school year), matters only got worse for JD15 at the hands of Aide 15.  JD15's new teacher told Parent 15 that her daughter had come to her classroom from the lunchroom crying.

577.    At the time, the teacher was unsure if there was an issue with Aide 15 or with other children.  She offered to have JD15 eat lunch in the classroom if it continued.

578.    Indeed, a few days later, when Parent 15 was picking JD15 up from school. Parent 15 asked her daughter about the situation in the lunchroom.  JD15 told her mother that she was now eating in the classroom because she was having continued difficulty with Aide 15's abuse.

579.    Aide 15 was within Parent 15's sight at that time.  Parent 15 approached Aide 15 to speak about the issues JD15 was experiencing.  In response, Aide 15 started to scream at Parent 15, telling her that Parent 15 needed to teach JD15 "better manners."  She also screamed, "I'm fucking tired of dealing with her."

580.    Unwilling to expose her daughter to further abuse, Parent 15 called Defendant DOE to complain and to request a transfer for her daughter.  She was told that she should meet with the

Principal ("Principal 15") and that if she wanted a transfer for the next school year, Principal 15 would have to approve it.

581.    In approximately May 2015, Parent 15 asked for a meeting with Principal 15 and Aide 15.  Parent 15 requested a third party to be present for the meeting as well.  An appointment date was set.

582.    Principal 15 then cancelled the meeting but promised Parent 15 he would get back to her with another date for the meeting.  Principal 15 did not, however, contact Parent 15 to reschedule the meeting.

583.    After receiving no response for some time, Parent 15 spoke with Principal 15's secretary, who told her she would pass along the message and get back to her for another date for the meeting.  Again, Principal 15 did not call Parent 15.

584.    To the best of Parent 15's knowledge, Principal 15 did not enter the allegation of verbal abuse into OORS or OSI's reporting system which violated CR-A421(IV)(A)(1)-(2).

585.    The school violated CR-A421(VI)(B)(1) by failing to interview JD15 or Aide 15 and by not obtaining their written statements.

586.    Principal 15 violated CR-A421(VI)(C)(1) by failing to determine whether JD15's complaint of verbal abuse was substantiated or not.  Furthermore, CR-A421(VI)(D) requires that Principal 15 inform the parent of the victim whether the allegations were substantiated or not. Principal 15 did not do so.

587.    Starting in fall of 2015—when JD15 entered fifth grade—Principal 15 refused to allow Parent 15 into the school.  School safety officers stopped her from entering while allowing other parents in.  This was a clear case of retaliation against Parent 15 for previously reporting the Aide's actions to Principal 15, in violation of CR-A421(IX) and N.Y. Educ. L. § 13(1)(f).

However, as the new school year commenced, JD15 again started eating meals in the cafeteria with the other children, and Aide 15 remained in the cafeteria as well.

588.    In March or April of 2016, Guidance Counselor 15 called Parent 15 and asked her to meet with him because of an issue with her daughter.  On this occasion, Parent 15 was allowed to enter the school.

589.    At the meeting, Guidance Counselor 15 told her that Aide 15 had reported that JD15 had called Aide 15 a "nigger," and that she wanted it to go on her school disciplinary record. Guidance Counselor 15 went on to say in substance that "there are a lot of issues with your daughter," though this was the first time that he had ever contacted Parent 15.

590.    JD15 told her mother that she had not called Aide 15 by the epitaph.  Parent 15 later learned that Aide 15 did not even claim to have heard JD15 call her that name.  Rather, Aide 15 claimed that JD15 had said this to another girl, who then told Aide 15 what JD15 allegedly had said to this other student.  JD15, however, denies making such a statement to this other student.

591.    Following the meeting with Guidance Counselor 15, JD15 told her mother that Aide 15 had, yet again, screamed at her, thrown her out of the lunchroom, and told her she could no longer eat in the lunchroom again.

### JD16

592.    JD16 is an eight-year-old Black male student, enrolled in the fourth grade at an elementary school in West Harlem, New York County.  He has a disability within the meaning of the IDEA, specifically classified as multiple disabilities that affect his learning, and has an IEP. He has been denied a FAPE, a consequence of the violence and bullying he has experienced at school.

593.    JD16's school is in District 5, where 90.9% of students are Black or Hispanic. District 5 experienced 26 violent incidents per 1000 students.  It also experienced over 36 disruptive incidents per 1000 students.[54]  *See* Section C *infra*.

594.    Because of his disability, JD16 has a "Crisis Para" assigned to him.  A Crisis Para is an individual who works with students who have emotional instability.

595.    As a child with a disability, JD16 had an IEP in place for the 2015-16 school year. The IEP stipulated that JD16 was to have a Crisis Para at all times, including when his normal Crisis Para ("Para 16") was away at lunch.

596.    On or about November 30, 2015, JD16's teacher ("Teacher 16") asked JD16 to leave the classroom and go to a third grade teacher's room down the hall.  At the time, JD16 was not attended by Crisis Para 16 or any substitute Crisis Para, in violation of JD16's IEP.

597.    When JD16 was unwilling to leave the classroom by himself, Teacher 16 grabbed JD16 by his shirt collar, pulled him out of his seat, and dragged him out of the room, in violation of the prohibition on corporal punishment and teachers' use of force under CR-A420.

598.    JD16's mother ("Parent 16") learned about this incident from one of JD16's classmates.

599.    After learning of this incident, Parent 16 met with the school's principal ("Principal 16") and another parent as an escort.  Parent 16 told Principal 16 what Teacher 16 had done and asked that appropriate action be taken.

600.    Principal 16 told Parent 16 that the school would need to file a complaint with OSI to open an investigation.  Parent 16 told Principal 16 that if anyone from OSI wanted to speak with her son, she would need to be informed since she wanted to be present.

---

[54] *Id.* ¶ 21.

601.    To the best of Parent 16's knowledge, however, JD16 was not interviewed as part of an investigation of this incident and was not asked to make a written account of the incident as required by CR-A420(VI)(B)(1).

602.    Similarly, to the best of Parent 16's knowledge, neither Teacher 16 nor any witnesses were ever interviewed regarding the incident as required by CR-A420(VI)(B) and N.Y. EDUC. L. § 13(1)(d).

603.    JD16 was very distraught about this incident.  Parent 16 asked to sit in on JD16's class to help resolve any issues.  Instead, and in retaliation for raising a complaint about Teacher 16, Principal 16 limited Parent 16's access to the school, in violation of CR-A420(IX)  and N.Y. EDUC. L. § 13(1)(f).

604.    After waiting several weeks, Parent 16 met with Principal 16 on December 21, 2015 to get an update on the investigation.  Principal 16 said that there was no update and that no information would be shared with Parent 16.

605.    Shortly thereafter, during the winter recess, Teacher 16 left the school on maternity leave.  To the best of Parent 16's knowledge, no disciplinary measures were taken as a result of the corporal punishment incident.

606.    On January 5, 2016, Parent 16 again contacted Principal 16 to ask about the investigation.  Principal 16 responded with a complaint number and said no other information could be shared.

607.    In late January 2016, Parent 16 called OSI and spoke with an officer.  The officer told Parent 16 that OSI had sent the complaint to the school in November 2015 and that the school had been instructed to investigate the incident and make a decision.  At the time of this call to OSI, the school had not reported the results of the investigation to OSI.

608.    To the best of Parent 16's knowledge, to date, the school has neither completed the investigation nor reported back to OSI.  Such failure violates CR-A420(VI)(C)(1), which requires school-based investigations to determine if the complaint is substantiated or not within 10 days of receiving the complaint.

609.    On April 14, 2016, Teacher 16 returned from maternity leave.

610.    JD16 told Parent 16 that he did not trust Teacher 16, because she "put her hands on him" and embarrassed him in front of his class.  Parent 16 spoke with Para 16, who confirmed that JD16 did not respond well to Teacher 16 because he was afraid of Teacher 16.

611.    As of the filing of this Complaint, the OSI case is still open.

612.    JD16 was the victim of harassment, intimidation, violence, and/or bullying, which are known risk factors that adversely affect learning, particularly in children with an IEP.  At a regularly scheduled IEP meeting after the November 30, 2015 incident, the discussion included how to protect JD16 from future incidents.  The school determined that JD16's IEP would be modified to ensure that the paraprofessional stays by JD16's side for the entire day, without interruption.  Despite this, the school never implemented this change, and never actually modified the IEP.  Principal 16 thus ignored a condition of federal funding as outlined in guidance provided by the U.S. Department of Education, *see supra ¶* 137, and was in contravention of the DOE's own operation manual.  *See supra ¶* 147.

613.    Upon information and belief, Defendant DOE did not provide Parent 16 with annual notice of the procedural safeguards available to students with disabilities, as required by 8 NYCRR § 200.5(f).

**JD17**

614.    JD17 is a 17-year old Hispanic male student enrolled in a high school in Bronx County ("School 17A").

615.    The school is in District 8, where 87% of students are Black or Hispanic.  District 8 experienced 23 violent incidents per 1000 students.  It also experienced 47 disruptive incidents per 1000 students.[55]  *See* Section C *infra.*

616.    On or about February 2, 2016, JD17 was attacked in his school hallway by another student ("Bully 17A") and at least four of his friends ("Bully 17B," "Bully 17C," "Bully 17D," and "Bully 17E").  The bullies, it was discovered later, were all part of the same gang.

617.    The attack began when Bully 17A approached JD17 and demanded that he empty his pockets.  JD17 was carrying a Metrocard in his pocket, and when he pulled it out, Bully 17A took it from him and began to walk away.

618.    In response, JD17 followed Bully 17A and demanded his Metrocard back.  Bully 17A then jumped JD17 and put him into a chokehold.

619.    Bully 17B, Bully 17C, Bully 17D, and Bully 17E, who were waiting nearby, also pounced on JD17.  They punched and kicked JD17, eventually throwing him against a wall, resulting in bruises to his side and to his forehead.  Bully 17A then crumpled up the Metrocard and threw it on the ground, and all five bullies walked away.

620.    The entire incident was captured on security camera. Parent 17 subsequently viewed the video and recalled that it showed a total of five or six students attacking JD17.

---

[55] *Id.* ¶ 24.

621.   A teacher ("Teacher 17") heard the commotion and came out of his classroom to find out what had happened.  JD17 told Teacher 17 that he had been attacked.  Teacher 17 told JD17 that he should report the incident.

622.   To the best of JD17's parents' knowledge, Teacher 17 did not himself report the incident himself to the school, in violation of CR-832(II)(D).  As a result, the school did not inform JD17's parents of the incident.  Instead, it was not until JD17 told his mother ("Parent 17A") about the incident later that day that she learned what happened.

623.   The next day, JD17's father ("Parent 17B") called the assistant principal ("Assistant Principal 17") to report the attack.  Because the Assistant Principal was not available, a receptionist said she would relay the message to Assistant Principal 17, who would call back Parent 17B.  No one called back Parent 17B.

624.   The following day, on or about February 4, 2016, Parent 17B went to the school to speak with Assistant Principal 17.  JD17 was called down to the office and all three watched the video, which showed the attack, including the five or six attackers.

625.   Parent 17B spoke with Assistant Principal 17 again the next day, who said that JD17 would need to provide a statement.  JD17 did so on or about February 8, 2016.  To the best of Parent 17B's knowledge, none of the bullies was asked to provide a written statement, in violation of CR-A832(III)(B)(4).

626.   Approximately one week after JD17 gave his statement, during which time no one from the school had contacted him, Parent 17B called his son's principal ("Principal 17A").  Principal 17A stated that a total of four schools occupy the building in which JD17 attends school, and that the bullies were from a different school ("School 17B") than JD17.  Principal 17A said he had spoken to the principal from the bullies' school ("Principal 17B").

627.    Based on his conversation with Principal 17B, Principal 17A told Parent 17B that School 17B was "more lenient" in its disciplinary process.  Principal 17A stated, in sum and substance, that the other school did not follow its own procedures for discipline (*i.e.*, the Chancellor's Regulations).  Principal 17A did not know whether the bullies would be disciplined in any way.  He asked for time to conduct an investigation, but noted that ultimately the superintendent's office would probably have to become involved.

628.    The mother of one of the bullies asked Parent 17A to speak with her, and Parent 17A agreed to call her.  On the telephone call, the bully's mother was crying. She begged Parent 17A to press charges—in other words, she was asking to have her son, the bully, arrested. Parent 17A thought this was unusual and asked the bully's mother why she wanted her son arrested.  The bully's mother responded that her son was in a gang and was uncontrollable.  The bully's school did not adequately discipline him, and his violent and antisocial behavior was escalating.  The bully's parent sought to disrupt the cycle of escalation by asking the police to impose discipline on her son, whereas the school had failed her.

629.    Parent 17B continued to call the school for a week following his meeting with Principal 17A, but his calls were not returned.

630.    On or about February 22, 2016, Parent 17B received a call from a DOE official who worked for Principal 17A.  The official left a voicemail apologizing for the delay in returning Parent 17B's call.

631.    The DOE official stated in her voicemail that she had tried to contact the principal of the bullies' school.  However, her message indicated that she had been attempting to contact the wrong principal.  Rather than trying to contact Principal 17B, she stated on her voicemail that she attempted to reach the principal ("Principal 17C") of one of the other two schools that shared the

same building ("School 17C").  Her apparent confusion led to a further delay in Defendant DOE's supposed efforts to resolve the incident of school violence.

632.    Ultimately, Parent 17B received a copy of the occurrence report.  Despite the fact that five or six students were involved in the attack, the occurrence report lists only four attackers.  Principal 17A informed Parent 17B that two of the bullies listed on the occurrence report were given 30-day superintendent's suspensions, but that the school did not have enough evidence against the other bullies (despite the video evidence).  Parent 17B asked Principal 17A for a copy of the video but was rebuffed.

633.    As a result of this incident, JD17 suffers from anxiety about attending school.

**JD18**

634.    JD18 is a 10-year old Black male student, who is enrolled at an elementary school in Bronx County.

635.    For the 2014-15 school year, JD18 attended a different elementary school in the same school district in the Bronx ("School 18A").

636.    School 18A is in District 11, where 82.6% of students are Black or Hispanic.  District 11 experienced 19 violent incidents per 1000 students.  It also experienced 33 disruptive incidents per 1000 students.[56]  *See* Section C *infra.*

637.    Throughout the 2014-15 school year, JD18's mother ("Parent 18") complained to School 18A, in writing and in person, of a bullying problem.

638.    School administrators claimed that they would investigate the allegations.  However, they did not request that JD18 submit a written narrative of the incidents, in violation of CR-A832(III)(B) and N.Y. Educ. L. § 13(1)(d).  The administrators subsequently claimed that

---

[56] *Id.* ¶ 26.

they had spoken to the other children and that the matter was "resolved."  Even assuming that is true, to the best of Parent 18's knowledge, school officials took no follow-up action to ensure the conduct had stopped, in violation of CR-A832(IV)(D) and N.Y. EDUC. L. § 13(1)(f).

639.    In or around November 2014, two students ("Bully 18A" and "Bully 18B") attacked JD18 on School 18A's playground.  Parent 18 took JD18 to a hospital where he was admitted for a week for treatment for asthma attack brought on by the violent incident.

640.    Parent 18 complained to the school about the attack and asked that JD18 and his attackers be placed in different classrooms.  The school obliged by transferring JD18, the victim of the incident, to a different classroom.  To Parent 18's mother's knowledge, the incident was not investigated and no disciplinary actions were taken against Bully 18A or Bully 18B, in violation of CR-A832(III)(B) and (IV)(C), and N.Y. EDUC. L. § 13(1)(d)-(e).

641.    Despite the classroom change, JD18 continued to be victimized by the bullies.  Later during the same school year, JD18 was pushed over a lunch table by Bully 18A and Bully 18B.

642.    Although this happened in plain sight of school employees, Parent 18 is not aware of any efforts to report or investigate the incident, or to take corrective action as required by CR-A832(II), (III) and (IV) and N.Y. EDUC. L. § 13(1)(d)-(e).  Parent 18 is not aware of any disciplinary action taken against the bullies.

643.    Instead, when Parent 18 went to the school district office in or about March 2015 to obtain an incident report, a district representative recommended that JD18's mother apply for a safety transfer.  This characteristic reaction of seeking to have the victim transferred, with all the attendant interruptions and trauma caused by a school transfer, is another example of Defendant DOE's policy of punishing the victim, instead of dealing with attackers in a meaningful way.  Here,

forced between terrible alternatives, Parent 18 decided against a safety transfer and instead homeschooled JD18 for the remainder of the school year.

644.    In the fall of 2015, Parent 18 enrolled JD18 in his current school ("School 18B").

645.    JD18 has continued to experience bullying and violence at School 18B.  There are approximately three students who regularly bully and physically attack JD18.

646.    In November 2015, one of the three students ("Bully 18C"), without any provocation, punched JD18 in the jaw.  Both JD18 and the other student were sent to the principal's ("Principal 18") office for fighting.  The school notified Parent 18 of the incident.  The following day, Parent 18 went to the current school to speak with school officials about the incident.

647.    To the best of Parent 18's knowledge, however, no investigation of the incident was conducted, in violation of CR-A832(III) and N.Y. Educ. L. § 13(1)(d).  Specifically, JD18 was not asked to prepare a written statement describing the incident, in violation of CR-A832(III)(B)(2).  To the best of Parent 18's knowledge, no follow up action was taken to ensure the bullying had stopped, in violation of CR-A832(IV)(D) and N.Y. Educ. L. § 13(1)(e).

648.    Meanwhile, JD18 continued to be bullied.  On or about February 26, 2016, one bully ("Bully 18D") punched JD18 in the face without provocation.  A lunchroom aide helped separate JD18 from his attacker.  To Parent 18's knowledge, neither the aide nor Principal 18 made efforts to identify and interview any witnesses to a lunchtime incident and obtain their statements as required by CR-A832(III)(B).

649.    The next day, Parent 18 complained to Principal 18 about JD18's lack of safety.  Principal 18 responded that JD18's mother should submit a letter that could be shown to the attacker's parents, a mechanism wholly outside the Chancellor's own regulations.  Principal 18 said words to the effect that the "the parents are in denial."  Dealing with the incident in this way

shows complete disregard for CR-A832 and its mandated procedures for conducting a meaningful investigation and implementing corrective actions reasonably designed to end the violence.

650.    On February 29, 2016, Parent 18 submitted the suggested letter.  This letter was circulated to JD18's teacher ("Teacher 18").  Shortly thereafter, at a parent-teacher conference, Teacher 18 raised the issue of the letter and denied that there was a bullying issue.

651.    At some point thereafter, Bully 18D was temporarily suspended for two days.

652.    Upon returning to school, on March 11, 2016, JD18's attackers, including Bully 18D, threatened to beat JD18 with a lead pipe.  JD18 took the threat seriously; he suffered nightmares that the bullies were going to beat him with the pipe.  He felt tormented.  On Sunday, March 13, 2016, JD18 notified Parent 18.

653.    Parent 18 filed a police report on March 14, 2016, and then on or about March 16, 2016, notified Principal 18 and the guidance counselor of the threat.

654.    When Parent 18 attempted to meet with Principal 18 (on or about Wednesday, March 16, 2016), Principal 18 confronted Parent 18 in a school hallway.  When Parent 18 brought up possible suspensions, Principal 18 said words to the effect of "things are not done that way anymore."  Principal 18 said that the discipline used is an "in-house suspension."  Principal 18 claimed that she would meet with the parents of the child who threatened JD18 to resolve the situation.

655.    To date, however, JD18 and Parent 18 have received no response concerning any supposed investigation.

656.    Principal 18 also suggested to Parent 18 that she should seek a safety transfer. Parent 18, however, asked in response why JD18 should be transferred rather than the student who had attacked and menaced JD18.  Principal 18 offered no response.

657.   On or about Friday, March 18, 2016, Parent 18 discussed the matter with Bully 18D's parent, who said words to the effect of "boys will be boys" and that "Parent 18 should not have put her son's name in the precinct."

658.   In retaliation for reporting this event, JD18 noticed that he began being treated differently by Teacher 18.  For example, when JD18 told Teacher 18 that another student was bothering him, Teacher 18 marginalized his complaint and took the other student's side.  JD18 believes that Teacher 18 does not call on him as much since Parent 18 reported the bullying.  And JD18 received copies of textbooks that were old and had writing in them, when other students received new books.

659.   On the night of March 27, 2016, JD18 told Parent 18 that he was experiencing suicidal ideation.  He told Parent 18, in sum and substance:  "I don't want to live anymore."  Concerned for his safety after the suicide threat, Parent 18 took JD18 to the hospital at 1:40 AM on March 28, 2016, and stayed with JD18 at the hospital until around 1:00 PM that day. At the hospital, JD18 was observed for several hours and released with a recommendation to see a therapist.  The hospital also gave Parent 18 information on how to deal with bullying.

660.   JD18 returned to school on March 29, 2016.

661.   Throughout this period, JD18 and the students who have bullied him continued to have lunch in the lunchroom during the same period.

662.   On April 18, 2016, the school offered to have JD18 tutored during the lunch period to remove him from contact with the bullies.  Parent 18 agreed to have JD18 spend two lunch periods a week with a tutor if JD18 so agreed.

663.     In the meantime, however, between April 18 and April 22, Bully 18C, Bully 18D, and the third student who was bullying JD18 ("Bully 18E"), continued subjecting him to verbal abuse, calling him fat and ugly.

664.     JD18 did not wish to return to school after spring break because of these experiences.  JD18 suffers from low self-esteem as a result of such incidents.

665.     On May 2, 2016, Parent 18 met with Principal 18 and a parent coordinator to report the bullying.  Principal 18 was dismissive, stating a disbelief that bullying was possible because the students were engaged in organized play.

666.     At this meeting, the parent coordinator offered to meet with the bully's parents. Since that time, however, the parent coordinator has not reported to Parent 18 about the occurrence or outcome of any such meeting.

667.     At this meeting, Principal 18 interviewed JD18, and promised to meet with JD18 daily, and to check in to ask JD18 if he was feeling bullied by asking JD18 for a "thumbs up or thumbs down."  Since making that promise, however, Principal 18 has checked in with JD18 only once.  Nor has Principal 18 offered to undertake, or actually undertaken, any measures to prevent future bullying.

### JD19

668.     JD19 is an 11-year old Hispanic male student who is enrolled in an elementary school in West Harlem, New York County.  He is a child with a disability within the meaning of the IDEA, specifically a hearing impairment, and has an IEP.  He has been denied a FAPE, a consequence of the violence and bullying he has experienced at school.

669.     JD19's school is in District 5 where 90.9% of students are Black or Hispanic. District 5 experienced 26 violent incidents per 1000 students.  It also experienced over 36 disruptive incidents per 1000 students.[57]  *See* Section C *infra*.

670.     JD19 is in the 5th grade and is instructed in an Integrated Co-Teaching classroom, which includes students with and without disabilities, and which is taught by one special education teacher and one general education teacher.

671.     JD19 receives special education services including speech counseling, hearing services, extended time for test-taking, and occupational therapy.  JD19 has an IEP.  He is hearing impaired and has been diagnosed with ADHD, articulation disorder, pervasive developmental disorder and sensory processing difficulty.

672.     On December 4, 2015, JD19's mother ("Parent 19A") sent a text message to JD19's teacher informing her that that she would be a few minutes late in picking up her son from school that day.  At approximately 2:40 PM, Parent 19A and her daughter ("Daughter 19") arrived at the school but could not find JD19 anywhere on the school's premises.

673.     No school staff member offered to help Parent 19A and Daughter 19 as they looked frantically throughout the school for JD19.

674.     At approximately 3:15 PM, JD19 called Parent 19A from an unidentified phone number, informing her that he walked home alone and was in their building's lobby.

675.     Parent 19A sent Daughter 19 home to JD19 while Parent 19A stayed at the school to question school officials about how and why her son with special needs was allowed to wander off alone with the school having no knowledge of his whereabouts.

---

[57] *Id.* ¶ 21.

676. After arriving home and speaking with her brother, Daughter 19 called Parent 19A and said that she should come home immediately because JD19 was assaulted at school that day.

677. Parent 19A was unable to speak with the school principal ("Principal 19") about the incident because Principal 19 was purportedly in a meeting. Parent 19A went home and heard from her son that he had been cornered twice that day by bullies, who kicked, smacked, and yelled threats, expletives, and racial slurs at him while he cowered in fear under a cubby.

678. A sixth grade teacher ("Teacher 19") witnessed this first occurrence of bullying as it was taking place in her classroom and intervened, telling the two six grade bullies and the fifth grade bully (a classmate of JD19's) to stop their behavior immediately and to leave JD19 alone.

679. For his protection, Teacher 19 removed JD19 from that class and placed him in another classroom, where he felt safe for a short period of time.  However, during that same class period, JD19 was then transferred to yet *another* sixth grade class, where he faced more bullies who kicked, smacked, and yelled threats at him.

680. After being cornered, threatened, and berated by bullies for the second time that day, when that class period ended, instead of heading to the auditorium to be picked up by a parent or guardian as he and his classmates were instructed, JD19 ran out of the school to his home.

681. To the best of Parent 19A's knowledge and that of her husband ("Parent 19B"), the teacher who witnessed the bullying never reported the abuse to Principal 19 or her designees, in violation of CR-A832(II)(D) and N.Y. EDUC. L. § 13(1)(c).

682. On or about December 4, 2015, Parent 19A contacted 311 to report the incident. The 311 operator stated that 311 would not submit any report on the incident until Parent 19A met with Principal 19.

683.    On or about December 7, 2015, Parent 19A went to JD19's school to speak to Principal 19 about the incident.  Parent 19A told the school secretary that she wanted to speak to Principal 19 about the attacks on JD19. The secretary told Parent 19A that the principal could not meet with her because the principal was in an all-day meeting, and instructed Parent 19A to come back another day.

684.    On or about December 7, 2015, Parent 19A contacted 311 again about the bullying incident and 311 submitted her report. The 311 operator instructed Parent 19A to contact the Community School District 5 Superintendent's Office to report the incident.

685.    On or about December 8, 2015, Parent 19A went with Parent 19B and JD19 to the District 5 Superintendent's Office and spoke to the District 5 Family Support Coordinator.  The Family Support Coordinator interviewed JD19 about the incident and initiated a report.

686.    JD19 did not return to school after the incident because he was in fear of further attacks from the bullies.

687.    On or about December 14, 2015, the District 5 Family Support Coordinator called Parent 19B to inform him that Principal 19 had investigated the incident and found that nothing occurred other than JD19 walking out of the school that day of his own volition.

688.    To the best of Parent 19A's and Parent 19B's knowledge, Principal 19 did not interview the bullies, in violation of CR-A832(III)(B)(3), nor did she advise the bullies' parents of the allegations brought against them, in violation of CR-A832(III)(C).  Nor did Principal 19 explain how this conclusion could be valid in light of Teacher 19's own observations and actions, in removing JD19 from the classroom for his own safety.

689.    To the best of Parent 19A's and Parent 19B's knowledge, Principal 19 also did not interview the sixth grade teacher who witnessed some of the bullying, in violation of CR-A832(III)(B)(5).

690.    On or about December 16, 2015, Parent 19A and Parent 19B attended a meeting to update JD19's IEP. At this meeting Parent 19A informed Principal 19, the school psychologist, and the rest of JD19's IEP team of the reason JD19 had not been in school since December 4, 2015.

691.    Parents 19A and 19B also informed the IEP team that JD19 would not be returning to school in the future because he was assaulted at school and, as a result, they feared for JD19's personal safety while in school.

692.    Principal 19 replied that this meeting was not the time and place to discuss the December 4th incident, in violation of her responsibility to ensure that students are provided the recommended programs and services set forth in their IEPs, which is a condition of federal funding as outlined in guidance provided by the U.S. Department of Education, *see supra* ¶ 137, and was in contravention of the DOE's own operation manual. *See supra* ¶ 147. Principal 19's comment was especially egregious because of the clear indication that the December 4th incident was impacting JD19's access to a FAPE.

693.    On or about December 22, 2015, at the request of Parent 19A and Parent 19B, a meeting was convened among Parent 19A, Parent 19B, Principal 19, a Vice Principal, and two school security representatives, one of whom witnessed JD19 leave the building on December 4th, 2015.

694.    At this meeting, Principal 19 and the other school staff members present all claimed they had not been informed of JD19's assault, despite the fact that Parent 19A had attempted to

report the incident several times at the school office and the incident had been discussed at the December 16, 2015 IEP meeting.

695.    Principal 19 stated that she thought the purpose of the meeting was to discuss the excessive absences of JD19. At this meeting, Principal 19 called JD19, who was still at home, to discuss the bullying.

696.    By this time, the incident had occurred nearly three weeks earlier.  The students who attacked him were not his classmates; they were sixth graders who JD19 did not know.  Not surprisingly, when asked by Principal 19, JD19 could no longer remember the details of the incident, including the identities of the bullies.

697.    Principal 19 suggested that if Parent 19A was interested in a safety transfer for JD19, Parent 19A should speak to the school's Family Assistant, make a police report, and bring it back to the school.

698.    On or about December 22, 2015, Parent 19A, JD19 and Daughter 19 went to the 32nd Precinct and filed a police report related to the attack on JD19 on December 4, 2015.

699.    On or about December 28, 2015, Principal 19 filed an Occurrence Report regarding the bullying incident of December 4, 2015.  This report was based on information taken from JD19 on or about December 22, 2015, three weeks after the incident, in violation of CR-A832(III)(A)'s requirement that the report be filed within 24 hours and then promptly investigated.

700.    On or about January 4, 2016, Principal 19 filed a safety intake transfer on behalf of JD19. In the Safety Transfer Summary of Investigation Form, Principal 19 stated that she interviewed two teachers and the dean, but that she interviewed no students because there were "no suspects and no witnesses."  The inadequacies of this "investigation," however, were of Principal 19's own making.  Because the school failed to investigate the incident promptly as

required by CR-A832 even though it knew of the incident on the day it occurred, key pieces of evidence—such as JD19's memories of the incident—were no longer available.

701.    On or about January 4, 2016, Parent 19A went to the District 5 Superintendent's Office to request a safety transfer.

702.    On or about January 8, 2016, a representative of School District 5 left a phone message for Parent 19A offering a safety transfer for JD19 to another school.  In this message, the representative said that Parent 19A may reject the safety transfer and choose home instruction.

703.    Parent 19A did not want to send JD19 to the proposed school because she did not believe he was ready to return to a school environment. Parent 19A prepared the required paperwork for home instruction, including obtaining a letter from JD19's physician recommending home instruction and presented the paperwork to the District 5 Family Assistant on or about January 15, 2016.

704.    On or about January 28, 2016, Parent 19A met with the Family Assistant and an official from Community School District 5 who oversees students' attendance.  Parent 19A informed the official that due to her family's concerns about JD19's safety at school, she was pursuing home instruction for JD19.

705.    Parent 19A also informed the official that while she awaited approval from Defendant DOE, JD19 was completing and turning in for review daily assignments given to him by his special education teacher.

706.    In a letter dated January 15, 2016, JD19's pediatrician reported that JD19 had a "significant emotional PTSD-like component added to [his] already existing medical issues" as a result of the bullying he experienced on December 4, 2015.

707.    In and between December 4, 2015 and May 12, 2016, JD19 lost significant learning time in the classroom because of his justified fears for his physical safety due to the assault and harassment he faced at the hands of his bullies.

708.    As a result of the bullying and harassment JD19 experienced, JD19 suffered anxiety, panic attacks, nightmares, fear of attending school, and other PTSD-type symptoms.

709.    JD19 was the victim of harassment, intimidation, violence, and/or bullying, which are known risk factors that adversely affect learning, particularly in children with an IEP.  Despite this, his school did not take the harassment, intimidation, and bullying into account when creating or modifying JD19's IEP.  The school also did not take JD19's IEP into account when addressing the harassment, intimidation, and bullying against JD19.  Principal 19 thus ignored a condition of federal funding as outlined in guidance provided by the U.S. Department of Education, *see supra ¶* 137, and was in contravention of the DOE's own operation manual.  *See supra ¶* 147.

710.    Upon information and belief, Defendant DOE did not provide Parent 19 with annual notice of the procedural safeguards available to students with disabilities, as required by 8 NYCRR § 200.5(f).

**JD20**

711.    JD20 is a 9-year old Hispanic female student, who attends a public elementary school in Maspeth, Queens County.  She is a child with a disability within the meaning of the IDEA.  She has been denied a FAPE, a consequence of the violence and bullying she has experienced at school.

712.    JD20's current school is in District 24, where 65.5% of students are Black or Hispanic.  District 24 experienced 8 violent incidents per 1000 students.  It also experienced 22 disruptive incidents per 1000 students.[58]  *See* Section C *infra.*

713.    JD20 enrolled in her current school in the fall of 2011 as a kindergarten student. Since that time she has experienced persistent bullying.  JD20 has been seeing a therapist since first grade.

714.    During her kindergarten year, another student ("Bully 20A") spat in her lunch, pushed her, teased her, and at times, took her lunch.  Parent 20 spoke to the kindergarten teacher ("Teacher 20A"), who said she would speak with the girl's parents.  However, the bullying did not stop.

715.    To the best of Parent 20's knowledge, Teacher 20A did not file an oral or written report of the incident, in violation of CR-A832(II)(D) and N.Y. EDUC. L. § 13(1)(c), and no one from the school prepared or filed an incident report with OORS regarding the bullying, in violation of CR-A832(III)(A).

716.    To the best of Parent 20's knowledge, no one from the school investigated the incidents, in violation of CR-A832(III)(B) and N.Y. EDUC. L. § 13(1)(d); no one from the school interviewed JD20 or asked JD20 to prepare a written statement of the incidents, in violation of CR-A832(III)(B)(1) and CR-A832(III)(B)(2); and no one from the school interviewed Bully 20A or asked her to prepare a written statement, in violation of CR-A832(III)(B)(3) and CR-A832(III)(B)(4).

717.    Bully 20A continued to harass and bully JD20 at lunch.  Thus, the school failed to take any follow-up or corrective actions to ensure that the bullying had stopped, in violation of

---

[58] *Id.* ¶ 28.

CR-A832(IV) and N.Y. EDUC. L. § 13(1)(e).  The bullying finally ended, months later, when in response to Bully 20A's aggression, JD20 pushed Bully 20A back.

718.   The following year, in first grade, another girl ("Bully 20B") started bullying JD20 in September 2013.  Bully 20B stole JD20's pencils and threatened to beat her up.  She threw JD20's books to the floor, stole her lunch, and hit her.  These incidents were witnessed by the first grade teacher ("Teacher 20B"), who took no remedial actions.  Parent 20 spoke to Teacher 20B about the bullying.  Teacher 20B said she would speak with both Bully 20B and her parents.

719.   To the best of Parent 20's knowledge, Teacher 20B did not file an oral or written report of the incident, in violation of CR-A832(II)(D).

720.   To the best of Parent 20's knowledge, the school did not prepare or file an incident report with OORS regarding the bullying, in violation of CR-A832(III)(A).

721.   To the best of Parent 20's knowledge, the school did not investigate the incidents, in violation of CR-A832(III)(B) and N.Y. EDUC. L. § 13(1)(d).

722.   To the best of Parent 20's knowledge, the school did not interview JD20 or ask JD20 to prepare a written statement of the incident, in violation of CR-A832(III)(B)(1) and CR-A832(III)(B)(2).

723.   To the best of Parent 20's knowledge, the school did not interview Bully 20B or ask her to prepare a written statement, in violation of CR-A832(III)(B)(3) and CR-A832(III)(B)(4);

724.   To the best of Parent 20's knowledge, the school failed to take any follow-up or corrective actions to ensure that the bullying had stopped, in violation of CR-A832(IV) and N.Y. EDUC. L. § 13(1)(e).

725.   Not surprisingly, given these multiple failures, the bullying did not stop; instead, it got worse.

726. In or around the end of October 2013, JD20 was summoned to the office of the guidance counselor ("Guidance Counselor 20") office to discuss the incidents with Bully 20B. Guidance Counselor 20 did not ask JD20 for any written statements and did not take any further investigative steps.

727. Reporting the bullying only angered Bully 20B more. She now rallied other girls—some in other classes—to tease and ostracize JD20, especially at lunchtime. Bully 20B also hit JD20 in the face and stomped on JD20's foot during lunch and sometimes in the bathroom.

728. Again Parent 20 spoke to Teacher 20B, who said, in sum and substance, that it was impossible to watch the students closely at lunch as there were too many students. Dissatisfied with Teacher 20B's response, Parent 20 then went to speak with the assistant principal ("Assistant Principal 20A"). Assistant Principal 20A said that all the school could do was try to keep the girls apart during lunchtime. Parent 20 then spoke with Guidance Counselor 20, who later met with both Bully 20B and JD20 individually.

729. Thus, school officials were both aware of Bully 20B's ongoing bullying, and Bully 20B's retaliation against JD20 for reporting past bullying. Yet, to the best of Parent 20's knowledge, no school official filed a written report of the incident, in violation of CR-A832(II)(D) and N.Y. EDUC. L. § 13(1)(c).

730. To the best of Parent 20's knowledge, no school official prepared or filed an incident report with OORS regarding the bullying, in violation of CR-A832(III)(A).

731. To the best of Parent 20's knowledge, no school official asked JD20 to prepare a written statement of the incident, in violation of CR-A832(III)(B)(1) and CR-A832(III)(B)(2).

732. To the best of Parent 20's knowledge, no school official asked Bully 20B to prepare a written statement, in violation of CR-A832(III)(B)(3) and CR-A832(III)(B)(4).

733.    To the best of Parent 20's knowledge, the school failed to take any follow-up or corrective actions to ensure that the bullying had stopped, in violation of CR-A832(IV) and N.Y. EDUC. L. § 13(1)(e).

734.    Again not surprisingly, given these multiple failures, the bullying continued.

735.    In mid-November 2013, another parent told Parent 20 that she had seen Teacher 20B screaming at JD20 and waving her hand menacingly in JD20's face.  According to JD20, Teacher 20B grabbed and pulled JD20's collar and said words to the effect of "be quiet, the assistant principal is here."

736.    Parent-Teacher conferences were held a few days later.  Parent 20 first spoke with Teacher 20B about the ongoing bullying problem.  Teacher 20B minimized the significance of the bullying, telling Parent 20, in sum and substance, "kids will be kids," and "that's how girls act when they are friends."  Parent 20 told Teacher 20B that JD20 and Bully 20B were not friends.  In fact, JD20 was afraid of Bully 20B.  But Teacher 20B offered no solutions except to try to keep the students apart as best as possible.

737.    After they had finished discussing JD20's bullying problem, Parent 20 told Teacher 20B what she had heard from another parent about the mid-November incident, in which Teacher 20B had verbally abused JD20.  After turning red in the face, Teacher 20B told Parent 20 that she was falsely accusing her of something.  Teacher 20B then abruptly ended the meeting.

738.    The next day, Assistant Principal 20A called Parent 20 to tell her that the school was filing a report against Parent 20 for harassing Teacher 20B.  Parent 20 had not harassed Teacher 20B.  Parent 20 did not raise her voice or use offensive language.

739.    Parent 20 lawfully and in good faith reported an incident of alleged teacher-on-student verbal abuse, in accordance with CR-A421.  Instead of discussing the alleged incident with

Parent 20, Teacher 20B filed a report of harassment against Parent 20. This was an act of retaliation against Parent 20, in violation of CR-A421(IX) and N.Y. Educ. L. § 13(1)(f).

740.    Upon information and belief, when Assistant Principal 20A received the complaint against Teacher 20B, he did not report the alleged incident of teacher-on-student verbal abuse either to the school principal, in violation of CR-A421(IV)(A), or to OSI, in violation of CR-A421(IV)(B).

741.    When Parent 20 asked for a copy of the harassment report, Assistant Principal 20A refused to give it to her. Assistant Principal 20A stated that if Parent 20 wanted the report, she would need to first obtain an attorney.

742.    Approximately two months after the parent-teacher conference, JD20, who was still in first grade, went to the bathroom. There, she found that she could not use the toilet, because it was filled with feces and a pencil had been placed among the feces, making it impossible to flush the toilet.

743.    JD20 asked Teacher 20B for help. Teacher 20B took JD20 back to the bathroom, and instructed JD20, in sum and substance, to get on her hands, pick up the pencil and throw it in the garbage, and then flush the toilet. JD20 refused and Teacher 20B began yelling at JD20 in front of the class to remove the pencil from the toilet. This was an act of retaliation against Parent 20 for reporting teacher-on-student verbal abuse, in violation of CR-A421(IX) and N.Y. Educ. L. § 13 (1)(f).

744.    JD20 picked up the pencil from inside the toilet, threw it out, flushed the feces down the toilet, and returned to her desk. Because of JD20's obvious embarrassment, she did not tell Parent 20 what had happened. Parent 20 only learned of this incident in April 2016.

745. Subsequent to this incident, Teacher 20B repeatedly did not allow JD20 to use the bathroom during class, forcing JD20 to risk soiling or wetting herself until she could use the bathroom during lunch. JD20 soiled herself once and wet herself once.

746. As a result of not being permitted to void her bladder when needed, JD20 developed urinary tract infections.

747. Parent 20 presented a letter from JD20's urologist to Teacher 20B, the principal, and complained to Assistant Principal 20A about the limited bathroom use. The principal claimed that the letter would "go into JD20's record," but Teacher 20B continued to prohibit JD20 from using the bathroom. JD20 was only allowed to use the bathroom when the principal visited JD20's class.

748. As a result of all these incidents, Parent 20 brought her daughter to a mental healthcare professional, who diagnosed JD20 with depression and anxiety.

749. In the following school year, JD20 was free from peer-to-peer bullying and abuse from teachers. Parent 20 noted a marked change in JD20's personality. JD20 began to smile again—she had stopped smiling in first grade—and demonstrated enjoyment of life and took pleasure from school. She was a happy second grader.

750. But soon after third grade began, in approximately September 2015, a boy ("Bully 20C") started bullying JD20. Bully 20C pushed and hit JD20. After one incident where Bully 20C slammed a door on her head, JD20 went to the nurse.

751. In late October, Parent 20 spoke with a new assistant principal ("Assistant Principal 20B") and told him that her daughter was still being bullied. Assistant Principal 20B said he would investigate and get back to the parent.

752.    The next day, Parent 20 followed up with Assistant Principal 20B, who said he "took care of it."  When Parent 20 asked why Assistant Principal 20B had not called her to inform her of the steps he took, Assistant Principal 20B reiterated that he had not called Parent 20 because he "took care of it."  Parent 20 does not know what actions Assistant Principal 20B allegedly took. However, despite the foregoing representation, the bullying continued.

753.    Subsequent to Parent 20's discussion with Assistant Principal 20A, Bully 20C choked JD20.  JD20 told her teacher ("Teacher 20C") what had occurred.  Teacher 20C spoke with Bully 20C, but the bullying continued.

754.    To the best of Parent 20's knowledge, neither Teacher 20C nor any other school official filed an oral or written report of the incident, in violation of CR-A832(II)(D) and N.Y. EDUC. L. § 13(1)(c).

755.    To the best of Parent 20's knowledge, no school official filed an incident report with OORS regarding the bullying, in violation of CR-A832(III)(A).

756.    To the best of Parent 20's knowledge, no school official investigated the incidents, in violation of CR-A832(III)(B) and N.Y. EDUC. L. § 13(1)(d).

757.    To the best of Parent 20's knowledge, no school official interviewed JD20 or asked JD20 to prepare a written statement of the incidents, in violation of CR-A832(III)(B)(1) and CR-A832(III)(B)(2).

758.    To the best of Parent 20's knowledge, no school official interviewed Bully 20C or asked him to prepare a written statement, in violation of CR-A832(III)(B)(3) and CR-A832(III)(B)(4).

759.    To the best of Parent 20's knowledge, the school did not adopt corrective actions to ensure that the bullying had stopped, in violation of CR-A832(IV) and N.Y. EDUC. L. § 13(1)(e).

760.    At the start of the current school year, in approximately September 2015, Parent 20 spoke with Teacher 20C about JD20.  Among other things, Parent 20 told Teacher 20C that JD20's father was absent, and asked Teacher 20C to please show consideration to JD20 regarding her home life.

761.    On information and belief, Teacher 20C and Teacher 20B are close friends.

762.    In approximately November 2015, Teacher 20C was discussing in class what every students' father does for a living.  When it was JD20's turn, she had to tell the class that she does not have a father.

763.    Most of the class began to openly tease and taunt JD20 for not having a father. Teacher 20C saw the conduct but did not intervene to stop it.  Even after JD20 began crying, Teacher 20C did not do anything to stop the conduct.  Finally, another third-grade girl in the class went over to JD20 to comfort her.

764.    To the best of Parent 20's knowledge, Teacher 20C did not file an oral or written report of the incident, in violation of CR-A832(II)(D).

765.    To the best of Parent 20's knowledge, no school official prepared or filed an incident report with OORS regarding the bullying, in violation of CR-A832(III)(A).

766.    To the best of Parent 20's knowledge, no school official investigated the incident, in violation of CR-A832(III)(B) and N.Y. EDUC. L. § 13(1)(d).

767.    To the best of Parent 20's knowledge, no school official interviewed JD20 or asked JD20 to prepare a written statement of the incidents, in violation of CR-A832(III)(B)(1) and CR-A832(III)(B)(2).

768.   To the best of Parent 20's knowledge, no school official interviewed the other students in the class or asked them to prepare written statements, in violation of CR-A832(III)(B)(3) and CR-A832(III)(B)(4).

769.   To the best of Parent 20's knowledge, the school failed to take any follow-up or corrective actions to ensure that the bullying had stopped, in violation of CR-A832(IV) and N.Y. EDUC. L. § 13(1)(e).

770.   Frustrated by the actions (and inactions) of Defendant DOE, Parent 20 decided to homeschool her daughter.

### **JD21**

771.   JD21 is an 8-year old Hispanic male student in second grade who attends elementary school in Bronx County.  He is a child with a disability within the meaning of the IDEA, specifically a learning disability, has an IEP, and is diagnosed with ADHD and anxiety.  He has been denied a FAPE, a consequence of the violence and bullying he has experienced at school.

772.   JD21's school is in District 10, where 85.1% of students are Black or Hispanic. District 10 experienced 18 violent incidents per 1000 students.  It also experienced 27.8 disruptive incidents per 1000 students.[59]  *See* Section C *infra.*

773.   JD21 has endured ongoing bullying which primarily has taken place in the lunchroom.  The incidents included other students taking his lunch and hitting him.

774.   Three of these attacks, which occurred on November 23, 2015, December 14, 2015 and January 5, 2016, required medical attention from the school nurse and follow-up medical care from JD21's physician.

---

[59] *Id.* ¶ 25.

775.    In an incident on November 23, 2015, JD21 went to the nurse with scratches to his face, stretching from his temple to his nose, after a student attacked him.

776.    The nurse's report noted that the injury was the result of an apparent altercation at school, and advised that JD21 should receive follow-up attention from a physician.

777.    Yet, despite the fact that the school nurse was aware that the injuries were the result of an attack by another student, to the best of the knowledge of JD21's mother ("Parent 21"), neither the nurse nor any staff members who witnessed the incident reported it to the principal ("Principal 21"), or filed a written report of the incident, in violation of CR-A832(II)(D) and N.Y. EDUC. L. § 13(1)(c).

778.    To the best of Parent 21's knowledge, Principal 21 did not prepare or file an incident report for the DOE's OORS regarding the bullying incident, in violation of CR-A832(III)(A).

779.    To the best of Parent 21's knowledge, Principal 21 did not otherwise investigate the incident, in violation of CR-A832(III)(B) and N.Y. EDUC. L. § 13(1)(d).

780.    Principal 21 did not interview JD21 nor ask JD21 to prepare a written statement for the incident, in violation of CR-A832(III)(B)(1) and CR-A832(III)(B)(2).

781.    To the best of Parent 21's knowledge, Principal 21 did not interview the accused attacker or ask him to prepare a written statement, in violation of CR-A832(III)(B)(3) and CR-A832(III)(B)(4).

782.    To the best of Parent 21's knowledge, Principal 21 did not ask other witnesses to prepare written statements, in violation of CR-A832(III)(B)(5).

783.    To the best of Parent 21's knowledge, Principal 21 did not attempt to contact any of the student's parents who harassed, bullied, or intimidated JD21, in violation of CR-A832(III)(C).

784.    To the best of Parent 21's knowledge, Principal 21 failed to take any follow-up or corrective actions to ensure that the harassment, bullying, and/or intimidation had stopped, in violation of CR-A832(IV) and N.Y. Educ. L. § 13(1)(e).   Indeed, the lunchroom bullying continued.

785.    The bullying resulted in further injuries to JD21 on December 14, 2015.  On that day, after a lunchroom incident in which he was attacked, JD21 reported to the nurse and presented with a scratch under his right eye and redness on the left side of his face, which were the result of another child hitting him.  The nurse was concerned enough about the severity of the injuries that she again recommended that JD21 see his physician.

786.    To the best of Parent 21's knowledge, neither the nurse nor any staff members who witnessed the incident reported it to the Principal 21 or filed a written report of the incident, in violation of A-832(II)(D) and N.Y. Educ. L. §13(1)(c).

787.    To the best of Parent 21's knowledge, Principal 21 did not prepare or file an incident report for the DOE's OORS regarding the bullying, in violation of CR-A832(III)(A).

788.    To the best of Parent 21's knowledge, Principal 21 did not otherwise investigate the incident, in violation of CR-A832(III)(B) and N.Y. Educ. L. § 13(1)(d).

789.    Principal 21 did not interview JD21 nor ask JD21 to prepare a written statement for the incident, in violation of CR-A832(III)(B)(1) and CR-A832(III)(B)(2).

790.    To the best of Parent 21's knowledge, Principal 21 did not interview the accused attacker nor ask him to prepare a written statement, in violation of CR-A832(III)(B)(3) and CR-A832(III)(B)(4).

791.    To the best of Parent 21's knowledge, Principal 21 did not ask other witnesses to prepare written statements, in violation of CR-A832(III)(B)(5).

792.    To the best of Parent 21's knowledge, Principal 21 did not attempt to contact any of the student's parents who harassed, bullied, or intimidated JD21, in violation of CR-A832(III)(C) and N.Y. EDUC. L. § 13(1)(d).

793.    To the best of Parent 21's knowledge, Principal 21 failed to take any follow-up or corrective actions to ensure that the harassment, bullying, and/or intimidation had stopped, in violation of CR-A832(IV) and N.Y. EDUC. L. § 13(1)(e).  Once again, despite the school's being on notice of the ongoing problem, the bullying continued.

794.    On January 5, 2016, JD21 again went to the nurse for swelling and redness on both sides of his face.  He told the nurse he was slapped by another child.

795.    Once again, the injuries were severe enough to warrant a recommendation by the school nurse that JD21 see a physician.

796.    To the best of Parent 21's knowledge, even though this was the third attack in less than one and a half months that was severe enough to require consultation with a physician, neither the nurse nor any staff members who witnessed the incident reported it to Principal 21 or filed any written reports of the incident, in violation of CR-A832(II)(D) and N.Y. EDUC. L. § 13(1)(c).

797.    To the best of Parent 21's knowledge, Principal 21 did not prepare or file an incident report for the DOE's OORS regarding the bullying incident, in violation of CR-A832(III)(A).

798.    To the best of Parent 21's knowledge, Principal 21 did not otherwise investigate the incident, in violation of CR-A832(III)(B) and N.Y. EDUC. L. § 13(1)(d).

799.    Principal 21 did not interview JD21 nor ask JD21 to prepare a written statement for the incident, in violation of CR-A832(III)(B)(1) and CR-A832(III)(B)(2).

800.    To the best of Parent 21's knowledge, Principal 21 did not interview the accused attacker nor ask him to prepare a written statement, in violation of CR-A832(III)(B)(3) and CR-A832(III)(B)(4).

801.    To the best of Parent 21's knowledge, Principal 21 did not ask other witnesses to prepare written statements, in violation of CR-A832(III)(B)(5).

802.    To the best of Parent 21's knowledge, Principal 21 did not attempt to contact any of the student's parents who harassed, bullied, or intimidated JD21, in violation of CR-A832(III)(C).

803.    To the best of Parent 21's knowledge, Principal 21 failed to take any follow-up or corrective actions to ensure that the harassment, bullying, and/or intimidation had stopped, in violation of CR-A832(IV) and N.Y. EDUC. L. § 13(1)(e) even after, as will be seen later, he was directed to do so by the district.

804.    Dissatisfied with the support her son was getting for his disability, Parent 21 requested a meeting with the District in January of 2016.  At that meeting, Parent 21 discussed the problem surrounding bullying and JD21.

805.    The District representatives were completely unaware of the bullying problem, and did not know of any of the incidents at school for which JD21 required medical attention.  This was an admission that the school had not properly filed written complaints in the online system, in violation of CR-A832(III)(A).  If they had, the District representatives would have seen the reports of the violence that had been committed against JD21.

806.    The District representatives acknowledged to Parent 21 that the school did not provide adequate supervision in the lunchroom and proposed a solution:  The school would increase the amount of supervision in the lunchroom.

141

807.    The District representatives said they would implement this step to ensure JD21's safety. Despite these representations, they never did so.  The lack of added supervision was a factor in at least one subsequent lunchroom incident.

808.    On April 1, 2016, JD21 was pushed by another student in the lunchroom.  JD21 was about to push the student back, when a Paraprofessional ("Para 21"), who was assigned to the other student, grabbed JD21's arm so hard that he was left with severe bruising.  Para 21 left clear fingerprints on JD21's arm that were still visible when JD21 visited his therapist over a week later.

809.    The assistant principal ("Assistant Principal 21") witnessed the incident but did not initially take any steps in response.  Instead, after the incident was over, JD21 went back to class.

810.    Later that afternoon, JD21 went to the nurse to take his regular medication, which he takes every afternoon.  The nurse saw the bruising on his arm and called Assistant Principal 21. On information and belief, Assistant Principal 21 told the nurse she had seen the incident happen. The school nurse sent JD21 to Assistant Principal 21's office, whereupon Assistant Principal 21 finally took steps to investigate the incident.

811.    Parent 21 took JD21 to the pediatrician where he received ointment for his arm. Shortly after leaving the doctor's office, JD21 began vomiting.  This lasted for multiple days before Parent 21 brought him back to the pediatrician for treatment.

812.    On or about April 5, 2016, Parent 21 called OSI to inquire into the status of the investigation.  She was told that the investigation would be done by the school.

813.    Lacking confidence that the school would do a competent job investigating the incident—and worse, that the school would leave JD21 in the company of Para 21—Parent 21 called a local television station to tell JD21's story.  The station ran a segment on the incident on the evening news.

814.   Several days later, on or about April 11, 2016, Parent 21 called Assistant Principal 21 to inquire about the status of the investigation.  She was told that "things ha[d] gotten complicated" and that the investigation was transferred to OSI.  Principal 21 gave Parent 21 an OSI case number and contact information for the lead investigator.

815.   Parent 21 then contacted the OSI investigator, who refused to provide any meaningful update to Parent 21, except to confirm that he was investigating the incident and that Parent 21 would be notified of the results when the investigation was complete.

816.   However, even two months after the incident, Parent 21 still had not received an update on the status of the investigation.  Parent 21 has made multiple attempts to meet with Principal 21, but Principal 21 will not meet Parent 21 without an appointment, and Principal 21's office has not made an appointment with Parent 21.

817.   To date, no one has informed Parent 21 as to whether the investigation has been completed.  This is in violation of CR-A420(VI)(D), which requires the DOE to inform the parent of whether the allegations were substantiated or not.

818.   JD21 has been the victim of prolonged harassment, intimidation, violence, and/or bullying, which are known risk factors that adversely affect learning, particularly in children with an IEP.  Despite this, JD21's school did not take the harassment, intimidation, and bullying into account when creating or modifying JD21's IEP.  The school also did not take JD21's IEP into account when addressing the harassment, intimidation, and bullying against JD21.  Principal 21 thus ignored a condition of federal funding as outlined in guidance provided by the U.S. Department of Education, *see supra ¶* 137, and was in contravention of the DOE's own operation manual.  *See supra ¶* 147.

**JD22**

819.    JD22 is a 9-year old Hispanic male student.  He is currently enrolled in the fourth grade at an elementary school in Bronx County.

820.    For the 2014-15 school year, JD22 was enrolled at a different elementary school in the Bronx ("School 22A").

821.    School 22A is in District 12, where 94.7% of students are Black or Hispanic. District 12 experienced 22 violent incidents per 1000 students.  It also experienced 55 disruptive incidents per 1000 students.[60]  *See* Section C *infra.*

822.    On or about January 14, 2015, while JD22 was waiting outside of his classroom at School 22A, a male student ("Bully 22") walked up to JD22 and, without provocation, punched him in the jaw.  This was witnessed by JD22's father ("Parent 22"), who volunteered at School 22A, and JD22's teacher ("Teacher 22").

823.    School personnel took JD22 to see the school's nurse.  Parent 22 went to the principal ("Principal 22") to complain about the attack on JD22.  Parent 22 asked for a meeting with Bully 22's parents.  Principal 22 claimed that she would investigate the incident and set up a parents' meeting.  Principal 22 did not ask for or receive a written statement from Parent 22, who witnessed the incident, in violation of CR-A832(III)(B)(5).

824.    Parent 22 also asked Principal 22 to suspend, or otherwise discipline, Bully 22. Principal 22 replied words to the effect of: "We do not do that anymore.  Suspensions are not normally considered."

825.    Parent 22 then picked up JD22 from the nurse's office.  The nurse advised Parent 22 to take JD22 to a doctor, which he immediately did.

---

[60] *Id.* ¶ 27.

826.     To the best of Parent 22's knowledge, neither Teacher 22 nor the school nurse provided an oral or written report to Principal 22 or her designee, in violation of CR-A832(II)(D).

827.     To the best of Parent 22's knowledge, Principal 22 did not report the incident to the OORS within 24 hours, in violation of CR-A832(III)(A).

828.     After the incident, which Teacher 22 witnessed, Teacher 22 began seating JD22 next to Bully 22 in class.  This allowed Bully 22 to taunt and verbally abuse JD22 on a daily basis. Parent 22 complained about this seating arrangement to Principal 22, who responded that she would look into it.  JD22 and Bully 22 continued to sit next to each other.

829.     About a month after the incident, Principal 22 set up a meeting with Bully 22, Bully 22's parents, JD22, Parent 22, and the school's Parent-Coordinator.  At the outset of the meeting, Principal 22 stated that the purpose of the meeting was to address Bully 22's problems with a number of students, not limited to JD22.  During this meeting, Principal 22 discussed her intervention plan, which included scheduling a pizza party for the class.  Such actions failed to address and minimize the risks of further violent incidents, in violation of CR-A832(IV) and N.Y. EDUC. L. § 13(1)(e).

830.     On April 20, 2015, during gym class, Bully 22 again walked up to JD22 and, without provocation, punched him in the mouth.  The gym teacher and other students witnessed the incident.  The gym teacher sent JD22 to the school nurse, who called Parent 22 to notify him about the incident.

831.     Parent 22 immediately went to the school to pick up JD22.  Parent 22 also met with Principal 22 to discuss the reoccurrence of violence by Bully 22 against JD22.  Principal 22 was surprised to hear about the incident because neither the gym teacher nor the nurse reported the incident to her, another apparent violation of CR-A832(II)(D) and N.Y. EDUC. L. § 13(1)(c).

Principal 22 summoned the gym teacher to explain the incident further.  After Principal 22 asked the gym teacher why she had not been informed, the gym teacher explained that he was busy with other things.

832.    Principal 22 told Parent 22 that she would deal with the matter "internally."  To the best of Parent 22's knowledge, Principal 22 did not report the incident to the OORS and did not further investigate the allegations, in violation of CR-A832(III)(A), CR-A832(III)(B) and N.Y. EDUC. L. § 13(1)(d).

833.    Even after this second incident, Teacher 22 continued to seat JD22 next to Bully 22.

834.    Parent 22 discussed the incident with the school safety officers, who Parent 22 knew through his volunteer work at the school.  To the best of Parent 22's knowledge, the school safety officers were aware of the multiple bullying incidents involving JD22 but had not reported them.

835.    As a result of these violent incidents, JD22 regularly tried to avoid going to school, and his grades dropped.  JD22 was petrified of attending school and suffered from recurring nightmares.  JD22 began suffering from suicidal ideation, stating to Parent 22 that he "wished that he were dead" and that he no "longer wants to live."

836.    In or around May 2015, Parent 22 began taking JD22 to therapy sessions.  JD22 continues to see a therapist.

837.    Around this time, Parent 22 pulled JD22 out of the previous school and enrolled him in his neighborhood school, JD22's current school ("School 22B").  Since his transfer to School 22B, JD22's grades have improved and returned to where they were before suffering from the aforementioned violent incidents at his previous school.

838.    On June 11, 2015, Parent 22 filed a complaint with the superintendent for District 12 about the actions and inactions at the previous school.  On April 3, 2016, Parent 22 filed a formal complaint with the superintendent's office.  Parent 22 has not heard back from the superintendent's office.

839.    As a result of the foregoing, JD22 has been seeing a therapist for weekly psychotherapy for approximately six months.

**JD23**

840.    JD23 is a 6-year old Hispanic male student in kindergarten, who attends public school in Bronx County.  He is a child with a disability within the meaning of the IDEA, specifically a speech or language impairment and diagnosed ADHD, and has an IEP.  He has been denied a FAPE, a consequence of the violence and bullying he has experienced at school.

841.    JD23's school is in District 11, where 82.6% of students are Black or Hispanic. District 11 experienced 19 violent incidents per 1000 students.  It also experienced 33 disruptive incidents per 1000 students.[61]  *See* Section C *infra.*

842.    On or about May 11, 2016, when JD23 was in the bathroom, an older boy in second grade ("Bully 23") opened his bathroom stall and started staring at his genitals.  Obviously very disturbed, JD23 quickly pulled up his pants and tried to run out of the bathroom.

843.    However, Bully 23, who was significantly bigger than JD23, stopped JD23 and pinned him up against the bathroom wall.  Fearful of what this boy would do next, JD23 kicked him and ran out of the bathroom.

844.    When JD23 went home after school, he told his mother ("Parent 23") about the incident.  Parent 23 reported the incident to the school's assistant principal ("Assistant

---

[61] *Id.* ¶ 26.

Principal 23") the same day by phone, and again the next morning in person.  Assistant Principal 23 determined the identity of Bully 23, and then asked the guidance counselor ("Guidance Counselor 23") to investigate further.

845.    Guidance Counselor 23 investigated the matter, which included, at least, discussing the matter with JD23's and Bully 23's respective teachers.  The day after the incident, Parent 23 spoke with Guidance Counselor 23.

846.    Subsequent to the investigation, Guidance Counselor 23 found that JD23's allegations were substantiated.  The guidance counselor told Parent 23, in candor, that she had identified some "red flags" about Bully 23.

847.    Guidance Counselor 23 would not reveal what most of the "red flags" were, but said that Bully 23 had a history of bullying.  She also noted that his bullying had been escalating over time.

848.    Parent 23 had a subsequent conversation with Guidance Counselor 23, who recommended that instead of disciplinary action, there should be a meeting between the parents, followed by a meeting between the boys with the parents also attending.

849.    Through these two conversations, Guidance Counselor 23 made clear to Parent 23 that the school had previously been unwilling to discipline Bully 23, and that it did not want to discipline him for this incident either.  By failing to discipline Bully 23 for his previous acts, however, the school invited an escalation of his problematic conduct, which is indeed what occurred.

850.    Parent 23 agreed to meet with the parent of Bully 23.  At the meeting, the Assistant Principal 23 suggested that JD23 may have invented the allegations (a position which Guidance

Counselor 23, who actually did the investigation, flatly contradicted).  Parent 23 was very upset with the fact that Assistant Principal 23 was blaming the victim instead of addressing the real issue.

851.    On information and belief, despite the fact that Guidance Counselor 23 informed Parent 23 that JD23's allegations had been substantiated, as of the date of this filing, Bully 23 has not been disciplined.

852.    This failure to discipline is in violation of CR-A832(IV)(C), which requires "appropriate disciplinary action" against students who have been found to be in violation of Defendant DOE's prohibition on discrimination, harassment, intimidation, and/or bullying.  The failure to discipline is especially egregious given the severity of Bully 23's conduct.

853.    Parent 23 has left messages with both the school principal ("Principal 23") and Assistant Principal 23 and to date has not received a call back.

854.    Upon information and belief, school officials have not filed a written report of the incident, in violation of A-832(II)(D) and N.Y. Educ. L. § 13(1)(c).

855.    Upon information and belief, Principal 23 did not enter an incident report into the OORS regarding the bullying incident, in violation of CR-A832(III)(A).

856.    To the best of Parent 23's knowledge, the principal failed to take any follow-up or corrective actions to ensure that the harassment, bullying, and/or intimidation had stopped, in violation of CR-A832(IV) and N.Y. Educ. L. § 13(1)(e).

857.    As a result of this incident, JD23 has suffered a great deal of anxiety and has not returned to school since the occurrence, missing nearly two weeks of school as of the date of this filing.

858.    JD23 was the victim of harassment, intimidation, violence, and/or bullying, which are known risk factors that adversely affect learning, particularly in children with an IEP.  Despite

this, his school did not take the harassment, intimidation, and bullying into account when creating or modifying JD23's IEP.  The school also did not take JD23's IEP into account when addressing the harassment, intimidation, and bullying against JD23.  Principal 23 thus ignored a condition of federal funding as outlined in guidance provided by the U.S. Department of Education, *see supra ¶* 137, and was in contravention of the DOE's own operation manual.  *See supra ¶* 147.

### Conclusion to Allegations of Named Class Plaintiffs

859.    As described in detail *supra*, the experiences of the Named Class Plaintiffs show Defendant's custom and practice of deliberate indifference to in-school violence:  (1) school administrators routinely fail to file incident reports; (2) school administrators routinely fail to seek a full investigation of the facts, including by failing to ask for or obtain narrative descriptions of in-school violence from victim and perpetrator; (3) school administrators routinely fail to take corrective actions reasonably intended to end in-school violence; and (4) school administrators take retaliatory and punishing actions toward students who report in-school violence, all in direct contravention of DASA, CR-A832, CR-A420 and CR-A421.

860.    Defendant DOE's failure to comply with DASA and the Chancellor's Regulations is not limited to a particular school district or a particular borough.  Schools across the city, in all five boroughs, regularly ignore allegations of bullying and rely on a "blame the victim" approach that only exacerbates violence.  Based on these actions and inactions, in violation of lawful procedure, Defendant DOE is denying Named Class Plaintiffs, and other students similarly situated, with their enjoyment of their constitutionally protected right to a free public education in a safe educational environment.

861.    Defendants' policies of ineffective or nonexistent discipline have created a disproportionate impact of school violence on Black and Hispanic students.  These students are

often enrolled in segregated schools with unusually high rates of violent incidents. Defendants'
failures to address the violence, as required by DASA and the Chancellor's Regulations,
disproportionately deprive Black and Hispanic students of their right to free education.

**B.**     **Other Instances of School Violence**

862.   Although the evidence described above is sufficient to sustain Plaintiffs' burden
concerning the Constitutional and statutory violations alleged, there is abundant additional proof
of Defendants' failures in the media and other sources.

863.   Several recent incidents of student-on-student and teacher-on-student violence in
the New York City public schools reported in the media further confirm both the widespread nature
of the problem and the urgent need for class relief.

864.   Last year, on or about March 10, 2015, five DOE employees stood idly by at a
public school in Long Island City, Queens while a group of eighth grade students coerced younger
students to square off with one another in a "fight club." A girl who refused was dragged down
the hallway by one of the organizers and slammed into a wall.[62]

865.   Last year, a third-grader in a public school on the Lower East Side reported being
bullied by eighth graders, who aggressively pushed him up against a wall and subjected him to
homophobic slurs. The bullies also attempted to humiliate the victim by shoving his face into their
crotch. The bullies were reportedly not disciplined, and their parents were not notified of the
incident by the school.[63]

---

[62] Ben Chapman et al., *4 Teachers, Students 'Removed' From Queens School Where 8th-graders Beat Up 7-Year Old Girl Over Refusal to Fight Other Kids*, N.Y. DAILY NEWS, Mar. 26, 2015, http://www.nydailynews.com/new-york/education/4-teachers-removed-school-teens-beat-girl-7-article-1.2163188.

[63] Samantha Silva, *Parent Opinion: Mayor de Blasio Needs to Give New Yorkers Real Facts About Violence in Our Schools*, 74 MILLION, Feb. 18, 2016, https://www.the74million.org/article/parent-opinion-mayor-de-blasio-needs-to-give-new-yorkers-real-facts-about-violence-in-our-schools.

866.    In or about April 2015, another parent reported that the school principal at a Staten Island public school falsely told her that her disabled son was "bumped out of his chair" by a teacher's aide, when in fact the teacher's aide had grabbed the student and thrown him to the floor.[64]

867.    On or about February 23, 2016, a teacher in Harlem has been charged with criminally assaulting a seven-year old student by throwing him across a hallway.  The teacher was "reprimanded" for corporal punishment, verbal abuse of students, and "using bad judgment."  This was not the teacher's first incident, as he had a history of violence toward schoolchildren.[65]

868.    Recently, on or about May 12, 2016, a teacher's aide at an elementary school was accused of assaulting a child during lunch period, causing bruising on the child.  The teacher's aide was arrested.  On information and belief, the same teacher's aide had been accused in 2013 by a different student and his mother of assaulting the student.  That student's mother claims that despite making her complaints to the school, no action was taken against the teacher's aide at the time.[66]

869.    Recently, the president of Teamsters Local 237, the school safety agents' union, discussed the NYPD's approach to the "surging tide of weapons—including loaded revolvers, 9mm handguns, meat cleavers and dagger—[that] has been confiscated this year from students in city schools, most of which do not have metal detectors."  He stated that "NYPD officials, who oversee school safety, are grilling the [school safety] agents and have threatened to dock their

---

[64]    Aaron Dickens, *Mother Claims Son Was Abused at School*, NY1, Mar. 22, 2016, http://www.ny1.com/nyc/staten-island/news/2016/03/23/mother-claims-son-was-abused-at-school.html.

[65]    Ben Chapman & Shayna Jacobs, *Harlem Teacher Held on $1G Bail on Charges of Assaulting 7-year-old Student*, N.Y. DAILY NEWS, Feb. 25, 2016, http://www.nydailynews.com/new-york/nyc-crime/harlem-teacher-held-1g-bail-assaulting-7-year-old-article-1.2543321.

[66]    Hoffer, *supra* note 47.

vacation days if they leak information."[67]  Thus, on information and belief, school safety officers are under pressure from the NYPD itself to minimize and obfuscate the level of weapons within schools, further masking the true picture of increasing school violence.

## C.   Citywide Statistics[68]

870.   Although the evidence presented by the Named Class Plaintiffs, and the additional incidents reported in the media and other sources, show a clear pattern of unremediated bullying, available statistics demonstrate not only the severity of the problem of in-school violence but also the disparate impact it has on Black and Hispanic students.

871.   New York State Law requires school districts to issue Violent and Disruptive Incident Reports ("VADIR").  The superintendent of each school district must annually submit a report on the number of violent and disruptive incidents for each school.[69]  The instructions for using the reporting software states:  "By clicking the 'Submit' button on the online data submission form, a Superintendent/CEO certifies that all reported data are complete and accurate."[70]

---

[67] Susan Edelman, *These Are the Weapons Brought to Schools No One Wants You to See*, N.Y. POST, May 15, 2016, http://nypost.com/2016/05/15/city-silences-safety-agents-as-weapon-seizures-soar-at-schools.

[68] Statistics and figures referenced in this Complaint were obtained and derived from publicly available datasets provided by New York State and New York City.  They include: (1) N.Y.S. EDUC. DEP'T., *NYC Violent and Disruptive Incidents 2014-2015*, http://www.p12.nysed.gov/irs/school_safety/2015/DATA/VADIR-INCIDENTS-NYC-2015.xls; (2) N.Y.S. EDUC. DEP'T., *NYC Violent and Disruptive Incidents 2013-2014*, http://www.p12.nysed.gov/irs/school_safety/2015/VADIR_INCIDENTS_NYC_2014.xls; (3) N.Y.S. EDUC. DEP'T., *2015-16 Persistently Dangerous Schools Designation Based on Violent and Disruptive Incident Reporting*, http://www.p12.nysed.gov/sss/documents/FINALPDSCHOOLSLIST1516.pdf; (4) N.Y.C. POLICE DEP'T, *School Safety Report*, https://data.cityofnewyork.us/Education/School-Safety-Report/qybk-bjjc; (5) N.Y.C. DEP'T OF EDUC., *Demographic Snapshots*, http://schools.nyc.gov/NR/rdonlyres/20056B95-8351-4E45-B8A1-9901B4B6A93B/0/DemographicSnapshot201112to201516Public_FINAL.xlsx; (6) N.Y.C. DEP'T OF EDUC., *Cohorts of 2001 Through 2011 (Classes of 2005 through 2015) Graduation Outcomes*, http://schools.nyc.gov/Accountability/data/GraduationDropoutReports/default.htm; and (7) N.Y.C. DEP'T OF EDUC., *New York State Common Core English Language Arts (ELA) & Mathematics Tests Grades 3 – 8 New York City Results*, http://schools.nyc.gov/Accountability/data/TestResults/ELAandMathTestResults.

[69] *See* 8 NYCRR 100.2(bb)(3) ("Each school district shall submit the following data at a time and in a format prescribed by the commissioner: . . . (vi) violent and disruptive incidents for each school.").

[70] N.Y.S. EDUC. DEP'T., DIRECTIONS FOR COMPLETING PART 1 OF THE SUMMARY DATA COLLECTION FORM (VADIR).
http://www.p12.nysed.gov/irs/school_safety/documents/School_Safety_Summary_Form_Part1_Directions.pdf.

872.    According to statistics compiled for VADIR, instances of in-school violence, including those described in detail *supra*, significantly and disproportionately harm Black and Hispanic students, who comprise 68% of New York City public schools.[71]

873.    There is a strong correlation—with a coefficient of determination[72] of 0.94— between higher rates of Black and Hispanic student enrollment and higher rates of violent incidents when schools are ranked from highest to lowest enrollment percentages of Black and Hispanic students and grouped into quintiles.[73]

874.    The disparate impact of in-school violence, harassment, and bullying on Black and Hispanic students is not a new phenomenon.  There have been strong correlations between higher rates of Black and Hispanic student enrollment and higher rates of violent incidents for years.  In the 2012-13 school year, the coefficient of determination is 0.98 when schools are ranked from highest to lowest numbers of violent incidents and grouped into quintiles.[74]  In the 2013-14 school year, the coefficient of determination is 0.95 when schools are ranked from highest to lowest numbers of violent incidents and grouped into quintiles.[75]

875.    There is also a strong correlation—with a coefficient of determination of 0.88— between higher rates of Black and Hispanic student enrollment and higher rates of disruptive incidents for the 2014-15 school year.[76]

---

[71] Jensen Decl. ¶ 31.

[72] The coefficient of determination is a measure of the proportion of variation in the data that can be explained by the regressor variable.  Where the correlation is between a variable and the rate of violent incidents, only violent incidents (and not other disruptive incidents) are considered.  A perfect correlation would have a coefficient of determination of 1.  Here, the coefficient of determination of 0.94 indicates that 94% of the variation in school violence can be explained by the enrollment percentages of Black and Hispanic students.

[73] Jensen Decl. ¶ 32.

[74] *Id.* ¶ 34.

[75] *Id.* ¶ 35.

[76] *Id.* ¶ 36.

876.    For the 2014-15 school year, across the city's thirty-two geographic school districts, the citywide average for violent incidents was 15 incidents per 1000 students.[77]  Additionally, the citywide average for disruptive incidents was 32 incidents per 1000 students.[78]  Fifteen districts were less violent than the citywide average.  They experienced 11 violent incidents and 28 disruptive incidents per 1000 students.  These districts had fewer Black and Hispanic students than the city's average; only 51% of students in these less-violent schools are Black or Hispanic.[79]

877.    There were seventeen school districts that experienced more violence than the citywide average.  Schools in these districts experienced 21 violent incidents and 40 disruptive incidents per 1000 students.  In these districts, 85% of students are Black or Hispanic.[80]

878.    In the eleven geographic school districts where at least 90% of students are Black or Hispanic, the rate of violent incidents jumped to 22 violent incidents per 1000 students, nearly 1.5 times the city's average.[81]  These eleven districts also averaged 44 disruptive incidents per 1000 students.[82]  However, the six districts with fewer than 50% Black and Hispanic students experienced only 11 violent and nearly 29 disruptive incidents per 1000 students.[83]

879.    District 23 in Brooklyn, which includes Ocean Hill, Brownsville, and parts of East New York, was the most violent district in the city.[84]  District 23 students experienced 36 violent incidents per 1000 students—2.4 times the citywide average—and 33 disruptive incidents per 1000 students.[85]  It has the highest percentage of Black and Hispanic students in the city:  97%.[86]

---

[77] *Id.* ¶ 37.
[78] *Id.* ¶ 38.
[79] *Id.* ¶ 39.
[80] *Id.* ¶ 40.
[81] *Id.* ¶ 41.
[82] *Id.* ¶ 41.
[83] *Id.* ¶ 42.
[84] *Id.* ¶ 13.
[85] *Id.* ¶ 14.
[86] *Id.* ¶ 15.

880.    District 26 in northeast Queens, which includes Bayside, Fresh Meadows, and Jamaica Estates, was the least violent district in the city.[87]   It also had the lowest percentage of Black and Hispanic students in the city:  29.2%.  District 26 students experienced less than 6 violent incidents and 22 disruptive incidents per 1000 students.[88]

881.    The racial disparity in rates of in-school violence cannot be explained by other variables.  For example, the correlation between the percentage of students living below the poverty line and the rates of violent incidents in schools is much weaker than that between race and violent incidents.  The coefficient of determination is only 0.68 when schools are ranked from highest to lowest poverty levels and grouped into quintiles.[89]

882.    The VADIR data also shows a very strong correlation—with a coefficient of determination of 0.96—between higher rates of students with disabilities and higher rates of violent incidents when schools (not including District 75 schools) are ranked from highest to lowest enrollment percentages of students with disabilities and grouped into quintiles.[90]

883.    Defendants have consistently asserted, including in filings with this Court, that New York City public schools have become safer in the last few years.[91]   It is clear that they are not relying on the VADIR data—the only dataset required by New York State law—to do so because the VADIR data shows that violent and disruptive incidents in Defendant DOE's schools have been rising.

---

[87] *Id.* ¶ 16.
[88] *Id.* ¶ 17.
[89] *Id.* ¶ 43.
[90] *Id.* ¶ 44.
[91] *See, e.g.,* Motion for Pre-Motion Conference at 1, Doe # 1 et al v. N.Y.C. Dep't of Educ., No. 16-01684 (E.D.N.Y. 2016), ECF No. 16.

884.    New York City law requires the collection of two sets of data.  One set is required by the New York City Charter.[92]  The other is required by the Student Safety Act.[93]  Neither law requires the collection and reporting of data as it relates to bullying, harassment, or simple assault. They deal with more serious incidents—felonies, misdemeanors, and violations—that are reported to NYPD personnel.  The NYPD data is published annually in the Mayor's Management Report ("MMR"). [94]

885.    As is clear from the experiences of Named Class Plaintiffs, school administrators fail to appropriately respond to incidents of school violence and bullying, including by failing to request assistance from NYPD School Safety Officers when appropriate.  Thus, the problem of in-school violence and bullying is not captured in either of the City's datasets.

886.    Nevertheless, the MMR data presents a nearly identical image of the disparate impact of school violence on Black and Hispanic students as the VADIR data.  For example, the MMR data for the 2014-15 school year shows that a strong correlation—with a coefficient of determination of 0.88—exists between higher rates of incidents requiring the attention of the NYPD and higher rates of Black and Hispanic enrollment.[95]

---

[92] *See* N.Y.C. CHARTER § 529(b) (requiring the DOE to make public "information reported by the [NYPD] to the [DOE] on the following:  [1] the total amount of major felony crime, disaggregated by felony category; [2] the total amount of other crime, disaggregated by crimes against persons and crimes against property; and [3] the total amount of non-criminal incidents.").

[93] *See* N.Y.C., N.Y., Local Law 93 (2015), *available at* http://legistar.council.nyc.gov/LegislationDetail.aspx?ID =2253272&GUID=9BACC627-DB3A-455C-861E-9CE4C35AFAAC (requiring the NYPD to collect and report data on the number of arrests made, summonses issued, and mechanical restraints used in public schools).

[94] *See, e.g.,* N.Y.C. MAYOR'S OFF. OF OPERATIONS, FISCAL YEAR 2015 MAYOR'S MANAGEMENT REPORT, Sept. 2015, http://www1.nyc.gov/assets/operations/downloads/pdf/mmr2015/2015_mmr.pdf.

[95] Jensen Decl. ¶ 61.

887.   For the 2013-14 school year, the MMR data shows a very strong correlation—with a coefficient of determination of 0.94—between higher rates of incidents requiring the attention of the NYPD and higher rates of Black and Hispanic enrollment.[96]

888.   The MMR data also shows a very strong correlation—with a coefficient of determination of 0.94—between higher rates of incidents requiring the attention of the NYPD and higher rates of students with disabilities enrollment for both the 2013-14 and the 2014-15 school years.[97]

889.   Defendant DOE also publishes data on graduation outcomes[98] and standardized testing results.[99]  These datasets show that higher rates of in-school violence are correlated with lower rates of academic proficiency and graduation rates, confirming what child psychologists have long understood—exposure to in-school violence, including bullying, is correlated with lower rates of educational attainment.[100]

890.   In public elementary and middle schools ("K-8 schools"), higher rates of in-school violence are tightly correlated with lower ELA-Math proficiency.[101]  The coefficient of determination is 0.98 when schools are ranked from highest to lowest rates of violent incidents and grouped into quintiles.[102]  In the 2014-15 school year, the citywide ELA-Math proficiency rate was 33%.[103]  Only 8% of students at the ten most violent K-8 schools—where students experienced

---

[96] *Id.* ¶ 62.

[97] *Id.* ¶ 63.

[98] N.Y.C. DEP'T OF EDUC., *Cohorts of 2001 Through 2011 (Classes of 2005 through 2015) Graduation Outcomes*, http://schools.nyc.gov/Accountability/data/GraduationDropoutReports/default.htm.

[99] N.Y.C. DEP'T OF EDUC., *New York State Common Core English Language Arts (ELA) & Mathematics Tests Grades      3      –      8      New      York      City      Results*, http://schools.nyc.gov/Accountability/data/TestResults/ELAandMathTestResults.

[100] *See* Declaration of Rona Novick, dated Aug. 31, 2016 ("Novick Decl.") ¶ 4-11.

[101] "ELA-Math proficiency" refers to schools' average proficiency rate in English language arts and math.

[102] Jensen Decl. ¶ 35.

[103] *Id.* ¶ 47.

148 violent incidents per 1000 students, nearly ten times the citywide average—are ELA-Math proficient.[104]

891.    In the most violent quintile of K-8 schools (comprised of 251 schools), only 18% of students were ELA-Math proficient.  These schools experienced 52 violent incidents per 1000 students.[105]

892.    As each successive quintile's rate of violent incidents decreases, rates of ELA-Math proficiency increase.[106]  The least violent quintile of K-8 schools (comprised of 251 schools) had a proficiency rate of 47%.[107]  These schools experienced only 1 violent incident per 1000 students.[108]

893.    Conversely, higher rates of ELA-Math proficiency are also tightly correlated with lower rates of in-school violence.  The coefficient of determination is 0.97 when schools are ranked from lowest to highest proficiency and grouped into quintiles.[109]  The most ELA-Math proficient quintile of K-8 schools had a proficiency average of 64%.[110]  These schools experienced only 7 violent incidents per 1000 students.[111]  As proficiency rates decreased, rates of violent incidents correspondingly increased.  The quintile of K-8 schools with the lowest ELA-Math proficiency rate—averaging only 9%—experienced about 35 violent incidents per 1000 students.[112]

894.    The correlation between higher rates of violent incidents and lower educational attainment continues past K-8 schools and into high school.  There is a tight correlation between

---

[104] *Id.* ¶ 48.
[105] *Id.* ¶ 49.
[106] *Id.* ¶ 49.
[107] *Id.* ¶ 50.
[108] *Id.* ¶ 50.
[109] *Id.* ¶ 51.
[110] *Id.* ¶ 52.
[111] *Id.* ¶ 52.
[112] *Id.* ¶ 53.

higher rates of violent incidents and lower rates of four-year high school graduation in public high schools. The coefficient of determination is 0.94 when schools are ranked from the highest to the lowest rates of violent incidents and grouped into quintiles.[113] The ten most violent public high schools experienced 72 violent incidents per 1000 students.[114] These schools also had the lowest educational outcomes in the city, with a four-year graduation rate of 53% and a dropout rate of 16%.[115]

895.    The most violent quintile of high schools (comprised of 90 schools) experienced 34 violent incidents per 1000 students. These schools had an average four-year graduation rate of 58% and a dropout rate of 14%.[116] As the rate of violent incidents steadily decreased in each successive quintile, four-year graduation rates increased and dropout rates decreased. The least violent quintile of high schools (comprised of 89 schools), experiencing only 2 violent incidents per 1000 students, had a four-year graduation rate of 82% and a dropout rate of only 6%.[117]

896.    Conversely, higher graduation rates are also strongly correlated with lower levels of violence. The coefficient of determination is 0.89 when schools are ranked from highest to lowest graduation rates and grouped into quintiles.[118] The quintile of schools with the highest graduation rates—with an average graduation rate of 95% and a dropout rate of 1%—experienced only 5 violent incidents per 1000 students.[119] However, as graduation rates decreased in successive quintiles, rates of violent incidents increased.[120] The quintile of high schools with the lowest

---

[113] *Id.* ¶ 54.
[114] *Id.* ¶ 55.
[115] *Id.* ¶ 55.
[116] *Id.* ¶ 56.
[117] *Id.* ¶ 57.
[118] *Id.* ¶ 58.
[119] *Id.* ¶ 59.
[120] *Id.*

graduation rates—with an average graduation rate of 35% and a dropout rate of 20%—experienced 19 violent incidents per 1000 students.[121]

## D.      The Link Between Bullying, Harassment, and Intimidation, with Poor Educational Outcomes

897.     As a general rule, children who are bullied have a poorer educational outcome than children who are not bullied.

898.     Published, peer-reviewed research by leading child psychologists have shown that school bullying is consistently and reliably correlated with poor educational outcomes for the bullies' victims.[122]

899.     Bullying is a strong contributing factor to poor performance in school for many students who are bullied.[123]

900.     Unremediated and persistent bullying produces cumulative effects of trauma, stress, and challenge, such that each additional stressor in a child's life increases his or her risk for poor academic outcomes.  For that reason, bullying and school difficulties often occur together.[124]

901.     School bullying contributes to feelings of rejection, lowered school attachment, and increased inattentiveness at school, all of which have themselves been conclusively shown to be highly correlated with poor educational outcomes in the bullies' victims.[125]

---

[121] *Id.* ¶ 60.

[122] *See, e.g.*, Hsi-sheng Wei and James Herbert Williams, *Relationship Between Peer Victimization and School Adjustment in Sixth-Grade Student: Investigating Mediation Effects*, VIOLENCE AND VICTIMS, 19:5 (Oct. 2004).  *See also* Novick Decl. ¶ 6.

[123] *See* Novick Decl. ¶ 4.

[124] *Id.* ¶ 5.  *See also* Christopher Donoghue, Angela Almeida, David Brandwein, Gabriella Rocha, and Ian Callahan, *Coping with Verbal and Social Bullying in Middle School*, THE INTERNATIONAL JOURNAL OF EMOTIONAL EDUCATION (Nov. 2014) ("Studies of children in many European countries and in America have consistently found that bullying victimization can have a negative impact on school functioning . . . and academic achievement."); Michael Vaughn et.al., *Psychiatric Correlates of Bullying in the United States: Findings from a National Sample*, PSYCHIATRIC QUARTERLY (Feb. 2010) ("[l]ongitudinal research clearly documents emotional consequences for victims of bulling, including . . . academic problems").

[125] *See, e.g.*, Hsi-sheng, *supra* note 122; Vaughn, *supra* note 124 ("[s]ome literature has supported the idea that being bullied impairs concentration and subsequent academic achievement").  *See also* Novick Decl. ¶¶ 7-9.

902.    Clinical research demonstrates that in many cases, when a previously non-bullied student is subjected to repeated bullying, he or she suffers a number of psychological and social effects, including and/or leading to an impairment of his or her ability to learn.[126]

903.    Moreover, the trauma, stress, and challenge of bullying have cumulative impacts on child development.  The longer bullying lasts without intervention, the more likely it is to impact multiple spheres of a child's life, and therefore the more extensive the psychological damage it can cause, including impairment of the student's ability to learn.[127]

904.    Thus, the New York legislature, in declaring that "students' ability to learn and to meet high academic standards, and a school's ability to educate its students, are compromised by incidents of discrimination or harassment including bullying, taunting or intimidation," N.Y. EDUC. L. § 10, has simply codified the conclusions drawn though scientific research.  In fact, the scientific community goes farther by associating bullying with **poor** educational outcomes, not merely the failure to achieve "high academic standards."[128]

### E.    Young Children's Total Dependence on Adults and Inability to Protect Themselves from Bullying, Harassment, and Intimidation

905.    As described above, New York City has compulsory attendance laws that require young children to attend school.  Many of Defendant DOE's 1.1 million students have no choice but to attend public schools.  Whether it is because their families lack the financial means, or because they live in single-parent homes, or because of any other countless possibilities, home-schooling and private schooling are not options for many of Defendant DOE's students.  These

---

[126] Novick Decl. ¶ 10.
[127] *Id.* ¶ 11.
[128] *Id.* ¶ 4-11.

students are essentially forced to attend Defendant DOE public schools and, once assigned to a school, it is very difficult to transfer to a different school.

906.    When it comes to the youngest of these children—those in elementary school or younger—child psychologists agree about several important facts.[129]

907.    First, these young students are wholly dependent on the adults who work at the school to meet many of their basic human needs, including their safety and general well-being.[130]

908.    Second, a failure to properly address bullying predictably results in bullies experiencing the freedom to continue and/or escalate their bullying and violence, and victims experiencing increased helplessness and alienation.[131]

909.    Third, young students are incapable—either physically or because they lack the mental wherewithal—to extract themselves from many dangerous situations, including bullying.[132]

910.    Fourth, bullying is marked by an imbalance of power between the bullies and victims, creating another obstacle that prevents victims from removing themselves from the dangerous environment.[133]

911.    Fifth, bullying is closely correlated with a significant reduction in self-esteem, which in turn further inhibits victims from being assertive and protecting themselves before, during, and after incidents of bullying.[134]

912.    Sixth, schools inculcate in children, at a very early age, the belief that they may not leave the school, or move independently within the school, without permission from a teacher or

---

[129] *Id.* ¶ 12.
[130] *Id.* ¶ 13.
[131] *Id.* ¶ 14.
[132] *Id.* ¶ 15.
[133] *Id.* ¶ 16.
[134] *Id.* ¶ 17.

other school official.   These students, especially young students, have no autonomy of movement—often they cannot even use the bathroom without permission.  Students know that if they break these rules and act without adult permission, they will be subject to serious discipline in the school; and this fear is in the back of young students' minds when they are being subjected to bullying, limiting their opportunity for escape, and causing many young students to remain in the dangerous bullying environment.[135]

913.    Seventh, schools inculcate in children, at a very early age, the belief that they may not use physical violence, even to defend themselves.  Students know that if they break this rule, they will be subject to serious discipline in the school.  This fear may lead young children to feel that they cannot defend themselves against the bully, but rather must passively continue to subject themselves to bullying.  This traps young children in a no-win situation where escape from the dangerous bullying environment requires the unthinkable denial of adult authority and ingrained rules.[136]

914.    Eighth, the trauma, stress, and challenge caused by bullying is cumulative.  A secondary result of unremediated bullying is a long-term effect on the student's ability to assert him or herself to defend against bullying.[137]

## CONCLUSION

915.    As described in detail *supra*, Defendant DOE's failures to identify, document, and remediate school bullying and violence are pervasive, and constitute a custom and practice of deliberate indifference to in-school violence.  As seen through the allegations of the Named Class Plaintiffs, the problem occurs across all boroughs, is not bounded by geographic district, and

---

[135] *Id.* ¶ 18.
[136] *Id.* ¶ 19.
[137] *Id.* ¶ 20.

164

persists at every level of the public school system.   The narratives told by the Named Class Plaintiffs are mirrored by media reports.   The problem of in-school violence is confirmed by the statistical evidence of bullying and violence in school—including the City's own data—which show a disproportionate impact of violence on Black and Hispanic students.   And finally, child psychologists agree on the devastating effect of bullying on students, especially young children, who are unable to protect themselves without the intervention of an adult.   Accordingly, Plaintiffs seek relief from this Court.

**FIRST CLAIM FOR RELIEF**
**(Violation of 42 U.S.C. § 1983)**
**(Procedural Due Process Claim)**

916.    Named Class Plaintiffs repeat and re-allege paragraphs 1 through 915 as if fully set forth herein.

917.    Under N.Y. EDUC. L. § 3202, the State of New York confers an entitlement upon Named Class Plaintiffs and all members of the class they represent to receive a free public education.

918.    Such right is a property interest within the meaning of the Fourteenth Amendment of the United States Constitution.[138]

919.    Alternatively, under DASA, Named Class Plaintiffs and members of the class also have a protected property interest in a school environment that is free of harassment and bullying by employees or students on school property or at a school function.

920.    In DASA, the New York State Legislature expressly decreed that students' ability to obtain the free public education to which they are entitled is directly and profoundly

---

[138] Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).

compromised by incidents of discrimination or harassment including bullying, taunting or intimidation.

921.    This legislative decree is supported by decades of research by child psychologists and by the extremely tight correlations between higher rates of violent incidents and (1) lower rates of ELA-Math proficiency in K-8 schools and (2) lower rates of graduation in high schools.

922.    This legislative decree is also supported by the experience of Named Class Plaintiffs, whose children's educations have been compromised as a result of being subjected to hostile education environments.  Named Class Plaintiffs and members of the class are being deprived of their protected property interest in education through exposure to a hostile education environment in which they routinely experience bullying, taunting, and intimidation, including physical violence and verbal abuse, at the hands of fellow students and teachers.

923.    Such ongoing, pervasive and severe bullying, taunting, and intimidation is occurring during school hours, on school grounds, and/or at school functions.

924.    Defendants are statutorily mandated to implement policies and procedures to prevent such harassment and bullying.  DASA, and its implementing Chancellor's Regulations, apply to each and every act of bullying and harassment that occurs during school hours, on school grounds and/or at school functions.  Defendants have the ability to prevent the foregoing deprivation through enforcement of such policies and procedures.

925.    Defendants, through receipt of complaints and otherwise, have actual knowledge that such incidents of harassment and bullying are occurring in New York City public schools. Notification of such incidents should have, but did not, trigger investigations, reporting, and remediation by the schools and Defendant DOE pursuant to the Chancellor's Regulations.  These Regulations were instituted specifically for the purpose of protecting the Plaintiff's property

interest.  But the schools and Defendant DOE have failed to follow the Regulations and have not initiated the mandatory investigative and reporting steps.

926.    Defendants are also aware that the schools are not following policies and procedures to investigate, report, and correct such harassment and bullying.

927.    Defendants have exhibited a custom and practice of deliberate indifference to the widespread incidence of harassment and bullying in New York City public schools by school employees and students alike, as well as to the failure of the New York City public schools to implement and follow the policies and procedures that are supposed to address, correct, and eliminate such bullying and harassment.

928.    In sum, Defendants have failed to provide Named Class Plaintiffs and similarly situated class members any pre-deprivation process.

929.    Accordingly, Defendants are responsible for the maintenance and perpetuation of hostile education environments and for the resultant deprivation of Named Class Plaintiffs' and their fellow class members' protected property interests.

930.    Named Class Plaintiffs and fellow class members have no adequate post-deprivation remedy.  Bullying and harassment directly compromise a student's ability to obtain a free public education through participation in the school curriculum and school activities at the time they are being offered.

931.    Unaddressed bullying and harassment also cause long-term psychological and emotional harm, including, but not limited to, loss of self-esteem; aversion to education and to participation in school events; extreme emotional distress; depression; and problems managing their anger.  These effects themselves further undermine a student's ability to obtain a free public education.  They also cannot be addressed through a post-deprivation remedy.

932.    Further, because education is fundamental to meaningful participation in all aspects of civil society—its economy, culture, and politics—no post-deprivation remedy could possibly compensate adequately for the loss of this cornerstone entitlement.

933.    By failing to follow procedures as required by law to prevent ongoing bullying and harassment by school employees and fellow students, Defendants have deprived, and are continuing to deprive, Named Class Plaintiffs and their fellow class members of protected property interests, without due process of law.

934.    By reason of the foregoing, Defendants have violated and are in continuing violation of 42 U.S.C. § 1983.

## SECOND CLAIM FOR RELIEF
### (Violation of 42 U.S.C. § 1983)
### (Substantive Due Process Claim)

935.    The Elementary School Subclass Plaintiffs repeat and re-allege paragraphs 1 through 915 as if fully set forth herein.

936.    Students are compelled by the New York Education Law to attend school.[139] Defendant DOE's admissions policies restricts the schools to which students can attend, often requiring them to stay in the particular school where they were already assigned.  Due to compulsory attendance laws—such as truancy laws and the threat of investigations by agencies such as the Administration for Children's Services—DOE students are compelled to attend the school to which they are assigned by Defendant DOE.

---

[139] Although the law does not specify a requirement that students attend public school, other schooling options (such as private school or homeschooling) are not feasible or possible for many members of the Class or Subclass. There is a high degree of poverty among Defendant DOE's students, and a large number of DOE's students come from single-parent households.  Given the cost of private schooling, and both the cost and high regulatory burden of homeschooling (including school district approval of the contents of individualized home instruction plans, 8 NYCRR 100.10(c)(3), mandatory courses, 8 NYCRR 100.10(e), and quarterly reports to school districts, 8 NYCRR 100.10(g)), many students in New York City have no choice but to attend public schools.

937.    While in the care of their school, students—especially young children—are wholly dependent on the school to provide for their safety, security, and other vital needs.  Schools take the place of parents in owing this duty to the students.

938.    Moreover, when faced with school bullying or violence, young children are unable to independently remove themselves from a dangerous situation or a dangerous school.  They are dependent on the adults charged with their care to ensure that they are in a safe environment or moved to safety.

939.    Taken together, the Defendants are in a special relationship with the Plaintiffs and members of the class—especially with respect to young children—and/or the Defendants have created a state-created danger within the school system.[140]

940.    Accordingly, the Defendants have an obligation to protect the Plaintiffs and members of the class from the deprivation of their freedom from unjustified intrusions on personal security, which is a protected liberty interest within the meaning of the Fourteenth Amendment of the United States Constitution.

941.    Defendants have failed to adequately address, correct, and eliminate in-school discrimination, harassment, intimidation, and/or bullying.

---

[140] In *T.K. v. New York City Dep't of Educ.*, Judge Weinstein determined that the question of whether Defendant DOE had a "special relationship" with students was an open question in the Second Circuit.  779 F. Supp. 2d 289, 307 (E.D.N.Y. 2011) ("The Court of Appeals for the Second Circuit apparently has not squarely been presented with a claim that by failing to prevent harm to a student in their care, school officials have violated substantive due process.").  To be clear, a number of district courts in this Circuit have held that no "special relationship" exists.  *See, e.g., Reid v. Freeport Public School District*, 89 F. Supp. 3d 450 (E.D.N.Y. 2015).  Two critical factors, however, should temper this Court's reliance on such cases.  First, such cases do not address the affirmative legal requirements imposed by DASA and, more importantly, Defendant DOE's own Regulations.  Second, they have not examined the body of scientific and clinical evidence that relates specifically to this issue, particularly as concerns very young students, discussed herein and in *T.K.*  Accordingly, the Court should look at this issue with a fresh eye, particularly with respect to the Elementary School Subclass—which consists of the most vulnerable Plaintiffs who are least able to defend themselves and who are the most dependent on Defendant DOE—and find that "under the Due Process Clause, a public school has the duty to protect an elementary school student from bullying where truancy laws are in effect." *T.K.*, 779 F. Supp. 2d at 308 (E.D.N.Y. 2011).

942.     Such failures have resulted in the Elementary School Subclass, and others similarly situated, being subjected to student-on-student discrimination, harassment, intimidation, bullying, and/or corporal punishment.

943.     The Elementary School Subclass, and others similarly situated, have thereby been deprived of their freedom from unjustified intrusions on personal security.

944.     Defendants' failure to implement their own regulations to address, correct, and eliminate bullying and violence in schools shocks the contemporary conscience and results in profound harm to all members of the class throughout the DOE system.

945.     By reason of the foregoing, Defendants have violated and are in continuing violation of 42 U.S.C. § 1983.

**THIRD CLAIM FOR RELIEF**
**(Violation of 42 U.S.C. § 1983)**
**(Equal Protection Clause)**

946.     Named Class Plaintiffs repeat and re-allege paragraphs 1 through 915 as if fully set forth herein.

947.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

948.     Under the Equal Protection Clause, discrimination based on race is presumptively unconstitutional and subject to strict scrutiny.

949.     As described *supra*, Defendants have exhibited a custom and practice of deliberate indifference to the widespread incidence of violence in the New York City public schools and to the failure of the schools to implement and follow the policies and procedures that are supposed to address, correct, and eliminate such violence.

950.   Defendants' custom and practice of deliberate indifference adversely impacts Black and Hispanic students enrolled in DOE schools, such as Named Class Plaintiffs and members of the class, more than students of other races.  Public schools with higher rates of Black and Hispanic enrollment have higher rates of violent incidents.  Schools with lower rates of Black and Hispanic enrollment have dramatically fewer violent incidents.  Thus, Black and Hispanic students suffer from in-school violence, and the resulting deprivation of their rights to a free public education, significantly more frequently than their peers who are not Black or Hispanic.

951.   Defendants have a statutory mandate, under DASA, to implement policies and procedures to prevent such instances of in-school violence.  DASA, and its implementing Regulations, apply to each and every act of bullying and harassment that occurs during school hours, on school grounds, and/or at school functions.

952.   Defendants have the ability to reduce the rate of violent incidents through enforcement of their Regulations, which require school officials to investigate, document, and remediate allegations of violence and bullying.  The Regulations allow for the administration of discipline that is appropriate for the severity of the violence and bullying.  Yet, Defendants have exhibited a custom and practice of ignoring their own Regulations, thereby allowing bullies to continue their violent and harmful behavior without sufficient attempts at remediation.

953.   Defendants' failure to implement the regulations for combating in-school violence was on the basis of an impermissible consideration of race.  There is an extremely tight correlation between higher rates of Black and Hispanic enrollment and higher rates of violent incidents in DOE schools.  Defendant DOE knew or should have known of the disparate impact on Black and Hispanic students because the correlation has existed for multiple years.  Moreover, the tight correlation between higher rates of Black and Hispanic student enrollment and higher rates of

school violence can be found in datasets compiled by both New York State and New York City. Other explanations for the discrepancy, such as the rate of students living below the poverty line, are unlikely because they are weakly correlated with rates of school violence.

954.    In addition, Defendants have exhibited deliberate indifference to incidents of race-based violence and bullying in New York City public schools, in violation of the Equal Protection Clause.  On multiple occasions, JD7 and JD19 were called racial slurs by bullies at their schools. JD4 was also targeted for bullying and violence because of her race.

955.    Defendants were on notice of these race-based incidents.  Sometimes school officials witnessed the incidents, as was the case with JD7.  Other times, parents reported the incidents to school officials, as was the case with JD4, JD7, and JD19.

956.    Moreover, students have reported to Defendant DOE for many years that race- or bias-based bullying occurs at DOE schools.  For the last several years, a majority of students reported race- or bias-based bullying in their schools in the annual School Survey Reports published by Defendant DOE.[141]

957.    Despite their knowledge of incidents of race-based bullying and violence, Defendants have not enforced their own Regulations to remediate the problem.  Instead, they have allowed the bullying and violence to continue, depriving these students of their education.

958.    By reason of the foregoing, Defendants have violated and are in continuing violation of 42 U.S.C. § 1983.

---

[141]    Defendant DOE publishes reports of student responses to NYC School Surveys.  Each year, the survey asks students about the prevalence of harassment, bullying, or intimidation based on demographic classifications, including race.  Consistently, a majority of students report that such harassment, bullying, and intimidation occurs in their schools.  For example, in each of the last three years, a majority of students who responded to the study replied that race- or bias-based harassment or bullying occurred at his or her school.  *See, e.g.,* N.Y.C. Dep't of Educ., NYC School Survey, http://schools.nyc.gov/Accountability/tools/survey/default.htm.

**FOURTH CLAIM FOR RELIEF**
**(Violation of 20 U.S.C. § 1400 et seq.)**
**(Violation of the Individuals with Disabilities Education Act)**

959.    The IEP Subclass and FES repeat and re-allege paragraphs 1 through 915 as if fully set forth herein.

960.    Pursuant to the IDEA and the implementing State and City policies, the IEP Subclass and others similarly situated are entitled to a FAPE.

961.    As described *supra*, Defendants have failed to respond to instances of in-school violence, harassment, and bullying, which have a disproportionate impact on students with disabilities, thereby diminishing the educational opportunities available to such students.

962.    By doing so, Defendants have denied the IEP Subclass and others similarly situated of their rights to a FAPE.  The IEP Subclass is unable to obtain a FAPE because their IEPs do not account for the violence and bullying that they face in Defendants' public schools, which have a deleterious impact on their ability to access educational opportunities.

963.    .  Public school students with disabilities across New York City—irrespective of a student's neighborhood, age, and race—have been denied a FAPE because of such unremediated bullying.  The diversity amongst the IEP Subclass is a testament to the systematic and pervasive nature of the problem.

964.    Defendants' denial of a FAPE to the IEP Subclass and others similarly situated is incapable of correction by the administrative hearing process because Defendants failed to provide the IEP Subclass with notice of the administrative remedies available to them, as required by law. Without such notice, Defendants deprived the IEP Subclass of the opportunity to take advantage of the procedural safeguards offered under the IDEA.

965.    Defendants' denial of a FAPE is also incapable of correction by the administrative hearing process because Defendants' have systematically failed to investigate and document their

allegations of in-school violence and bullying.  This deprives the IEP Subclass of the ability to present evidence at any administrative hearing.  Impartial hearing officers can determine only whether a student received a FAPE based on substantive grounds, including the evidence presented at the hearing.  Without documentation of the incidents of violence and bullying—which would constitute evidence of the hostile educational environment—the IEP Subclass cannot fairly present its case that persistent violence and bullying limits their access to a FAPE.

966.    To require each and every individual member of the IEP Subclass, as well as all others similarly situated, to use the administrative hearing process to combat violence in public schools would also be unduly burdensome and would lead to inconsistent results amongst the IEP Subclass.  Because Defendants have failed to consistently record instances of violence and bullying—recording some but not others—an impartial hearing officer would consider school violence and bullying when amending IEPs for some members of the IEP Subclass, but not others. Requiring the IEP Subclass and others similarly situated to use the administrative hearing process would make their access to a FAPE wholly contingent on Defendants' erratic and inconsistent investigative and documentation habits.

1.   By reason of the foregoing, Defendants have deprived the IEP Subclass and others similarly situated of rights secured by 20 U.S.C. §§ 1400 et seq.

## FIFTH CLAIM FOR RELIEF
### (Violation of the Constitution of the State of New York)

967.    Named Class Plaintiffs and FES repeat and re-allege paragraphs 1 through 915 as if fully set forth herein.

968.    Article XI(1) of the Constitution of the State of New York provides:  "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated."

969. N.Y. EDUC. L. § 3202 confers an entitlement upon Named Class Plaintiffs and all members of the class they represent to receive a free public education.

970. Defendants' failure to adhere to the Chancellor's Regulations have created an atmosphere where Named Class Plaintiffs are unable to receive the minimum education required by the New York State Constitution.

971. By reason of the foregoing, Defendants have deprived Named Class Plaintiffs and members of the class of rights secured by the New York State Constitution.

**SIXTH CLAIM FOR RELIEF**
**(Failure to Adhere to Perform Duties Enjoined by Law)**
**(Failure to Follow Lawful Procedure)**

972. Named Class Plaintiffs and FES repeat and re-allege paragraphs 1 through 915 as if fully set forth herein.

973. DASA requires Defendants to create policies, procedures and guidelines intended to create a school environment that is free from harassment, bullying and discrimination. N.Y. EDUC. L. § 13(1). Defendants, moreover, are directly responsible for creating a school environment that is free from harassment, bullying and discrimination through enforcement of DASA and attendant Chancellor's Regulations.

974. Defendants have failed to perform duties imposed by the Chancellor's Regulations, including, but not limited to, duties imposed by Regulations A-420 (Pupil Behavior and Discipline - Corporal Punishment), A-421 (Pupil Behavior and Discipline – Verbal Abuse), A-449 (Safety Transfers), and A-832 (Student-To-Student Discrimination, Harassment, Intimidation, and/or Bullying).

975.    The Chancellor's Regulations apply to every act of bullying, harassment, discrimination, and violence. But, by custom and practice, Defendant DOE has granted its employees a wide berth of flexibility that is not found anywhere in the regulations.

976.    As a result, Named Class Plaintiffs have been subjected to school violence, harassment, intimidation, and bullying at the hands of both students and school employees.

977.    By reason of the foregoing, Defendants have failed to perform duties enjoined upon them by law within the meaning of CPLR 7803(1), and failed to follow lawful procedure within the meaning of CPLR 7803(3).

## JURY TRIAL DEMANDED

978.    Plaintiffs demand a jury trial as to all issues triable by a jury.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray that the Court:

a.    Determine that this action can be maintained as a class action;

b.    Declare that Defendants are in violation of 42 U.S.C. § 1983 and any applicable provisions of state law;

c.    Issue permanent injunctive relief requiring Defendants to adopt provisions in CR-A832 requiring schools to (1) "take prompt actions reasonably calculated to end the harassment, bullying or discrimination," (2) "prevent recurrence of the behavior," and (3) "ensure the safety of the student" after an investigation verifies a bullying allegation, in accordance with N.Y. EDUC. L. § 13(1)(e); and, further, requiring Defendants to adopt enforcement and self-execution provisions in CR-A832, CR-A420, and CR-A421, so that school officials cannot deviate from the Regulations.

d.     Issue permanent injunctive relief requiring Defendants to enforce the Chancellor's Regulations, including the new provisions, in all instances of suspected, reported, or known harassment, bullying or discrimination;

e.     Declare that Defendants did not comply with DASA, the attendant Chancellor's Regulations, the New York Constitution, and/or the United States Constitution when the Named Class Plaintiffs, and similarly situated class members in the New York City public schools, reported acts of school bullying and violence, or when school officials knew or should have known about acts of school bullying and violence;

f.     Issue permanent injunctive relief requiring Defendants to review all previous, unresolved reports of school violence by the Named Class Plaintiffs and those of similarly situated class members in the New York City Public Schools, and requiring Defendants to resolve said matters pursuant to Chancellor's Regulations that are amended in accordance with this Court's orders, and compliant with DASA, the New York Constitution, and the United States Constitution;

g.     Issue permanent injunctive relief requiring Defendants to develop an action plan to comply with this Court's orders, to be approved by the Court and a Court-appointed independent monitor;

h.     Issue permanent injunctive relief requiring Defendants to create an enhanced and transparent record-keeping system to track all allegations of bullying, harassment, and violence in schools;

i.     Issue permanent injunctive relief requiring Defendants to report back to this Court at regular intervals, at least quarterly, with status updates on Defendants' progress in complying with this Court's orders;

j.     Issue permanent injunctive relief requiring Defendants to regularly review and update training programs for teachers and staff on compliance with the amended Chancellor's Regulations;

k.     Appoint an independent monitor, with the power to audit Defendants' progress and issue recommendations that are binding on Defendants, to ensure Defendants' compliance with the orders of this Court and Defendants' future compliance with DASA, the Chancellor's Regulations, the New York Constitution, and the United States Constitution;

l.     Award Plaintiffs their costs and reasonable attorney's fees pursuant to any and all applicable statutes and provisions of law; and

m.    Grant such other and further relief as is just, equitable, and proper.

Dated: New York, New York
      August 31, 2016

                              WALDEN MACHT & HARAN LLP

                    By: _____ APC
                              Jim Walden
                              Adam Cohen
                              Daniel Cohen
                              Johnson Lin
                              Avni Patel
                              Catherine Sloane
                One Broadway, 6th Floor
                New York, NY 10004
                Tel.:   (212) 335-2030
                Email: jwalden@wmhlaw.com

                *Attorneys for Plaintiffs*